IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

IN RE:  ACTOS (PIOGLITAZONE)      ) MDL NO. 6:11-md-2299
PRODUCTS LIABILITY LITIGATION     )
                                  )
                                  )
                                  )
THIS DOCUMENT APPLIES TO:         ) JUDGE DOHERTY
                                  )
Terrence and Susan Allen v.       )
Takeda Pharmaceuticals            )
International, Inc., et al.,       )
NO. 6:12-cv-00064-RFD-PJH         ) MAGISTRATE JUDGE HANNA


ORAL ARGUMENT ON MOTIONS IN LIMINE


Transcript of Proceedings before The Honorable

Rebecca F. Doherty, United States District Judge,

Lafayette, Lafayette Parish, Louisiana, commencing

on October, 15, 2013.


Cathleen E. Marquardt, RMR, CRR
Federal Official Court Reporter
Post Office Box 5056
Lafayette, Louisiana 70502
Phone:  (337) 593-5223

```
 1    Appearances of Counsel:

 2         For the Plaintiffs:          MR. RICHARD J. ARSENAULT
                                        Neblett Beard & Arsenault
 3                                      P. O. Box 1190
                                        Alexandria, LA 71309-1190
 4
                                        MR. PAUL J. PENNOCK
 5                                      MR. JONATHAN SEDGH
                                        Weitz & Luxenberg, P.C.
 6                                      700 Broadway, 5th Floor
                                        New York, NY 10003
 7
                                        MR. MARK LANIER
 8                                      MR. ALEX BROWN
                                        The Lanier Law Firm
 9                                      6810 FM 1960 West
                                        Houston, TX 77069
10

11         For the Defendants:         MS.SARA J. GOURLEY
                                        Sidley Austin
12                                      1 S. Dearborn St., 48th Floor
                                        Chicago, IL 60603
13
                                        MR. BRUCE ROBERT PARKER
14                                      Venable LLP
                                        750 E. Pratt Street, Suite 900
15                                      Baltimore, MD 21202

16                                      MR. JOHN E. McELLIGOTT, JR.
                                        Davidson, Meaux, Sonnier
17                                       & McElligott, LLP
                                        810 S. Buchanan Street
18                                      Lafayette, LA 70501

19                                      MS. LYN P. PRUITT
                                        Mitchell Williams
20                                      425 West Capitol Avenue
                                        Suite 1800
21                                      Little Rock, AR 72201-3525

22

23

24

25
```

 1              (Lafayette, Lafayette Parish, Louisiana; October 15,

 2    2013, in open court.)

 3              THE CSO:  All rise.  United States District Court for

 4    the Western District of Louisiana is now in session, Honorable

 5    Rebecca Doherty presiding.  God save the United States and this

 6    Honorable Court.

 7              THE COURT:  You already have your hands on your hips,

 8    Mr. McElligott?  I haven't said anything this morning.

 9              MR. McELLIGOT:  Sorry.

10              THE COURT:  Not sorry.  It just shows the stance,

11    you know.  I taught school way too long not to pick up on

12    hostility.

13              All right.  Please be seated.  All right, good

14    morning.

15              ATTORNEYS:  Good morning, Judge.

16              THE COURT:  Now, for those of you who have been with me

17    before, you know I am very punctual; I am rarely late.  So don't

18    think you can just come lollygagging in.  I have been dealing

19    with other things.

20              Carmen, Gary, Kenny, Judge Davis says we can use Duhe's

21    space.  Cathy will block off the third floor area.  I suggest we

22    flip a coin.  Okay?  What that is about -- and that's one of the

23    reasons I'm late.  The Special Masters came -- I'm going to stand

24    for awhile -- came and we were going through some of the trial

25    logistics.  One of the things that they suggested was that each

1    side will need a staging area, so I was trying to get that

2    arranged because it will be a very busy time here.

3           Because of my being in trial, the magistrate judges are

4    going to be trying a lot of consent trials, and so they have to

5    have cases -- I mean, courtrooms to do it.  And Judge Foote, who

6    is handling my criminal docket -- the new criminal docket; I have

7    my old criminal docket -- is going to be trying cases during that

8    time.  So you see what all -- it takes like three people to do

9    what I ordinarily do.  So you understand now why I, you know,

10   these things have to be done on time if I'm going to keep all the

11   trains running on time.

12          So Judge Duhe was, for those of you who are not local,

13   one of our two Fifth Circuit judges.  We have Fifth Circuit

14   judges chambers on the fifth floor.  Judge Davis still is active

15   and he has his area up there.  Judge Duhe took senior inactive

16   status.  It's complicated, but basically it means he doesn't have

17   to come in, but they can call him back if they need him.  So his

18   chambers area is still up there.

19          So when I was trying to find space, Cathy Bacon

20   suggested we see if I could beg a favor from Judge Davis, and he

21   very graciously agreed.  There's a separate door that goes into

22   it.  Just whichever side ends up using that, you know, don't

23   bring a lot of chaos up to the fifth floor, okay.  You know, they

24   don't do trial work.  Don't bring a lot of chaos.  Because he

25   said, Which side?  I said, I don't know, Judge.

1         My suggestion will be we'll flip a coin because it's

2    going to be much nicer than the third floor, and it's larger.  So

3    if y'all can agree which side might need it, great.  If not, I

4    suggest you flip a coin, and whomever gets it, gets it.

5         Now, it will put neither side at an advantage or a

6    disadvantage because one group will be coming up from the third

7    floor, one group will be coming down from the fifth floor, and

8    we're on the fourth.  But it gives everybody a place where you

9    can leave all your stuff, and you don't have to worry about it.

10   Technically, we cannot guarantee that anything that you leave in

11   a room in the building during the time that the building is

12   closed will be safe.  Consequently, you need to take everything

13   with you when you leave.  So, the doors are locked at night.

14   It's your choice.  Okay?

15        All right.  So that takes care of that.  So we just

16   need to -- Carmen, Gary, and Kenny -- figure out which one is

17   going to do it and then get them arranged.

18        Richard?

19        MR. ARSENAULT:  They can have the fifth floor, Your

20   Honor.

21        MS. GOURLEY:  That's very generous and kind.  I was

22   going to suggest that perhaps the party whose case in chief it is

23   might need more space and we can switch off or --

24        THE COURT:  My God, you're acting like McConnell and

25   Reid.  Well, y'all decide; I don't care.  And I appreciate each

1      of you being gracious about it.  So just figure it out.  It

2      doesn't matter.  And in fact, if we have time, I don't know

3      whether my clicker works up there or not.

4              And Shree and Chris, we're going to have to work with

5      Cathy to make certain they have a way to get in that door up on

6      the fifth floor, the one that goes to Duhe's chambers.  We can go

7      up when we finish here, go up and look at it.  And then you know

8      what the third floor looks like.  And it might be -- of course,

9      again, I'm just, you know, considering things here.  It might be

10     better for the plaintiffs to be in the third floor conference

11     room.  And I say that because you have all the electronic stuff

12     there, and you can get your PSC members and that sort of thing on

13     that, which is perhaps of more value to the plaintiffs -- thank

14     you, Carol.

15                         (Brief pause.)

16              THE COURT:  Okay.  Cathy Bacon said the only concern

17     about using Judge Duhe's chambers is that, if you really wish to

18     try to do this, you can go through the library and get into Judge

19     Davis' chambers.  If any of you does that, you will be shot on

20     sight, and you'll lose the privilege of using Judge Davis'

21     chambers -- I mean, Judge Duhe's chambers, so I don't think with

22     this group it's going to be a real issue.

23              Okay, where was I?  Oh, yes.  It might be of benefit

24     for the plaintiffs to be on the third floor, because if you

25     coordinate with Brent ahead of time, you know, you can have the

 1    video conferencing capability, and that may be -- cause y'all,

 2    you know, I don't think the defense is going to have that same

 3    concern, but the plaintiffs might.  So it may be that that would

 4    be advantageous for you.

 5              All right.  Now would each party please identify for

 6    the record?

 7              MR. PENNOCK:  Paul Pennock from Weitz & Luxenberg for

 8    the plaintiffs, Your Honor.

 9              THE COURT:  Okay.  Just one moment.

10                        (Off the record.)

11              THE COURT:  Once you decide, you know, who is going to

12    go where, let me know, and as Shree said, we might need to

13    schedule a "tar" with Linda who is Judge Davis' secretary.  He

14    says that's tour, but looks like tar to me.

15              All right.  Would everyone please identify for the

16    record because there are faces I have never seen before.  Start

17    with the plaintiffs.

18              MR. PENNOCK:  Paul Pennock for the plaintiffs, Your

19    Honor.  Good morning.

20              THE COURT:  Good morning.

21              MR. LANIER:  Good morning, Your Honor.  Mark Lanier,

22    plaintiffs.

23              THE COURT:  Good morning, Mr. Lanier.

24              MR. ARSENAULT:  Good morning, Judge.  Richard

25    Arsenault, plaintiffs.

1              THE COURT:  Good morning, Mr. Arsenault.

2              MR. SEDGH:  Good morning, Your Honor.  Jonathan Sedgh

3    from Weitz & Luxenberg for the plaintiffs.

4              MR. BROWN:  Good morning, Your Honor.  Alex Brown for

5    plaintiffs.

6              THE COURT:  Okay.  Remind me again the two of you, why

7    you're here.

8              MR. BROWN:  I'm with Mr. Lanier's firm.

9              THE COURT:  Okay.  So you're with Lanier.

10             MR. SEDGH:  I'm with Mr. Pennock.

11             THE COURT:  Oh, you're with Pennock.  Okay.  All right,

12   okay.  All right.  Good morning, Ms. Gourley.

13             MS. GOURLEY:  Good morning, Your Honor.  Sara Gourley

14   on behalf of the defendants.

15             THE COURT:  Good morning.

16             MR. PARKER:  Good morning, Your Honor.  Bruce Parker

17   for the defendants.

18             THE COURT:  Oh, my goodness gracious, you do exist.

19             MR. PARKER:  Yes, Your Honor, I do.

20             THE COURT:  All right.  Nice to finally meet you,

21   Mr. Parker.

22             MR. PARKER:  Wonderful to be here, Your Honor.

23             THE COURT:  Okay.  And you're from where?

24             MR. PARKER:  Baltimore.

25             THE COURT:  Maryland, okay.  For some reason I had you

1    from one of the Carolinas.  So you're from Maryland.

2              MR. PARKER:  I'm from Maryland.  Well, that's where I

3    am now.

4              THE COURT:  That's where you are now, uh-huh.  Okay,

5    all right.  Parker, right, Bruce?

6              MR. PARKER:  Yes, ma'am.  Yes, Your Honor.

7              THE COURT:  If I call you John, forgive me.  We had a

8    judge over in the middle district who is John Parker.

9              MR. PARKER:  I've been called a lot of things, Your

10   Honor.  That's probably one of the more polite ones, John.

11             THE COURT:  Okay, all right.  Bruce Parker, Maryland,

12   okay.  All right.

13             MR. McELLIGOT:  Jack McElligott for the defendants.

14             THE COURT:  Yes, I know you, Mr. McElligott.  All

15   right.

16             MS. PRUITT:  Your Honor, my name is Lyn Pruitt.  I'm an

17   attorney from Little Rock, Arkansas, and I'm here for the

18   defendants observing.  I may be involved in some of the future

19   trials.  They may ask me to do that, so I wanted to get familiar

20   with the Court.

21             THE COURT:  Okay.  Is your microphone on?  Pull it over

22   in front of you, and the light should be glowing green.

23             MS. PRUITT:  It's glowing.

24             THE COURT:  Now it's glowing.

25             MS. PRUITT:  I've never been accused of being quiet, so

1    I can speak up.

2              THE COURT:  Yeah, yeah.  Well, you have that nice

3    southern, soft manner about you.  Okay.  So, as I understand it,

4    Ms. Pruitt -- well, first, I don't know you, do I?

5              MS. PRUITT:  I don't think so, Judge.  I've never --

6    I've never tried a case in your court.

7              THE COURT:  No, that wasn't my question.  My family is

8    from Arkansas, and do you know Sam Perroni?

9              MS. PRUITT:  Yes, very well.

10             THE COURT:  Uh-huh.  I've met you, and the name, when

11   the name was brought up, it was extremely familiar.  What about

12   Nicole Graham?  She's now Nicole Vaccarella.  She went to the

13   same law school that you did.

14             MS. PRUITT:  I don't know Nicole.

15             THE COURT:  No, so it's probably through Sam.

16             MS. PRUITT:  Probably through Sam because he and I are

17   good friends.

18             THE COURT:  That's probably where I've heard the name

19   and probably where I've met you.

20             MS. PRUITT:  And I was going to ask where your

21   relatives were from because mine are from south Arkansas.

22             THE COURT:  Well, it's a long and not a pretty story.

23   My father's family was from Wells Bayou.  If you know where that

24   is, you win the turkey.  My mother's family is -- they are the

25   Knights.  They were from Gould.  If you know where that is, I

1    give you my deepest sympathies and condolences.

2              MS. PRUITT:  I definitely know where Gould is.

3              THE COURT:  Yes.  And my mother and sister live in Hot

4    Springs and have for some time and have a place in the Quapaw in

5    Little Rock, and so, you know, stomping grounds.  Arkansas didn't

6    like me and I didn't like Arkansas.

7              MS. PRUITT:  I'm sorry.

8              THE COURT:  Yeah.  I only lived there for about

9    two-and-a-half years when my parents first separated and

10   divorced.  And as I say, I didn't like Arkansas and Arkansas

11   didn't like me.  We've come to a truce, and I do enjoy going up.

12   But it's probably through Sam.  But I've met you before.  I

13   remember the face, and the name was exceedingly familiar, so it

14   was probably through Sam.

15             MS. PRUITT:  Yeah.  Don't ask Sam any questions.  He

16   has several stories he might tell you.  I'm not sure if they will

17   be good or bad.

18             THE COURT:  Well, I'll probably be seeing Sam before

19   too long.  I'll be going up, I think, around Thanksgiving.  I try

20   to see Sam when I can when I go up.

21             For those of you who are on the other side, Sam Perroni

22   is a family friend.  He is a lawyer in Little Rock, Arkansas.  He

23   was an AUSA, and then he went out and started doing defense work.

24   In my opinion he's probably one of the best trial lawyers I've

25   ever seen operate.

12

 1          He is pretty much quasi retired now.  He had some

 2   medical issues.  Sam is about 12 feet tall, literally, and he's

 3   been rear-ended a couple of times, none of them his fault, which

 4   have given him some real problems with his back.  I think he

 5   really is like 7-2 or something.  Yeah, he's quite tall.  And he

 6   also has had some other issues, but he still dabbles.

 7          And he used to call my mother who knew everybody from

 8   southeast Arkansas -- Lord, God, Anna Belle did and does -- when

 9   he had a jury from southeast Arkansas to find out who these

10   people were.  So he's an old family friend from way, way back.

11   So that's the connection.

12          And I knew when I heard the name, I mentioned it to the

13   Special Masters.  I just wanted to make certain there wasn't a

14   stronger connection here, but we just have a mutual friend, and

15   that's probably why I've heard the name, and that's probably why

16   the face is familiar.  I've probably seen her at a cocktail party

17   or something like that.

18          All right, okay.  Now, Ms. Pruitt, as I understand it,

19   you are likely to try the second bellwether.  If, in fact, that

20   is the case, it is this Court's long-standing, some 21-year in

21   tradition, custom, and requirement that trial counsel must

22   participate in a meaningful fashion in all matters that are

23   interactive with the Court that lead up to a trial.  Anyone else

24   can participate if they want, but trial counsel, and that means

25   all trial counsel, unless they are excused, must participate.  If

1    for no other reason -- and I'm not just being persnickety, but it

2    creates an institutional memory.

3           Now that you see how I handle motions in limine, any

4    conference you have with me, other than, you know, the ones that

5    are for different purposes, okay, once we get to trial

6    conferences, they are working conferences, and I want the

7    institutional memory there.  I want the understanding of what the

8    rationale was behind any ruling that I make before trial because

9    I don't want to have to explain it or defend it in front of a

10   jury when we come to trial.

11          If it's a jury trial, I do not get involved beyond, you

12   know, yes, we have no bananas, or speak a little more slowly.

13   That's what this means.  You will see this.  It means speak a

14   little more slowly.  Ms. Gourley is smiling.  Those who have been

15   here have seen it.  Mr. Lanier knows it well.  So does

16   Mr. Arsenault.

17          So there are certain things that just make it go more

18   smoothly once we have the jury here, and you know, this has been

19   something that -- I was a litigator, so having litigated, I

20   thought this was very important, and I have found over the 21

21   years it is exceedingly important, and I do not compromise on

22   that point.

23          MS. PRUITT:  I understand, Your Honor.

24          THE COURT:  Okay.  Same thing, Mr. Parker.  Because

25   there was perhaps some confusion about this early on, I have

 1   compromised a tad on this, but that tad has already been used up,

 2   okay?  So, all righty.  Okay.

 3           All right.  Now I spoke with the Special Masters --

 4   again, that was one of the reasons we were -- I was running a

 5   little bit behind -- about some of the things that you had ideas

 6   about and concerns about.  Mr. Parker and Ms. Pruitt, yes, since

 7   you are kind of new to the party -- yeah, and you're just going

 8   to have to listen to it for a while.  It's the way it is.  You're

 9   just going to have to listen to it for a while.

10           Since you are somewhat new to the party, I think they

11   will tell you, I'm pretty much open to suggestion, I really am.

12   I told the group at the very beginning, you know, one of the

13   knocks, if you will, against MDLs in coming to the federal court

14   is people believe they lose control of their cases.  And I said,

15   Okay, if that's what you want, I'll give you control of it, but

16   be careful what you wish for because that means you're going to

17   have to be responsible.  You're going to have to move it forward,

18   and you're going to have to act like professionals, and you know,

19   they have risen to the occasion beautifully.

20           Now, that having been said, so now that we're coming

21   down to the ones that will be standing up and doing most of the

22   chatting with the jury, I'm open to suggestions, you know.  You

23   got to, you know, you want to -- they talked about starting

24   early.  We will not be starting at 8:30.  Will not happen.

25   9:00 perhaps, but I've talked with them about that.  I think your

1    idea of finishing early in the day and letting the jurors go home

2    is a great idea, because otherwise we're going to lose a large

3    portion of our potential jurors because south Louisiana, we have

4    a lot of people that are welders and self-employed kind of people

5    and, you know, their business will shut down.  If they don't

6    work, they don't eat.

7             Also, we've got a lot of people that, you know, work in

8    the oil patch, and that sort of thing.  And the oil patch is not

9    necessarily known for its indulgence of people who don't show up.

10   So notwithstanding it's against the law kind of thing to kick

11   them out, but -- so I think that's an excellent idea.  I have

12   talked with the Special Masters about it.  Chat with them.  So I

13   think that's a great idea.

14            I also raised some concerns that I had about some of

15   the issues that are likely to come up with the potential jury

16   venire.  So they will be talking with you about that.  I'm pretty

17   open, but I just want you to have time to think about it.  Again,

18   Mr. Parker and Ms. Pruitt and to some extent Mr. Lanier -- I

19   think he knows this -- pretty much with me, what you see is what

20   you get, and I'm really nice unless backed into a corner.

21   Folklore is I'm not nice when backed into a corner.  I think

22   folklore is incorrect on that point, but there might be those who

23   would beg to differ.

24            So, you know, if you have something you want to, you

25   know, lay out there, let me know.  I'm easy to do it.  Like, you

1    know, the Special Masters said this morning, you need a staging

2    area.  Okay.  I spent some time and got you a staging area, so --

3             So, at any rate, work with them on that.  Having been a

4    litigator, I would much prefer that we have all of this

5    extraneous stuff figured out before we get into this business of

6    trying it because then you don't have to worry about that.  You

7    can put your focus on -- somebody has got a Blackberry or

8    something that's receiving, downloading information.  One of your

9    phones is not on air -- put it on airplane mode.  Might as well

10   get this straightened out before we get a jury in here.

11            You hear that click, click, click, click?  What that

12   means is that somebody's phone is downloading information.  So

13   you need to put it on airplane mode when you're in the courtroom

14   or turn it off completely.

15            The other thing is, if your phone goes off during the

16   trial, I have a wonderful collection of phones, and some of them

17   are really neat.  And you'd be amazed the pictures on them.  So

18   you don't want to have your phone go off during trial.  All

19   right.  So, okay.  But please put it on, as I said, airplane mode

20   because that's what happens.  It interferes with the sound

21   system.  Okay.  Again, let me see.  As I said, I'd much prefer to

22   have this extraneous stuff dealt with.

23            I am pretty prompt.  I'll give you a minute or two one

24   way or the other.  If I'm going to be late coming back in because

25   something has blown up back there, I generally send Shree or

1    someone in to say, you know, she's going to be late coming back

2    so you can do another bathroom break or whatever.

3            I don't keep the jury waiting.  I don't think it will

4    be a problem with this group, but I have twice in 21 years come

5    in, waited, brought the jury in, and we all just sat and waited

6    for the lawyer who was late to show up.  They didn't do that

7    again.  I've only done it twice in 21 years.  But you know, I

8    mean, a minute or two one way or the other, you know, sometimes,

9    you know, it just takes an extra minute or two to get there, so

10   -- but try to kind of be here on time.

11           As the Special Masters will tell you, I have been

12   chomping at the bit to want to get, start getting to these jury

13   instructions.  Now we can't get to them yet because we don't know

14   some of the aspects of the applicable law, and Carmen is already

15   looking at me up over her glasses because I've said the dirty

16   words again.  But the reason I'm bringing it up, I want you to

17   understand, I think the jury instructions and the jury

18   interrogatories are the most important thing you will do in any

19   given trial.  They do not come out of your word processor, and

20   they have to be joint.  That does not mean yours, mine, and ours

21   put together with a cover letter.  That means they are footnoted

22   and you say, you know, they want "reasonable," and we want

23   "legitimate."  Okay.  You drop a footnote and you tell me the

24   case you are relying on in New York law that says "reasonable"

25   and the one you are relying on that says "legitimate."  I will

1    look at it, and you will have some sense of it.

2           It is my practice to have the jury instructions in the

3    can before you start your trial cause I don't understand how you

4    can try a case if you don't know what the jury instructions are

5    going to be.  That's my thought on it.  Sometimes we don't know

6    what the facts are going to be, so we'll have one that says,

7    Okay, if the facts come out this way, this is the one we're going

8    to use.  If they come out this way, this is the one we're going

9    to use.  If they come out this way, we're not going to use it at

10   all, but we will have them in our back pocket.  So this is just

11   so that you will understand how important I think they are.

12          The other thing that you need to know when I get your

13   proposed jury instructions and jury interrogatories is I check

14   them.  Every jury interrogatory you have must have a

15   corresponding jury instruction, and I check them, blunk, blunk,

16   blunk, blunk, blunk, blunk, because the jury has to understand

17   how they need to answer this question.  And it's also a wonderful

18   exercise for you because it will keep you, I hope, from trying to

19   put on that jury interrogatory form of question that is not

20   grounded in law, okay?

21          For instance, this is just an exemplar.  As I

22   understand it, under New York law, loss of enjoyment of life is

23   recoverable, but it is not a separate recovery.  Richard smiles.

24   He knows how I feel about that.  So it won't have its own little

25   question.  It will be included in, you know, the mental pain and

19

```
1    anguish.  Isn't that --
2              THE CLERK:  Pain and suffering.
3              THE COURT:  Pain and suffering, thank you very much.
4    That's where it will be.  So, you know, you want that to be known
5    to them, I suggest you put it in a jury instruction, okay?  So it
6    keeps that from being grounded.  Same thing from the defense
7    side, all right?  So it also forces you to look at the elements,
8    okay.
9              And it's also what I call the traffic instructions.
10   You got to have your traffic instruction.  Richard is going, what
11   is a traffic instruction?  You know, if you answer "yes" to this,
12   skip to question 12.  If you answered "no" to this, skip to
13   question 42.
14             And my suggestion to you is, after you think you've
15   gotten it all done, give it to a layperson, somebody who doesn't
16   know anything about the case, and let them see if they can work
17   through it.  That's one of the best things you can do, because
18   that way you know whether it's going to work or not, and you
19   don't run the risk of having hopefully an inconsistent jury
20   verdict form.
21             All right.  Those are just some of the things that I
22   suggest you start -- as we turn our attention more towards trial,
23   you start thinking about.  The Special Masters will be talking to
24   you about that.  I suggest you listen to them.  They know me
25   well.  They have tried cases before me and worked with me.  So
```

 1    they can probably give you some wonderful guidance on that.

 2            All right.  Now let's turn our attention to the motions

 3    in limine.  I am going to apologize if I don't automatically get

 4    the computer up and running as quickly as I would like.  I had

 5    planned on sitting down and going through all of these again.  As

 6    you can see, I've already been through them multiple times, but

 7    to get it back up and running, but I got involved with the

 8    Special Masters.  All right.

 9            Okay.  The first one in our normal pattern that I want

10    to go to are the ones that were left from the last time.  This

11    one would be the Defendants' Motion in Limine to Exclude Evidence

12    and Argument Regarding Unrelated Corporate History, Document

13    Number 3288.  Plaintiffs' response, Document Number 3342.

14            Now, as to the concept of World War II, I think

15    everyone recognizes that will be granted.  Mr. Lanier, that shall

16    not come up in any fashion whatsoever.  No expert shall blurt it

17    out.  No expert shall even allude to World War II.  Thank you.

18    All right.  So it's granted as to World War II.

19            Now, as to the -- as to TAP and the CIA, that's a

20    little more interesting concept.  Now, as to the argument,

21    Ms. Gourley, and Mr. Parker, that was made in response to the

22    plaintiffs' response -- actually, it was made in reply -- yeah, I

23    agree with you as to saying, you know, because they robbed banks

24    before, they must be robbing banks now.  So as to that aspect, I

25    would grant it, and I would agree.

1          That is not to say, however, that there might or might

2     not be some other basis of independent relevance.  I don't know,

3     and I will not be able to know until the trial.

4          So if the plaintiffs are intending to put that forward

5     to show that they are bad people because they were bad people

6     there back with TAP and they got in trouble with the government

7     and it was criminal, and yadda, yadda, yadda; no, I will on the

8     motion in limine grant their motion there.

9          However, if there is an independent basis for

10    relevance, then I ask that you bring it to the Court's attention

11    at sidebar outside the presence of the jury.  If, in fact, we end

12    up stopping around 3:30 each day, which again, I think, is an

13    excellent idea, then we can -- you can anticipate those things as

14    the trial unfolds, you can say, today we think we've proved up X,

15    Y, and Z.  So we tomorrow want to go into D, and you told us we

16    couldn't go into D unless there was an independent relevance.

17    And the defendants have an opportunity to say, Oh, no, no, no,

18    they still don't get to go into D, because on a 104-403 analysis

19    the prejudice outweighs the benefit, et cetera, et cetera.

20          In any given case, for those of you and all of you here

21    I'm assuming are litigators.  You know.  You don't know -- I

22    mean, witnesses can go south.  You just don't know what's going

23    to happen.  So I'm not going to say it can never come up, but it

24    cannot come up for the purpose that the defendants highlighted

25    because I agree with them on that point.  But if there is an

22

```
 1    independent relevance, you know, don't go into it, Mr. Lanier.
 2              MR. LANIER:  Approach the bench.
 3              THE COURT:  Yeah, approach the bench before that, or do
 4    it, you know, after we let the jury go at 3:30.  All right.  So,
 5    as to -- Chris, as to Document Number 3288, granted in part and,
 6    I guess, deferred in part, okay.  It's granted as to World War
 7    II.  It is deferred -- well, I guess it's deferred.
 8              No, Chris, let's do it, it's granted.  Okay.  As to
 9    this one, the Court grants it.  However, with no prejudice to the
10    plaintiffs' right to reurge an independent relevance outside the
11    presence of the jury.  All right.
12              MR. PENNOCK:  Thank you, Your Honor.
13              THE COURT:  You're welcome.  Okay.  So if y'all can
14    find a way to get it in; I'm not saying you can, I'm not saying
15    you can't; but, you know, I'm a fan of Hannibal, so we'll see
16    what happens.
17              Ms. Pruitt, Mr. Parker, y'all weren't here.  Hannibal
18    comes from an old friend of mine who was a plaintiff's attorney,
19    and he used to say that, you know, I could find a pinhole, and
20    then the next thing he knew I was driving Hannibal and all his
21    elephants through it.  And I said, Well, that's my job.  So
22    pinholes can lead to Hannibal and all of his elephants and, as I
23    have suggested, with Ms. Gourley or Mr. Parker waving the flag on
24    it as they go through, or Mr. Lanier and Mr. Arsenault waving the
25    flag on the back of the elephant as they go through, so --
```

1          All right.  So, Chris, granted on both parts, but with

2    no prejudice to the plaintiffs' right to approach the bench and

3    ask if they have established an independent relevance.

4          All right, the next one.  Okay.  This is Defendants'

5    Motion in Limine to Exclude Evidence and Argument Regarding the

6    Attendance or Nonattendance of Certain Witnesses at Trial,

7    Document Number 3286, Chris.  All right.  On that one I

8    originally -- Ms. Gourley, you're standing.

9          MS. GOURLEY:  I'm sorry, Your Honor.

10         THE COURT:  That's all right.  Go right ahead.

11         MS. GOURLEY:  I didn't want to interrupt you.  This was

12   one where we thought originally we had an agreement, and then it

13   turns out we did not.

14         THE COURT:  Yeah.

15         MS. GOURLEY:  And we were urged to refile with the

16   sections separated, and the date we were given for that was

17   October the 16th.

18         THE COURT:  Yes.  Well, I didn't --

19         MS. GOURLEY:  That's what we intend to do unless

20   something you are about to say supersedes that.

21         THE COURT:  That's exactly what I was about to say.

22         MS. GOURLEY:  Okay.

23         THE COURT:  This was one that I originally deferred on

24   because the parties thought that they would be able to reach an

25   agreement.  And again, Mr. Parker, and Ms. Pruitt, this

1    particular case, because of the manner in which the parties and

2    the Court have chosen to approach it, the majority of the

3    movement is by agreement, and then it is memorialized, if you

4    will, by the Court.  So I ask you to please continue to

5    participate in that professional manner that has been the culture

6    of this case up to now, and I think that's why we've been able to

7    get this case as far along as quickly as we have, so --

8            All right.  So, originally, I deferred because the

9    parties said they would discuss.  However, there was no

10   agreement.  Now, because of that, I asked the parties, I think,

11   through the Special Masters, and I guess they have already

12   explained that to you, because I sit down, I go through

13   everything multiple times; hence, get it to me on time.  I sit

14   down with them and go through it.  We spent a long time going

15   through this with the Special Master.

16           So I think, Chris, the proper procedural ruling is that

17   it is denied for failure to carry their burden.  However, the

18   defendants have until October 16th at 4:30 Central Time to file

19   or, and/or reurge this if they wish to, and to fully brief the

20   segregated issues.  And then the plaintiffs will have until

21   Tuesday, the 22nd of October, at 4:30 to respond.  And I ask that

22   you, please, unless it would prejudice you to do so, use the same

23   segregation that the defendants have used so I can match up the

24   responses and go through it quickly.

25           MR. PENNOCK:  Very good, Judge.  Thank you.

1          THE COURT:  Okay, thank you.  All right.  And then once
2    I get those, I will look at it again.  And I'm sure they have
3    gone through it with you.  I just think it may or may not be
4    different vis-a-vis corporate reps, vis-a-vis third parties,
5    vis-a-vis corporate employees, vis-a-vis former employees, so --
6    and then there are some other issues that might or might not play
7    into this.

8          So I need you to think with specificity as to what
9    issues, because there are multiple issues in this case.  It might
10   or might not be relevant.  You know, we have multiple issues.  I
11   don't want to flag it for anybody, but we've got multiple issues
12   here.

13         So you will find, Mr. Parker, Ms. Pruitt, as they have
14   already found, don't paint with a broad brush with me.  I parse
15   things out, so don't paint with a broad brush.  So, you know,
16   just as an exemplar, probably not relevant to this issue.  I
17   don't know whether it is or isn't, but something might or might
18   not be relevant if we get to punitive damages that would not be
19   relevant as to liability.  That's just an exemplar.

20         There are other issues that tend to segregate
21   themselves.  So, again, I'm not going to flag it for either side.
22   There's a thin line between my flagging it for you and/or, you
23   know, telling you what I need you to consider, so -- but, please,
24   when you break it down, break it down as to all the individual
25   categories, and then, you know, as to what issues, maybe, maybe

1    not.

2            And if you don't want to flag it, defendants, for the

3    plaintiffs' side, then we'll let the plaintiffs flag, well, it

4    may not be relevant for this, but hey, it's relevant for this,

5    okay.  And if you don't want to flag it, you don't have to flag

6    it for them.  Let them flag it.  But you know, the more we can

7    get out on the table now and cleared up, the easier the trial

8    will be for all.  But it may be that some of this will just have

9    to kind of wait.  But at any rate, that's that one.

10           Okay.  Is that every thing on that one, Shree?  Okay,

11   need to look and see.  Cause a lot of this right now is fact

12   dependent.  I don't know about these people, and I don't know as

13   to what issue.

14           As an exemplar, again, the thing for me that will make

15   me, you know, turn my nose up, so to speak, on a motion for

16   summary judgment is if the first sentence says, there's no

17   genuine issue of material fact, period.  I know it's a loser.  As

18   to what issue.  There are multiple issues in most cases.  So if

19   you want to put that and put a period, you've lost because you

20   haven't told me as to what issue, okay?  All righty, so, fact

21   dependent, issue dependent.

22           All righty, now, the next one is Document Number 3368.

23   That's the Defendants' Motion in Limine to Exclude Argument

24   Regarding Witnesses Testifying by Deposition.  Now, you know,

25   when you force me to go back to the Federal Rules of Civil

1    Procedure and pull it out and read the actual rule again just to

2    see what we're going on, I'm interested from the plaintiffs'

3    standpoint why you might want to -- if you're not, you know,

4    throwing out your strategy here, why you might want to comment on

5    this?  I mean, generally, you know, if it's over a hundred miles,

6    and pretty much everybody is going to be over a hundred miles

7    from Lafayette, you know, they get to bring it by deposition.

8              Is it -- boy, Mr. Lanier has got his poker face on.  So

9    he isn't going to be telling me, but I -- right now I'm

10   interested -- I can see where maybe there might be some

11   relevance, but I don't want to flag it for anybody and I'm not

12   sure there is.

13             So, Mr. Pennock, you at liberty to say?

14             MR. PENNOCK:  Your Honor, I think I can address the

15   question.

16             THE COURT:  Cool, cause this one is fascinating.  If

17   you hadn't figured it out, I'm a nerd.

18             MR. PENNOCK:  I hope I'm on the right motion.

19             THE COURT:  Well, let's see, it says --

20             MR. PENNOCK:  No, I'm sure I am.  I think that from our

21   perspective, or as the Court knows, there's been a very large

22   number of depositions taken of the defendant in this case.  There

23   were current employees.  There were former employees.  Some of

24   those former employees we believe were under agreements to

25   cooperate fully in any litigation that may occur subsequent to

1    their departure.

2         So, in essence, I think that, with respect to the

3    Takeda employees and some of the former employees, they are

4    available to the defendant to bring them here to testify at

5    trial.  They are not available to us because we do not, as the

6    Court noted, have subpoena power over them.  Yet they are

7    available to the defendant.  And therefore, from our perspective,

8    the defendants should not be able to rely upon the depositions of

9    their own witness, of their own employee to -- at trial.

10        Now I think -- I thought that Rule 32 was fairly clear

11   on this, and that if -- that you may use a deposition -- as an

12   adverse party, you may use a deposition against someone, but to

13   proffer it in your own behalf when you have control over

14   producing that witness I didn't think was something that would be

15   permitted.

16        Now they cited a case, Herbert v. Wal-Mart Stores which

17   is a Fifth Circuit case, and I can read the cite if you want,

18   Your Honor, but it's in the brief, as I'm sure you know.  And

19   that case is not -- it does not stand for anything different than

20   what we have argued which is, when the witnesses are equally

21   available to both sides, then you cannot claim some -- you cannot

22   claim some adverse inference or suggestion because one side did

23   not bring the witness.

24        But when they are not equally available, as in this

25   instance, then I think the defendants are either under the

1    obligation to bring that witness or at their peril we may

2    appropriately and not cumulatively or create any duplicative or

3    repetitive discussion of this or argument at trial, but if there

4    are witnesses who are significant and who we think should have

5    been brought here to stand up for this company, then I think we

6    should, under the rule, under the Herbert case as well, be able

7    to comment on that.  And the defendants ought not have as their

8    fallback position, well, we're just going to show them by

9    deposition.  So I think we are squarely within the rule here and

10   the case.

11              THE COURT:  Do you have Rule 32 available to you?

12   Mr. Lanier does.

13              MR. PENNOCK:  I do, Your Honor.

14              THE COURT:  Okay.  Pull 32, because I looked at this,

15   and, you know, 21 years I've never had to look at it this

16   carefully.  This is really rather interesting because I'm a

17   procedural nerd.

18              All right.  So if you look at 32(3), all right,

19   Deposition of a party -- Cathleen, I've had three cups of coffee,

20   so if I get to going too fast, raise your hand, okay.

21              It says, "Deposition of Party, Agent, or Designee.  Any

22   adverse party" -- and that's what you're -- where you're hanging

23   your hat, I assume.  "Any adverse party may use for any purpose

24   the deposition of a party or anyone who, when deposed, was the

25   party's officer" -- okay -- "director, managing agent, or

1    designee under Rule 30(b)(6) or 31(a)(4)."  And we could look at

2    31(a)(4), but I don't think we really need to right now.

3    Everybody, I think, probably is clear in your back pocket it's

4    30(b)(6).

5            But then you go, "Unavailable Witness."  And it says,

6    "A party may use for any purpose the deposition of a witness,

7    whether or not a party" -- okay -- "if the court finds:"  They

8    are dead, a hundred miles from the courthouse, infirmity,

9    illness, et cetera, and then exceptional circumstances.

10           So my question was, when I read this, it seems that

11   Rule 32 is making a distinction between a party's officer,

12   director, managing agent, or designee under Rule 30(b)(6) or

13   31(a)(4), and in those whether or not a party, if they are

14   unavailable, and they lay out "the unavailable."  It seems that

15   that is the distinction that's being made.

16           Now, whether or not -- let me look at 31, go back and

17   look at 31(a)(4).  Don't think that helps us.  I think I looked

18   at that earlier.  31.  No, that doesn't help us.  Okay, I didn't

19   think so.

20           So I think the distinction is being made between a

21   party, however that's defined, and I think it is an officer,

22   director, managing agent, or designee.  Well, I don't think

23   that's going to include former employees or people with whom they

24   may or may not have had this continuing -- this agreement for

25   continuing cooperation if they don't fall under that category

1    unless they are -- and if they are unavailable, the question then

2    becomes whether or not -- cause, see, (3) is separate from (4).

3              MR. PENNOCK:  Yes, Your Honor.

4              THE COURT:  So (4) is unavailable.

5              MR. PENNOCK:  Yes, Your Honor.

6              THE COURT:  So if they are unavailable, that's one

7    thing.  An adverse -- that's you -- can use it for their party

8    people, or if they are unavailable, they can be used by anybody.

9    Okay.  So my question would become, if they are unavailable, does

10   that -- it says whether or not they are a party.  So does that

11   not also include agents, officers, et cetera, you see, where it

12   says, "A party" -- doesn't have to say adverse.  "A party may use

13   for any purpose the deposition for a witness, whether or not a

14   party," if they are unavailable, and then we go through these (A)

15   through (E).  Would not (A) through (E) include, also, the

16   officers, directors, managing agents, et cetera, it would seem.

17   I don't know.  I'm asking.

18             MR. PENNOCK:  Yes, Your Honor, and you're right.  This

19   dilemma frequently occurs under Rule 32 in these settings.  I

20   think that the -- in our view under (D), which is 32(a)(4)(D),

21   that these defendants have the burden of demonstrating that these

22   parties -- I'm sorry -- these witnesses would not consent to the

23   jurisdiction of the court and become available for testifying

24   here live.

25             THE COURT:  So you're arguing that under (D) that it

1    says that the party offering the deposition could not procure the

2    witness's attendance by subpoena.  Well, they can't procure them

3    by subpoena.  They are over a hundred miles from the courthouse.

4              MR. PENNOCK:  I think that if there were consent to

5    come, if the par -- if the witness consents, if the witness is

6    sitting in Chicago and consents to come for trial to give

7    testimony --

8              THE COURT:  They are going to say they didn't consent

9    to come.  They didn't ask them or didn't consent to come, and the

10   question then becomes, because I'm not being merely facetious

11   here, must they?  I don't know the answer.  That's why I'm

12   interested in your thoughts, and then I'm going to let someone

13   from the defense argue it as well, because this is an interesting

14   little ambiguity, it seems to me.

15             And I agree, the Wal-Mart case doesn't help them.  It

16   doesn't help them, it doesn't help the Court.  So I don't know

17   that I have any -- have been given at this stage any case law

18   that gives me the answer.

19             So I don't -- I don't know whether or not within (D),

20   the fact that it's attendance by subpoena, should encompass

21   consent or control, but let's step out of that, Mr. Pennock.

22             MR. PENNOCK:  Yes, Your Honor.

23             THE COURT:  And let's just say that we're talking about

24   a normal company employee, okay, and we're going to take it out

25   of this realm entirely.  We're going to -- we're going to put it

1    in the admiralty realm merely because it wouldn't be applicable

2    here, okay, and you've got a witness, and the witness clearly is

3    aligned with the defense, but he works in Jakarta, and he works,

4    you know, 27 -- 21 and 21 or 27 and 27, and the trial gets

5    continued.  They had him set up, but the trial gets continued,

6    and it's now going to be slap dab in the middle of his 27 days

7    when he is scheduled to be in Jakarta, and he's the only one that

8    can run this super-duper mud pump.  Could not at that point the

9    defense or the plaintiff, if it were the other side around, be

10   able to use the deposition because they would be unavailable

11   because of either (E) exceptional circumstances, or certainly

12   over the hundred miles, you know, and they can't really subpoena

13   him.  They didn't subpoena him.  I mean, that happens all the

14   time.  And then you don't get to get up there and say, well, the

15   reason they didn't bring him is because the mud pump on this one

16   was defective, and that's why he's not here because this is a

17   defective mud pump.  Doesn't that happen all the time?  Why is

18   this different?

19             MR. PENNOCK:  Well, I think the difference is there

20   have been no facts adduced here or alleged here by the defendant

21   yet because the witnesses that might be commented upon have not

22   yet been identified because we're not yet at trial, but there's

23   nothing that's been asserted --

24             THE COURT:  Let me interrupt you.  That's going to

25   happen before trial, Mr. Pennock.

1            MR. PENNOCK:  Sure, because of the deposition

2     designations, true.

3            THE COURT:  Deposition designations and --

4            MR. PENNOCK:  Pretrial order.

5            THE COURT:  There you go, which is --

6            MR. PENNOCK:  Thank you.

7            THE COURT:  It is sacrosanct.

8            MR. PENNOCK:  Understood.

9            THE COURT:  Okay.

10           MR. PENNOCK:  And the Special Masters have made that

11    very clear.  But in any event, there has been no assertion, let

12    alone demonstration, that there are circumstances such as those

13    that Your Honor has described, or akin to those circumstances,

14    that might preclude this witness from appearing at the request of

15    their employer or appearing under a contract that they entered

16    into when they left the employ when they said, we will come and

17    cooperate.  We will come and testify.  I mean, I think that's a

18    fair interpretation from the contracts that we understand may

19    have existed.  You know, we've learned that, I think, through one

20    witness at least.

21           So I think there is certainly something afoot here

22    behind the scenes that we know they can bring those witnesses,

23    and we know that they will ask and tap whoever they want to bring

24    to come to this trial.  And if that person is working in Chicago

25    or working for the company and it's going to be good for the

1    company, they will be here at this first MDL trial in this

2    situation.

3              So I think that, under those circumstances, I do think

4    that they are, in essence, tapping into the power and authority

5    that they have over these individuals akin to a subpoena, akin to

6    consenting, getting them to consent to accepting a subpoena, and

7    accepting the jurisdiction of the Court, and bringing them here.

8              If they list that witness as a witness in the pretrial

9    order, I mean, they are essentially asserting that this witness

10   will be here, this witness is testifying for us, and essentially,

11   tantamount to putting that person under the jurisdiction of the

12   court in the same way that a subpoena would operate.

13             THE COURT:  Hold that thought because you are

14   overreaching there, and I will explain to you -- wait a minute.

15   When I get to talking, I get to talk.

16             MR. PENNOCK:  Sorry, Your Honor.

17             THE COURT:  That's all right.  Now, because the way the

18   pretrial order will be formulated is that this running list of

19   witnesses that I keep reminding y'all to please tell me who they

20   are, okay, you will pare it, both sides, pare it down, and when

21   you come to your pretrial order, you will have a will call

22   witness list, and you will designate which of those witnesses

23   will be coming live and by deposition.  So just putting it on the

24   witness list, no, that doesn't certify that they will be here,

25   et cetera.

1          Okay, all right.  Defense, whomever is speaking for

2    this, let's come up because I want to talk with you about this.

3          MS. GOURLEY:  I'm a little nervous because I didn't

4    bring my rule book.  I thought about it.

5          THE COURT:  If you smile real nice at Mr. Lanier, he

6    might let you borrow his cause they seem to have a couple.  Judge

7    Feldman taught me, never show up in court without my handy dandy

8    Federal Rules of Evidence and Federal Rules of Civil Procedure,

9    so it's a habit that I had kept from when I practiced.

10          All right.  Now, Ms. Gourley, this is the way this

11    particular rule reads.  Somebody do give her one.  It's not fair

12    for her not to have one.

13          MS. GOURLEY:  Thank you.

14          MR. LANIER:  You're very welcome.

15          THE COURT:  All right.  Go to Rule 32, Federal Rules of

16    Civil Procedure.  Got it?

17          MS. GOURLEY:  No.

18          THE COURT:  Shree, go get us another -- wait.  Give

19    this one to Ms. Gourley and then give that one back to

20    Mr. Lanier.  He was playing in the Federal Rules of Evidence.

21          MR. LANIER:  You need me to find it?

22                    (Counsel conferring.)

23          THE COURT:  All right.  It should be open to 32.

24          MS. GOURLEY:  Yes, Your Honor.

25          THE COURT:  All righty.  Go to 32.  And then I want to

1    go to (3) and (4), because it seems that this is what was meant

2    by this rule.  Notice the emphasis on the word "seems."  All

3    right.  It says, "Deposition of Party, Agent or Designee," and

4    that's where it says "an adverse party."  That's in part the

5    argument that Mr. Pennock is making.  So an adverse party can put

6    it forth, period.  Okay.  That's all right.  You're not an

7    adverse party.  So I don't think (3) applies to you.  You can't

8    just use it there.  They can use it, plaintiffs, but you can't

9    because you are not adverse to yourself.  Then, so you're going

10   to be under (4), it would seem.

11         MS. GOURLEY:  Uh-huh.

12         THE COURT:  And that means an unavailable witness

13   whether or not a party.  Okay.  So whether or not a party if they

14   have to be unavailable.  So they have to be dead, over a hundred

15   miles from the place of hearing or trial or is outside the United

16   States, unless -- and this is what Mr. Pennock, I think, is

17   arguing -- unless it appears that the witness's absence was

18   procured by the party offering the deposition, and that, I think,

19   is the basis.  Although Mr. Pennock did not actually cite that

20   language, I think that is the basis of his argument on this

21   point.  He is saying, Hey, they are cherry-picking the ones they

22   want to bring and the ones they don't want to bring.  So, hey,

23   that is clearly being procured by them.  And I tend to agree with

24   him on that point.  You don't get to cherry-pick the ones you

25   want to bring and the ones you don't want to bring.

38

1          Then you go to (C), that the witness cannot attend

2     because of age, illness, infirmity, or imprisonment.  Of course

3     none of us argues about that one.  And then (E) on motion and

4     notice, and again, I think that's what Mr. Pennock was attempting

5     to allude to.  I'm looking at you, Mr. Pennock, but you're behind

6     her.  I think that's what he was attempting to allude to when he

7     was over, being a bit overbroad about the Scheduling Order, okay?

8     It requires notice, okay, that exceptional circumstances make it

9     desirable and in the interest of justice, et cetera.  So I think

10    he has an argument on that point.

11         Now he went to (D) which was "that the party offering

12    the deposition could not procure the witness's attendance by

13    subpoena."  Well, you can't procure them by subpoena, but I think

14    that if you look at (B), okay, which is "unless it appears that

15    the witness's absence was procured by the party offering the

16    deposition," and this concept of not being able to get their

17    attendance, and although it says by subpoena, I think that he

18    makes at least a reasonable argument that, in fact, neither side

19    should be able to cherry-pick whom they wish to bring and then

20    make the other rely upon the depositions.

21         Now I am interested in your thoughts.

22         MS. GOURLEY:  Your Honor, I think there's two things

23    with respect to this motion that have been somewhat conflated.

24    One is the issue of whether witnesses have to come live or for

25    whom depositions may be read, and I think there is a distinction

1    between officers, directors, managing agents, and other

2    witnesses.

3              The discussion I have had with the plaintiffs on this

4    issue is around the fact that so many of the people, so many of

5    the people deposed in this case are, in fact, former employees.

6    The plaintiffs' discovery has focused on time periods literally

7    decades ago, and the depositions of people who are no longer

8    employed by Takeda and over whom we cannot insist that they

9    attend any trial.  I, in fact, know of no case law that says that

10   we're obligated to insist that someone who is not employed by us,

11   even though we have deposed them, and perhaps they have

12   cooperated in a deposition, be required to attend a trial in

13   Lafayette, Louisiana, as lovely a place as we all know that to

14   be.

15             THE COURT:  Well, I agree with you on that point, but

16   he raises some sort of extraneous contract.  First I've heard of

17   it, but he raises an extraneous contract that says these people

18   will, and I'm certainly paraphrasing here, in effect, act as if

19   they are still employees because we will come and cooperate.

20             MS. GOURLEY:  Well, I don't know what Mr. Pennock is

21   referring to there.  I don't personally know of any provision

22   that requires someone to travel to testify in a trial, but if

23   there is one, I'd be happy to discuss it with him.

24             THE COURT:  That's not what he said, and we're not

25   going to get into the difference between bladder cancer and

1    cancer.  I don't appreciate not being dealt with forthrightly.

2    Okay.  Now -- not saying that you did, Sara, but we're not going

3    to get into parsing the difference between bladder cancer and

4    cancer when we were talking about -- well, it wasn't me --

5    talking with Judge Hanna about, you know, these litigation holds.

6    But at any rate, I digress here.

7            But that's not what he said, Sara.  What he said was

8    that there is at least one witness who has said that there was

9    some sort of a contract that said, we will cooperate with you,

10   Takeda, in the future as to what you might need us to do.  Again,

11   I don't -- I don't want to put words in his mouth.  That doesn't

12   mean that the contract said, of course, that we would come to

13   Lafayette, Louisiana.  Of course it wouldn't say that.  You

14   didn't even think you'd be coming to Lafayette, Louisiana, ever

15   in your wildest dreams, but here you are.  It probably didn't say

16   you will come to trial for us.  It probably didn't say that.

17           What it might have said, and I have no idea, but what

18   it might have said would be that we will cooperate with you in

19   whatever way you need based upon the work that we did for you

20   during the time we worked for you.  And if that -- if that

21   exists, then I think he might have an argument because that would

22   be like being, in effect, a present employee.  Agreed, or no,

23   assuming it exists?

24           MS. GOURLEY:  A, assuming it exists.

25           THE COURT:  Assuming it exists.

1          MS. GOURLEY:  B, assuming it exists with an employee

2     who is relevant to the issues here who is on the witness list.

3          THE COURT:  Yes, gotcha.

4          MS. GOURLEY:  And C, I would think that in that

5     circumstance you would still need to look to unavailability,

6     because former employees, remember, whether they agree to

7     cooperate or not cooperate -- and leaving aside for a second

8     exactly what that means -- could, for example, have taken a job

9     in Jakarta.

10          THE COURT:  I agree, I agree on that.  So if we start

11     out with -- and we're just dealing in hypothets here.  Okay.  And

12     in no way are defendants prejudiced by answering these hypothets,

13     okay, nor am I assuming that these contracts exist for everybody

14     or anybody they might want, okay?  Now, but setting aside, I'm

15     just trying to deal with the parameters of the law here.

16          Assuming that there was some sort of a contract that

17     said, in effect, we will cooperate with you to address the work

18     that we did for you when we worked for you, okay, and that's what

19     I was talking about cancer, bladder cancer, you know, litigation

20     holds, et cetera.  I don't want to get into that.  So it doesn't

21     have to be so specific that we would come to Lafayette,

22     Louisiana.  Please.  Or that we would come to trial.  I don't

23     think it need say that.

24          But if whatever that document that was alluded to by at

25     least one witness were to say, if the spirit of that was, we

42

```
1   will, in effect, make ourselves available to you as if we were

2   still your employee if you need us, based upon what we did for

3   you, then it would seem at that point they are not, unless

4   otherwise unavailable, unavailable.

5         Now they are not under (3) because I don't think they

6   are going to be a director, a managing agent, or designee.  They

7   might be, but that doesn't help you anyway.  (3) doesn't help

8   you.  That only allows the plaintiffs to put on those depositions

9   because they are adverse.  So we're down in (4).

10        So if, in fact, these documents exist, then they are

11  kind of like present employees.  So they are not necessarily

12  otherwise unavailable because of their nonpresent, at-present

13  employee status, okay?  So we look at (4).  So if they're dead,

14  certainly, okay?

15        Now, if they are over a hundred miles, which is what

16  one would ordinarily argue, but then you have that caveat, unless

17  it appears that the witness's absence was procured by the party

18  offering the deposition, and that's his argument.  He really

19  should have been hanging his hat, I would argue, on (B) rather

20  than (D), okay?

21        So then we get to (C).  Of course, if they're too old

22  or too ill or infirmity, or imprisoned, notwithstanding having

23  signed this document, whatever it would be, you don't have to

24  bring them, okay?

25        And then (E) is Jakarta.  (E) is on motion and notice,
```

1    that exceptional circumstances exist, and that would be what you

2    just said, if they are in Jakarta.  Yes, they don't work for us

3    anymore; but, yes, they signed some sort of document that would

4    put them in the same shoes, if you will, as a present employee,

5    as to our having control over them, then, yeah, we can't

6    cherry-pick.  I would suggest that's a strong argument, that you

7    can't cherry-pick the ones you want to bring or don't bring

8    without risking an adverse argument on their part, but you get to

9    argue that under (E), if you give them notice, and that's why I

10   was so persnickety with Mr. Pennock about the obligations under

11   the Rule 26 disclosure of witnesses, telling me who they are, and

12   the obligation that you must declare, if not before, certainly by

13   the pretrial order, who is going to be will call and whether they

14   are coming live or by deposition.  I think you might even have to

15   do it earlier.  I know I argued for that point, but I might have

16   lost that.  Carmen might have beaten me back on that point.  She

17   is your champion, parties, in case you didn't know.  She might

18   have beaten me back on that.

19        So at some point that designation must be made,

20   Ms. Gourley, and once you make that, then I think they are not

21   without reasonable argument to say, you have to bring these

22   people, if you want to use them, unless you can show exceptional

23   circumstances.

24        MS. GOURLEY:  Uh-huh.

25        THE COURT:  Do you disagree with that analysis, and if

1    so, why, based upon the admitted assumptions that underlie it.

2              MS. GOURLEY:  Based on the assumptions, including

3    specifically with respect to a contract that has only been

4    described to me by Mr. Pennock.

5              THE COURT:  Yes.

6              MS. GOURLEY:  Then I think you may be -- you are right.

7    However, I, again, have not reviewed the case law on Rule 32,

8    specifically.

9              THE COURT:  Okay.  Then why don't we do this.

10             MS. GOURLEY:  A brief?

11             THE COURT:  Yes, if you would like to do that, because

12   this one I find interesting.  I don't know.  Yeah?

13             MS. GOURLEY:  I just want to add one other thing.

14   There is another piece to this motion in limine which has been

15   kind of lost in this, and that is, we cited and the proposal we

16   made was with respect to the Fifth Circuit pattern jury

17   instructions.

18             THE COURT:  Oh, I read it.

19             MS. GOURLEY:  -- with regard to depositions.

20             THE COURT:  Oh, I'm coming to that.  I haven't gotten

21   there yet.

22             MS. GOURLEY:  Okay.

23             THE COURT:  I'm doing it -- you know, I'm very

24   methodical.

25             MS. GOURLEY:  Okay.

1          THE COURT:  We've got to deal with this part and then

2     we're coming to the other.

3          MS. GOURLEY:  Okay.

4          THE COURT:  Okay.  So three or four pages; shouldn't

5     take more than that.

6          MS. GOURLEY:  Are you asking for a response from the

7     plaintiffs first and then a reply since this was --

8          THE COURT:  Oh, that was your motion?  Yeah.  All

9     right, Mr. Pennock, yeah, three or four pages.

10         MR. PENNOCK:  Very well.

11         THE COURT:  And then I'll let you do a reply, three or

12    four pages.

13         MS. GOURLEY:  Thank you, Your Honor.

14         THE COURT:  Timing, 16th and 22nd as well?  No, Carmen

15    is shaking her head no.  Work out with Carmen when to get the

16    timing on that.

17         Mr. Pennock, yes?

18         MR. PENNOCK:  Your Honor, I just wanted to let the

19    Court know that the contract that I was alluding to was discussed

20    at, I believe, at a deposition of Terri Smith.  I don't expect

21    Ms. Gourley to know every piece of testimony that's happened in

22    every deposition in this litigation.  That wouldn't be in any way

23    fair.  But the fact is it was discussed at a deposition and the

24    language I have available, but we'll put it in our brief.

25         THE COURT:  Okay.  Bottom line -- Mr. Arsenault?

46

1              MR. ARSENAULT:  I apologize, Your Honor.

2              THE COURT:  It's okay.

3              MR. ARSENAULT:  I was at the deposition, as was

4    Mr. Lanier.  We did not attach that document, and I'm not certain

5    that it was in fact discussed, but we have the document.  We have

6    the Bates number.  We'll provide it to Ms. Gourley momentarily,

7    as soon as we can make a copy of it, or we'll E-mail it to her,

8    as a matter of fact.

9              THE COURT:  Cool.

10             MS. GOURLEY:  Thank you.

11             MR. ARSENAULT:  I just wanted to make sure the record

12   was straight on that.  I don't think it was actually discussed.

13   And I'm positive it was not attached, but we had it in connection

14   with the deposition.  We have it here, and that's the agreement.

15             THE COURT:  Okay.  Remember that, if you're going to

16   use this as a foundation, at some point you've got an

17   authentication issue, huh?  I don't know, but I just point that

18   out.

19             MR. ARSENAULT:  Yes, Your Honor.

20             THE COURT:  Okay.  That's Bill Pugh's, you know,

21   Evidence 101.

22             Okay.  Now, bottom line on this part of this particular

23   motion, what I just went through with Ms. Gourley is how I see

24   the law, unless you can show me some case law to the contrary.

25   Okay?  So that's really what I'm looking at.  So don't give me

1   flowery language in your three to four pages; I'm not interested

2   in it.  The Wal-Mart case -- I think was that on this one or the

3   other one?  Yeah, I've read it.  That doesn't help.  It's not on

4   all fours.  It just doesn't help here.  So go looking and see if

5   you can find something, because this is interesting.  This was

6   fun.  This was great fun.  So, go see if there's some case law

7   out there.  Start with the Fifth Circuit always, please; it's

8   very, very helpful to me.  If there's nothing in the Fifth

9   Circuit, say there's nothing in the Fifth Circuit, so we went to

10  look at that this circuit, that circuit.  Avoid the Ninth if you

11  can.  They're most overturned circuit in the country.  But, you

12  know, if you have to go there, it's fine.  I have some great

13  friends in the Ninth Circuit, literally.

14          All right.  The way I just -- the analysis that I just

15  walked Ms. Gourley through is how I see this, unless there's some

16  case law out there to the contrary or something in the comments,

17  hidden in the comments when these were coming up or something

18  that would change that analysis.  So that is the invitation I'm

19  giving you in these three to four pages.  It's not to give me a

20  bunch of bull.  I'm not interested in it. Okay?

21          All right.  The next point is, as Ms. Gourley alluded

22  to, you can anticipate that I'm going to be instructing vis-a-vis

23  the Fifth Circuit pattern instruction on the use of depositions

24  unless there is some reason why that should not be the case.  If

25  there is some reason why that should not be the case, when you

 1    have -- you create your pretrial order, one of the questions that

 2    you are going to be answering are any questions of law or

 3    evidence that remain outstanding that have not already been dealt

 4    with by the Court in motions in limine or dispositive motions.

 5    If there's a deposition which has been designated, because

 6    everyone must designate by the time you do that, if not before,

 7    which ones are coming live and not, and then we can fight about

 8    it.  I would suggest you certainly need to do it before then

 9    because you have to do your deposition designations.  And if you

10    don't know which ones you're going to use, how can you do your

11    deposition designations, which I think are scheduled to be done

12    before the pretrial order is completed.  So logically that just

13    seems the case to me.

14            So if there is a deposition that we know is going to be

15    used and there's some reason why the Fifth Circuit pattern should

16    not apply, then you need to bring it to the Court's attention as

17    soon as you are aware of this by bringing it to the Special

18    Master's attention and no later than including it in the pretrial

19    order.  And then I will look at it and see if there's some reason

20    why that shouldn't apply, okay?  And inherent in that is

21    Mr. Pennock's argument, so we're going to have to know, all

22    right?  So those two things kind of dovetail, because I think

23    Mr. Pennock's right.  If you look at it in its entirety, you

24    can't cherry-pick whom you want to bring because this one, I

25    don't want to bring him because he or she might hurt me, and this

1    one, if you have control over them.

2            Now, if they are not your party or agent -- I mean, I

3    they are not your agent or your designee, et cetera, they don't

4    have control over prior employees unless there is some document

5    to the contrary.

6            And, Mr. Arsenault, I'm not suggesting that in order to

7    argue that point you have to have it authenticated.  But, you

8    know, we've got to have some sense that somebody signed it.

9    You're going to have to show, lay a foundation for Ms. Gourley

10   that, you know, whomever this person is that you want brought

11   live signed one of these documents.

12           MR. ARSENAULT:  Yes, Your Honor.  And we're E-mailing

13   that right now to Ms. Gourley.

14           THE COURT:  Great.  Okay.  All right.  Do I need to

15   review the pattern instruction that was argued about in the

16   brief?  I have it.  We can do it, Mr. Pennock.  No?

17           MR. PENNOCK:  I don't think so, Your Honor.

18           THE COURT:  I don't think so either, I mean, and it's

19   pretty standard, and you can expect I'll give it unless there's a

20   reason not to give it.  And that's inherent in all of this

21   argument.  So I think you know the analysis, you know what I'm

22   likely to do.

23           Plaintiffs, you have the burden of finding this

24   document as to people you want there.

25           Defendants, once they find that document, I think the

1    burden's on you to show that they are otherwise unavailable under

2    the rules.  I think that's how this is going to play out.

3           All right.  So as to Defendants' Motion in Limine to

4    Exclude Argument Regarding Witnesses Testifying by Deposition,

5    that's 3368, I guess I'm going to give you a chance to brief it

6    just to see if there's any case law out there.  Talk to the

7    Special Master; she'll tell you when your deadlines are on that.

8    Okay?

9           MR. PENNOCK:  Thank you, Your Honor.

10          THE COURT:  They don't let me mess with the calendar

11   much, so --

12          All right.  Chris, I'm deferring on that one, awaiting

13   additional briefing.  That one was interesting.

14          Okay.  The next one is Document 3370, Plaintiffs'

15   Motion in Limine to Exclude Any Reference to the Quantity of

16   Information Produced, the Number of Custodial Files Produced, or

17   Terabytes of Information Produced.  Basically, I can't deal with

18   this one without a context.  So I need to hear from both of you

19   as to why and within what contextual basis this might be

20   relevant.

21          You want to -- you want to -- you stood up.  You want

22   to go first, Mr. Pennock?

23          MR. PENNOCK:  I'm sorry, Your Honor.  Whoever you want

24   to hear from.

25          THE COURT:  Pop up's good.

1           MR. PENNOCK:  It was my motion.

2           THE COURT:  Again, this will come to trial.  When you

3    stand up, I will always comment on it because it's what

4    punctuates and I will stop whatever I'm doing.  So in --

5           MR. PENNOCK:  I'm sorry.

6           THE COURT:  No, that's good.  So in trial, if you stand

7    up, you can expect I'm going stop the witness or whatever because

8    I'm assuming that you want the Court's attention, unless you are

9    one of the second chairs sitting in the back and you are moving

10   computers back and forth, which is what was happening with

11   Mr. Arsenault and the gentleman behind him.  You know, that's

12   fine.  But if one of the primary trial attorneys pops up, and if

13   you pop up and I don't notice that you popped up, clear your

14   throat, okay, because sometimes I'm -- you will notice when I'm

15   really interested in a witness, I'm watching the witness, and I

16   may not see you in my peripheral vision.  So clear your throat.

17   Okay?

18           All right, Mr. Pennock.

19           MR. PENNOCK:  Thank you, Your Honor.  The -- a context,

20   an exemplar, if you will, for this is that, ladies and gentlemen,

21   understand, as you heard from Dr. Smutspuck from our company that

22   was on the stand, we have produced more information in this case

23   to these plaintiffs than exists in the Library of Congress.

24           THE COURT:  Okay.  Why is that not relevant?  And I'm

25   going to ask the defendants the same question.  Why is that

1    relevant?  Why is that not relevant?

2              MR. PENNOCK:  Yet they have come here and --

3              THE COURT:  No, no.  Why is that not relevant?

4              MR. PENNOCK:  Because it goes like this.

5              THE COURT:  I know what it goes like.  I want you to

6    tell me why it's not relevant.

7              MR. PENNOCK:  Because we couldn't possibly put into --

8              THE COURT:  No, no, no.  Why is it not relevant?  Why

9    is it not relevant, the fact that they produced all these

10   documents?

11             MR. PENNOCK:  It is not relevant because of the second

12   part of that.

13             THE COURT:  Okay.  Give me --

14             MR. PENNOCK:  The second part of that is, and what is

15   before you, are literally a handful of E-mails, a handful of

16   documents that they want to say over 20 years proves that my

17   client did all of these terrible things, from a terabyte of

18   information.  That's all they put here before you.  And so it's

19   not relevant because it'd be -- it's like:  Wait a second; we

20   really probably couldn't impanel a jury to sit here for three

21   years to go through each, and as the Court is better aware than

22   most, trials need to be boiled down to the evidence that

23   hopefully can carry the burdens in the case, and that indeed

24   there are rules against cumulative evidence, and so on and so

25   forth.

1          So, this kind of argument, when we hear it, it's very

2     hard to overcome it.  And I suggest we shouldn't have to because

3     it's not about the terabyte, it's about the byte.  It's about

4     what was -- what can we learn from these pieces of evidence.  And

5     the fact that there might be, for example, 1742 little pieces of

6     information in the new drug application, pages and pages and

7     pages, doesn't really impact or have any effect on the commentary

8     and the thought processes that are reflected in the two or three

9     E-mails about that new drug application and what they were really

10    thinking and what they were really saying about it and whether

11    they thought that, you know, it was a smoke and mirrors job on

12    the FDA.  That's not a document in this case; I'm giving you an

13    example.  So it's the bytes that matter, not the terabytes.  And

14    it's impossible to unwind that from a jury once they hear, yeah,

15    jeez, how come there's only 40 E-mails that we saw with all of

16    these -- how come -- because when things like this happen, they

17    don't happen over and over and over again through thousands and

18    thousands of E-mails through dozens of employees.  It's digging

19    in.

20          And in this particular case, it's even more important

21    than it usually is because there's -- there is some volume of

22    evidence, perhaps, not a terabyte, but certainly large volumes of

23    evidence that we have never seen, we will never see, and the

24    bytes in that body of evidence is not going to be seen by the

25    jury either.

1          So it's an argument of volume over fact.  And we've

2    heard it.  We have here, in this case, think that we should

3    exclude that argument.  We've heard it over and over again from

4    defendants before in trials, and it's something that strikes us

5    as being unduly prejudicial.

6          I mean, first of all, it's simply, we don't think it's

7    relevant, but we do think it's, at the very least, very

8    prejudicial and really not probative in the first instance of

9    anything that's happening up here on the witness stand or what

10   happened over the last 20 years.

11          THE COURT:  So you believe it's not relevant, for the

12   reasons given.  Plus, on a 104-403 analysis, you believe that the

13   probative value, if any, which you dispute, is outweighed by the

14   prejudice?

15          MR. PENNOCK:  Yes, Your Honor.

16          THE COURT:  All right.  Ms. Gourley, are you going to

17   be responding?

18          MS. GOURLEY:  Yes, ma'am.

19          THE COURT:  Why isn't he right?

20          MS. GOURLEY:  He's just not.

21          THE COURT:  Okay.  Tell me why.

22          MS. GOURLEY:  He's not right -- well, I'm going to say

23   one word right at the very beginning that ought to put an end to

24   this, at least for now, which is spoliation.  And while that

25   claim is pending, I find it astounding that he would stand up

1    here and say that the amount of information we have produced in

2    this litigation is not relevant to anything.  That's number one.

3          Number two, even setting that aside, I do think -- you

4    know, it's sort of akin to the cherry-picking you were talking

5    about before.  Mr. Pennock wants to say these four E-mails are

6    the only important things in this case.  Pay no attention to the

7    millions and millions of pages of studies that were contained in

8    the new drug application, to the documents that were provided to

9    the FDA, to the documents that have been compiled in connection

10   with all of the ongoing studies, including the KPMC study now and

11   the clinical studies that were done during the life of this drug.

12         Similarly, with respect to -- it's somewhat akin to the

13   argument made before about witnesses.  The plaintiffs will stand

14   up and say, "why didn't they bring Joe" -- who did you say?

15         MR. PENNOCK:  Dr. Smutspuck.

16         MS. GOURLEY:  Dr. Smutspuck?  Why didn't they bring him

17   to trial?  And I should be able to stand up and say, "We produced

18   to these plaintiffs 900,000 E-mails from him.  You didn't see a

19   single one."

20         There's lots of ways it can be relevant, Your Honor.

21   Predicting them all right now is difficult.  I think the amount

22   of effort, the amount of time, the amount of documents which have

23   been generated over this drug and this product since 1999 is

24   relevant to some issues in this case.

25         I know for sure that you're not going to be letting us

1    introduce cumulative evidence.  I would say as well that, given

2    the size of the exhibit lists as they currently exist, we may

3    well be introducing terabytes of evidence unless and until those

4    are whittled down.

5           I think this is potentially relevant.  It's certainly

6    relevant to the claims which I believe are being made by the

7    plaintiffs.  I guess that motion isn't due until next week, the

8    spoliation, whatever that motion is going to be.  But I think

9    the -- I think the amount of information, if it's not relevant at

10   all, I kind of wonder what I've been doing for the last two

11   years.

12          THE COURT:  Okay.  Now, in big green letters here was

13   spoliation.  I wasn't going to flag it for either side.  I do not

14   know whether or not this will end up being something that is

15   going to end up before the jury or not.  I don't know.  When I

16   say "this," I'm using an indefinite pronoun, and I will always

17   correct you when you do it, so I will correct myself on that

18   point.  When I say "this," I'm talking about the amount of

19   information produced, i.e., then additionally, spoliation.  I

20   don't know whether -- and I think, again, just as foreshadowing,

21   when we do talk about spoliation, and it is the elephant in the

22   room, please, do not conflate the question of whether spoliation

23   occurred or did not occur -- quite frankly, I think that's

24   probably a rather simple inquiry here -- with what happens if

25   that did occur.  That's the less simple inquiry, and the

1    interplay that gets popped up every now and then in some of these
2    cases with 37(c).  Those things are three separate prongs.  Don't
3    conflate them.
4            Now, that having been said, I think -- well, first, let
5    me go to some aspect.  This whittling down process, again, this
6    is why, to me, the pretrial order is sacrosanct.  You will have
7    whittled your exhibits down once you put them on that order,
8    because on the pretrial order, you have to give this Court some
9    indication as to what issue -- you don't have to play your hand
10   of how you're going to use it, but as to what issue that exhibit
11   is going to bear.  Otherwise, how do they know whether they have
12   a valid objection.  Again, remember, no genuine issue of material
13   fact, period, you lose.  It's very simple.
14           So, if the other side is going to know whether or not
15   they have a valid objection, they have to know to what issue.
16   You know, and that raises the question, well, it may be relevant
17   as to this issue, spoliation, Ms. Gourley, but it may not be
18   relevant, Mr. Pennock, to, my goodness gracious, I gave you 28
19   kazillion pieces of paper.  Because the argument there is:  Yeah,
20   I gave you 28 kazillion pieces of paper, which is sometimes one
21   of the defense strategies -- not in this case -- that happens of
22   hiding the needle in the haystack which happens to be one of this
23   Court's pet peeves.  You don't hide the needle in the haystack.
24   It only takes the one smoking gun.
25           So I think he has the stronger argument that it's not

1   relevant that you put in 28 kazillion terabytes, because a lot of

2   those terabytes -- now I'm getting outside my area of

3   understanding and into my area of ignorance -- Richard's

4   laughing -- it could have been E-mails about the birthday party

5   they were having on the 20th floor, you know.

6           So particularly in this case, because of the way the

7   parties chose to address it, which was putting as much out on the

8   table as, you know, we possibly could that wasn't privileged, and

9   then sorting through it; in this case, I think, Ms. Gourley, your

10  argument that you get to say I put out 28 million, is weakened.

11  I think it's severely weakened because the nature of this case

12  was that even the E-mails about the birthday party on the 20th

13  floor were put on the table.  So I really don't think that you're

14  going to be able to convince me to be able to make that argument

15  in this case given the unique manner in which this case went

16  forward with folding in predictive coding, okay, where everybody

17  agreed that we would go as broad as we could and then try to

18  whittle it down.  So I don't think that's fair to then say, well,

19  we gave them, you know, 28 kazillion terabytes, I don't know,

20  because you knew you were including the ones about the birthday

21  party on the 20th floor.

22          So, Mr. Pennock, I think you're probably on rather firm

23  ground that that argument will not be accepted by the Court.

24          Ms. Gourley, Mr. Parker, that argument probably will

25  not be accepted by the Court, because this case, the facts of it

1    just don't -- I'm not saying it would never be an appropriate

2    argument, but in this case probably not.

3         Now, that is not to say, Mr. Pennock, that there may

4    not be some other independent basis for relevance for that

5    argument, and I don't know.  So on that one I think I cannot rule

6    on this, certainly until after I've dealt with spoliation --

7    that's number one -- and we see whether or not that's going to be

8    something that is going to come to the jury's attention.

9         And that's the other thing that I have alluded to with

10   the Special Masters, you know.  Depending upon how this motion on

11   spoliation gets laid out by the two parties, whether it becomes a

12   37(c) issue, versus a spoliation issue.  If it's a 37(c) issue, I

13   don't think that involves the jury.  If it's a spoliation, it

14   might involve the jury.  Okay?  So, again, that's why you don't

15   want to conflate these things, guys and gals.  Don't conflate

16   them.  So I don't think I can rule on this one until after I've

17   ruled on spoliation.  That's number one.

18        Then number two, after I've ruled on spoliation --

19   because I see this issue as separate.  We've got the general

20   argument that Mr. Pennock made, and we've got the potential

21   spoliation argument, maybe, maybe not.  The spoliation argument

22   will be illuminated by the ruling the Court makes on spoliation.

23   And I'm assuming -- I could be wrong -- but I'm assuming 37(c)

24   will be folded in as an alternative.  Maybe I'm wrong.  And if

25   not, that's fine, too; but depending upon how it's presented.

1    So once I deal with that, then that is not to say,

2  Mr. Pennock, that there might not be some way or some bases, as

3  Ms. Gourley alluded to, that it might be relevant.  I can't

4  envision that.  I don't know the facts here.

5    So much like with the people that don't come, whatever,

6  and I gave you the opportunity to bring it up outside the

7  presence of the jury, Mr. Parker, Ms. Gourley, and Ms. Pruitt in

8  the second trial, if we get to the point where you think this is

9  going to be relevant, then please bring it up outside the

10  presence of the jury, and I'll give you the opportunity to argue

11  that point.  Now that doesn't mean I'll let you; doesn't mean I

12  won't let you.  It means I'll give you the opportunity.  You're

13  going to have to show me why it is relevant.

14    Now, so on this one, Chris, it is granted in part and

15  deferred in part.  It is granted, Ms. Gourley, as to

16  Mr. Pennock's argument that we gave -- you know, the defendants

17  gave 37,000 terabytes of information.  That is not an argument,

18  given the unique discovery engaged in, in this case, and the

19  manner in which discovery was agreed to be engaged in.  I just

20  don't think it's a fair argument.  It's overly prejudicial on a

21  104-403 analysis and has very little probative value as to the

22  issues before the jury.  So on that point, granted.

23    It is deferred until -- no.  It is granted, but with no

24  prejudice to the defendants' right to bring it up again at trial

25  outside the presence of the jury should they find that they

 1    believe that there is an independent relevance that has been

 2    established.

 3             It goes without saying, you don't put it in your

 4    opening statement; you don't argue that to the jury without

 5    having gotten permission from this Court.  Whether it'll end up

 6    in your closing arguments or not, we'll just have to see how the

 7    trial goes.

 8             All right.  Chris, I will defer on that aspect that

 9    might relate to spoliation until after the Court has ruled on

10    spoliation.

11             And, Shree, we'll need to pull this one back up and

12    make certain I rule on it after that point in time.

13             THE CLERK:  Okay.

14             THE COURT:  And if I forget, Mr. Pennock, remind me,

15    because it's your motion.

16             MR. PENNOCK:  Yes, Your Honor.

17             THE COURT:  Okay.  All right.  That's that one.

18    Cathleen, you need a break?

19             THE REPORTER:  Yes, ma'am.

20             THE COURT:  We're going to take Cathleen's break, about

21    five or ten minutes, and I'll let you know in a minute.

22             We still have several we have to go through.  You can

23    anticipate that at some time after 1:00, but before 2:00 o'clock,

24    I will be taking my break, a quick break for lunch, and then we

25    can come back and finish these if we have not already finished

62

```
1    them.  I hope we will have finished them because -- but we'll
2    see -- because I have to read to my granddaughter between
3    1:00 and 1:30.  That's her bedtime.  And depending upon when she
4    gets her teeth brushed, it's between 1:00 and 1:30 our time,
5    which is 8:00 and 8:30 her time.  My granddaughter, you will hear
6    about her, Mr. Parker and Ms. Pruitt, she lives in Bavaria.  So
7    you know, you can pick up something to eat, but we'll have a
8    sense.  We may just go read and come right back and finish it up
9    if I'm almost done.  All right.  It is -- let's be back at 12:00.
10                        (Recess taken.)
11              THE CSO:  All rise.
12              THE COURT:  Okay, you may be seated.  All right, got
13    another minute.
14              Carmen, there are six.  There was one that was stuck
15    together.
16              Okay.  Is that everybody, because technically you have
17    another minute, so --
18              MR. PENNOCK:  We're good to go, I think.
19              THE COURT:  Okay, cool.  All right.  I understand
20    there's some travel complications.  Ms. Pruitt, you have to try
21    to get back at 2:00 something, or something?
22              MS. PRUITT:  Yes, ma'am.  If I could ask permission to
23    leave when you take your break.
24              THE COURT:  Well, if you do that, you may be here at
25    10:00.  I'm not good at taking them normally at a normal time,
```

1    but you can leave in time to make your plane.

2              MS. PRUITT:  Thank you, Your Honor.

3              THE COURT:  You're welcome.  But be sure you talk with

4    Ms. Gourley and she'll get you up to speed, and Mr. Parker,

5    because you see now the nuances that play out here, okay?

6              Okay, all right.  The rest of you I think it's 3:00-ish

7    or something?

8              MR. PENNOCK:  Yes, whenever.  At your pleasure, Your

9    Honor.  Although I will say that we spoke at the break, I spoke

10   with Jack and Bruce and Sara, and on two of the three remaining

11   motions, the parties agree that you might want to defer them,

12   although we're fully prepared to argue them.  And that's the

13   vitamin C and the Lipitor motion.

14             THE COURT:  Okay.  Well, we'll come to that one.

15             MR. PENNOCK:  Those are two motions.

16             THE COURT:  Cathleen, we're not on the record.

17                        (Off the record.)

18             THE COURT:  Carmen?  I'm sorry.

19             DEPUTY SPECIAL MASTER RODRIGUEZ:  People who need to

20   catch planes at 3:15, so they'll need to leave about 2:00 or so

21   is what time we need to finish if we possibly can.

22             THE COURT:  Okay, we will shoot for that.  Now that

23   having been said, then, what we'll probably do is work straight

24   through except for the time I will have to stop and go read to

25   the baby, because that's my lunch hour and I'm not giving that

1    up.  Hopefully, I'll find my cell phone, and I can Viber the kids

2    and ask them what time they think it's going to happen.

3           Cathleen, this isn't on the record.

4                      (Off the record.)

5           THE COURT:  All right.  The next one that comes up --

6    and Shree, if the other two stick together, remind me -- Document

7    3371, Plaintiffs' Motion in Limine to Exclude Any Mention That

8    Lipitor is Alleged to Cause Cancer.

9           Now, I think from what I heard from Mr. Pennock, both

10   parties agree there's no need for an opposition at this time.

11   Rather, what I had thought I would do would be defer until after

12   the *Daubert* motions and hearings.  Is that accurate?

13          MR. PENNOCK:  Your Honor, yes.  We were prepared to

14   discuss, but we think that's probably the best course.

15          THE COURT:  I agree.  Now the only thing that I would

16   ask there is that, when you're doing it, no one has told me in

17   what I have read whether Mr. Allen took Lipitor.  That seems to

18   be a rather relevant piece of information, and no one has told me

19   that, so I would like to know that.  Did he take it?

20          MS. GOURLEY:  He did, Your Honor.

21          THE COURT:  Cool.  How long did he take it?  Did he

22   quit taking it before, after?  Do we know?  Find out; let me

23   know.

24          MR. PENNOCK:  Yes, Your Honor.  I think what will be

25   the fundamental issue here on the Lipitor is that there is not a

1    defense expert ascribing any part of the causation of his bladder

2    cancer to Lipitor.

3         THE COURT:  And if that's the case, then we won't have

4    an issue.  Ms. Gourley looks like a goldfish wanting to get air,

5    so I think she's going to disagree.  So there you go.  We'll just

6    see how it comes up, and if there's an expert that does it --

7         MS. GOURLEY:  I do disagree, Your Honor, both with the

8    characterization and the statement made, but I will agree,

9    obviously, to defer this until after, after the *Daubert*.  We

10   would -- if these kind -- if you would like us to file a response

11   now, we can to address the claims Mr. Pennock just made.

12        THE COURT:  No, no, no.  What I put here is ask if need

13   opposition.  I will likely defer until after Daubert.  Without an

14   expert, it's probably too speculative.  However, remember when

15   you're arguing this, there are multiple issues at play here.

16   There could be -- I can envision maybe, but I'm not sure, and I'm

17   not going to flag it for you, so I want y'all to think about to

18   any of the issues that might be coming before the Court and the

19   jury, but I also think it's very interesting to know whether or

20   not Mr. Allen took it, when he took it, for how long, et cetera,

21   if I'm going to -- if she does, Mr. Pennock, have an expert

22   that's going into this.

23        MR. PENNOCK:  Yes, ma'am.

24        THE COURT:  Y'all are going to argue that.  We'll deal

25   with it at *Daubert*.  She does or she doesn't.  Or she does and

1    it's outside the scope, you know, whatever.  We'll deal with it

2    at Daubert.

3           Shree, did we ever find the answer to the question

4    about New York law, sole, significant cause or --

5           All right, guys and gals, I want you to get me one

6    page, okay, each side.  I want to know under New York law, under

7    the applicable products liability law, I want to know whether or

8    not the alleged offending product, and I'm using that as a

9    generic, has to be the sole cause, has to be a significant cause,

10   has to be contained within a differential diagnosis, et cetera.

11   Two pages maximum, normal font, and give me your case law.  All

12   right?  It's New York law.  All right?  So that is relevant, and

13   I need to know, and I'd like to know that before I hit *Daubert*.

14          Mr. Pennock, you stood and then sat back down.

15          MR. PENNOCK:  I was just saying very good, Your Honor,

16   we'll take care of that right away.

17          THE COURT:  Cool beans.  All right.  Get that for me.

18          MS. GOURLEY:  Do you have a date by which you would

19   like this, Your Honor?

20          THE COURT:  You can negotiate that with Ms. Rodriguez.

21   But I really would like to have that one; I'd like to know that.

22   That bears on a lot.  And Shree and I have been trying to get to

23   it, but I keep pulling him off on doing other things.  We're

24   trying to get that Bowerman completely finalized.  Every time I

25   think I have it finalized, it slips sideways on me, so -- it's a

 1    sideways kind of slippery thing.

 2              All right.  I wish the Arkansas Supreme Court had been

 3    a little more distinct, but that's not the point here.

 4              So I want to know that.  If you agree, it would just

 5    be, you know, hunky-dory, peachy-keen, marvelous if you would say

 6    we agree and this is what it is.  And this is your primary case.

 7    You know, the New York Supreme Court lays it out in this case.

 8    That would be marvelous.  If you disagree, then please set it up

 9    in your one page so that I understand where the tension is

10    between the two arguments, all right?

11              Now the small bit of guidance that I will give you on

12    this one is that this is not going to turn into a mini trial on

13    whether Lipitor causes cancer or not.  You know, the tail is not

14    going to wag this dog.  So don't expect the tail is going to wag

15    the dog because, you know, it's not.

16              Oh, I said Arkansas Supreme Court.  I meant New York

17    Supreme Court.  It's the Arkansas Supreme Court that has not been

18    helpful on Bowerman, on exaction on Bowerman.

19              MS. PRUITT:  Sometimes their opinions aren't helpful in

20    certain other areas as well, Your Honor.

21              THE COURT:  Well, they have not been helpful on that

22    one.  And every time I think I have it, it slides sideways on me.

23    No, it's the New York Supreme Court -- thank you, Shree -- that I

24    want to know under the applicable products liability law.  And

25    then I'm assuming -- and this is an assumption on my part -- that

1    if New York has a products liability statute, which I understand

2    it does, I've actually kind of looked at it, that that -- there

3    will not be other tort claims outside of the products liability

4    statute.  And if one is arguing that there are, then I need to

5    know what you are arguing and on what basis.

6            For instance, in Louisiana, you want to bring a

7    products liability claim, you bring it under the products

8    liability statute.  So if you're going to have a products

9    liability claim plus some other tort that the New York Supreme

10   Court has said you can have, then flag that for me so I know, all

11   right?  And then I want to know what the elements and the

12   standard are under that one.

13           I think, as I understand it, again, failure to warn

14   falls under the products liability statute as well.  All right.

15   So I would very much like to have that.

16           And again, whether Lipitor causes cancer, in my

17   opinion, is irrelevant and it is misleading and it is beyond the

18   ability to help the jury make any decision.  Whether Lipitor

19   might or might not cause bladder cancer is a different matter,

20   perhaps, I don't know.  So I'm not -- so don't frame this in

21   terms of, well, it causes cancer.  I don't care whether it causes

22   cancer, and I don't think the jury cares whether it causes

23   cancer.  On an analysis that is overly prejudicial because it's

24   perhaps not probative to the injury that this particular

25   gentleman might or might not have suffered.  So I don't care

1    whether it causes cancer, okay?

2          And when I was reading the information that was

3    provided, I didn't find that that particular aspect had been

4    painted with a sufficiently narrow -- either turn off your mic or

5    don't tear your pages, Richard -- a particularly fine enough

6    brush.  All right?

7          Okay.  Let me see.  And there's one other thing I'm

8    going to be interested to see if it gets brought up in your --

9    when we argue this.  So when you think about whether this is

10   relevant, I want you to think about as to -- thank you, Carol.

11                      (Off the record.)

12         THE COURT:  As to what issue.  There are multiple

13   issues here, and there could -- I'm not saying there's no way it

14   may be relevant; I don't know.  But I'm not going to flag it for

15   you.  All right.  If you'll excuse me one moment.

16                      (Off the record.)

17         THE COURT:  All right.  So on that one, Chris, did I

18   give you the document number?  I don't think I did.  That was

19   3371, Plaintiffs' Motion in Limine to Exclude Any Mention That

20   Lipitor is Alleged to Cause Cancer.  That is deferred until after

21   the Daubert hearings.

22         Shree, put it on our list.

23         Again, please deal with bladder cancer, per se.  That's

24   the alleged problem that this gentleman has.  Additionally, be

25   issue specific if you want to try to get it in, Mr. Parker.  Be

1    issue specific.

2              And then, Mr. Pennock, if you want to keep it out, you

3    know, probably so you don't have to play your hand, if they do

4    their response, remind me I told you you'll have a brief reply.

5    If this doesn't get done until after the Daubert hearing, you can

6    anticipate it might well be done in this venue and forum of oral

7    argument.

8              MR. PENNOCK:  Very good.

9              THE COURT:  All right.  Okay.  The next one, Document

10   Number 3372:  Plaintiffs' Motion in Limine To Exclude Any

11   Reference To Any Mention That Vitamin C Has Been Alleged to Cause

12   Cancer.

13             Now I see this as a little bit different than Lipitor,

14   quite frankly, because Lipitor may or may not have a warning

15   label.  Lipitor may or may not have, you know, tests and studies

16   that have been vetted.  But again, we're not going to turn this

17   into a mini trial on Lipitor.

18             Vitamin C is a little looser, from what I gather, here.

19   However, it is likely that this Court would grant this motion

20   unless there is an expert with testimony that would, in fact,

21   convince this Court that this is sufficiently relevant.  So I'm

22   likely to defer until after the Daubert.

23             But again, Mr. Parker, I'm not interested in whether or

24   not the internet says that vitamin C can cause "cancer."  Nor am

25   I interested in whether or not any given expert might say that

1   vitamin C causes cancer.  I think that is overly broad, therefore

2   misleading, and therefore on a 104-403 analysis, the probative

3   value, if any, is outweighed by the prejudicial value, and it

4   will not be allowed.

5          So if you're going to try to get this in, you're going

6   to have to have expert testimony that's going to make it

7   sufficiently relevant as to the malady that this gentleman

8   actually is experiencing, i.e., bladder cancer.  And it's going

9   to have to be sufficiently hammered out, if you will, at the

10  Daubert hearing that what he or she is relying on is not,

11  metaphorically speaking, coming off the internet.

12         And again, I'm not going to let this become a trial on

13  whether or not vitamin C causes cancer or does not cause

14  "cancer."  So I think you have the short end of the stick here,

15  but I will defer until after the Daubert hearings.

16         And Shree we'll bring it back up on our list after

17  Daubert.

18         Again, because Daubert will be so late in the game, you

19  can likely anticipate that this will be a -- done in this venue

20  of oral argument.  So kind of keep this in the back of your mind.

21         I really think you have the short end of the stick on

22  this, Mr. Parker.  Are you planning on putting forth evidence

23  that vitamin C causes bladder cancer?

24         MR. PARKER:  No, Your Honor.  And I explained to

25  Mr. Pennock, we make no claim that Lipitor or vitamin C caused

1    bladder cancer in humans.  The evidence on vitamin C in

2    particular, Your Honor, goes to an entirely different issue in

3    this case.  Has nothing to do with case specific causality.  The

4    issue here, Your Honor, has to do with the front end of this case

5    with respect to plaintiffs' experts in the cases that we've tried

6    who have testified that the explanation and the analysis of the

7    bladder cancer in the laboratory animals was faulty, i.e., the

8    crystal theory, and part of the reasoning given by the experts at

9    that time -- not today, but at that time in 1996 to 1999 was, in

10   fact, that Pioglitazone, Actos, and many other chemicals and

11   agents like folic acid, vitamin C, were shown to induce bladder

12   cancer in laboratory animals through the same mechanism that was

13   seen with Actos.

14          So it is an issue that goes to the reasonableness of

15   the company's position in negotiating and discussing the animal

16   data with the FDA from '96 to '99, which has been criticized by

17   some plaintiffs' experts.

18          We have never argued and do not intend in this case to

19   argue that Mr. Allen's use of Lipitor or vitamin C caused his

20   bladder cancer, and we've told that to Mr. Pennock.

21          THE COURT:  Well, that's helpful.  That would have been

22   helpful to have known.

23          MR. PARKER:  I told him that.

24          MR. PENNOCK:  Well, wait a second, Your Honor.

25          THE COURT:  Whoa, whoa, whoa, don't start with "wait a

1    second."  That's argumentative.

2            MR. PENNOCK:  I'm sorry.

3            THE COURT:  Just take a breath.  We're going to come

4    back to that.  That would have been helpful to know.  So let's

5    get the record straight.

6            Mr. Parker, I'm putting you on the record.

7            MR. PARKER:  Yes, Your Honor.

8            THE COURT:  You and the defendants do not intend --

9    and, Ms. Pruitt, this is going to bind you in the second trial

10   unless you bring to my attention why it should not prior to

11   trial, that you do not intend with your experts or in argument,

12   opening, closing, or by inference in questions asked intend to

13   argue that Lipitor, and the fact that Mr. Allen took Lipitor or

14   vitamin C, and the fact that Mr. Allen took vitamin C,

15   contributed to or caused his bladder cancer; is that correct?

16           MR. PARKER:  Absolutely.

17           THE COURT:  Okay.  So on that point, Chris, it's

18   granted by way of stipulation of the parties.

19           Now, as to whether or not, Mr. Pennock, it can be --

20   "it" meaning the fact that, in certain studies in 1990-esque, it

21   was shown that perhaps Actos had a certain consequence or

22   response and that was handled in a certain way with the FDA, that

23   they can come back on cross with one of your experts who might

24   have testified that Actos did not handle that discussion or

25   interplay with the FDA in a reasonable fashion, that in fact that

1     was that they had the same result, didn't they, with the same

2     mechanism, as to vitamin C.  That seems like a persuasive

3     argument.  At this time, Mr. Pennock, would you like to be heard?

4              MR. PENNOCK:  If I may, Your Honor.

5              THE COURT:  Certainly.

6              MR. PENNOCK:  I want to make sure that the Court

7     appreciates that my -- the first time I heard the basis for

8     opposing our motion was from Mr. Parker at the break.  So I think

9     he said, I keep telling him that.  I've only heard it once, and

10     he wasn't nearly as articulate as he was here in court, nor would

11     I have expected him to as we walked by each other in the hall and

12     had this discussion.

13              THE COURT:  Hold that thought.  Okay.  Everyone here is

14     of a certain age, except probably Shreedhar and maybe Ms. Pruitt.

15     Maybe not Mr. Lanier, I don't know.  Do you remember Cool Hand

16     Luke?  All right.  Do you remember what the bull would say to him

17     every time he beat him violently about the head and shoulders?

18              MR. PARKER:  Yes, Your Honor.

19              THE COURT:  What was it, Mr. Parker?

20              MR. PARKER:  We have a failure to communicate.

21              THE COURT:  Thank you very much.  Don't let this happen

22     again, guys and gals.  Sit down, make certain that we don't have

23     a failure to communicate.  Clearly he didn't understand it, and

24     he's an honorable man.  Clearly Ms. Gourley or somebody thought

25     they'd told him.  And she's an honorable woman.  Guys and gals,

1    sit down and make certain you understand it.  This is not --

2    because I'm working on this stuff.  Sit down and talk.

3              That's from which the folklore of the fire breathing

4    dragon comes.  Okay.  Sit down and talk about this.  Don't let it

5    come up here:  Well, that's the first time I've heard it.  No, I

6    told you.  I am not interested in that.  I've already raised my

7    children.  They live in Bavaria, okay?  So, come on; sit down and

8    talk about it.

9              Now, Mr. Pennock.

10             MR. PENNOCK:  Yes, ma'am.

11             THE COURT:  As you were saying, let's assume that I

12   have now pinned him to the wall like a butterfly, okay, on a

13   specimen board, so he's not going to make that argument.  All

14   right.  What he is going to make an argument on, he says, is if

15   one of your experts, if I'm understanding him correctly, one of

16   your experts wants to testify that Actos -- I mean, Takeda or

17   whomever, the Takeda entities, their interaction with the FDA was

18   less than stellar -- I'm using deliberately generic terms here --

19   because here we had all these tests way back then.  Then I think

20   he gets up and gets to be able to say:  Well, wasn't three a test

21   on vitamin C during the same time, using the same mechanism that

22   had the same result?  He gets to ask that question.  Why wouldn't

23   he?  You want to think about it and do a brief?

24             MR. PENNOCK:  I would like to think about that, Judge,

25   because I think there's a lot of foundation that would be

1    lacking, number one.

2          THE COURT:  Well, he's going to have to lay his

3    foundation.

4          MR. PENNOCK:  I also think that there then becomes --

5    you know, it could be very confusing if we start talking about

6    things like vitamin C causing cancer in animals and what does

7    that have to do --

8          THE COURT:  No, I don't think that's where he's going.

9          MR. PENNOCK:  I'm not saying that's where he's going,

10   Your Honor.  I'm saying I think there are potential confusion

11   issues that might require an exclusion of that, but I would like

12   to write on that if I may.

13         THE COURT:  Think about it.  Think about it.  All

14   right.  I'm going to tell you what.  Mr. Parker, you get him two

15   to three pages about how you intend to use this evidence.

16         And then, Mr. Pennock, you get two to three pages

17   response on why no.  Okay?

18         MR. PENNOCK:  Yes, Your Honor.

19         THE COURT:  Don't get off on it causes cancer because

20   he's not going there.  You can get a copy of this record from

21   Cathleen, and you can print that out and give it to Mr. Lanier,

22   and he will wave it at the time of trial, all right.

23         So talk to Carmen about your deadlines on that, all

24   right, and then I will still defer, but it might be there's not

25   much to deal with here.  With that stipulation, that takes care

1    of the causing cancer business, quote, unquote.

2           If he only puts it forth, if your guy wants to try to

3    nail them, hey, I think that's fair game on cross.  I really do.

4    If they want to say -- your people want to say Actos knew back in

5    1996 because of this study, you know, and therefore they are bad

6    people, I think he gets to stand up and say:  In 1996, wasn't

7    there also a study that said vitamin C causes cancer under the

8    same mechanism, same conditions, et cetera, et cetera?  Then you

9    get to come back and say:  Well, it really wasn't the same, was

10   it?

11          Now there will come a point in time where we're

12   spending more time on the tail than the dog, and I'm not going to

13   let us go down that path entirely.  That's why this motion in

14   limine will help us, but, okay.

15          All righty.  Now I'm going to ask that, Mr. Parker, you

16   go first on that one because he's saying this is the first time

17   he's heard that one.

18          And Mr. Pennock, you get to respond on the two to three

19   pages.

20          Carmen, you wanted to --

21          DEPUTY SPECIAL MASTER RODRIGUEZ:  Judge, am I right

22   that you want this on both the Lipitor and vitamin C?

23          THE COURT:  Please.  Yes, both the Lipitor and the

24   vitamin C, because he's saying that's the same thing as to

25   Lipitor.

1          Am I not correct, Mr. Parker?

2          MR. PARKER:  Yes, Your Honor, you are correct.

3          THE COURT:  So the stipulation that I just pinned you

4    down on ties to Lipitor and vitamin C, correct?

5          MR. PARKER:  Absolutely.

6          THE COURT:  All right.  You can wave it, Mr. Lanier.

7          MR. LANIER:  I will.

8          THE COURT:  All righty.  Okay.  So as to Lipitor and

9    vitamin C, Parker, you go first because he now knows -- he now

10   understands what that was.

11         And Ms. Pruitt, whatever happens here is going to

12   happen in your trial, unless you can give me a reason why it

13   should be different.

14         MS. PRUITT:  Yes, Your Honor.

15         THE COURT:  All right, the next one.  All right, so

16   let's see.  Chris, let me go back.  3372, the Court orders

17   additional briefing.  Deadline to be declared by the Special

18   Master, Shree.

19         Carmen, get it, you know, folding it in with everything

20   else we've got to do, let's go ahead and get this one as quickly

21   as possible, but certainly so that I have time to look at it

22   before I get into the expert reports for Daubert prep.  Okay.

23         So as to 3372 and as to 3371, the Court has ordered

24   additional briefing with the defendants to take the lead, two to

25   three pages.  Thereafter, the plaintiffs can reply, two to three

1    pages.  Deadline to be set by the Special Masters.

2            And once I have that briefing, the Court will determine

3    whether I will need to defer until after the Daubert hearings.

4    So I'm waiting on briefing on those, Shree, Chris.  So I didn't

5    defer; I've ordered briefing.

6            Okay.  All right.  The next one, Document Number 3373,

7    Plaintiffs' Motion in Limine to Exclude any Reference to

8    Conditions in Plaintiffs' Medical Records That Were Never

9    Diagnosed by a Physician.

10           Okay.  Now, again, if there's some confusion as to why,

11   who is doing what, Mr. Parker, y'all intend to bring this up?

12           Ms. Gourley, y'all intend to bring this up?

13           MS. GOURLEY:  Your Honor, my only point on this one was

14   the condition for which this motion was brought is a reference in

15   the plaintiff's medical records to --

16           THE COURT:  This the gastritis one?

17           MS. GOURLEY:  Gastroparesis --

18           THE COURT:  Yeah.

19           MS. GOURLEY:  -- yes, which, Your Honor, diabetes is a

20   risk factor for developing that disease and may have some bearing

21   on -- and may have some bearing on the severity of Mr. Allen's

22   diabetes, which is, I think, fair game in this trial.  In fact, I

23   think having put his medical condition at issue, I don't think

24   the plaintiffs can pick and choose what conditions or diagnoses

25   out of his medical records we are or are not allowed to discuss,

1  having to do with his diabetes and bladder cancer.  This goes to

2  that.

3        And obviously, if they think it is never diagnosed by a

4  physician and completely irrelevant to the case, presumably they

5  deal with that on cross-examination and make me look like a fool

6  for having raised it.  But I don't think, having put his medical

7  condition at issue, having brought this suit because he alleges

8  an injury from taking a medicine used to treat his diabetes, that

9  conditions which are associated with diabetes or anything else in

10  his medical record can be declared off limits by the plaintiffs.

11        THE COURT:  Who wants to respond for the plaintiffs?

12        MR. PENNOCK:  I will, Your Honor.

13        THE COURT:  Okay, go ahead, Mr. Pennock.

14        MR. PENNOCK:  You're probably tired of hearing from me.

15        This particular condition he was not diagnosed with.

16  And the point of our motion is that they ought not be able to

17  pick questions that doctors might have popped to their head as to

18  a problem that Mr. Allen might have had and then they make a

19  note, "question of gastroparesis," but he's never diagnosed with

20  it, and there's no evidence that he had it at all.  In fact, this

21  was a fairly self-limiting problem that he had in terms of, I

22  think it resolved in something like seven days.

23        So there simply is nothing in his medical record that

24  he suffered from this condition which probably would not go away

25  or suffers from it, and therefore they should not be able to

1    throw that one against the wall.

2            Now, with respect to -- I may note, as I mentioned to

3    Sara, I think, yesterday in my E-mail, we are withdrawing --

4    these motions are not on for today, but we are -- they are not

5    on.  The two motions that are not on are the toe amputation.

6            THE COURT:  I've already looked at that one.  They're

7    on today, aren't they?  They're on.

8            MR. PENNOCK:  Okay.  They were filed --

9            THE COURT:  They are up, they're on.

10           MR. PENNOCK:  They were filed on October 7th.

11           THE COURT:  Can't speak to that.  They're up, they're

12    on.  I've got them.

13           MR. PENNOCK:  Well, I'm sorry, Your Honor.  We filed

14    those on 10-7.  I didn't understand --

15           THE COURT:  Those were the two late filings.

16           MR. PENNOCK:  Yes, Your Honor.

17           THE COURT:  Late filings get thrown in, and if I get

18    another late filing, I shall beat you all violently about the

19    head and shoulders.  They get thrown in with the regular group.

20    So, yeah, those were the two that came in late.  So, yep, they're

21    up.

22            All right.  And we're going to talk about that.  But

23    let's go back to this one.  And if you're going to withdraw that

24    one, I will talk about that in a minute when we get to it,

25    but let's -- I'm very methodical, Mr. Pennock.

1              MR. PENNOCK:  I understand.  Thank you.

2              THE COURT:  Let's go with this one.  As to this one,

3    now is the treating physician -- there are two, as I understand

4    it, a male and a female.  And the only reason that's relevant is

5    because I can distinguish it.  The male came first and the female

6    came later, and I don't remember their names.  So, am I not

7    right?  Didn't the male doctor treat him for a time and then the

8    female doctor who starts with an "A," she came after him?

9              MR. PENNOCK:  Yes, Your Honor.

10             THE COURT:  All right.  Are these two treating

11   physicians going to be testifying at trial?

12             MR. PENNOCK:  By video, trial video.

13             THE COURT:  Have you already taken those trial videos?

14             MR. PENNOCK:  No, Your Honor.

15             THE COURT:  Okay.  All right.  If they are going to be

16   testifying at trial, I think that the defendants can go into

17   whatever is in the medical records.  I think she gets to ask

18   about what is this that, you know, it's not double hearsay.  It's

19   not like where you have an emergency doctor's records and the

20   intake nurse rights down "he was stewed," you know.  I mean, she

21   doesn't know whether he was drunk or not.  That's hearsay within

22   hearsay.

23             Here's that he had some kind of an indigestion issue,

24   to put it in the plaintiff's sense, and he had possible

25   gastro-whatever, to put it in the defense.  Ask the doctor, it

1    seems.

2           Now I don't think, Ms. Gourley, that that gives you the

3    right to ask:  Did he not have, you know, gastromelitis [sic], or

4    whatever?  I mean, I guess you can ask it.  And the doctor will

5    say, no, because based upon what I saw here, it resolved; it was

6    never diagnosed; they didn't know whether that's what he had or

7    not.  And I think it's a double-edged sword if you try to start

8    bringing up stuff that's really not relevant and you get shot

9    down on cross.

10          But if it's in his medical records, I think they get to

11   bring it up.  Now what arguments they get to make off of that,

12   that's a different matter.  So let's see what the doctors are

13   going to say, okay?  And if the doctors say, no, it wasn't that;

14   it resolved in seven days, et cetera, et cetera.  If you shoot

15   her down in that, she might well want to edit it out when you're

16   doing your final editing and we won't have to waste the time in

17   front of the jury.  If you don't shoot her down with the doctor,

18   then she was right, there is some potential relevance here.  So

19   let's see what the doctors do on that one.

20          But I -- my gut on that one, Ms. Gourley, just so

21   you'll know, is that it was too speculative; it's entirely too

22   speculative, and I didn't know why it was relevant, because what

23   they have here, he was treated with -- I'm on page 2.  He was

24   treated with nausea medication, which later resolved the nausea

25   and vomiting.  The records go on to state, quote, there was

1    some ? -- and that's a question mark, Cathleen, not the word --

2    as to whether he [plaintiff] has gastroparesis, or whatever.

3              Now, if that's all that's in the records, even if you

4    don't shoot her down in the video, make your objection at the

5    time as being overly speculative.  When you do your editing, one

6    of the things that we'll do with the video is you're going to

7    have to show me where there are -- in any deposition -- any

8    objections you want the Court to rule on, edit out all other

9    objections.  I will rule on them.  Whether I will rule on them

10   ahead of time or contemporaneously in front of the jury so that

11   they will have the benefit of the objection will depend upon the

12   nature of the objection.  And you might still get it out, because

13   I'm not going to spend three hours arguing about something that

14   was never diagnosed.

15             I really don't think this is your strongest argument,

16   Ms. Gourley, and Mr. Parker.  Quite frankly, I think this is not

17   likely to make it out of the wash.  But with the, you know, try

18   if you want on cross with the doctor and let's see where it goes

19   because there may be something underneath that of which I'm

20   unaware.  But do not expect, in your trial strategy, that I'm

21   going to let you spend three hours trying to prove up whether

22   gastroparesis actually means he has severe diabetes or not.

23             Now I'm going to take two steps back.  Why is this

24   potentially relevant at all was my original question.  I went

25   back to the New York products liability law, and on the design

1    defect, it's a risk benefit analysis as to the utility.  And that

2    might or might not be why it might or might not be relevant.  I

3    don't know, okay?  But the tail will not wag the dog.

4         So on this one it is denied, okay, but with no

5    prejudice to the plaintiff's right to reurge it after the video

6    depositions of the treating physicians have been taken.  And I

7    strongly urge the two of you to come to agreement on this once

8    you see what washes out with the treating physicians, because

9    Mr. Parker, Ms. Gourley, I don't think you have a winner here.  I

10   think you're going to lose on this one, but we'll wait and see.

11        All right.  So, Chris, denied with no prejudice to the

12   rights of the plaintiffs to reurge their position after the video

13   depositions of the treating physicians have been taken.  That's

14   3373.

15        The next one is 3374.  All right.  On this one I think

16   the Special Master should have talked with you about this one.  I

17   want a response on this one by the 22nd at 4:30.  I ask that you

18   don't paint with an overly broad brush.

19        Carmen, you're standing up.  Am I misspeaking?

20        DEPUTY SPECIAL MASTER RODRIGUEZ:  Judge, can we have

21   the title of that motion?

22        THE COURT:  Oh, I'm sorry.  Plaintiffs' Motion in

23   Limine to Preclude Testimony/Argument That Lack of Statements by

24   the FDA and Other Entities such as the ADA, ACA, SUO, AUA, ASCO,

25   CDC, NIH, and URH is Evidence Regarding General Causation With

 1    Respect to Actos Causing Bladder Cancer.

 2              I'm sorry.  If you see me looking down, I'm not

 3    checking my stocks, I don't have any; I'm a government employee.

 4    I'm checking to see about the other matter I had mentioned to

 5    you.

 6              First, in the response, please do not blend the factual

 7    distinctions, as well as the different aspects of the exhibits.

 8    All right.  Now, first, I am -- I hope I am correct in assuming

 9    that the questions from different depositions that were included

10    here are not being submitted, asking this Court to rule on the

11    questions as being objectionable in and of themselves as to when

12    you are dealing with the deposition excerpts.  I'm assuming that

13    will be dealt with later in that venue.  So I am not looking to

14    these in that light at this time, but rather merely as support

15    for the plaintiff's argument here.

16              Now I see a distinction between the FDA and the NGOs.

17    I'm just going to use the term NGOs.  It's probably not accurate

18    as to, for instance, the CDC, but just -- there's a distinction

19    there.  I also see some factual distinctions as to the different

20    arguments and/or factual analyses alluded to by the different

21    exhibits.  I could go through them, but because of our time

22    constraints, I won't.

23              Additionally, I am interested in -- well, no, let me go

24    back.  First, the plaintiff's motion as it exists now will likely

25    be denied because it is overly broad, if you check your

1    conclusion.  You basically ask me in the conclusion is don't let

2    them talk about anything.  I'm engaging in hyperbole here.  So on

3    that you are going to lose.

4          So after the defendants respond, I suggest you narrow

5    your prayer, if you will, from the conclusion of your motion,

6    because right now it is way overly broad.  Check your conclusion.

7    You will lose.

8          Number two, on both sides, all the way around here,

9    just, you know, there are double-edged swords at play here, guys

10   and gals.  That's all I'm going to say about that.  Forrest Gump

11   allusion.

12         Three.  All right, look at the exhibits that were done,

13   because different ones raise different aspects of issues.  Now,

14   so, in the responses the defense will respond -- well, they will

15   give their response, all right.  And I'm going to have you go

16   first because we already have their motion.  Then the plaintiffs

17   will get to reply.  I'll let you know the page limitation in a

18   minute.  And then the timing, again, I'm going to let Special

19   Master Rodriguez and Russo help you with that because I don't

20   know what else you have on your plate at any given point in time.

21         Now this is my question, defendants.  Mr. Parker, for

22   what purpose do you feel this is relevant, if at all?

23         MR. PARKER:  On the question of -- particularly, on the

24   FDA, Your Honor, the FDA has, as Your Honor knows, looked at this

25   for 17 years.  It is relevant on --

1          THE COURT:  Now I'm going to back and stop you.

2     "This," that's an indefinite pronoun.  They have not looked at

3     everything for 17 years.  And I'm not just being persnickety.

4     There are different questions chronologically when you look at

5     this.  There's the time during the test.  There's the time when

6     the -- what is it called when they changed their position -- the

7     warning was changed.  There's a time after -- so it's not been

8     the same for 17 years.  So the use of the indefinite pronoun is

9     going to cause you to lose.  That's no genuine issue of material

10    fact, period.  Okay, start over.

11          MR. PARKER:  Beginning in 1996 there was a dialogue

12    that started between Takeda and the FDA on the issue of whether

13    or not Actos could, in fact, induce bladder cancer in people

14    based upon the animal data.  For the next three years, the FDA

15    looked at the clinical studies that were going on that were being

16    taken to show the efficacy of the drug and were questioning

17    Takeda on whether or not they were also finding any evidence

18    that, in fact, Actos may have relevance vis-a-vis bladder cancer

19    in humans.

20          THE COURT:  Okay.  Why is that relevant to the inquiry

21    before this Court and this jury?  To what issue is that relevant?

22    Liability?  Causation?  Good faith?  To what issue, if any, is

23    what occurred in the administrative arena between Takeda and the

24    FDA, when the FDA was making certain of its administrative

25    determinations, why, if at all, is that relevant to the inquiry

1    before this jury?

2         MR. PARKER:  On the period of time in which these

3    discussions about Actos and bladder cancer have been occurring

4    between Takeda and the FDA, it is relevant, Your Honor, on the

5    question of the adequacy of the labeling because the discussions

6    and the FDA's views on whether the available evidence

7    demonstrated an increased risk for bladder cancer were central to

8    the question of what information were to go into the label.

9         It is also relevant, Your Honor --

10        THE COURT:  Well, let me ask you this, before we leave

11   that one.  Are you then arguing that the FDA's determination of

12   what was on the label or was not on the label is determinative of

13   whether or not Takeda violated the New York products liability

14   law as to warning?

15        MR. PARKER:  No, I don't believe that that follows,

16   Your Honor, but it does go to the reasonableness of Takeda's

17   conduct in the discussion --

18        THE COURT:  Why do we care as to what Takeda's --

19   whether Takeda's conduct was reasonable with -- in the discussion

20   with the FDA?  And I'm going to pull it out of this and let's say

21   Takeda went on -- who is that horrible man?  Howard Stern.  Let's

22   say Takeda went on the Howard Stern Show.

23        MR. PARKER:  Yes, Your Honor.

24        THE COURT:  We don't care whether their response was

25   reasonable or not to Howard Stern, you see?  So I'm coming back

1    to the underlying legal issue here that you're asking this jury

2    to decide, and that is, whether or not under the New York

3    products liability law and the elements therein, and in

4    particular, I'm assuming, the failure to warn, why what Takeda

5    did or did not do with the FDA is any different than what they

6    did or did not do when they went on the Howard Stern Show?

7            MR. PARKER:  Well, it's hard for me to respond in the

8    context of the Howard Stern, but the argument is this.

9    Ultimately -- and you're right, Your Honor, it's not the

10   reasonableness of the conduct.  And I misspoke.  It is ultimately

11   whether or not the available -- and I'll slow down.

12           THE COURT:  Thank you.

13           MR. PARKER:  Whether the available evidence justified

14   at that point, under all the legal standards, a modification of

15   the label.

16           THE COURT:  What does it matter whether the FDA felt

17   they did or they didn't?

18           MR. PARKER:  Because I do believe it is probative when

19   an expert gets on the stand and says:  In my opinion, they should

20   have put A, B, and C at this point in time in the label because

21   it happens to be my opinion as a high-priced litigation expert.

22   I do believe it is probative for a jury to know that the agency

23   responsible for making decisions on labeling as submitted by the

24   company disagrees with that expert.

25           THE COURT:  Why?  Why is that probative?

1              MR. PARKER:  Because I think it goes to the very --

2              THE COURT:  Like Howard Stern.  Howard Stern disagrees.

3     Why is it probative?  Why is the FDA -- and then we're going to

4     get into the NGOs -- but why is the FDA's decision, if we accept

5     the argument -- and you might not accept it -- that the FDA is an

6     administrative agency; that as an administrative agency, there

7     are a great many different factors that go into their

8     decision-making process at any given point in time; that some of

9     those factors might or might not be political in nature; that the

10    studies that the FDA might or might not have had at any given

11    point in time might have been provided by one side or another, or

12    might have been biased or another, which means we end up with a

13    mini trial on what the FDA might have had or not had, which I

14    don't think is judicially efficient.  Why is it -- additionally,

15    the FDA has a different standard that they are looking to.  Case

16    law even talks about that.  There's not a whole lot on this, but

17    the case law talks about that the FDA has a different standard in

18    the degree and level of risk, et cetera.

19             So if all of that is the case, why is it -- and I'm

20    going to give the plaintiffs the opportunity to defend the

21    arguments I'm making because I'm not suggesting they are

22    necessarily correct.  I'm playing devil's advocate here.

23             Why is it that it is judicially efficient, then, to get

24    into what the FDA did or did not do unless what the FDA did or

25    did not do has a legal impact or influence?  Otherwise, it's

1    factual, and then we are forced, are we not, to go into an

2    exploration of what the FDA relied upon, what they didn't rely

3    upon, the efficacy of the studies they relied upon, the

4    information they looked at, the information they didn't look at,

5    and we, in effect, are doing a mini trial on what the FDA was

6    looking at, at any given point in time.

7            MR. PARKER:  It is legal, Your Honor, has legal

8    implications.

9            THE COURT:  Tell me what the legal implications are

10   under New York law.

11           MR. PARKER:  Under New York law.

12           THE COURT:  Yes, sir.  That's the law that's applicable

13   to this case.  Any law clerk that walks into my office, that's

14   the first question I ask them, if they have a thing.  What law

15   applies?  I'm a stickler that way.

16           MR. PARKER:  My client is obligated to comply with

17   those laws of New York which require that labels be amended,

18   included -- excuse me -- updated, as evidence becomes available.

19           THE COURT:  That's fine, but that's not the FDA.

20           MR. PARKER:  At some point in time, Your Honor -- and I

21   was getting to the second point.  At some point in time, this

22   jury is going to hear litigation experts squaring off, having

23   different opinions as to what should have happened at different

24   points in time under New York law.  It is helpful to the jury to

25   know that the group of scientists who have looked at this product

1    for 17 years --

2           THE COURT:  You're assuming there was a group of

3    scientists looking at it.  And, see, that's my concern.

4           MR. PARKER:  Well --

5           THE COURT:  Listen to me so that you can run with me

6    here, because I'm not wedded to this, but I have problems with

7    this.  My layman's gut says, yeah, what the FDA says is relevant.

8    My legal mind says, no, it's not.  So we come back to this.  No,

9    we don't know whether or not a group of scientists at the FDA

10   were looking at this issue.

11          And let's assume we get past the fact that there were a

12   group -- don't give it to him until I'm finished talking,

13   Ms. Gourley -- that there were a group of scientists that looked

14   at it.  We don't know what they looked at.  So we've got to go

15   into that.  Then we don't know if that was the full body of

16   information out there at the time.  So we've got to look into

17   that.  Then we don't know the efficacy of what they did look at.

18   We've got to look into that.  Then we've got to figure out

19   whether or not Senator Joe Blow or Mary Blow, who has the largest

20   pharmaceutical manufacturer in the country in their district,

21   sent their staffer down the road to chat, if you will, with the

22   FDA and say, you know, let's look at this and, you know, we want

23   you to think about this, too.  We got to look into that.  I can

24   see this being a really problematic factual inquiry.  So I'm

25   interested in what legal significance it has.

1              And, Shree, the case that -- was it U.S. Supreme Court,

2      the one that they failed -- they refused to hear -- they refused

3      to grant cert. -- they refused to grant cert., the U.S. Supreme

4      Court recently refused to grant cert. to one of the

5      pharmaceutical companies wherein -- as to punitives, wasn't it,

6      as to punitive damages, the issue of the FDA?

7              THE CLERK:  I can go get it.

8              THE COURT:  Yes, run go get it.  Because I was thinking

9      in these terms, and then because I'm a nerd, I enjoy listening to

10     what the Supreme Court's doing.  That one caught my eye, because

11     the question, I think, Mr. Parker, and you're not going to win or

12     lose it today; I'm going to give you the chance to brief it.  You

13     don't have to freak out.  You haven't been -- yeah, but your eyes

14     are getting smaller and smaller.  You started out with them, and

15     I could see --

16             MR. PARKER:  I should put my glasses on.

17             THE COURT:  I can see your eyes, but as we've

18     continued, they've gotten smaller and smaller.  Now, see,

19     Mr. Lanier turns red.  Your's turn smaller and smaller.

20     Mr. Arsenault's veins pop, and Ms. Gourley eyes get bigger.  So,

21     you know, and Mr. McElligott puts his hands on his hips.  That's

22     why I want you here.  I learn your quirks, okay?  Mr. Pennock

23     does this.  And then he gets anxious.  Okay, now -- like wait a

24     minute.  Okay.  Now let's go back.

25             I am interested in what the legal significance is

1    because I find it an interesting question.  Now there is some

2    argument to be made that, if we went through this entire trial

3    without the FDA coming up, that's the first question we're going

4    to get from the jury; what did the FDA say about this?  So I

5    think, you know, it's going to play in --

6            All right, I'm going to step aside.  The United States

7    Supreme Court has declined to hear an appeal from Novartis

8    Pharmaceuticals Corporation challenging the authority of courts

9    to impose punitive damages under state law for wrongful conduct

10   related to marketing of federally approved drugs.

11           And it goes on and it talks about, and my memory is

12   they talk about the FDA and the FDA's goals.  I'm reading from a

13   Reuters Legal.  But here's the case that talks about it; Lexus

14   and Nexus, okay.  So you might want to look at it.  I don't know

15   if it's on point.  I haven't sat down and read it in its

16   entirety, but you might want to look at it.

17           But in the little blurb that I got, it's out of the

18   Fourth Circuit, and they were talking about the FDA and the FDA

19   power.  And of course, it was the difference between punitives

20   and -- which might be how this might come up.  That's what Sara

21   is pointing and saying, see, I was trying to get that to him.

22   See, it might come up as to punitives.  It might be relevant as

23   to punitives.  That's why I said, there are double-edged swords

24   here, guys.

25           So if this becomes, you know, if you get into

1    punitives, and I don't know whether you will or you won't, but if

2    you get into punitives and the plaintiffs start arguing that

3    Actos is, you know, a bad actor that should be punished, then we

4    may have a pinhole that Hannibal gets to come running through

5    with all of his elephants.

6         And I digress for a moment, but talk to the Special

7    Masters.  I think I have mentioned this to them.  I think they

8    have mentioned it to you how we want to bifurcate the punitive

9    damage aspect.  So be thinking about that.

10        So it might be relative as to punitives.  Okay, that --

11   I'm going to give you the answer to the question I've been

12   pinning.  There might be legal significance if the question is

13   whether or not Actos -- huh-uh -- Takeda was a bad actor, using

14   generic terms, in the manner in which they dealt with Actos in

15   the manner in which they dealt with the FDA.

16        See, look, they hid it, they had all this, et cetera.

17   In that instance, you might well be able to come in and say, hey,

18   look, none of these NGOs said it was bad.  The FDA didn't say it

19   was bad.  Granted it didn't control; but, you know, we thought we

20   were okay, yadda, yadda, yadda.

21        But as to liability and causation as to general

22   liability and damages, I am not certain of the legal

23   significance.  I certainly understand the seductive nature of the

24   argument.  Hey, you know, the FDA didn't say we were bad.  But

25   the FDA's got other stuff going on.

1          Now hold that thought.  You're like a dog with a bone.

2    Hold that thought.

3          If there's a certain seductiveness to the argument

4    that, if we get all the way through this trial and the FDA has

5    not been brought up at all, that the jury is going to send out a

6    question.  However, hence, justification for why I'm asking you

7    to identify these people.  If I'm not mistaken, one of the

8    plaintiffs' experts was a -- is a former person at the FDA or a

9    head of the FDA during a certain relevant time frame.  I cannot

10   imagine he's going to get on and off the stand without the FDA

11   coming up.  If the FDA comes up, you might have created a pinhole

12   and here come Hannibal and here come all his elephants and here

13   come Mr. Parker waving his banner.

14         Now, as having independent relevance as to a legal

15   issue, under New York law as to the Products Liability Act --

16   when I'm finished talking to him, Ms. Pruitt, you can bring it

17   up; you can give it to Ms. Gourley now if you wish -- then I'm

18   interested in what it is.  I haven't figured it out, but that

19   doesn't mean it's not there.  So when you brief it, brief it with

20   that mind-set.

21         I think the seductive argument that the FDA should get

22   to come up will come up if they put that person on.  Now Richard

23   has now crossed his arms, so they may not pull that person -- I

24   don't know -- he's thinking.  But, you know, if that person comes

25   on, the FDA will be the elephant in the room and he'll be

1    squatting out here.  There's no way.

2             So as to the legal significance as to causation on

3    general damages, please begin your brief in the first paragraph,

4    telling me what, if any, legal significance it has under New York

5    law as to what the FDA thought or did not think or did or did not

6    do.  I am not convinced there is any because of the different

7    standards, if you look at some of the case law argued and if you

8    understand what their goal is as an administrative agency.

9             Now, however, it might well have relevance as to

10   punitive damages, and if it has relevance as to punitive damages,

11   he's going to get to bring it up.  Excuse me.

12            Off the record, Cathleen.

13                      (Off the record.)

14            THE COURT:  Okay.  So, all right, on this one, now

15   there is a distinction in my mind between the FDA and all these

16   NGOs.  And that's an incorrect term, but it is a term we'll use.

17   I am not at all certain why that is relevant, if at all, except

18   perhaps to punitive damages, okay?

19            So, again, if you open that door or you stick a pin

20   there, you know, in going after punitives, and it's assuming, of

21   course, you can get over the threshold that's needed under New

22   York law to get it to the jury, which is why I'm likely to let

23   the evidence in but not the argument, and certainly not evidence

24   of damages and the value of Takeda, et cetera, before the jury

25   until after we've determined if they think it should go there.

 1    But as to punitive damages, double-edged sword.  But if we have

 2    liability done ahead of time, which is what I'm thinking to do,

 3    then I don't see it coming in unless you can give me a legal

 4    significance, okay?

 5          And sauce for the goose is sauce for the gander.  I am

 6    terribly sorry, plaintiffs, but I do not see a distinction

 7    between the stated goal of one of the NGOs that you want to cite

 8    and the ones they want to cite.  Good try, no turkey.

 9          Off the record, Cathleen.

10                     (Off the record.)

11          THE COURT:  So, all right, now I don't see a

12    distinction between that, so -- and I read it and I looked at it.

13    I don't see a distinction between the stated goals.  So as to

14    3374, again, I want a response from the defendants by the 22nd at

15    4:30.  Please bear in mind the distinctions I made.

16          Mr. Parker, I'm interested in legal significance, not

17    the seductivity of the argument, all right?  And I think your

18    stronger argument is as to punitives.  I really don't see the

19    basis under general liability, but I could be wrong.

20          And then secondarily, I think your argument -- it is of

21    interest.  I think the jury needs to know what FDA did in some

22    fashion, I think, maybe; I don't know.  But I can't imagine that

23    guy is going to get on and off the stand without it coming up,

24    so, all right.

25          Now the plaintiffs can have a reply.  Carmen, I don't

1    see we set up a reply.  Are they going to do them at the same

2    time on the 22nd at 4:30?

3              DEPUTY SPECIAL MASTER RODRIGUEZ:  No, Your Honor.  I

4    was going to set the 29th for the reply.

5              THE COURT:  Okay.  So the reply will be the 29th.  No

6    more than three to five pages.  I don't think you need more than

7    that on this, I don't think.  If you do, talk to Carmen.  Sara

8    looks perplexed.  Carmen, if they have to have more than that,

9    let me know.

10             MS. GOURLEY:  Well, Your Honor, the plaintiffs' motion

11   was 15 pages, and so for our response, I understand a shorter

12   reply, but for our response we would like more pages.

13             THE COURT:  Oh, all right.

14             MS. GOURLEY:  I'm happy to --

15             THE COURT:  13.  It was 13 pages, their conclusion is

16   on page 13.  So your response is 13.  Reply, three to five,

17   somewhere in that neighborhood because you've already done it.

18   All right.  Okay, now.

19             So, Chris, on that one I'm deferring until I get the

20   briefing.  Shree, we'll pull this one up -- hopefully we'll be

21   able to -- no, we won't, we won't be able to do it the next time.

22             Carmen, if we don't get these replies, we won't be able

23   to do it the next time.  So we'll have to do it -- we'll have to

24   set up one more.  Do we have one more hearing on limines beyond

25   the one on the 28th or whenever that is?

1          DEPUTY SPECIAL MASTER RODRIGUEZ:  No, Judge, that's the

2     last one that was scheduled.  We never scheduled one to deal with

3     this last round that got filed yesterday and to deal with

4     deferred motions.

5          THE COURT:  So we'll set that up.  Okay.  So we will

6     set up another one to deal with this last round that just got

7     filed and the last of the deferreds.  And when it will be, Carmen

8     will let you know.

9          All right.  So, Chris, on 3374, that is that one.

10          3377 which is Plaintiffs' Motion in Limine to Exclude

11     any Evidence or Discussion of Plaintiff Terrence Allen's Diabetic

12     Foot Ulcerations, Toe Amputation, Toe Joints, et cetera.

13                         (Off the record.)

14          THE COURT:  All right.  Now I'm going to wait and do

15     that one when I come back from reading to the baby because I'm

16     interested in this one.  I know you say you can defer it.

17          MS. GOURLEY:  No.  They withdrew it, Your Honor.

18          THE COURT:  Oh, you withdrew it?  Entirely?

19          MR. PENNOCK:  Your Honor, as to that motion, yes.  And

20     as to the next one as well, yes.

21          THE COURT:  You withdrew them completely?

22          MR. PENNOCK:  Yes, because with consultation with the

23     defendants, it's apparent to me that they need to be withdrawn.

24     New York law under the learned intermediary, there are two ways

25     you can defeat a learned intermediary, and one of them is that

1    the doctor says, I would have still prescribed it, but I would

2    have passed the warning on to the patient.  And the patient says,

3    well, I wouldn't have taken it in the face of that bladder cancer

4    risk.  In that context, of course, what he was suffering from

5    potentially from the diabetes is relevant, so --

6              THE COURT:  Yeah, I think it also perhaps is relevant

7    as to damages.  I don't know.  You know, maybe, maybe not, from

8    your side.  I mean, if you're talking about loss of enjoyment of

9    life, which is a part of pain and suffering.  And he already had

10   lost a lot of his enjoyment of life because he had these other

11   problems, so I think -- all right, so they're both withdrawn.

12             Again, it would be very beneficial to the Court, if

13   you're going to withdraw motions, that you let me know before you

14   are standing in court arguing the motion and I've been through

15   them three and four times, particularly, ones that were filed

16   late.  Please, guys and gals, when you get it to me, that doesn't

17   mean the game is over.  On my side of the net, the game is just

18   beginning.

19             All right.  Is that all of them?

20             MR. PENNOCK:  Yes, Your Honor.

21             THE COURT:  Okay.  All right.  Carmen, anything else we

22   need to bring up at this time?

23             DEPUTY SPECIAL MASTER RODRIGUEZ:  I want to clarify the

24   docket number of the last -- document number of the last one?

25             THE COURT:  Okay.  The last one is 3378, and then the

1    other one was 3377.  Chris and Shree, they were withdrawn by the

2    plaintiffs.

3            All right.  Are there any other matters that need come

4    before the Court at this time?

5            MR. ARSENAULT:  No, Your Honor.

6            MS. GOURLEY:  No, Your Honor.

7            THE COURT:  All right.  Mr. Parker, it was nice to have

8    met you.

9            MR. PARKER:  Wonderful to be here, Your Honor.

10           THE COURT:  All right.  And Ms. Gourley, please ask

11   Ms. Pruitt to attend as many of these as possible --

12           MS. GOURLEY:  Yes, she will, Your Honor.

13           THE COURT:  -- because what's going to happen here will

14   govern what'll happen in the second case unless there's reason

15   not to be.

16           MS. GOURLEY:  I understand.

17           THE COURT:  And Mr. Parker, I expect and intend that

18   you will continue to participate fully unless you are excused by

19   the Court.

20           MR. PARKER:  Yes, Your Honor.

21           THE COURT:  All right.  Mr. Russo?

22           SPECIAL MASTER RUSSO:  Nothing, Your Honor.

23           THE COURT:  Mr. DeJean?

24           DEPUTY SPECIAL MASTER DEJEAN:  Nothing, Your Honor.

25           THE COURT:  All right.  Ms. Rodriguez, nothing else?

1        DEPUTY SPECIAL MASTER RODRIGUEZ:  No, Your Honor.

2        THE COURT:  So if no other matters need come before the

3   Court, this court is adjourned.

4                    (Hearing concluded.)

5

6                    *  *  *  *  *  *

7

8

9                    **C E R T I F I C A T E**

10      I, Cathleen E. Marquardt, RMR, CRR, Federal Official Court

11   Reporter, do hereby certify this 21st day of October, 2013,that

12   the foregoing pages 1-104 constitute a true transcript of

13   proceedings had in the above-entitled matter.

14                          */s/ Cathleen E. Marquardt*
                          Federal Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25