RECEIVED

JAN 1 4 2014

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

IN RE: ACTOS® (PIOGLITAZONE)
PRODUCTS LIABILITY LITIGATION

MDL No. 6:11-md-2299

JUDGE DOHERTY

This Document Applies To:
*Allen, et. al. v. Takeda Pharmaceuticals
North America, Inc., et al.*
(Case No. 12-cv-00064)

MAGISTRATE JUDGE HANNA

## MEMORANDUM RULING:
## ADRIANE FUGH-BERMAN, M.D.

This multidistrict litigation arises from product liability claims against the manufacturer

and marketer of Actos® and other drugs containing pioglitazone.  Pending before this Court is

the Defendants' Motion to Exclude Testimony of Plaintiffs' Expert, Adriane Fugh-Berman,

M.D.[1]  For the following reasons, the Defendants' Motion will be DENIED IN PART AND

GRANTED IN PART.

### EVIDENCE AT ISSUE

Adriane Fugh-Berman is a medical doctor and professor of medicine, who works as an

Associate Professor in the Department of Pharmacology and Physiology at Georgetown

University Medical Center teaching evidence-based medicine, which is the critical assessment of

biomedical literature, and the evaluation of the risks and benefits of drugs, herbal medicines and

other therapies.  She has been proffered as an expert in the areas of sales, marketing, promotion

and pharmaceutical influence on physicians.  Her work in this case consists almost entirely of

---

[1] Rec. Doc. 3542.  This motion has been urged on behalf of all named defendants in this matter and for these purposes only, this Court will not distinguish among Defendants, as there is no legal significance to that distinction for purposes of this Ruling.  The Memorandum in Support of Defendants' Motion to Exclude Testimony of Plaintiffs' Expert Adriane Fugh-Berman, M.D. is found at Rec. Doc. 3542-1 ["Memorandum"]; the Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Exclude Testimony of Plaintiffs' Expert Adriane Fugh-Berman, M.D. is found at Rec. Doc. 3685 ["Opposition"]; and the Defendants' Reply in Support of Defendants' Motion to Exclude Testimony of Plaintiffs' Expert Adriane Fugh-Berman, M.D. is found at Rec. Doc. 3710 ["Reply"].

reviewing documents which have been produced by the Defendants, evaluating those documents, analyzing them, and drawing conclusions from them.

Dr. Fugh-Berman has submitted a 63-page report,[2] together with two attachments: her curriculum vitae and a listing of the case materials that she considered in developing the following opinions:

- Although scientific studies have demonstrated that ACTOS increases the risk of bladder cancer and other health risks, Takeda distorted scientific data and promoted off-label use.

- Takeda promoted ACTOS through many means of communication, often in ways that masked industry influence.

- Takeda's influence on the many sources of information available to health care practitioners inflated perceptions of ACTOS' benefits and mitigated perceptions of risks, increasing sales while unnecessarily exposing millions of patients to the risks of a diabetes therapy that was not superior to other marketed therapies.

- Takeda manipulated discourse within the medical communications through promotional talks, CME, and publications, so that clinicians and patients were given the impression that ACTOS prevented cardiovascular disease and had unique benefits that outweighed its risks.

- Takeda ignored, obscured or downplayed evidence that ACTOS caused bladder cancer.

- Had health care providers been equipped with the truth regarding ACTOS' risks and benefits, fewer patients would have been exposed to ACTOS and its risks.[3]

The Defendants' Motion challenges the admissibility of Dr. Fugh-Berman's opinions regarding (a) the Defendants' marketing of Actos®, (b) whether Actos® is associated with a significantly

---

[2] "The Fugh-Berman Report" was submitted by the Plaintiffs as their Exhibit 1, and was submitted by the Defendants as their Exhibit 3.  "The Fugh-Berman Deposition" was submitted by the Plaintiffs as their Exhibit 2 and by the Defendants as their Exhibit 4.

[3] Fugh-Berman Report, at 4.

increased risk of bladder cancer, (c) the risk/benefit profile of Actos®, (d) labeling negotiations and the adequacy of Actos® labeling, and (e) Defendants' intent, knowledge, or motives.[4]

## APPLICABLE LAW

While state law governs the Plaintiffs' claims in this matter, the Federal Rules of Evidence control the admission of expert testimony.[5]  Under the Federal Rules of Evidence, "relevant" evidence is admissible, while irrelevant evidence not admissible.[6]  Evidence is "relevant" if it has any tendency to make a fact more or less probable than it would be without the evidence, and the fact being proven or disproven is of consequence in determining the action.[7]  The party seeking to have expert opinion testimony admitted into evidence bears the burden of demonstrating, by a preponderance of the evidence, that the expert's findings and conclusions are based on the scientific method and, therefore, are reliable.[8]

The Federal Rules of Evidence require that a judge, faced with a proffer of expert scientific testimony, must begin by determining, pursuant to Rule 104(a), whether the expert is proposing to (i) testify to scientific knowledge (ii) that will assist the trier of fact to understand or determine fact in issue.[9]  This will require a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or

---

[4] Memorandum, at 1.

[5] Huss v. Gayden, 571 F.3d 442, 452 (5th Cir. 2009), citing Mathis v. Exxon Corp., 302 F.3d 448, 459 (5th Cir. 2002).

[6] F.R.E. 402.

[7] F.R.E. 401.

[8] Moore v. Ashland Chemical, Inc., 151 F.3d 269, 276 (5th Cir. 1998) (en banc).

[9] Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469 (1993).

methodology properly can be applied to the facts in issue.[10]   This requirement is found in Rule

702 of the Federal Rules of Evidence, which reads as follows in its entirety:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)   the testimony is based on sufficient facts or data;
>
> (c)   the testimony is the product of reliable principles and methods; and
>
> (d)   the expert has reliably applied the principles and methods to the facts of the case.

In the United States Supreme Court's landmark decision in Daubert v. Merrell Dow Pharmaceuticals, Inc., the Court acknowledged the existence of a federal court's gatekeeping role with regard to expert scientific opinion testimony, characterizing that role as one ensuring that such evidence meet the requirements of both reliability and relevance.[11]   "Reliability" as discussed in Daubert refers to *evidentiary* reliability, *i.e.*, trustworthiness, rather than *scientific* reliability, which asks whether application of the principle produces consistent results, a distinction often blurred by Defendants' arguments.   In a case involving scientific evidence, evidentiary reliability is based upon scientific validity, which asks whether the principle supports what it purports to show.[12]

The objective of this requirement is to make sure that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same

---

[10] Id., 509 U.S. at 592-93; Moore, 151 F.3d at 276.

[11] Moore, 151 F.3d at 275.

[12] Daubert, 509 U.S. at 590 n.9.

level of intellectual rigor that characterizes the practice of an expert in the relevant field.[13] The Supreme Court identified several non-exclusive factors a court should consider in determining whether proffered scientific opinion testimony is sufficiently reliable to permit admission into the record.[14] Those factors are:

- whether the expert's theory can be or has been tested;

- whether the theory has been subject to peer review and publication;

- the known or potential rate of error of a technique or theory when applied;

- the existence and maintenance of standards and controls; and

- the degree to which the technique or theory has been generally accepted in the scientific community.[15]

Several years later, the Supreme Court clarified when it held the gatekeeping role applied to all types of expert opinion testimony, not just scientific evidence, and revisited the reliability analysis.[16] Moreover, the Supreme Court reiterated that a court must have considerable leeway in deciding, in a particular case, how to go about determining whether particular expert testimony is reliable.[17] Therefore, the test of reliability is flexible and there is no necessary or exclusive list of factors that must exist in order for a particular opinion to be admissible.[18]

> Daubert makes clear that the factors it mentions do not constitute a definitive checklist or test. Daubert adds that the gatekeeping inquiry must be tied to the facts of a particular case. We agree with the Solicitor General that the facts identified in Daubert may or may not be pertinent in assessing

---

[13] Kumho Tire Company, Ltd. v. Carmichael, 526 U.S. 137, 152, 199 S.Ct. 1176, 143 L.Ed.2d 238 (1999). See also Brown v. Illinois Central Railroad Co., 705 F.3d 531, 535 (5th Cir. 2013).

[14] See discussion, 509 U.S. at 594-595.

[15] Moore, 151 F.3d at 275.

[16] Kumho Tire, 526 U.S. at 141-142.

[17] Kumho Tire, 526 U.S. at 152.

[18] Id., at 141-142, 149.

reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of her testimony. The conclusion, in our view, is that we can neither rule out, nor rule in, for all cases and for all time the applicability of the factors mentioned in Daubert, nor can we now do so for subsets of cases categorized by category of expert or by kind of evidence. Too much depends upon the particular circumstances of the particular case at issue.[19]

In the Fifth Circuit, "[t]o determine whether proffered testimony is reliable, the trial court must make 'a preliminary assessment of whether the reasoning or methodology underlying the testimony is . . . valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'"[20]  Further, "[t]o establish reliability under Daubert, an expert bears the burden of furnishing 'some objective, independent validation of [his] methodology.'"[21]  In doing so, "[t]he expert's assurances that she has utilized generally accepted [principles] is insufficient."[22]

In Brown the Fifth Circuit held that the trial court did not abuse its discretion where an expert testified that offered opinions were reliable merely upon and because of "education and experience" and did not engage in or rely upon a credible methodology, particularly in the face of evidence in opposition to those opinions.  Standing alone then, it is insufficient for an expert to base her or her opinion on education and experience alone, especially in the face of evidence to the contrary.

---

[19] Id., at 150 (citations and quotation marks omitted).

[20] Brown v. Illinois Central Railroad Co., 705 F.3d 531, 535 (5th Cir. 2013) (quoting Daubert, 509 U.S. at 592–93).

[21] Brown, 705 F.3d at 536 (quoting Moore, 151 F.3d at 276).

[22] Id. (quoting Moore, 151 F.3d at 276).

## ANALYSIS

Plaintiffs bear the ultimate burden on their proffered evidence, thus, this court will first look to Plaintiffs' *prima facie* showing on each issue.  If a *prima facie* showing is made, this Court will proceed to a consideration of the Defendants' specific challenges.

### A.    Dr. Fugh-Berman's Report, Opinions, and Supporting Evidence

Dr. Fugh-Berman is a physician, who obtained her medical degree from Georgetown University Medical Center; has practiced medicine; has served as administrator of medical clinics; currently serves as an Associate Professor of medicine in the Departments of Pharmacology and Physiology in the Department of Family Medicine at Georgetown University. She teaches, *inter alia*, "critical assessment of biomedical literature and the evaluation of the risks and benefits of drugs, herbal medicines, and other therapies."[23]  She directs a research and education project at the Georgetown University Medical Center that "promotes rational prescribing and studies pharmaceutical marketing practices,"[24] and has published a number of peer-reviewed articles that reveal her close study of the subject of medical marketing by pharmaceutical companies.

The Defendants have not challenged Dr. Fugh-Berman's qualifications as an expert in the areas described above, except to note that she has not practiced medicine full time for almost 20 years,[25] and is a self-professed "activist."[26]  The Defendants have not explained to this court why either of these points is of relevance to this Court's determination as to Dr. Fugh-Berman's qualifications beyond, possible, providing rich fodder for cross-examination at trial.  Moreover,

---

[23] Fugh-Berman Report, at 1.

[24] Id.

[25] Memorandum, at 1.

[26] Id.

7

this Court is unaware of any jurisprudence suggesting that a medical expert must be practicing full-time in order to present reliable opinion evidence at trial, nor why the qualifications of an expert who enthusiastically supports her opinions as an 'activist' are automatically suspect. In light of the evidence presented by the Plaintiffs demonstrating that Dr. Fugh-Berman is qualified by education, knowledge, and experience (including her own research) to attest to matters associated with the Actos® marketing program and promotion pursued by the Defendants, the objections as presented, will be overruled.

The body of the Fugh-Berman Report is 63 pages in length, with an attached list of the case materials she reviewed in developing her opinions and producing her report.[27]

The Fugh-Berman Report contains:

- a summary of her professional background and relevant publications;[28]

- a summary of the opinions that she has developed in this matter;[29]

- a narrative description of both the selling of Actos® and the problems she perceives with the Defendants' efforts to sell, promote, and market the drug,[30] including sections on:

  o selling Actos;[31]

---

[27] The Defendants declare the "questionable propriety" of Dr. Fugh-Berman's production of three reports in this matter. This observation borders on disingenuous as the Defendants are fully aware that: (a) Dr. Fugh-Berman was ordered by this Court to produce a report long before the depositions on the Defendants' marketing practices were taken, and both the Defendants and this Court fully understood that this would require Dr. Fugh-Berman to be permitted to supplement her report with newly-developed evidence; (b) Dr. Fugh-Berman was asked *by the Defendants* to produce her second report days *ahead of the deadline* for doing so and she complied with this request, then the Defendants objected to the scope of the second report; so (c) Dr. Fugh-Berman produced a third report *on the deadline for supplementing her report* to *address the objections that the Defendants had raised*. This Court cautions the Defendants as to their extremely questionable characterization of Dr. Fugh-Berman's production of expert reports in this matter as having "questionable propriety" when in fact they, in part, played a role in that "propriety."

[28] The Fugh-Berman Report, at 1-4.

[29] Id. at 4.

[30] Id. at 5-63.

[31] Id. at 6-15.

- o   the risks associated with Actos and the perceptions of those risks;[32]

- o   the promotion of off-label cardiovascular benefits;[33]

- o   Takeda's efforts to control the published science;[34] and

- o   Takeda ads and sales aids for Actos; and[35]

- •   her conclusions.[36]

This Court has conducted an exhaustive review of the briefs, the exhibits submitted in support of both parties' arguments, and the published articles, studies and reports, including those specifically of Dr. Fugh-Berman that currently are under challenge. This Court finds, as a threshold matter, that Dr. Fugh-Berman is qualified to develop the opinions she has reached in this case, that as a threshold matter, she relied on standard and accepted scientific methods in formulating those opinions and again, as a threshold matter, the studies, publications and data which she relied upon were sufficiently reliable as to overcome Defendants' threshold challenge. This Court has considered the five illustrative factors noted below and identified in Daubert and concluded that they either weigh in favor of the admissibility of Dr. Fugh-Berman's opinions and foundational underpinnings or, alternatively, do not weigh in favor of the exclusion of the challenged opinions and foundational underpinnings.

---

[32] Id. at 15-28.

[33] Id. at 28-42.

[34] Id. at 42-55.

[35] Id. at 55-63.

[36] Id. at 63.

### B.     Rule 702/Daubert Factors

After full review of all argument, evidence and supporting documentation, this Court

finds the five factors identified in <u>Daubert</u>, either weigh in favor of admissibility of Dr. Fugh-

Berman's opinions or do not weigh in favor of their exclusion of the challenged evidence.

- *Testability*.  Dr. Fugh-Berman's analysis and application of well-established principles to the evidence produced by the Defendants are not themselves subject to testing.   However, the studies on which Dr. Fugh-Berman relies *are* founded on scientific testing.   The fact that Dr. Fugh-Berman has not engaged in independent testing *of her actual case specific opinions*, but relies on published studies, case materials produced by the Defendants, her research, is not fatal under the circumstances in this case because she has used an acceptable methodology of review and the underlying foundational underpinnings found in the cited studies, papers and information have been tested.

- *Peer Review*.  Dr. Fugh-Berman relies upon peer-reviewed publications that provide scientific support for her opinions; she also relies upon her own published findings in peer-reviewed articles.   While it does not appear that Dr. Fugh-Berman's specific *opinions in this case* have been subjected to peer review, this Court finds the *underlying concepts* she relies upon, incorporates, and uses as foundational support for her conclusions, are and have been sufficiently subject to peer review and are sufficiently accepted within the relevant scientific community to meet a threshold challenge.   The absence of peer review for Dr. Fugh-Berman's opinions, in and of itself, does not invalidate Dr. Fugh-Berman's opinion when otherwise accepted methodology of review has been employed to extrapolate information from peer-reviewed publications and her independent research.   Dr. Fugh-Berman's reliance on identified peer-reviewed publications, studies, and information – together with her discussion and consideration of those studies she finds unpersuasive and her own peer reviewed articles – lend strong support for the argument in favor of admissibility of her opinion and foundational support for her conclusions, as a threshold matter.

- *Rate of Error*.  The underlying studies relied upon by Dr. Fugh-Berman have rates of error attached to the theory or technique used and are readily available for review and cross examination.   The absence of a rate of error as to her specific opinions should not be fatal in the face of such error rates as to the underlying studies.

- *Standards and Controls*.  Dr. Fugh-Berman is a qualified physician who has conducted her investigation and developed her opinions, in this matter, in compliance with the standards and controls under which she normally operates in her professional life.   This Court finds that those standards and controls lend strong support for the argument of/for reliability of Dr. Fugh-Berman's opinions, as a threshold matter.

- *General Acceptance*.  Dr. Fugh-Berman's report provides ample evidence that her review methodology is not divergent from that generally-accepted in the scientific

community and that her investigation is consistent with those generally-accepted principles. Dr. Fugh-Berman's process employed, conclusions reached, and opinions posted have been guided by scientifically-accepted processes found within the accepted scientific method, and stand upon a foundation of independent peer-reviewed studies and articles.   Consequently, this factor argues for allowing presentation of Dr. Fugh-Berman's opinions to the trier of fact.

This Court, also, notes, that unlike in <u>Brown</u>, in the instant matter, the opinions Dr. Fugh-Berman offers are not based merely on her "education and expertise." Dr. Fugh-Berman relies on studies, and publications, and – most importantly here – extensive data about the Defendants' marketing and promotion of Actos®. Had Dr. Fugh-Berman merely relied on her "education and expertise" as did the expert in <u>Brown</u>, Defendants' argument would be more persuasive, however, that is not the case. This Court finds that Dr. Fugh-Berman's opinions do not fail the threshold test of <u>Brown</u>, that the Plaintiffs have met their *prima facie* burden of demonstrating, as a threshold matter, that Dr. Fugh-Berman's opinions are admissible.

**C.      The Defendants' Challenges**

The Defendants argue that Dr. Fugh-Berman's conclusions are not relevant; that she has included opinions that are outside of her expertise; that her conclusions are unreliable; and that she presents "conclusory personal opinions, guesswork, narrative testimony, and speculation regarding Defendants' knowledge, intent, and motives."[37]

**1.      Relevance of Marketing Opinions**

The Plaintiffs have asserted a claim for "negligent marketing;" Dr. Fugh-Berman's opinions about the nature and reasonableness of the Defendants' marketing and promotion are clearly relevant to that claim, if otherwise admissible. Additionally, the Plaintiffs intend to bolster their "failure to adequately warn claims" with evidence in the form of Dr. Fugh-Berman's

---

[37] Memorandum, at 2.

opinions, about the effect of the Defendants' approach to marketing and on the adequacy of the warning the Defendants provided.

The Defendants argue Dr. Fugh-Berman's opinions about the Defendants' marketing practices and promotion of Actos® are not admissible because they are not relevant. Clearly, they are relevant; whether admissible or inadmissible, perhaps on other grounds, might be the more relevant inquiry under the objections made by Defendants within their motion as Defendants tend to conflate two separate legal inquiries as will be discussed below. Specifically, the Defendants allege Dr. Fugh-Berman's opinions are "not relevant" because there allegedly is *no evidence* to connect the marketing program to either the physicians who prescribed Actos® to Mr. Allen, nor to Mr. Allen himself. Defendants' argument is, once again, focused almost exclusively to the issue of causation and the Court, for these purposes, will address those objections within that context.

Clearly, the Plaintiffs must, at trial, establish the relevance of the Actos® marketing program and, therefore, the relevance of Dr. Fugh-Berman's opinions about that program, by linking the Defendants' marketing efforts to either Mr. Allen or his physicians. While the Defendants *argue* that no such link exists, they have expressly acknowledged *evidence* exists to argue that such a link does exist.[38] The Defendants' error is in seeking to impose upon the Plaintiffs an obligation to *absolutely prove* the existence of such a link and establish that absolute *before* Dr. Fugh-Berman's opinions may be found *relevant* and, therefore, *admissible*, in connection with the instant motion.

---

[38] *See* Memorandum, at 5 ("Dr. Reilly agreed that in general information from sales representatives, including 'brochures,' also 'play[s] into [his] risk/benefit analysis'"; "Notes of calls made to Dr. Reilly by sales representatives detailing Actos reference a 'slim jim'"; "Dr. Reilly testified that Actos had 'lipid advantages, and it – which is supposed to help your cardiac risk factors,' and also that representatives told him that Actos had 'little extra benefits on the side' as compared to Avandia.'").

Absolute proof is not the legal inquiry at issue; proof by a preponderance of the evidence is the relevant standard as to general liability, and that inquiry is the province not of this Court as the gatekeeper, but of the trier of fact if evidence exists to support a prima facie finding. At this point, it is necessary only that this Court, in its role as gatekeeper, determine whether the Plaintiffs have demonstrated a relevance of Dr. Fugh-Berman's opinions and this Court finds Plaintiffs have so demonstrated. The record reflects Dr. Fugh-Berman is a physician with expertise in pharmaceutical marketing, who intends to proffer opinions about the Defendants' marketing program, and that *some* evidence exists that the marketing program under discussion had, or could have had, an effect on one or more of the physicians who prescribed Actos® to Mr. Allen.[39] This Court, therefore, finds the Plaintiffs have sufficiently demonstrated, as a threshold matter, the potential relevance of Dr. Fugh-Berman's opinions to meet the gatekeeper standard. The Defendants' objection is overruled without prejudice to their ability to re-urge their relevance objection at trial, if appropriate.

### 2.  The Risk Of Bladder Cancer

The Defendants argue Dr. Fugh-Berman should be prevented from opining that Actos® increases the risk of bladder cancer. However, this Court has closely reviewed Dr. Fugh-Berman's Report and Deposition and it does not appear she intends to testify as to actual causation. Rather, her opinions are directed to conclusions about what the Defendants knew, or should have known, *based on their own documents*, and how that did effect, or, in her opinion, should have affected, the Defendants' marketing, regulatory, and promotional activities. These opinions are squarely within the scope of her unchallenged expertise. The objection is overruled.

---

[39] *See* fn 38.

### 3. Risk/Benefit Profile Of Actos Is Outside Her Expertise

The Fugh-Berman Report reflects a full analysis of many documents produced by the Defendants in these proceedings, and contains lists of the conclusions reached as a result of that analysis. The Defendants challenge Dr. Fugh-Berman's qualifications to reach these conclusions on her own, alleging that Dr. Fugh-Berman is not qualified to opine as to how health care providers would have responded if the labels had accurately reflected the information that the Defendants had in their possession; the risk/benefit profile of Actos®; etc.

This Court agrees, Dr. Fugh-Berman cannot know how health care providers might have actually responded to any information they received. However, given her area of expertise, she might or might not be able to opine as to what effects have been found or could or should be expected, given existing marketing principles, if a proper foundation were to be laid and proper questions were to be asked. Consequently, this Court finds this objection cannot be ruled upon in a vacuum and is better left to the context of trial and the foundation, if any, laid and the actual question asked. However, once again, a reading of the Fugh-Berman Report makes it clear Dr. Fugh-Berman is *not* reaching the contested conclusions founded upon her personal knowledge as Defendants' argue, or her medical experience, or independent research. Instead, she is relying on the factual foundation of the *information found within the Defendants' documents* and making what she believes to be reasonable inferences from *Defendants' own documents* given her experience, expertise, and review of relevant scientific or industry literature. Whether the actual questions asked at trial and answers given, ask Dr. Fugh-Berman to/is "read[ing] Takeda's mind," so to speak, is an inquiry not answered in a vacuum and thus, better reserved for trial. However, to the extent the questions asked and answers given are factually grounded within Defendants' own documents, this Court, at this juncture and without benefit of context, cannot find Defendants have carried their burden as to the <u>Daubert</u> challenge raised, such that the

14

opinion, in its entirety, should be stricken by the gatekeeper. This Court notes, on its face, each statement challenged by the Defendants is supported by reference to, citations to, and quotations from extensive evidence *produced by the Defendants* in this matter. For instance, her statement that "[h]ad health care providers been equipped with the truth regarding ACTOS' risks and benefits, fewer patients would have been exposed to ACTOS and its risks,"[40] is not based upon her own research, knowledge, or experience, but upon *Takeda's* evidence and *a conclusion she makes* given the facts at hand, and her knowledge and expertise of marketing and the impact, or lack of impact, certain types of information can have in the marketplace. Again, whether she can support this conclusion in fact and science remains to be seen and is matter for vigorous cross-examination.[41] The same result would flow for each of the statements challenged by the Defendants in this portion of their motion. Defendants have not, in their motion, carried their burden to establish Dr. Fugh-Berman has improperly left the arena of her expertise merely to re-state conclusions the Plaintiffs' experts have reached elsewhere – as Defendants argue; rather, on its face, it seems Dr. Fugh-Berman relies *on the Defendants' own documents* as her factual basis and her expertise and review of relevant marketing studies, research and information to demonstrate what Takeda was doing in terms of marketing and promotion, and its impact within the relevant niche marketplace – i.e., physicians. Consequently, as a threshold inquiry, the objection, at this juncture, is overruled subject to Defendants' right to object at trial based upon the foundation laid and questions actually asked.

---

[40] Memorandum, at 10, *citing* Fugh-Berman Report, at 4.

[41] *See* discussion and supporting evidence, Fugh-Berman Report, at 17-18 (describing 2003 market research to gauge physician concerns about bladder cancer; 2011 study demonstrating that physicians were prescribing Actos® less after they heard about of the risk of bladder cancer; and the resignation of one Takeda speaker for the same reason).

### 4.   Labeling

The Defendants challenge as "mere personal opinions" the following statements included in the Fugh-Berman Report.

- "Takeda knew about the elevated risk of bladder cancer associated with ACTOS use and should have conveyed this risk to patients and prescribers via its labeling and marketing several years prior to the FDA required warning in 2011."[42]

This statement – which is Dr. Fugh-Berman's *concluding statement* in the Section II.A discussion of "ACTOS' Risks of Bladder Cancer" – on its face, might well be objectionable as a question asked or answer given at trial, as this Court agrees, Dr. Fugh-Berman cannot know what Takeda might or might not have known.  However, as a conclusory statement made *following a review of Takeda's own documents, the opinion* might or might not be objectionable given the context of the trial, and the question actually asked.  The statement reflects *an opinion* based upon three pages of discussion of *the evidence* that Dr. Fugh-Berman cites as having started emerging in 2005 concerning the risk of bladder cancer allegedly caused by pioglitazone, discussion of *the evidence* Dr. Fugh-Berman cites of Takeda's alleged efforts to downplay that evidence, discussion of *the evidence* Dr. Fugh-Berman cites that Takeda allegedly knew (as a result of its own market research as well as its experience with one of its speakers) that once it became known that Actos® represented a risk of bladder cancer, sales would drop off significantly.  As a physician and expert who studies pharmaceutical marketing practices and teaches the critical assessment of biomedical literature, she conducted research of the peer-reviewed literature, read Takeda's documents and deposition testimony, and reached *conclusions* based upon *the evidence*, available information, and her expertise – on its face not objectionable conduct of an expert, if a proper foundation as to each prong is laid.  If, and as, Defendants likely

---

[42] Memorandum, at 12, *citing* Fugh-Berman Report, at 18.

perceive that same evidence differently, Defendants will be allowed to make appropriate objections *to the actual questions asked, and answers given*, at the time of trial, and to engage in vigorous cross-examination.   The objection as raised in Defendants' motion on this basis, therefore, is overruled, on this basis, at this juncture.   However, the Defendants continue and argue:

- "In addition, she alleges that the bladder cancer data from the PROactive study, which was negotiated with the FDA prior to its inclusion in the label, 'failed to make clear a shift from a non-significant to a significant bladder cancer risk' and that as a result, 'physicians and patients relying on the label were not fully informed of the doubling of bladder cancer risk demonstrated in PROactive.'"[43]

On its face, the quoted portion of Dr. Fugh-Berman's report might be objectionable *if it were framed as a question asked at trial* or answer given without proper foundation being laid. However, the quoted *statement* represents Dr. Fugh-Berman's *opinion* based upon her *conclusion* reached after a four-paragraph discussion of *the evidence produced by the Defendants* in this matter.   She discusses the fact (acknowledged by the Defendants) that the report of the 2005 PROactive clinical study included an erroneous report of bladder cancer in the placebo group; that a recalculation was conducted based upon this new information; and that the new statistical analysis reflected a significantly increased risk of bladder cancer with exposure to Actos®, and the fact Defendants did not change the Actos® label to reflect this new information, therefore, Dr. Fugh-Berman concludes this failure would have resulted in individuals relying on those labels not being fully informed of the results of the PROactive clinical study.   This is not a "personal conclusory opinion," but an opinion based upon the listed and described evidence she reviewed before reaching her opinion.   Again, this Court cannot determine, in a vacuum, whether a given question or answer might, within the context of the trial, might be objectionable as

---

[43] Memorandum, at 12, *citing* Fugh-Berman Report, at 27.

factually unsupported or speculative in nature and suggests that is an inquiry for the trial. Defendants objection, as presented herein, is overruled.

Separately, the Defendants argue that the language quoted above "*amounts to nothing more than sheer speculation, as [Dr. Fugh-Berman] has no way of knowing how physicians interpret a label.*"[44]  This argument is not without some legal basis.  Of course, Dr. Fugh-Berman cannot presume to know what a physician, or for that matter Takeda, knew, thought, or how they actually interpreted any information available and this truth, and objections grounded upon this truth, will be and are well founded.  However, again, this Court cannot know whether a proper foundation can be laid as to what impact upon marketing and Actos' sales might or might not have been expected, nor can this Court know the actual question that will be asked and actual answer given.  Again, this is not a matter for challenge under <u>Daubert</u>, *as argued by Defendants*. Rather, it is a possible objection as to a specific question within the context of the foundation laid at trial.  Therefore, this Court cannot, at this juncture, know if an objection is or will be well grounded without first knowing how the question is posed and answer framed and within what legal context.  Here, Dr. Fugh-Berman is a physician who has the responsibility for *teaching medical students how, as physicians, they should go about interpreting labels* and *she has reviewed and conducted marketing studies and research*.  The Defendants' blanket statement seems to ignore the reality of Dr. Fugh-Berman's qualifications, work experience, knowledge, and role as teacher of individuals preparing to become physicians; whether that work experience, knowledge, and role will be sufficient for her to respond to a given question asked, as it is framed, must await the actual question asked.  Consequently, Defendants' argument made, herein, is not well founded and the objection is overruled.

---

[44] Memorandum, at 13 (emphasis added).

Next, Defendants argue:

- "Dr. Fugh-Berman testified that this was a 'very important piece of information' that should have been given to doctors.'"[45]

This Court first point out Defendants did not provide a complete or fair reading of the challenged opinion. The full, and accurate, quote from Dr. Fugh-Berman is as follows:

> A.     As I stated in my report and I believe Dr. Kessler also stated in his report, although the numbers are, are changed in the label, it does not actually state that the difference is statistically significant, which would be a very important piece of information to give to doctors.[46]

Defendants are, again, cautioned as to their propensity to provide and argue only selected portions of challenged information and to exclude those portions of the information which, on its face, undercuts Defendants' arguments. Such practice does not serve counsel or their clients well. Defendants have repeatedly argued, in <u>Daubert</u> motions, that a statistically significant finding is much more important and reliable than a finding with no statistical significance.[47] Consequently, when given a fair and full reading, the Defendants' argument is at its *very best*, perplexing. This Court is at a loss to understand how Dr. Fugh-Berman's statement that a finding that *statistical significance* would be important to doctors could be a "conclusory personal opinion." The objection is overruled.

Defendants further argue:

- "Dr. Fugh-Berman also purports to interpret Takeda's interactions with regulatory agencies, asserting that that [*sic*] Takeda *'fended off'* an EU label change regarding bladder cancer and *'stalled'* the same process with the FDA a few years later."[48]

---

[45] Memorandum, at 12, citing Fugh-Berman Deposition, at 217.

[46] Fugh-Berman Deposition, at 217.

[47] *See, e.g.*, Rec. Docs. 3463-1 (Memorandum on Delacroix motion), 3464-1 (Memorandum on Schneeweiss motion), 3465-1 (Memorandum on Grossman motion).

[48] Memorandum, at 12-13, *citing* Fugh-Berman Report, at 24. (emphasis added)

This quotation from the Fugh-Berman Report represents her characterizations of Takeda's regulatory efforts *as reflected in two documents produced in this case*. The particular verbs that offend the Defendants do not represent "opinions" – personal, conclusory or otherwise – but a linguistic choice that, if in error, or inflammatory, the Defendants will be permitted to challenge at trial through cross-examination or objection. The objection, herein, is overruled.

Next, Defendants argue:

- "Dr. Fugh-Berman . . . observes in her Report that 'if regulators are given incomplete or no information about the risks associated with a drug, such risk information may not get incorporated into the label,' insinuating Defendants may have done so, and also that 'Takeda attempted to manage regulators' perceptions of bladder cancer risk in order to avoid adverse labeling changes.'"[49]

The Defendants claim these statements are inadmissible because "Dr. Fugh-Berman "possesses no insight into the label negotiation process that could possibly support an expert opinion in this area."[50] However, Dr. Fugh-Berman's comments are not directed to characterizing the "label negotiation process," rather, a reading of her report shows they characterize *her interpretation and conclusions drawn from the documentation produced by the Defendants*, describing and reflecting the interactions with regulators those documents reflect, an act of analysis she is, as a threshold matter not unqualified to conduct. To the extent Defendants disagree, again, that is a matter for vigorous cross-examination and not the gatekeeper. The objection is overruled.

### 5.    Miscellaneous Objections.

In the Defendants' final set of arguments Defendants, regrettably, collect a group of objections that, again, are not based on Daubert challenges, but on normal evidentiary challenges

---

[49] Memorandum, at 13 n.11, *citing* Fugh-Berman Repot at 24, 25.

[50] Memorandum, at 13 n.11.

and considerations and provide little, if any, support for their challenges. Nonetheless, this Court will address those challenges, as best this Court can determine them.

*Conclusory Personal Opinions*. The Defendants allege Dr. Fugh-Berman has included a number of "conclusory personal opinions" arguing that they are not based upon objective grounds, nor any alleged violation of FDA regulations by Defendants, nor any contrast with others in the industry.[51]

Specifically, the Defendants challenge Dr. Fugh-Berman's statement that, "Pharmaceutical companies also have an obligation to act reasonably."[52] Again, Defendants do not provide a complete or fair reading of the challenged portion of Dr. Fugh-Berman's report. This statement is found in a paragraph entitled, "How Physicians Get Information," and is **a portion of** the final statement in the paragraph:

> Pharmaceutical companies also have an obligation to act reasonably **to ensure that physicians, other health care providers and patients have appropriate information about both the benefits and the risks of drugs.**[53]

Again, this Court cautions Defendants as to their propensity to take statements out of context and to fail to provide the full statement challenged. The portion of the statement challenged might seem objectionable when viewed out of context, however, when read in its entirety, and in context, it is not. The statement is one based upon common sense. Surely, Defendants do not intend to argue pharmaceutical companies have no need to act reasonable in providing information to physicians and other healthcare providers. Furthermore, while it is true the specific statement is without citation to any supporting documentation, this Court is at a loss to

---

[51] The Court is a bit perplexed as to this last portion of their objection as Defendants vehemently objected to questions posed to Dr. Ge as to "contrast with others in this industry."

[52] Memorandum, at 14, *citing* Fugh-Berman Report, at 10.

[53] Fugh-Berman Report, at 10. (emphasis added)

understand Takeda's argument that the statement requires such a cite given its full context. Neither is the statement, when read in its entirety, based *solely upon* Dr. Fugh-Berman's "personal conclusory opinion," when pharmaceutical companies' duty of reasonableness in the regulatory and legal arenas has been in place for decades, if not centuries, as may be confirmed by consulting any statutory, regulatory, jurisprudential, scholarly, or academic resource available. Far from being Dr. Fugh-Berman's "personal conclusory opinion," this Court finds the quoted sentence to be a fairly straight-forward, reliable description of the general duty upon which the Defendants are operating, and have been operating at all relevant times, and this Court finds Defendants' argument, as presented, borderline specious.

The Defendants, also, challenge the statement by Dr. Fugh-Berman that, "Takeda's and Lilly's conduct fell beneath accepted standards of what is reasonable."[54] *This sentence fragment, again, represents only a portion of Dr. Fugh-Berman's conclusion to her report and is again, taken out of context*:

> It is my professional opinion, to a reasonable degree of scientific certainty, that Takeda's and Lilly's conduct fell beneath accepted standards of what is reasonable, and that many patients were harmed as a result.
>
> The methodology and materials upon which I relied in formulating my opinions are generally accepted in the scientific community. My opinions contained herein are neither new nor novel and are expressed to a reasonable degree of scientific certainty. I will testify at trial regarding the matters and opinions proffered in this report, as well as items reasonably related to the opinions contained in this report.
>
> The opinions expressed are based upon my review of materials provided to me and the relevant medical literature as well as my training, experience, and research. I have reviewed many internal documents, sales and training materials, depositions and corresponding exhibits, and have had access to all documents referred to. Additionally, I have reviewed

---

[54] Memorandum, at 14, *citing* Fugh-Berman Report, at 63.

advertisements, materials distributed by sales representatives, and other materials on thiazolidinediones within my own files.[55]

Dr. Fugh-Berman's opinion, by her own assertion, is based upon materials she reviewed and additional research she conducted. The standard to which she seeks to hold the Defendants is that of "reasonableness," which, in the manner used, is an indistinct non-legal standard, but is one that, likely, plays a role in the day to day choices we all make, and here, specifically, doctors make each day when prescribing; it is for the jury to decide what, if any, weight they might grant the doctor's opinion. The question of the doctor's analysis and conclusions, again, is better left to Cross-examination at trial. The objection is overruled.

The Defendants' third allegation that Dr. Fugh-Berman has issued "conclusory personal opinions" is directed to challenges of her use of allegedly "[p]ejorative language [that] belies her role as an objective expert."[56] As they have done in another context,[57] the Defendants object here, not to the substance of, but to the tone and language used by Dr. Fugh-Berman, who is described by the Defendants as a "self-professed 'activist,' who has not engaged in the full-time practice of medicine for approximately twenty years."[58] The Defendants do not favor this Court with any citation to controlling or guiding precedent suggesting that an expert's use of the language of advocacy renders her unqualified to serve as an expert, although this Court admits it makes her more vulnerable to cross-examination – however, again that is a matter not for the gatekeeper, but for trial. Neither <u>Daubert,</u> nor any other applicable jurisprudence this Court has reviewed, suggests the gatekeeper role should be used to exclude experts who are "activists" or

---

[55] Fugh-Berman Report, at 63.

[56] Memorandum, at 14-15, citing the Fugh-Berman Report, at 4, 25-26, 39, and the Fugh-Berman Deposition, 241, 238.

[57] *See* Memorandum Ruling: Herbert Barton Grossman, M.D. (Rec. Doc. 3848), at 17-18 (discussing the Defendants' objections to the tone of advocacy used by Dr. Grossman in his Report).

[58] Memorandum, at 1.

experts who use the language of advocacy in presenting their opinions.   The "pejorative" language to which the Defendants object suggests strong feelings on the part of the expert – perhaps even suggest bias in favor of her clients and might, in fact, be inflammatory – but, again, that is grounds for objection made at trial and robust cross-examination, not for exclusion of her opinions.  The objection is overruled.

          ***Narrative Testimony***.  The Defendants complain the Fugh-Berman report contains lengthy factual narratives, document summaries that regurgitate the contents of company documents, and a description of the history of thiazolidinediones.  The objection that her opinion is "narrative" again, is an objection as to form, foundation, or responsiveness, *if a question or answer to a question were at issue*, and is, therefore, an objection that must be presented within the context of a question actually asked and answer actually given at trial. The objection is overruled at this time, without prejudice to the Defendants' ability to re-urge their objection, if appropriate, at the proper time depending upon the actual question asked and answer given.

          ***Defendants' Knowledge, Motives, and Intent***. The Fugh-Berman Report contains, in the Defendants' words, "multiple references to Defendants' knowledge, motives, and intent."[59]  Specifically under challenge are references on Pages 10, 17, 20, 24, 26, 28, 29, and 43.  According to the defendants, these "'musings' on the 'intent, motives or states or mind of corporations, regulatory agencies and others have no basis in any relevant body of knowledge or expertise,' and are inadmissible."[60]   This Court agrees with the Defendants' general premise,

---

[59] Memorandum, at 16.

[60] Memorandum, at 17, *citing* In re Rezulin Products Liability Litigation, 309 F.Supp.2d 531, 546 (S.D.N.Y. 2004); In re Trasylol Products Liability Litigation, 709 F.Supp.2d 1323, 1337-8 (S.D.Fla. 2010); In re Fosamax Products Liability Litigation, 645 F.Supp.2d 164, 192 (S.D.N.Y. 2009); and Lofton v. McNeil Consumer & Special Pharmaceuticals, 2008 WL 48780660, at *6 (N.D.Tex. 7/25/2008).  While this Court's esteemed brethren in New York, Florida, and Texas reached certain conclusions under the facts and circumstances of the cited cases,

however, a close reading of each of the pages referenced above reflects Dr. Fugh-Berman repeatedly uses *marketing information produced by the Defendants*, as the factual basis for her opinions and then applies her knowledge and expertise of how the industry works, generally, to interpret the documents she has reviewed, and to explain their point and purpose in relation to various aspects of the Defendants' marketing. Again, outside the context of the foundation laid and actual question asked and answer given, this Court cannot address Defendants' objection as argued. Accordingly, this Court directs Defendants attention to its discussion and ruling found in section four (4) and adopts that discussion to support its ruling given here. The Defendants' objections are overruled.

   *Speculation*.  Finally, the Defendants challenge three statements that "are nothing more than inadmissible guesswork."[61]

   On Page 32, Dr. Fugh-Berman states that, "It is possible that Takeda promoted ACTOS for what is now called prediabetes," after which she lays out the evidence she reviewed that suggests such promotion occurred at a meeting of key opinion leaders in 2010.[62]

   On Page 42, Dr. Fugh-Berman states the conclusion to the discussion found in Section III of the Report,[63] entitled "Takeda Promoted ACTOS' Off-Label Cardiovascular Benefits":

---

those comments about those defendants' intent and knowledge were made under those circumstances and were based upon the actual questions asked and answers given in their respective cases.  This Court cannot evaluate and compare those rulings to the facts of this case (for the purpose of accepting guidance or distinguishing facts) in the absence of an ability to read the reports and/or depositions upon which those decisions were based and the actual questions asked and answers given in those cases and compare those situations to the one at hand.  Suffice it to say this Court is satisfied Dr. Fugh-Berman possesses certain expertise, the comments made by Dr. Fugh-Berman in *this* case *are relevant* and are, it would seem, based upon Defendants' documents she reviewed, therefore, depending upon the actual question asked and answer given, her opinions might or might not be found to be objectionable at trial.  Whether or not they are *correct,* if found not objectionable, again, is a separate inquiry and a decision likely for the jury after hearing both the Plaintiffs' evidence and the Defendants' cross-examination at trial.  Again, Defendants blending of objections based upon actual <u>Daubert</u> issues and those which are best left to trial is unfortunate and presents an analytical challenge within the context of a "<u>Daubert</u>" challenge.

[61] Memorandum, at 17.

[62] Fugh-Berman Report, at 32-24.

Takeda used promotional talks, CME, medical journals, advertisements, and other means to persuade physicians and others that ACTOS had benefits beyond hypoglycemic effects. Takeda caused physicians to believe that ACTOS was an effective treatment for dyslipidemia, prevented cardiovascular disease and had unique benefits among diabetes drugs. Takeda's efforts caused physicians to choose ACTOS over other drugs that may have been superior in safety and/or efficacy for their patients.[64]

On Page 63, Dr. Fugh-Berman states the two-part conclusion to the discussion found in Section V of the Report,[65] concerning "Takeda Ads and Sales Aids of ACTOS":

It is my professional opinion that Takeda's print ads that appeared in multiple professional journals disseminated misleading and unbranded messages regarding ACTOS' cardiovascular and mortality risk reduction benefits to prescribing healthcare professionals. Additionally, Takeda's direct to consumer promotion campaign may have caused consumers to believe that ACTOS extended life or had other benefits beyond lowering blood sugar.[66]

Each of the quoted opinions, this Court agrees, on their face, as stated, is objectionable. Dr. Fugh-Berman, without proper foundation having been laid in her report, opines what a physician were "to believe" – or for that matter what a physician might not have "believed;" without a proper factual and scientific foundation having been laid, Dr. Fugh-Berman comes perilously close to the cautionary instruction in Brown and this Court agrees, Dr. Fugh-Berman cannot know what a physician or consumer *actually might have known or done.*  Nor is Dr. Fugh-Berman's opinion and belief as to what might or might not be "possible" within this factual and legal context of any moment.  Unless proper foundation can be laid, Dr. Fugh-Berman cannot be said to know whether *Takeda's* actions *actually caused* consumers "to believe" – or for that matter, what consumers might or might not have actually "believed."  Whether certain

---

[63] Id. at 28-42.

[64] Id. at 42.

[65] Id. at 55-63.

[66] Id. at 63.

types of marketing and conduct might or might not have been shown *to influence* consumer choice or not in a given fashion, might, or might not be – with the proper foundation laid – within an expert such as Dr. Fugh-Berman's purview.  However, without such foundation being laid and no such factual or legal foundation is included within her report as to these opinions – this Court finds what a doctor or consumer *might actually* have believed or *actually done* is, without question, outside her purview.  In these instances, as Defendants' argue, Dr. Fugh-Berman's zealousness has overtaken her expertise – Defendants' objection made on these grounds as to the noted statements is granted, without prejudice to Plaintiffs' right to attempt to lay a proper foundation at trial.

## EVIDENTIARY HEARING

The Defendants requested this Court agree to hear live testimony from the experts prior to ruling on the instant motion; this Court carefully considered the Defendants' request.  The decision of how to go about ruling on the instant motion is squarely within this Court's discretion.

> The trial court must have the same kind of latitude in deciding *how* to test an expert's reliability, and to decide whether and when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides whether or not that expert's relevant testimony is reliable.  Our opinion in Joiner makes clear that a court of appeals is to apply an abuse-of-discretion standard when it reviews a trial court's decision to admit or exclude expert testimony.  That standard applies as much to the trial court's decisions about how to determine reliability as to its ultimate conclusion.  Otherwise, the trial judge would lack the discretionary authority needed both to avoid unnecessary "reliability" proceedings in ordinary cases where the liability of an expert's methods is properly taken for granted, and to require appropriate proceedings in the less usual or more complex cases where cause for questioning the expert's reliability arises.  Indeed, the Rules seek to avoid unjustifiable expense and delay as part of their search for truth and the just determination of proceedings.[67]

---

[67] Kumho Tire, 526 U.S. at 152-53 (emphasis in original) (citations and quotations omitted).

This Court reviewed the extensive briefing provided by both parties, as well as the large number of exhibits, including expert reports, depositions, and other documents, and concluded the nature of the challenges presented and the arguments made did not illustrate a need for live testimony. Live testimony would not be likely to contribute to any greater understanding of the nature of the dispute than can be and has been found in a careful reading and analysis of the briefs and accompanying evidence and documentation. The request for an opportunity to present live testimony in an evidentiary hearing is DENIED.

## CONCLUSION

For the foregoing reasons, the Defendants' Motion to Exclude Testimony of Plaintiffs' Expert, Adriane Fugh-Berman, M.D., shall be DENIED IN PART and GRANTED IN PART.

THUS DONE AND SIGNED this _____14_____ day of January, 2014.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE