UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

IN RE: ACTOS® (PIOGLITAZONE)
PRODUCTS LIABILITY LITIGATION

This Document Applies To:
*Allen et al. v. Takeda Pharmaceuticals*
*North America, Inc. et al.*
Case No. 6:12-cv-00064-RFD-PJH

MDL No. 6:11-md-2299

JUDGE DOHERTY

MAGISTRATE JUDGE HANNA


## MEMORANDUM RULING:
## DEFENDANTS' RULE 50(B) MOTION FOR JUDGMENT AS A MATTER OF LAW
## (REC. DOC. 4347)


## I.      INTRODUCTION

Pending before this Court is the Defendants' Rule 50(b) Motion for Judgment as a Matter of Law,[1] filed on behalf of all Defendants.[2]  The Defendants have moved, pursuant to Rule 50(b) of the Federal Rules of Civil Procedure for judgment as a matter of law on all of the Plaintiffs' claims, including the *factual* basis for Plaintiffs' demand for punitive damages.  Briefing in this matter now being complete, the matter is ripe for ruling.[3]

---

[1] Rec. Doc. 4347.

[2] The Defendants joining in this Motion are: Takeda Pharmaceutical Company, Limited, Takeda Pharmaceuticals U.S.A., Inc., Takeda Pharmaceuticals International, Inc., Takeda Pharmaceuticals LLC, Takeda Development Center Americas, Inc., Takeda California, Inc. (referenced collectively as "Takeda"), and Eli Lilly & Company ("Lilly").  The term "Defendants," as used in this Memorandum Ruling, refers to both Takeda and Lilly.

[3] The Defendants' Memorandum in Support of their Motion is found at Rec. Doc. 4347-1.  The Plaintiffs' Opposition is found at Rec. Doc. 4469.  The Defendants' Reply Brief in support of their Motion is found at Rec. Doc. 4491.

## II.    MOTION

This Court tried the first bellwether case of this Multidistrict Litigation, by agreement of all parties, beginning on January 27, 2014 and concluding with a jury verdict for the Plaintiffs, Mr. and Mr. Allen, on April 7, 2014.  The Defendants, now, re-urge their motion pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, for issuance of judgment as a matter of law in favor of the Defendants and against the Plaintiffs on all claims that were tried in the Allen case.  Their arguments are briefly described below.

First, Lilly asserts the Plaintiffs' claims against it are preempted because it did not have the authority to enact any change to the Actos® label.  Lilly argues that, as a co-promoter, it was not the holder of the New Drug Application (NDA), therefore, had no authority to change the label, and consequently, it was bound by the label that the FDA approved.  Based on these facts, Lilly claims that it is similarly situated to generic drug companies and should be similarly protected by the doctrine of preemption.

Second, and relatedly, both Takeda and Lilly assert preemption arguments based on the role and decisions of the FDA.   Specifically, the Defendants invoke several theories of preemption, arguing that clear evidence was presented at trial that the FDA *would not have allowed* any further warning of the risk of bladder cancer; they are protected by the preemption doctrine from liability resulting from the FDA's bad decision-making; and that imposing liability under the facts of this case would create a state-based obstacle to the FDA's ability to do its job.

Third, the Defendants argue that insufficient evidence of specific causation was presented at trial to permit the jury to find in favor of the Plaintiffs on any claim against any Defendant. These arguments reiterate and rely, primarily, upon many of the arguments previously presented in the Daubert motion regarding Plaintiff's specific causation medical expert, Dr. Delacroix's

opinion testimony.

Fourth, Takeda specifically argues there is insufficient evidence in the record to support a jury award on the claim for breach of the implied warranty of merchantability, arguing that the absence of any evidence that Actos® is unfit for its intended purpose or that it is not minimally safe, mandates a judgment as a matter of law should be issued in favor of Takeda.

Fifth, the Defendants argue the Plaintiffs presented no evidence of a wanton disregard of safety by any Defendant and argue the New York standard for imposing punitive damages is a strict one, permitting punitive damages awards only in "singularly rare cases." Defendants argue the misconduct being punished must be "exceptional" and demonstrate a "reckless or wanton disregard of the safety of others," implying almost a criminal indifference to civil obligations. The Defendants argue the risk of bladder cancer with Actos® is low, and thus, such a stringent standard cannot be met. Moreover, the Defendants claim that because the Actos® label has always contained information about bladder cancer, again this stringent standard cannot be met. Rather, they argue, the Defendants' labeling was the opposite of reckless or illustrating a wanton disregard, and, therefore, punitive damages should not have been awarded.

The Defendants, also, assert several miscellaneous arguments they suggest support their assertion criticism of their actions is unwarranted.

Finally, Lilly asserts several additional arguments supporting its request for judgment as a matter of law on the punitive claims lodged against it: (a) damages based on Lilly's alleged failure to change the Actos® label are not permitted because it had no authority to make such changes; (b) there is no "co-promoter" liability and, even if there were, there can be none in this case because the co-promotion agreement ended in 2006, which is before Mr. Allen began taking Actos®; and (c) spoliation damages cannot form the basis of the punitive damages award against

Lilly because Lilly didn't spoliate any documents.

This Court will address each of the Defendants' arguments in more detail below. However, preliminarily, this Court notes that the Defendants' motion reiterates much of what has been argued previously, without presenting appreciable new argument, jurisprudential support, or evidence.  Furthermore, much of the Defendants' argument is presented without addressing the plethora of evidence presented to the jury by Plaintiffs as to each issue.

Rather, Defendants' arguments are heavily weighted toward straw-men argument and reveal a tendency to focus their arguments on a single piece of evidence, discussing it without acknowledging its larger context, or the competing evidence, and attempting to attach meaning neither argued by Plaintiffs, nor mandated for the jury.  Finally, this Court notes the Defendants' tendency, also, to conflate disparate issues – perhaps most troubling, Takeda's repeated conflation of the separate legal issues referenced by their use of the broad term "spoliation," *i.e.*, this Court again notes, *whether a spoliation tort exists* is irrelevant to the jury's consideration of *evidence of Takeda's conduct*, as no such tort claim was made.  Rather, whether *the fact that Takeda destroyed files*, arguably for the purpose of concealing information connecting Actos® to bladder cancer, is relevant when *determining Takeda's intent* in its dealings with the bladder cancer issue, *as that intent might relate to the punitive damages claim* made against it; and, whereas, *the evidentiary matter of whether spoliation occurred* within Takeda's conduct and Takeda's obligations under the Federal Rules of Civil Procedure, and within Takeda's discovery obligations owed to the judicial process is, and was, *a matter handled by this Court and the subject of two previous rulings* and is a separate legal inquiry from Takeda's possible legal liability under a punitive damages claim. Takeda's propensity to conflate these three separate legal issues into one and to argue the amalgamation is problematic at best.

Specifically, *evidence of the fact that Takeda destroyed files and why*, is relevant to the questions of *Takeda's intent,* and *to the nature of its conduct,* a pivotal aspect inherent in the punitive damages claim – which is separate and apart from any <u>tort</u> of spoliation, and separate and apart from the finding of this Court, that Takeda violated its *obligations as to discovery,* for which sanctions were ordered.  And this Court reminds, those sanctions **in no way included punitive damages.**[4]  Takeda's arguments intermingling these three separate legal issues to create multiple straw-man arguments is, again, quite problematic.  This Court will discuss each of Takeda's arguments in turn.

## III.   STANDARD OF REVIEW

Once a party has been fully heard during a jury trial, Rule 50 permits a court to evaluate whether a reasonable jury would have a *legally sufficient evidentiary basis* to find for that party.[5] A Rule 50(a) motion seeking judgment as a matter of law is the proper procedural mechanism by which a party presents a challenge to the *legal sufficiency* of the evidence.[6]  ***It is not, however, an invitation for the Court to substitute its determination for those of the jury.***

A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury, and must specify the judgment sought, as well as *the law and facts* that entitle the movant to judgment.[7]  Where such a motion has been made and denied, the court is considered to have submitted the action to the jury subject to the court's later deciding *the legal* questions raised by the motion.[8]  Rule 50 allows the moving party to re-urge its motion for

---

[4] Amended Memorandum Opinion and Ruling, at 69-72 (Rec. Doc. 3933).

[5] Fed. R. Civ. P. 50(a)(1).

[6] <u>Kevin M. Ehringer Enterprises v. McData Services Corporation</u>, 646 F.3d 321, 324 (5th Cir. 2011).

[7] Fed. R. Civ. P. 50(a)(2).

[8] Fed. R. Civ. P. 50(b).

judgment as a matter of law within 28 days after entry of judgment.[9]  In ruling on the renewed motion, the court may:

(1)   allow judgment on the verdict, if the jury returned a verdict;

(2)   order a new trial; or

(3)   direct the entry of judgment as a matter of law.[10]

These procedural mechanisms are available – and federal standards govern – even when the court exercises diversity jurisdiction over the case.[11]

After a jury trial, the standard of review is ***"especially deferential"*** to the jury's determination.[12]  Courts should be wary of upsetting jury verdicts, and ***should do so only when there is not a legally-sufficient evidentiary basis for the jury's verdict***.[13]  In considering a motion for judgment as a matter of law after a jury verdict, the court must uphold the verdict ***"unless the facts and inferences point so strongly and so overwhelmingly in favor of one party that reasonable jurors could not arrive at any verdict to the contrary."***[14]  In making this determination the court ***must credit the non-moving party's evidence***; ***must disregard all evidence favorable to the movant that the jury is not required to believe***; ***must draw all reasonable inferences in favor of the nonmoving party***; **and** ***may not make credibility***

---

[9] Id.

[10] Id.

[11] Dawson v. Wal-Mart Stores, Inc., 978 F.2d 205, 208 (5th Cir. 1992) (citation omitted).

[12] Williams-Boldware v. Denton County, 741 F.3d 635, 639 (5th Cir. 2014); Brown v. Sudduth, 675 F.3d 472, 477 (5th Cir. 2012) (citation omitted).

[13] Roman v. Western Manufacturing, 691 F.3d 686, 692 (5th Cir. 2012).

[14] Williams-Boldware, 741 F.3d at 639; Goodner v. Hyundai Motor Company, 650 F.3d 1034, 1039 (5th Cir. 2011).

determinations or weigh the evidence.[15]  To defeat a motion for judgment as a matter of law, *the nonmovant must point to substantial evidence in the record supporting the jury's verdict; this evidence must be of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions.*[16]

The Fifth Circuit has noted that *it is not the court's charge to decide which side has the more persuasive case*, **"for it is the function of the jury as the traditional finder of the facts, and not for the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses."**[17]

During the trial, the Defendants made Rule 50 motions that substantially overlap the arguments presented in the current motion.  These motions were urged at the close of the Plaintiffs' case,[18] and at the close of the evidence.[19]  This Court denied the motions on both occasions.  In order to avoid unnecessary repetition, this Court adopts and incorporates its earlier rulings as though set forth in full.[20]  Because the arguments are largely the same as those made earlier, and Defendants present little, if any new persuasive argument, the outcome of this Court's consideration of the current Rule 50 motion is identical to the rulings on the earlier motions, but the analysis given herein is more detailed and thorough.

---

[15] Kevin M. Ehringer Enterprises, 646 F.3d at 325 (*citing* Reeves v. Sanderson Plumbing Productions, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)); Brown, 675 F.3d at 477.  This court uses the same standard of review articulated by the Fifth Circuit for its appellate review because both standards of review are identical.  *See* Kevin M. Ehringer Enterprises, 646 F.3d at 324 ("We review denials of motions for judgment as a matter of law under Federal Rule of Civil Procedure 50 *de novo*, applying the same standard as the district court.") (citation omitted).

[16] Viazis v. American Association of Orthodontists, 314 F.3d 758, 761 (5th Cir. 2002) (citation omitted).

[17] Roman, 691 F.3d at 692.

[18] *See* Trial Tr. vol. XXVI, at 3901(B), *et seq.*

[19] *See* Trial Tr. vol. XXXV, at 5826, *et seq.*

[20] Trial Tr. vol. XXVI, at 3903(B), *et seq*; Trial Tr. vol. XXXV, at 5830, *et seq.*

## IV.     PLAINTIFFS' BURDEN ON RULE 50 MOTION

As noted above, the **Plaintiffs' task** in response to the Defendants' Motion for Judgment as a Matter of Law, is to point to "**substantial evidence in the record supporting the jury's verdict; this evidence must be of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions.**"[21]   Following is a streamlined narrative description of the majority of the evidence in the record to which the Plaintiffs have pointed in opposing the instant motion.  Where necessary for completeness sake, this Court has identified additional citation to that evidence with a "*See also*" citation.

It should be noted at the outset, that having sat through the entire trial, this Court is not unaware of additional evidence which might, also, support Plaintiffs' arguments and claims, and of evidence which might support Defendants' argument.  **However, it is not for this Court, upon a Rule 50 Motion to conduct a *de novo* review, make *credibility calls*, or *substitute its determinations* for those made by the jury**.  Rather, this Court's task is one of determining *legal sufficiency*, rather than, "the better argument," and as noted, this Court **must credit** *the non-moving party's evidence*; *must* **disregard all evidence favorable to the movant that the jury is not required to believe**; must **draw all reasonable inferences in favor of the nonmoving party**; and *may not make credibility determinations or weigh the evidence*.[22]

### A.     Plaintiffs Point to Evidence Regarding Takeda's Actions

The Plaintiffs point to a plethora of evidence presented at trial of Takeda's actions while

---

[21] Viazis, 314 F.3d at 761.

[22] Kevin M. Ehringer Enterprises, 646 F.3d at 325 (*citing* Reeves v. Sanderson Plumbing Productions, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)); Brown, 675 F.3d at 477.  This court uses the same standard of review articulated by the Fifth Circuit for its appellate review because both standards of review are identical.  *See* Kevin M. Ehringer Enterprises, 646 F.3d at 324 ("We review denials of motions for judgment as a matter of law under Federal Rule of Civil Procedure 50 *de novo*, applying the same standard as the district court.") (citation omitted).

Takeda was developing Actos®, as well as Takeda's actions with regard to marketing Actos®, and, of Takeda's pattern of treatment of the bladder cancer issue, all of which Plaintiffs argue act to support the jury's findings. Plaintiffs point to evidence Takeda did not include *a warning* as to bladder cancer, in the warnings section of the Actos® label until 2011.[23]   Illustratively, Plaintiffs point this Court to evidence presented at trial supporting:

### 1.        Developing Actos®

Takeda began developing the drug now known as Actos® (also known as "pioglitazone") some time prior to 1986. In 1986, Takeda conducted a 90-day beagle study, which yielded information suggesting the need for follow-up study and testing. [24]   At that time (or shortly thereafter – the record is unclear), Takeda partnered with Upjohn to develop Actos®. Upjohn's pharmaceutical executive council had the task of evaluating toxicology and clinical studies in connection with their continued development of Actos®.[25]   Upjohn's pharmaceutical executive council made the determination, in 1993, that further clinical development of Actos® could not be justified based on their concerns regarding the margin of safety,[26] and Upjohn withdrew from the venture. Giving, perhaps, a first glimpse of the pattern of effort Takeda would put into hiding safety-related concerns from regulators, physicians, and the public, Takeda made an effort to persuade Upjohn to publicly describe Upjohn's decision to discontinue work on Actos® solely as a business decision and to keep silent about its safety concerns.[27]

---

[23] Trial Tr. vol. XI, at 1525-26; Trial Tr. vol. XXXII, at 5211.

[24] Trial Tr. vol. XXIX, at 4704.

[25] Trial Tr. vol. XXIX, at 4705.

[26] Trial Tr. vol. XXIX, at 4706-07, 4709-12; Trial Ex. P-0002; Trial Tr. vol. IV, at 413-14.

[27] Trial Tr. vol. XXIX, at 4717-19; Trial Ex. P-0003; Trial Tr. vol. IV, at 423; Trial Ex. P-6056; Trial Tr. vol. IV, at 434.

### 2. Plaintiffs Point to Evidence of Takeda's Actions Concerning the Bladder Cancer Issue

The Plaintiffs point to evidence presented at trial that, in 1999, the FDA approved Actos®; approximately six months earlier, Takeda and Lilly had entered into a Co-Promotion Agreement, which is discussed *infra*. In Lilly's PowerPoint slide deck discussing the major contract terms between Takeda and Lilly, bladder cancer is listed below the heading "most significant adverse event risks for pioglitazone,"[28] thus, demonstrating both Lilly's and Takeda's early knowledge of the potential risk of bladder cancer presented by Actos® to its consumers. The Plaintiffs, also, point to evidence that Takeda's approach to the FDA – despite its early recognition of this concern – involved withholding and obfuscating information that might have implicated a risk of bladder cancer *and* involved presenting questionable information to undermine any suggestion of an association between Actos® and a risk of bladder cancer.[29]

### a. Plaintiffs Point to Evidence that Takeda Refused to Completely, Accurately, and Timely Report Test Results and Other Data to the FDA

*The PPAR-alpha question.* Actos® belongs to a class of drugs known as thiazolidinediones ("TZDs"). Those members of the TZD class that act on urothelial cells by interacting *with both* PPAR-alpha and PPAR-gamma receptors are known as *dual-agonists*. The effect on PPAR-*alpha* receptors was, at one point, thought to have a beneficial effect on lipid levels (and, thus, a beneficial cardiovascular side-effect), and Plaintiffs point to evidence Takeda initially embraced the theory that Actos® was a *dual PPAR* agonist as a marketing tool to demonstrate Actos'® superiority over its closest competitor, Avandia, which is a PPAR-gamma

---

[28] Trial Tr. vol. IV, at 404; Trial Ex. P-5350.

[29] Plaintiffs' Opposition, at 4.

agonist.[30]  However, Plaintiffs point to evidence that by 2002 the FDA was becoming concerned that dual-PPAR agonists, such as Actos®, were associated with an increased risk of bladder cancer; and that the FDA had contacted Takeda, expressed its concerns, and requested feedback.[31]

Plaintiffs point to evidence Claire Thom – former Vice President of Research and Development for Takeda Pharmaceuticals North America – agreed the FDA had raised serious concerns about Actos®.[32]  Plaintiffs point to evidence that as a result of these concerns, Takeda made a "high-level" decision to abandon its former position that Actos® had a positive effect on lipids due to its interaction with PPAR-*alpha* receptors,[33] and turned its attention to ensuring the Actos® label would distinguish it as a PPAR-gamma (only) drug, as opposed to a dual agonist, as certain dual agonists had been associated with bladder tumors.[34]  Plaintiffs point to evidence that during this general time frame, Lilly, as the primary marketer of Actos® in the United States, had written an article focusing on the alleged positive cardiovascular impact of Actos® and its alleged positive effect on lipids,[35] thus suggesting the *dual agonist* characteristic; however, Takeda urged Lilly to omit this information from the article, and Takeda's request was followed by Lilly and the offending reference removed.[36]

---

[30] Trial Tr. vol. X, at 1272-73.  *See, also,* Trial Ex. P-4630 (the Executive Policy Committee established a clinical plan to support Actos®, which included promoting the "enhanced lipid profile" over Avandia (*i.e.,* the PPAR alpha effect)."

[31] Trial Tr. vol. X, at 1247-51; Trial Ex. P-0459.

[32] Trial Tr. vol. X, at 1247.

[33] Trial Tr. vol. X, at 1348-50; Trial Ex. P-2285.

[34] Trial Tr. vol. X, at 1284; Trial Ex. P-3712.

[35] Trial Tr. vol. X, at 1349-50.

[36] Trial Tr. vol. X, at 1349-56.

*The PROactive Clinical Study*. The following year (2003), Takeda undertook the single largest *clinical* trial of Actos® that has been completed to date.[37]  One reason for conducting this trial was to ascertain whether an increased risk of bladder cancer existed, and Takeda agreed to inform the FDA in an expedited fashion of new cases of bladder cancer discovered during the study; to unblind those study subjects and, for any such subject taking pioglitazone, remove him or her from the clinical trial.[38]  During the course of the clinical trial, 19 people developed bladder cancer: 14 were in the group taking Actos®, while 5 of them were in the control group.[39]  Plaintiffs point to evidence that the PROactive study found that the group taking Actos® had a statistically significant increase in bladder cancers than those in the placebo group.[40]  Notwithstanding Takeda's earlier promise, however, Plaintiffs point to evidence Takeda did not unblind the subjects who developed bladder cancer.[41]  Moreover, Plaintiffs point to evidence that certain Takeda employees expressed concern about this failure to unblind the cancers, in light of the earlier FDA agreement.[42]  On March 10, 2004, Takeda justified this decision not to provide the information to the FDA by claiming that Takeda Europe Research & Development, Ltd.

---

[37]  The evidence describes three different types of scientific studies.  A "randomized controlled trial" ("RCT"), a/k/a a "gold standard" study, is a clinical experiment in which a large number of participants are assigned, in a double-blind trial, to two treatment groups (one group receiving the drug being studied and the other group either receiving no treatment or receiving a different treatment) (Trial Tr. vol. XXI, at 2942-43).  Next, a "cohort study" is an observational study (as opposed to an experimental study) that is conducted in real life and follows two groups of patients who take two different drugs, collecting information on their developing medical condition over time after they begin taking the drugs (Trial Tr. vol. XXI, at 2974).  Third, a "nested case control study" is an observational study (as opposed to an experimental study) in which the researchers use information collected in a completed cohort study to study a sub-group within the cohort study (*e.g.*, the group of participants who developed bladder cancer), together with a randomly-selected control group within the cohort study.  (Trial Tr. vol. XXI, at 2975-77).

[38]  Trial Ex. P-4719-0002; Trial Tr. vol. XXVIII, at 4447-48; Trial Tr. vol. VIII, at 1013-1014 (Rec. Doc. 4179); vol. XI, at 1459, 1461-62, 1465-66, and 1528-31; Trial Ex. P4869.

[39]  Trial Tr. vol. XVII, at 2429-30, 2480.

[40]  Trial Tr. vol. XVII, at 2430; Trial Tr. vol. XXI, at 2950.

[41]  Trial Ex. P-4719-0002; Trial Tr. vol. XXVIII, at 4448.

[42]  Trial Ex. P-4719-00003; Trial Tr. vol. XXVIII, at 4450.

preferred not to break the study blind, given its obligation to European regulators.[43]   However, Plaintiffs point to evidence that Takeda Europe Research & Development, Ltd. had not existed as a separate corporate entity for over two months.[44]

*Disproportionality Analysis.* Takeda, also, performed a statistical analysis of the FDA-AERS database (a somewhat limited database tracking self-reported cases of side effects) in 2005, which showed a signal for bladder cancer when comparing Actos® to all drugs in the FDA-AERS database; however, Plaintiffs point to evidence Takeda edited the table so as to omit this statistical analysis from the final reports provided by Takeda to the FDA, and thereby included only non-significant signals of Actos® when compared to anti-diabetic drugs, insulin, metformin, sulfonylureas, and Avandia.[45]   Furthermore, Plaintiffs point to evidence that Takeda failed to reveal to the FDA the result of the October 2005 Disproportionality Analysis showing a signal of excess bladder cancer among Actos® patients, despite and in the face of the FDA's request, in May 2006, for "any recent data you may be aware of."[46]

*The KPNC Study.*   At some point, Takeda and the FDA agreed a nested-case control study – a different longer term human study protocol than utilized heretofore – would be conducted on behalf of Takeda, by Kaiser Permanente Northern California ("KPNC").   In November, 2004, Takeda wrote the FDA and proposed, with regard to the KPNC study, that data from the nested-case control study be analyzed separately for the retrospectively- and prospectively-identified cases (and their matched controls).   The data would then be combined only if the results were comparable.   Takeda declared, before the study started, that they believed

---

[43] Trial Ex. D-1324; Trial Tr. vol. XXVIII, at 4452.

[44] Trial Tr. vol. XXVIII, at 4453.

[45] Trial Ex. P-1033; Trial Ex. P-1617; Trial Tr. vol. IX, at 1132, 1136, 1139-41.

[46] Trial Tr. vol. IX, at 1121-45; Trial Ex. P-1617-00001; Trial Ex. P-1033.

the results from the prospectively-identified cases and controls would have greater validity than those from the retrospectively identified cases and controls.[47]  Plaintiffs point to evidence that after conducting the analysis, the prospective arm reflected a substantial increase in the risk of bladder cancer for those taking Actos® over 36 months (between 320% and 360% increase).[48] Nonetheless, Plaintiffs point to evidence Takeda did not immediately disclose these results to the FDA.[49]

Plaintiffs point to evidence that in the Summer of 2009 Takeda had in its possession the results of the third interim analysis of the KPNC data; results that ultimately became the basis of the published KPNC study, and that data included data which was ultimately included in the warning which was added to the Warnings section of the Actos® label at the behest of the FDA in the Summer of 2011.  Despite having this information in 2009, Plaintiffs point to evidence Takeda failed to fully notify the FDA, change its label, or notify either the involved patients or the public of this information for nearly two years.[50]

> **b.  Plaintiffs Point to Evidence that Takeda Was Submitting Questionable Information to the FDA**

Plaintiffs point to evidence that in addition to withholding problematic information about Actos®, Takeda also, and simultaneously, was submitting questionable information to the FDA in order to support their position that no causal connection exists between Actos® and bladder cancer.  Much of the testimony pointed to by Plaintiffs concerns the so-called Cohen Hypothesis and Takeda's use of that hypothesis and the strong scientific challenge made to that hypothesis.

---

[47] Trial Ex. P-0341-00002; Trial Tr. vol. XXXIII, at 5449-50.

[48] Trial Tr. vol. XXXIII, at 5451.

[49] Trial Tr. vol. XXXIII, at 5452-53.

[50] Trial Ex. P-0128; Trial Tr. vol. XXXIII, at 5444-47; Trial Ex. P-1943; Trial Ex. P-1790; Trial Tr. vol. XXXI, at 5046-47.

When Takeda originally realized – Plaintiffs point to evidence that this occurred during preclinical testing – that a number of the involved laboratory animals were developing bladder cancer, it hired Dr. Sam Cohen to address the identified issue of rats having developed bladder cancer after having been exposed to Actos®.[51]   The Plaintiffs point to evidence presented at trial calling the Cohen Hypothesis into serious scientific and factual question:

- Evidence gathered by Novo Nordisk and Dr. Jennifer Southgate suggests that no correlation exists between the presence of calculi and bladder tumors, as Cohen argues within his alternate explanation for the manifestation of bladder cancer in rats exposed to Actos®.[52]

- Dr. Southgate testified that, in testing she conducted, the pH levels in rat urine were not sufficiently elevated to sustain a foundational prong of the Cohen Hypothesis.[53]

- Dr. Cohen's hypothesis, also, rests, in part, on the fact that male rats are more susceptible to the development of calculi than female rats because males have a different urinary composition from females, which makes it easier for calcium-type stones or crystals to form.[54]   Dr. Cohen claimed that females can form these crystals, but the effect is usually less, which results in a lower incidence of, or even no, bladder cancer with Actos®.[55]   In trying to replicate Dr. Cohen's work, Dr. Southgate agreed that these calculi changes should only occur in male rats, but testified that her findings included changes in female rat bladders, as well, and that these changes were due to proliferation of cell division occurring throughout the urinary tract.[56]   In other words, the hyperplasia was occurring in female rats as well, and this fact undermines another foundational prong of the Cohen Hypothesis.

- Dr. Cohen testified that rats always have transitional cell cancer, or almost always (99% of the time).[57]   By contrast, Dr. Southgate testified that, once the lining of the

---

[51] Trial Ex. P-0004; Trial Tr. vol. XXVI, at 4105.

[52] Trial Tr. vol. X, at 1339; Trial Tr. vol. XII, at 1645.

[53] Trial Tr. vol. XII, at 1652-53.

[54] Trial Tr. vol. XXVII, at 4296.

[55] Id.

[56] Trial Tr. vol. XII, at 1653-54.

[57] Trial Tr. vol. XXVII, at 4180-82.

bladder is irritated, changes are expected to be squamous cell, not transitional cell,[58] again undermining another foundational prong of the Cohen Hypothesis.

- As of July 31, 2002, the FDA informed Takeda it was no longer accepting the company's "Cohen Hypothesis" to explain bladder cancers found in test animals.[59]

Plaintiffs point to evidence Takeda was aware of the contrary scientific evidence, serious challenge, and FDA concern as to the validity of the Cohen Hypothesis and, nonetheless, continued to insist that the hypothesis was correct and to put it forth as Takeda's explanation of the increased instance of bladder cancer in preclinical testing.[60]

### c.     Plaintiffs Point to Evidence of Takeda's Resistance to Label Changes

Next, the Plaintiffs point to evidence that, overall, notwithstanding knowledge of possible risks of bladder cancer, Takeda responded to the FDA's requests for information with an organized, steadfast, resistance to label changes which would have fully addressed this risk, taking an obstructionist approach, which was expressly approved at the highest level(s) of Takeda leadership.[61]   Plaintiffs point to a series of communications between Takeda and the FDA, illustrating the history of Takeda's recalcitrant refusal to comply with FDA requests to strengthen bladder cancer labeling, and the Plaintiffs point to the FDA's own documentation that in response, it had merely agreed to labeling that would be "acceptable to Takeda."[62]   It should be noted that, at the relevant time, the FDA's authority allowed only for negotiation with drug companies as to their labels – that policy has since been changed.

---

[58] Trial Tr. vol. XII, at 1654.

[59] Trial Tr. vol. X, at 1250-51.

[60] Trial Tr. vol. X, at 1334.

[61] *See, e.g.*, Trial Tr. vol. X, at 1247, 1249, 1293.

[62] Trial Tr. vol. VIII, at 1051-67; Trial Tr. vol. IX, at 1080-1083, 1087-93, 1095-97; Trial Ex. P-1595; Trial Ex. D-1621, at 53-54.

Page 16

Plaintiffs point to evidence that in 2002, the FDA was considering requiring new warnings for Actos®, based upon concern surrounding Takeda's application for approval of pediatric use of Actos®;[63] the pediatric use of Actos® would have granted exclusivity to Takeda for such pediatric use and thus, breathed new financial life to Takeda's soon to expire patents on Actos®. Plaintiffs point to evidence that because of the possible dual PPAR-agonist activity of Actos® and the possible association of dual PPAR agonists with bladder cancer, the FDA informed Takeda that it was no longer accepting the company's "Cohen Hypothesis" to explain bladder cancers found in test animals as attributable to bladder crystals.[64] Plaintiffs point to evidence that in response, Takeda determined it would now abandon including mention of the PPAR *dual-agonist* hypothesis, but would, nonetheless, continue to rely on the Cohen Hypothesis, and would act to construct a theory addressing toxicity and pharmacology and determined Takeda would not accept any revision of the Actos® label within its negotiations with the FDA.[65] Plaintiffs point to evidence that Takeda's basic strategy for responding to the FDA was to "make best efforts to keep the current wording for carcinogenicity"; "to find a good rationale for not conducting any bladder toxicity monitoring"; and "to obtain approval from the CEO before any documents were submitted to the FDA."[66] Plaintiffs point to evidence that Takeda's decisions were motivated by an anticipated negative financial impact on the market for Actos® and, thus, serious negative impact on Takeda's income from Actos®, if a different result of their negotiations with the FDA were to occur.[67] The sale of Actos® and Actos®-based

---

[63] Trial Tr. vol. X, at 1277-81.

[64] Trial Tr. vol. X, at 1250-51.

[65] Trial Tr. vol. X, at 1284.

[66] Trial Ex. P-0452-00003, -00004, -00006.

[67] Trial Tr. vol. X, at 1287.

products represented the vast majority, if not all, of Takeda's income at the time.[68]

> **d.  Plaintiffs Point to Evidence that Takeda had Sufficient Information, Before April 2006, to Require a Warning About the Increased Risk of Bladder Cancer**

Mr. Allen was first prescribed Actos® on April 12, 2006; the Plaintiffs point to evidence that Takeda had in its possession sufficient information to know, by the time Mr. Allen began taking Actos® (April, 2006), that Takeda owed Mr. Allen's physicians and, thus, Mr. Allen, a warning that the drug was associated with a possible increased risk of bladder cancer.[69]   New York law requires a drug company to warn *of all potential dangers* that it knows or reasonably should know about with the exercise of reasonable care.[70]

The Plaintiffs point to expert opinion testimony by a former Commissioner of the Food and Drug Administration (Dr. David Kessler) that Takeda had sufficient information and thus, the obligation to provide Mr. Allen's physicians with warnings about the increased risk of bladder cancer associated with the taking of Actos® *no later than January, 2004.*[71]   Dr. Kessler reviewed a plethora of documents and testified, based on knowledge derived through his document review, as well as his experience as the former head of the FDA and his training within the field, that primary responsibility for the safety of Actos® and the adequacy of its warnings rested with Takeda Pharmaceuticals, in conjunction with Lilly.[72]  Dr. Kessler testified the reason Takeda and Lilly remain ultimately responsible for communications concerning the safety of Actos® is that "they're in the best position to give doctors and patients the information

---

[68] Trial Tr. vol. VIII, at 996-98.

[69] Trial. Tr. vol. VIII at 1014.

[70] *See* Trial Tr. vol. XXXVII, at 6267; Martin v. Hacker, 83 N.Y.2d 1, 8-9 (N.Y. 1993)

[71] Trial Tr. vol. VIII, at 1013-14.

[72] Trial Tr. vol. VIII, at 962, 964-65.

they need to make informed decisions."[73]

Dr. Kessler testified that Takeda, consistent with this obligation, should have *strengthened the labeling* as to bladder cancer *as early as July 2002.* At that time, the FDA first expressed concern that Dr. Cohen's crystal hypothesis did not explain the increased bladder cancer in animals; and that there might be a "class effect" of dual PPAR agonist drugs, including Actos®, in causing the increased risk, and that the increased risk might be relevant to humans.[74]

Eighteen months later, according to Dr. Kessler, *the evidence was strong enough for a warning* as to bladder cancer to be required. Specifically, Plaintiffs point to evidence that, had Takeda conducted its meta-analysis in January 2004 with all the data already available at that time, the meta-analysis would have showed that a statistically significant result with Actos® and bladder cancer existed.[75] Dr. Kessler testified that the meta-analysis ultimately conducted includes important information, which links bladder cancer and Actos® at *the very end of 2003, early 2004,* and that the data are reliable and statistically significant.[76] Dr. Kessler opined that Takeda, certainly, therefore, should have included *information about bladder cancer **in the warning section** of the label* **as of January 2004** because, once clinical trial data (data from humans) became significant for an association, *this certainly would have triggered the FDA requirement for a warning.*[77]

Asked about the state of Takeda's knowledge as of Spring, 2006 (when Mr. Allen was

---

[73] Trial Tr. vol. VIII, at 964.

[74] A "class effect" is an effect caused by an entire class of pharmaceuticals – in this case, TZDs. Trial Tr. vol. IX, at 1089, *et seq.*

[75] Trial Tr. vol. XVI, at 2273-74.

[76] Trial Tr. vol. VIII, at 1024.

[77] Trial Tr. vol. VIII, at 1014.

first prescribed Actos®), Dr. Kessler testified that:

> There's animal data.  There's multiple different types of animal data.  There's the clinical trial data, the meta-analysis data, and then there's epidemiological data.  So I was focusing on specifically, happy to talk about all, whichever you're asking me about, but my – to me, the meta-analysis, because remember, that's based on controlled clinical trials, if you look at Dr. Madigan's report, that has very important information that you asked me about earlier that linked bladder cancer and Actos® at the end of 2003, early 2004 and that data are reliable statistically significant.[78]

Discussing medication labels, Dr. Kessler testified a product's entire label cannot be considered a warning,[79] and that data concerning human bladder cancer must be included in the "warnings section" of the label for it to be an actual warning to patients and physicians.[80]  Dr. Kessler concluded that it was inadequate for Takeda to leave such information out of the warning section because it represents *human* data that may reveal that Actos® may be "cancer carcinogenic," and *human data* must be put *in the warning section*.[81]  Dr. Kessler testified that, *during the time Mr. Allen was taking Actos®, the warning section of the label did not include any information about the meta-analysis of the clinical trials, nor did it include any statement about bladder cancer being a clinically-significant hazard of Actos®.*[82]

Dr. Kessler testified that it was not adequate at the point in time when proper data was available (early 2004 bladder cancer data) to leave the bladder cancer data out of the warning

---

[78] Trial Tr. vol. VIII, at 1024.

[79] Trial Tr. vol. VIII, at 996-997.

[80] Trial Tr. vol. VIII, at 1024-25.

[81] Trial Tr. vol. VIII, at 1025.

[82] Trial Tr. vol. VIII, at 1031; Trial Tr. vol. XXIV, at 3565-66 (Dr. Spanheimer acknowledging that the 2006 label did not contain a warning for bladder cancer); Trial Tr. vol. XXXII, at 5211 (Dr. Feigal testifying that a reference to an association between bladder cancer and Actos® never appeared in the warnings section of the label until after Mr. Allen's bladder cancer in January 2011).

section of the label. He testified the reason for this conclusion is, "when I read those sections, this human data that may reveal that Actos® – again not definitively, but it may be cancer carcinogenic. That's under that, so there's human data, and human data has to be in the warnings section."[83] *Dr. Kessler testified that Takeda's history of recalcitrance and obfuscation would have affected the negotiations between Takeda and the FDA, resulting in an inadequate label change that buried the human data on bladder cancer risk in the label section reserved for animal data, as of 2006.*[84] Finally, Dr. Kessler testified that, notwithstanding all the existing data, *even within the 2007 Actos® label, there was no mention of bladder cancer in the warnings section of the 2007 Actos® label.*[85]

Plaintiffs, also, point to the testimony of Dr. Schneeweiss that the PROactive study completed in 2005 showed that Actos® use can create a relative risk of 2.83 of the development of bladder cancer in Actos® users, thus, *almost-tripling the risk of bladder cancer with exposure to Actos®;*[86] and the net result of Takeda's meta-analysis, which reviewed and evaluated data available before and after 2006, conducted in 2011, shows there is a *more than doubling in the risk of bladder cancer* in patients exposed to Actos® – a relative risk of 2.64, which converts to a 164% increase in bladder cancers – which Dr. Schneeweiss testified was statistically significant.[87]

---

[83] Trial Tr. vol. VIII, at 1024-25.

[84] Trial Tr. vol. XI, at 1512-13; Trial Ex. D-1626; Trial Ex. D-1621-0053, 54.

[85] Trial Ex. P-7395; Trial Tr. vol. VIII, at 985.

[86] Trial Tr. vol. XXI, at 2950.

[87] Trial Tr. vol. XXI, at 2968. The Azoulay study dated May 31, 2012 (a nested, case-control study using information derived from the British General Practitioner Research Database. *See* Trial Tr. vol. XVII, at 2492, *et seq.*; Trial Tr. vol. XXI, at 2973, *et seq.*) showed that Actos® was associated with an increased risk of bladder cancer (rate ratio 1.83, 95% confidence interval, significant). Trial Tr. vol. XVII, at 2493.

### B.     Plaintiffs Point to Evidence Regarding Lilly's Actions

The Plaintiffs point to evidence against Lilly presented at trial which is more limited and focused more upon the ways in which Lilly and Takeda closely collaborated – arguing the Takeda and Lilly relationship was in no way an arms- length relationship.

### 1.     Plaintiffs Point to Evidence of Lilly's Role

Plaintiffs point to evidence Takeda and Lilly entered into a Co-Promotion Agreement in 1998, thus, Lilly, effectively, then, and for a time, became Takeda's *sole marketing arm* in the United States.  Under the Co-Promotion Agreement, Lilly accepted the obligation to provide the service of "primary details."[89] .  Under the Co-Promotion Agreement, Lilly agreed to a target of 800,000 primary details per year for Actos®.  Over the course of seven years, this agreement amounts to more than five million presentations of Actos® by Lilly representatives made to U.S. doctors.[90]   Plaintiffs point to evidence establishing Lilly detailed Mr. Allen's two primary physicians multiple times before Mr. Allen was prescribed Actos®.[91]

The Agreement between Lilly and Takeda was signed on December 14, 1998,[92] for a term of seven years following the Actos® launch date.[93] It provided for Takeda's and Lilly's names and/or logos to appear in "equal prominence" on the product, sample packages, product label, as well as promotional material,[94] and Lilly agreed to deploy at least 500 sales

---

[89] Under Section 1.22 of the Co-Promotion Agreement a primary detail is defined as a person-to-person meeting between a health care professional and a representative of Lilly or Takeda to promote the identified drug or drugs. Trial Ex. P0470-0008-0016.

[90] Plaintiffs' Opposition, at 12 n.10; Trial Ex. P-0470-00009 and 00016.

[91] *See* Trial Ex. P-7153; Trial Ex. P-7135.

[92] Trial Ex. P-0470.

[93] Id. at ¶ 2.08.

[94] Id. at ¶ 2.01.

representatives throughout the year.[95]  The Agreement acknowledged that effective co-promotion of Actos® required distribution of samples of Actos® to physicians, as well as other marketing efforts.[96]  Finally, the Co-Promotion Agreement provided for **a 3-year period** *following the end of the actual agreement during which Lilly was, nonetheless, to be paid a fee based upon the sales of Actos® - during that residual period -* **in acknowledgement of and due to the anticipated success of _Lilly's_ earlier marketing and promotion efforts**: "In recognition that . . . Lilly's efforts . . . will be important in maximizing the commercial potential of Actos® . . . and Actos® will, in all probability, continue to be a commercial success even after Lilly is no longer participating in the promotion . . . Takeda shall pay Lilly a residual co-promotion fee on sales of Actos® in the territory (all United States) . . . for an additional three years following the expiration of the term of the agreement."[97]  In 1999, Lilly and Takeda entered into an amendment to the Co-Promotion Agreement requiring Lilly to provide an additional 255 sales representatives for a one year period beginning October 1, 1999 and ending September 30, 2000.[98]

Plaintiffs point to evidence that Ronald Hoven, a former employee of Lilly, was responsible for certain marketing activities for Actos® for Lilly in the United States from 2004 to 2006.[99]  He was the brand leader for diabetes care from 2003 to 2006, and led the strategy development and operational execution across all marketing channels, including Actos®.[100]  Mr.

---

[95] Id. at ¶ 2.04(A).

[96] Id. at ¶ 2.03.

[97] Id. at ¶ 2.06.

[98] Trial Ex. P-0472.

[99] Trial Tr. vol. XIV, at 2019-20

[100] Id.

Hoven was the marketing lead for the Takeda-Lilly Alliance,[101] and knew that Lilly retained a financial interest in Actos® even after the Co-Promotion Agreement ended in 2006, as the company continued to receive royalties on sales in the United States for the next three years.[102] Mr. Hoven believed that resultant revenue, to Lilly, was over $200 million.[103]

### 2. Plaintiffs Point to Evidence of Lilly's Actions Concerning the Bladder Cancer Issue

As mentioned above, Plaintiffs point to Lilly's PowerPoint slide deck, in <u>1999</u>, discussing the major contract terms between Takeda and Lilly, *which acknowledged bladder cancer as among the "most significant adverse event risks for pioglitazone."*[104] The Plaintiffs point to evidence that, in the fullness of time, these noted concerns about bladder cancer were found to be well-founded:

- The PROactive study found that the group taking Actos® had statistically significant more bladder cancers than those in the placebo group.[105]   Dr. Schneeweiss testified that the PROactive study shows that Actos® has a relative risk of 2.83 of those using Actos® to develop bladder cancer, and an almost-tripling of the risk of bladder cancer when one is exposed to Actos® versus when one is not.[106]

- The Azoulay study showed that Actos® was associated with an increased risk of bladder cancer (rate ratio 1.83, 95% confidence interval, significant).[107]

- The net result of the meta-analysis that Takeda ultimately did is that there is a more than doubling in the risk of bladder cancer in patients exposed to Actos®,

---

[101] <u>Id.</u>, at 2020.

[102] Trial Tr. vol. XV, at 2114.

[103] Trial Tr. vol. XV, at 2114.

[104] Trial Tr. vol. IV, at 404; Trial Ex. P-5350.

[105] Trial Tr. vol. XVII, at 2430; Trial Tr. vol. XXI, at 2950.

[106] Trial Tr. vol. XXI, at 2950.

[107] Trial Tr. vol. XVII, at 2493.

specifically a relative risk of 2.64 – which converts to a 164% increase in bladder cancers – which Dr. Schneeweiss testified this increase was statistically significant.[108]

Plaintiffs point to evidence presented at trial that Takeda shared information concerning Actos® with Lilly and Lilly with Takeda, as will be discussed in further detail below. Thus, the Plaintiffs point to evidence presented at trial that Lilly, also, was aware of the early suspicions of a causal connection between Actos® and bladder cancer, and the subsequent confirmation of the early suspicions, and yet Lilly did not provide warning, *of any kind*, within *its marketing of Actos® to physicians* and Mr. Allen's physicians in particular, and that Lilly withheld the knowledge it did have from Mr. Allen's physicians, and specifically shared no information or evidence of the risk of bladder cancer with Actos® with either of Mr. Allen's physicians, in any fashion.[109] As noted below, Plaintiffs point to evidence that Lilly made marketing calls to both of Mr. Allen's physicians before either prescribed Actos® to Mr. Allen and both physicians testified they would not have prescribed Actos® to Mr. Allen had they known about the risk of bladder cancer with Actos® use. Plaintiffs, also, point to evidence presented at trial that Lilly was aware of such risks, as noted above and further discussed below.

### a. Plaintiffs Point to Evidence that Lilly's Involvement in the Suppression of an Adequate Warning and Accurate Information About Actos® was both Active and Essential

***Lilly's Involvement was Essential.*** First, the Plaintiffs point to evidence that Lilly's involvement was essential to enacting Takeda's pursuits concerning its marketing of Actos® in the United States and to the success of Takeda's approach to deflecting the Actos®/bladder cancer association, because *Lilly, for a time and initially, was the sole promoter and marketer of*

---

[108] Trial Tr. vol. XXI, at 2968.

[109] Trial Ex. P-7141 (Email from Lilly sales representative Gigi Chen to Buffalo-area Lilly representatives, dated July 31, 2007).

*Actos® in the U.S.*, thus, for that time, Lilly was *the sole provider of marketing information to physicians in the United States about Actos®*, including Mr. Allen's physicians,[110] and since 1999 Lilly had known, at least, that bladder cancer was among the "most significant adverse event risks of pioglitazone."[111]  Plaintiffs point to evidence that Lilly played not a passive, but an active role acting in tandem with Takeda, in developing the strategy for responding to the FDA's requests, and that Lilly's communications about Actos® were funneled to the highest executive levels in Takeda Japan.[112]  Specifically, communications from Lilly went directly to Mr. Saito, Senior Director, Pharmaceutical Development Division, Strategic Development Department (Takeda Pharmaceutical Company), for transmission to Takeda's CEO.[113]  Plaintiffs pointed to evidence that Takeda, also, communicated important information to Lilly and kept Lilly apprised as new information became available throughout the course of the development and marketing process and suggested nuanced language for use in at least one study.[114]

**Plaintiffs Point to Evidence Lilly Assisted Takeda and Participated in Developing Strategy for Communications with the FDA.**  The Plaintiffs point to evidence that, from the time the FDA began challenging Takeda on the bladder cancer issue (August 2002), Lilly was involved in assisting Takeda with determining its position,[115] formulating its response,[116] and

---

[110] *See, generally*, Trial Ex. P0470 (Co-Promotion Agreement).

[111] Trial Tr. vol. IV, at 404; Trial Ex. P-5350.

[112] Trial Tr. vol. X, at 1296-97.

[113] Trial Tr. vol. X, at 1296-97.

[114] Trial Tr. vol. X, at 1349-56; Trial Ex. P-0470, at 00042-52; Trial Ex. P-0452, at 00007; Trial Ex. P-5350, at 00004; Trial Tr. vol. XIV, at 2075, 2079; Trial Ex. P-3712; Trial Tr. vol. X, at 1268-71; Trial Tr. vol. X, at 1270-71.

[115] Trial Tr. vol. X, at 1287.

[116] Trial Tr. vol. X, at 1296.

agreeing to a strategy.[117]

*Plaintiffs Point to Evidence Lilly Assisted Takeda in Changing Marketing for Actos® from a dual-PPAR agonist to Actos® as a single, PPAR-gamma agonist.* Plaintiffs point to evidence noted above, that Takeda and Lilly were involved in using Actos'® dual PPAR nature and possible resultant effect on reducing lipids to promote and market Actos® as superior to its nearest competitor, Avandia.[118] However, after the FDA became concerned and raised questions about a possible association between the class of drugs which were dual PPAR agonists and bladder cancer,[119] Takeda and Lilly worked together to decide how to adjust the marketing of Actos®, and Lilly, thereafter, adjusted its promotion-related activities and marketing to reflect the decision to portray Actos® as, only, a PPAR-gamma agonist.[120] Evidence was pointed to which could support Plaintiffs' argument this change was made after an analysis was conducted of the negative effect on Takeda's and Lilly's profits if Actos® were to have become associated with bladder cancer.[121]

*Plaintiffs Point to Evidence Lilly agreed not to disclose information about bladder cancer.* The Plaintiffs point to several pieces of evidence presented at trial, that Lilly, in its role as co-promoter with Takeda, agreed to suppress or withhold information about bladder cancer and Actos® (and related issues) at Takeda's behest. For example, Plaintiffs point to evidence that Takeda kept Lilly up to date on all issues relating to Actos® and obtained Lilly's consent not to disclose information about the bladder cancer risk to Lilly distributors until Lilly had

---

[117] *See* Trial Ex. P-0452-0006, -0003, -0004, -0007.

[118] Trial Tr. vol. X, at 1272-73, 1348-50; Trial Ex. P-4630.

[119] Trial Tr. vol. X, at 1281.

[120] Trial Tr. vol. X, at 1284, 1348-50, 1352-53; Trial Ex. P-3712; Trial Ex. P-2285.

[121] Trial Tr. vol. X, at 1286-87, 1351-56; Trial Ex. P-7407.

received Takeda's instructions.[122]  Plaintiffs point to evidence Lilly, also, agreed with Takeda not to raise the bladder cancer issue during a telephone conference call with physicians in and around January, 2003.[123]  Finally, in Comprehensive Meeting Materials dated August 5, 2002, a section entitled "Responses to FDA," refers to a four-way conference call among Lilly and several Takeda employees;[124] the stated reason for the call was to "stress the importance of managing information" regarding an association between Actos® and bladder cancer and confirm the future communication routes.[125]

### b.    Plaintiffs Point to Evidence Identifying Lilly's Responsibility

Plaintiffs point to David Kessler's testimony that primary responsibility for the safety of Actos® and the adequacy of its warnings rested **with Takeda Pharmaceuticals, *in conjunction with Lilly*.**[126]  Thus, according to Dr. Kessler, former head of the FDA, Takeda and Lilly shared responsibility for communications with physicians.[127]  Dr. Kessler stated that the reason drug companies remain ultimately responsible for communications about the safety of Actos® is that "they're in the best position to give doctors and patients the information they need to make informed decisions."[128]  Plaintiffs note, Dr. Kessler's opinion is in harmony with New York law that visits liability on companies such as Lilly that are responsible for placing a drug into the

---

[122] Trial Tr. vol. X, at 1290.

[123] Trial Tr. vol. XIV, at 2075, 2079.

[124] Trial Ex. P-3712; Trial Tr. vol. X, at 1268-71.

[125] Trial Tr. vol. X, at 1270-71.

[126] Trial Tr. vol. VIII, at 962, 964-65.

[127] Trial Tr. vol. VIII, at 964.

[128] Trial Tr., vol. VIII, at 964.

marketplace.[129]

### C.    Plaintiffs Point to Evidence Surrounding Mr. Allen's Physicians

Finally, the Plaintiffs point to evidence presented at trial that Takeda's efforts to avoid providing an adequate warning to the public, and, specifically, to Mr. Allen's physicians, were motivated by an anticipated negative effect on their profits. Plaintiffs point to the testimony of Dr. Claire Thom – former Vice President of Research and Development for Takeda Pharmaceuticals North America, who testified that Actos® had the potential to make billions of dollars per year worldwide, and the fact that a label change that could substantially affect the market for Actos® would get the attention of the CEO of the company.[130] Plaintiffs point to evidence that in service of the goal of protecting the Defendants' profits, Mr. Allen's doctors were never informed by either Takeda, through the label, or by Lilly representatives, through the details and calls made on Drs. Reilly and Lamb, of the known risk of a possible class effect for certain TZDs related to bladder cancer, nor that an unrelated pharmaceutical company had withdrawn a similar drug from testing due to the risk of this otherwise same class effect, nor that the FDA had expressed concerns over possible risks and requested a stronger label.[131]

***Dr. Reilly.*** The spreadsheet list of Lilly and Takeda sales representative visits to the office of Mr. Allen's physician, Dr. Reilly, reflects that Lilly's sales representatives "detailed," *i.e.*, visited for the purpose of engaging in marketing Actos®, Dr. Reilly's office 97 times between 1999 and 2004, including 21 times after July 2002, and three times after January 1,

---

[129] *See* Trial Tr. vol. XXXVII, at 6266 (Jury Instruction on Failure to Warn Claim); Brumbaugh v. CEJJ, Inc., 152 A.D.2d 69, 71, 547 N.W.S.2d 699 (N.Y. Sup.Ct. – App.Div. 3rd Dept. 1989).

[130] Trial Tr. vol. X, at 1316-17; Trial Ex. P-0452.

[131] Trial Ex. P-1595; Trial Tr. vol. IX, at 1078; Trial Tr. vol. IX, at 1079; Trial Ex. P-0009; Trial Tr. vol. IX, at 1080-1082; Trial Tr. vol. IX, at 1096-98; Trial Ex. P-2298; and Trial Ex. P-0010; Trial Ex. P-7514A, at 21-23; Trial Ex. P-7512A, at 22.

2004.[132]

All of the Lilly sales representatives' visits to Dr. Reilly occurred prior to Lilly's termination as co-promoter with Takeda (March 2006), and prior to the date on which Dr. Reilly began prescribing Actos® to Mr. Allen. Lilly's visits to Dr. Reilly were less than three (3) years prior to the time that Dr. Reilly began prescribing Actos® to Mr. Allen. Thus, Plaintiffs point to evidence that Lilly's visits to Dr. Reilly's office occurred within the window of time that both Lilly and Takeda had acknowledged that their marketing efforts could be expected to have effect.

Dr. Reilly acknowledged Lilly representatives visited his office and testified that he had read the entire Actos® label,[133] and that, *had he received a warning that Actos® caused bladder cancer or might be associated with promoting bladder cancer, he would not have prescribed Actos® for Mr. Allen.*[134] Dr. Reilly testified *he relied on Lilly's sales representatives for adequate warnings,*[135] and testified that *at no time did any Actos® sales person inform him of any information or data about Actos® causing, or being associated with, bladder cancer.*[136]

***Dr. Lamb.*** Plaintiffs point to evidence that Dr. Lamb took over Mr. Allen's primary care in December, 2007 after Dr. Reilly retired. The spreadsheet list of Lilly and Takeda sales representative visits to Dr. Lamb's office reflects that Lilly sales representatives detailed Dr. Lamb's office eight times for Actos® sales calls, starting on August 14, 2002; the calls included four visits after January 1, 2004, the latest one on May 25, 2004.[137] Dr. Lamb testified that she

---

[132] Trial Ex. P-7153; Trial Ex. P-7512A, at 21-22.

[133] Trial Ex. P-7512A, at 22.

[134] Id. at 22.

[135] Trial Ex. P-7512A, at 20-21.

[136] Trial Ex. P-7512A, at 22.

[137] Trial Ex. P-7135.

reads the warning sections of labels and that *she probably would have prescribed a medicine other than Actos® for Mr. Allen had she been informed that Actos® increases the risk of bladder cancer*, especially in light of Mr. Allen's previous urinary tract infection.[138]  Dr. Lamb testified that it was important to her to have confidence that companies accurately report information in articles and medical journals, and that it would be a bad thing for a company to misrepresent the number of bladder cancer cases associated with use of a drug,[139] and stated that, if there were a genuine concern of bladder cancer, that concern "should be in the warnings" section.[140]

Dr. Lamb testified that *neither Lilly nor Takeda sales people ever informed her of any concerns about bladder cancer with Actos®* and, *had they done so, she would have listened to them*, would have been concerned about it, and would have spoken to Mr. Allen about the risk.[141] Dr. Lamb initially consulted Mr. Allen in December 2007; Dr. Lamb continues to treat Mr. Allen but does not prescribe Actos® to Mr. Allen any longer.[142]

### D.    Overview of Evidence Presented by the Plaintiffs

Considering the foregoing, this Court concludes that the Plaintiffs have pointed to substantial evidence, of such quality and weight, that was put into the record during the trial of this matter, to establish a legally–sufficient basis for the jury's finding reflecting that Actos® exposure creates an increased risk of bladder cancer; that both Takeda and Lilly were aware that Actos® creates this increased risk; that both Takeda and Lilly undertook a concerted, coordinated pattern of effort, of several years' duration, to prevent the FDA, the medical

---

[138] Trial Ex. P-7514A, at 21-23.

[139] Trial Ex. P-7514A, at 82.

[140] Trial Ex. P-7514A, at 80.

[141] Trial Ex. P-7514A, at 21-23.

[142] Trial Ex. P-7514A, at 15.

community, and the public from obtaining knowledge of this risk; and that the primary reason for this effort was to preserve the tremendous profits generated by the sale of Actos® in the United States and worldwide.

The evidence pointed to by Plaintiffs as presented at trial, supports the jury's finding that the Defendants' failure to provide an adequate warning about the bladder cancer risks associated with Actos® was not an oversight, an inadvertent omission, nor otherwise a product of mere negligence. The Plaintiffs pointed to evidence that the Defendants' effort to withhold information from the FDA – despite the Defendants' specific knowledge of this potential danger in 1999[143] and despite the FDA's heightened misgivings, which it began expressing in 2002 – succeeded in preventing the medical community, including Mr. Allen's physicians, from receiving full, complete and accurate descriptions of the data and the scientific analysis of those data, as well as the adequate warnings that should have flowed from such data.

Plaintiffs point to evidence demonstrating that both Lilly and Takeda marketed Actos® to Mr. Allen's physicians (Dr. Reilly and Dr. Lamb); that the physicians never understood the Actos® label or product information to include a warning concerning an increased risk of bladder cancer; and that the physicians never heard of any such risk from any representative of either Lilly or Takeda, and, finally, the Plaintiffs point to evidence that Mr. Allen's physicians would not have prescribed Actos® to Mr. Allen had they received such an adequate warning, and yet, they did prescribe Actos® to Mr. Allen.

Finally, this Court would note that the jury's findings and awards reflect an apparent broad acceptance by the jury of the Plaintiffs' evidence generally, and their experts' opinion, more particularly. The record reflects the fact that the Defendants' experts, along with many of

---

[143] Trial Ex. P-5350. The Plaintiffs pointed to additional evidence of the Defendants' knowledge of the risk, which appeared in July 2002 and became stronger over time.

their lay witnesses, were severely challenged by Plaintiffs' counsel during cross-examination. Given the intensity of the challenges presented by the Plaintiffs, the jury had ample grounds to accept Plaintiffs' experts' testimony over the Defendants' and this Court's task under a Rule 50 analysis is not to weigh competing evidence or make credibility calls as Defendants' argument would imply – that is the purview of the jury.

## V.    ANALYSIS

This Court finds, based upon the foregoing, that Plaintiffs have pointed this Court to substantial evidence which is sufficient to support the jury's findings.  However, Defendants make certain conceptual arguments which this Court must, also, address.  Before turning its attention to Defendants' specific arguments, this Court must address the Defendants' overall false framing of certain issues raised during the trial, which now form the foundation of certain of Defendants' arguments.

Plaintiffs point to evidence presented at trial that Takeda and Lilly intentionally concealed potential health risks associated with Actos®, reflecting a deliberate, financially driven, decision to write off a highly vulnerable segment of the known and identifiable target population of diabetics in pursuit of profit and reflects the position that a drug company should be permitted to sacrifice an identifiable set of individuals (to bladder cancer), in order to protect their profits.  Takeda's argument in response, that Actos® provides a valuable service to diabetics *as a whole* and that this clear benefit is reflected by Actos'® still being on the market as an FDA-approved drug, is, at best, one of misdirection as it is a hypothesis that is not challenged.  The Plaintiffs do not dispute this argument and in fact, as Takeda argues, expressly adopted this position before the jury.

However, with this response, Takeda ignores the Plaintiffs' evidence presented and

argument made that Takeda, ultimately, added a warning only in 2011, *when before that Takeda and Lilly had, in their possession, data sufficient to require a warning as early as 2002 or 2004.* Takeda's argument attempts a false framing of the issue. The issue is not whether Actos® provides potential benefits to a large portion of an already-vulnerable population – Type II diabetics whose glucose levels are out of control – all agree it does. Rather, the issue is whether a drug company, such as Takeda should be free to withhold information of a known health risk (of bladder cancer) to members of that same target population. Plaintiffs presented evidence Takeda and Lilly *failed to provide an adequate warning* to prescribing physicians of the *known risks of bladder cancer* with the use of Actos® *when it had information sufficient to require the warning* and thus, placed certain individuals, such as Mr. Allen, at risk for contracting bladder cancer. In other words, whether a drug company, in defense of its financial interest in a drug, can intentionally conceal and fail to warn of potential risks associated with the use of that drug so that prescribing physicians are deprived of the information necessary to make informed medical choices for their patients, here, particularly, the identifiable group of patients who already had other risk factors for bladder cancer and, thus, for whom Actos® use would have been contraindicated. The fact that the risks involved could be deadly, also, undercut Takeda's argument and the fact that perhaps only a smaller percentage of the target population would be subject to this risk of significant harm, does not release a drug company from warning those individuals of those known risks, in order to preserve its profit. Again, Takeda frames the issue incorrectly – the question *under New York law* is *whether a drug company can fail to warn of potential risks of a drug, no matter how desirable a drug; under New York law, it cannot.*

A.    **Preemption: Arguments Related to Lilly's Alleged Inability to Change the Actos® Label.**

Prior to trial, Lilly filed a motion for summary judgment, seeking dismissal of all claims

on the grounds of insufficient evidence.[144]   In opposing Lilly's motion, the Plaintiffs argued that Lilly should be held liable for the failure to warn Mr. Allen's physicians adequately about the increased risk of bladder cancer posed by Actos®.  The Plaintiffs specifically asserted, as part of their argument, that virtually every document used in marketing or distribution is considered "labeling" under 21 C.F.R. § 202.1(I)(2).[145]    This Court, in ruling on Lilly's motion for summary judgment, accepted and relied, in part, on the Plaintiffs' argument in concluding that Lilly's participation in formulating many labeling, marketing, documents, in part, helped to preclude summary judgment on Lilly's potential liability for failing to adequately warn Mr. Allen's physicians of the risk of bladder cancer associated with Actos® use.[146]  Three (3) months later, during closing arguments, the Plaintiffs stated that they were not suggesting Lilly was responsible for changing the Actos® label.[147]  Consequently, Lilly now argues that the Plaintiffs' claims against it should therefore, be preempted because it could not, as a matter of law, have affected any change to the Actos® *label*.

Lilly's effort to obtain a finding of conflict preemption – *i.e.*, Lilly alleges that a conflict exists between federal and state law such that the Supremacy Clause has the effect of preempting the state law claims the Plaintiffs have asserted in this case – fails on several grounds as will be discussed below.

(a)    *Applicable Law.*  First, Lilly's argument rests on the idea that *it is precluded from including*, on any written document that falls within the broad scope of the "labeling" definition discussed above, any information or warning language beyond that actual language included on

---

[144] Rec. Doc. 3415.

[145] *See* Rec. Doc. 3545, at 19-21.

[146] *See* In re Actos (Pioglitazone) Products Liability Litigation, 2014 WL 46579, *7 (W.D.La. 1/6/2014).

[147] Memorandum in Support, at 4, *citing* to Trial Tr. vol. XXXVII, at 6247.

the insert label approved by the FDA.  However, Lilly has not cited this Court to adequate legal support for this premise.  Specifically, Lilly has not identified any statutory provision, regulation, or rule, nor any controlling applicable jurisprudence compelling this Court to conclude that Lilly could not *vary its marketing literature* <u>in any way</u>, <u>whatsoever</u>, from the languaging of the insert label.  This Court cannot simply assume the existence of such a stringent preclusion (or preclusive effect), without legal support for such a sweeping interpretative inference, Lilly's *legal* argument on this point is unpersuasive to this Court.[148]  Lilly, also, and once again seeks to persuade this Court to grant it the benefit of the "sameness" requirements that apply to manufacturers of generic drugs described in <u>PLIVA, Inc. v. Mensing, 131 S.Ct. 2567 (2011).</u> PLIVA is applicable to this case to the extent that it describes the "impossibility" doctrine generally.  However, the Defendants seek to use it for the proposition that Lilly was forbidden from issuing any warning whatsoever about bladder cancer as if it were a generic drug company; when it is not.  This is a misreading of the applicability of PLIVA generally.  Moreover, the other cases cited by Lilly, stand for the unexceptional proposition that the supremacy clause – a provision of the constitution that applies in every area of the law – preempts state law that is incompatible with federal law, a legal premise that is without question.  This Court has already ruled that the applicable law does not allow this Court to treat either Lilly or Takeda as a generic drug manufacturer, as neither is a generic drug manufacturer, nor does the underlying rational at play in that case apply to Takeda or Lilly given the facts of this case.[149]  Lilly's one-sentence

---

[148] Even had Lilly demonstrated that the law might have afforded it some protection from the obligation to provide an adequate warning of the risk of bladder cancer associated with Actos®, the evidence at trial suggests that Lilly's actions were not consistent with this legal theory.  Specifically, Lilly presented no evidence its marketing, actually conducted to doctors and in the medical community, was itself, actually exactly what was of and on the insert label.  Rather, the evidence and suggestion is to the contrary.

[149] *See* Memorandum Ruling on Motion for Partial Summary Judgment (Preemption)(Rec. Doc. 3827), at 9.

argument that it should be held to the same standards as were imposed on PLIVA, Inc. by the Supreme Court stands forlorn and cannot persuade this Court to change its previous ruling on the applicability of the generic drug manufacturers' regulatory regime to the facts of this case. This Court references and adopts that ruling found in Rec. Doc. 3827, herein.

      *(b)*     ***Wyeth v. Levine*[150] *suggests that no such preclusion exists.*** The United States Supreme Court recently was presented with factual circumstances, and arguments, that are strongly comparable to the ones at bar. Although Lilly has not explicitly declared that issuing a warning about bladder cancer would cause a misbranding violation of the FDA regulations, this notion is implicit in its argument. The Court in Wyeth, heard a similar argument by the manufacturer of Phenergan, who wished to avoid liability for having failed to provide a warning about the risk of administering the drug improperly.[151] The Court responded by rejecting the argument (made by both Wyeth and the FDA) that including *an enhanced warning* on the label would result in misbranding, which is a violation of the FDA's regulations:

> **The FDCA does not provide that a drug is misbranded simply because the manufacturer has altered an FDA-approved label;** instead, the misbranding provision focuses on the substance of the label and, among other things, proscribes labels that fail to include "adequate warnings." Moreover, because the statute contemplates that federal juries will resolve most misbranding claims, the FDA's belief that a drug is misbranded is not conclusive.[152]

In light of the Supreme Court's rejection of the foundational premise upon which Lilly's argument rests – that information available concerning a health risk cannot be shared, or that providing that information or providing *an enhanced warning* of a serious health risk associated

---

[150] 555 U.S. 555, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009).

[151] 555 U.S. at 564-65, 129 S.Ct. at 1194.

[152] Wyeth v. Levine, 555 U.S. at 570 (emphasis added).

with an approved drug, automatically constitutes a misbranding violation – Lilly's argument must be seen as flawed. This Court cannot simply assume that Lilly was precluded from providing any type of additional information of a possible health risk, which might have been known at the time the label was negotiated with the FDA, or one which is learned about thereafter, to physicians to whom they were marketing a drug. Such an assumption would not be supported either by the case law relied upon by Lilly, or by the United States Supreme Court's decision in Wyeth.

(c) *The Hoven Testimony*. Also, of significance to this Court in considering Lilly's argument, is the testimony of Lilly's former employee, Ron Hoven, who worked for Lilly for almost 30 years; was responsible for marketing activities for Actos® for Lilly in the United States from 2004 to 2006;[153] was the brand leader for diabetes care from 2003 to 2006; and led the strategy development and operational execution across all marketing channels, including Actos®.[154] Mr. Hoven – who has significant experience with Lilly's marketing operations – *acknowledged that the limitation upon which Lilly now is relying, in the instant motion, played no role in Lilly's marketing operations*. Specifically, Mr. Hoven testified that in determining the content of sales pitches and marketing efforts directed to Mr. Allen's physicians, along with all of the other physicians with whom they had contact while promoting Actos® on behalf of Takeda, those efforts were not limited to the label, *per se*.[155] Mr. Hoven testified that there was a "MRL" process used by Lilly to approve the content of marketing and sales pitches;[156] the "MRL" process involved representatives from the medical, regulatory, and legal divisions in

---

[153] Trial Tr. vol. XV, at 2116.

[154] Trial Tr. vol. XV, at 2119-21.

[155] *See* Trial Tr. vol. XV, at 2165-2166; 2185-87.

[156] Id. at 2165.

Lilly;[157] and that marketing was permitted to extend to "information that is deemed consistent with the label."[158]  Mr. Hoven was asked repeatedly about Lilly's ability to market outside the label.  Although his answers were ambiguous, and perhaps seemingly contradictory, he testified he agreed with the overall proposition that marketing materials were not limited to the content of the label *per se*.[159]

(d)     *Lilly's Role in Creating the Label*.  It is undisputed that Lilly had no regulatory or statutory *obligation* to participate in the process of developing (and getting approval of) a label that would maximize sales and marketing potential.  However, Plaintiffs point to evidence noted above that Lilly, in fact, did participate in that overall process.  Plaintiffs point to evidence Lilly did not choose to operate as a simple marketer of Actos®, a company simply taking orders from Takeda and carrying them out; Lilly chose, instead, to play a much larger role in the development of the labeling and dissemination of information concerning Actos®.

The Plaintiffs have pointed to substantial evidence that Takeda and Lilly exchanged information and communicated within the course of the regulatory history of Actos®, that Lilly knew, or should have known, of the increased risk of bladder cancer presented by Actos®; that Lilly had the duty to warn Mr. Allen's physicians of this risk; that Lilly provided information concerning Actos® to physicians and, in particular, Mr. Allen's doctors; and that Lilly failed to comply with its duty to provide an adequate warning as to bladder cancer to those physicians and, in particular, Mr. Allen's doctors.  Lilly presented evidence that its marketing efforts were

---

[157] Id.

[158] Id. at 2185.

[159] Mr. Hoven was questioned about Lilly's ability to market outside the label three times, at Trial Tr. vol. XV, at 2185-86.  The jury was free to embrace whichever account it found persuasive, and under a Rule 50(b) analysis, the Plaintiffs pointed to the evidence in the record that the jury could have accepted.

*not* strictly bound by the contents of the Actos® label, but that it was required by law to provide information to physicians that was *consistent with* the label.[160] This Court finds Defendants have failed to present sufficient legal or factual support for their argument that preemption should operate as to Lilly.

In addition to the foregoing arguments involving the preemption doctrine as to Plaintiffs' claims of inadequate warnings on the package "label," Lilly, also, invokes conflict preemption to argue that: (a) Lilly could not have issued a "Dear Doctor" letter that included any heightened warning about the bladder cancer risk; (b) Lilly was under no obligation to try to convince Takeda to initiate a change to the Actos® label; and (c) Lilly was under no obligation to cease selling and marketing Actos® simply because the label did not comply with State law.[161] These arguments rest on the same legal analysis as the one discussed above concerning the "label."

For the same reasons – including the lack of legal foundation of an actual conflict between state, here New York, and federal law; the lack of evidence of an anticipated misbranding of Actos®; the substantial gap between Lilly's argument as to the application of the New York law and the way Lilly actually conducted its normal operations; and noting Lilly's substantial role in the formulation of this particular warning the jury found to be inadequate – this Court finds sufficient evidence was presented that Lilly was aware of the potential danger of an increased risk of bladder cancer posed by exposure to Actos®; that Lilly had many

---

[160] Trial Tr. vol. XV, at 2185-86.

[161] The Defendants cite this Court to the unreported opinion issued by this Court's esteemed colleague, Judge Pisano, in In re Fosamax (Alendronate Sodium) Products Liability Litigation (No. II), 2012 WL 181411 (D.N.J.), where that Court granted judgment on the pleadings in favor of a marketer/distributor of Fosamax on the theory that the distributor had no authority to initiate a labeling change of Fosamax. Id. at *4. There are marked differences between the procedural postures in In re Fosamax (a ruling on a pre-trial motion) and the instant case (a Rule 50 motion presenting both legal and factual challenges to a trial record), which make it difficult for this Court to elicit guidance from the In re Fosamax opinion, particularly in light of the dearth of detailed allegations or evidence of conduct or knowledge that the plaintiffs might have made in that case, when compared to the plethora made by Plaintiffs in this case.

opportunities to share its knowledge with physicians, in multiple ways and formats; that Lilly had the duty to convey such a warning under New York law and that Lilly has not established it would have been precluded from conveying that warning by federal law, and yet Lilly specifically and repeatedly declined to do so. Lilly's preemption arguments addressed above are OVERRULED.

### B.       Preemption:  Arguments that Apply to Both Takeda and Lilly

Both of the Defendants argue that additional grounds exist for this Court to find that the Plaintiffs' New York law claims against them are preempted by action of the Supremacy Clause. Each of those claims will be addressed separately.

***Impossibility Preemption.***    As this Court discussed more fully in its Memorandum Ruling addressing the Defendants' earlier preemption arguments – the discussion of which is incorporated as though fully set forth herein[162] – the Supreme Court, in Wyeth v. Levine,[163] declared that the preemption doctrine would apply to state claims where there was ***clear evidence*** that **it is impossible** for the drug manufacturer to comply with both federal and state requirements.    Impossibility preemption is a demanding defense.[164] "[A]bsent clear evidence *that the FDA **would not have approved** a change to Phenergan's label*, we will not conclude that it was impossible for Wyeth to comply with both federal and state requirements."[165]  The Defendants argue that the "clear evidence" doctrine – informed by the fact that both the FDA and Wyeth previously had only paid "passing attention" to the problem

---

[162] Memorandum Ruling (Rec. Doc 3827), at 8-12.

[163] 555 U.S. 555, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009).

[164] Wyeth v. Levine, 555 U.S. 555, 573, 129 S.Ct. 1187, 1199, 173 L.Ed.2d 51 (2009).

[165] Wyeth v. Levine, 555 U.S. 555, 571, 129 S.Ct. 1187, 1198, 173 L.Ed.2d  51 (2009)(emphasis added).

that led to Ms. Levine's injuries[166] – is automatically met if a side effect has been given "careful consideration" by the FDA.  This argument misreads Wyeth; the Court merely indicated that the "clear evidence" standard *cannot* be met under circumstances *where the FDA has not* given serious consideration to the issue:

> [Wyeth suggests] that the FDA intended to prohibit it from strengthening the warning about IV-push administration because the agency deemed such a warning inappropriate in reviewing Phenergan's drug applications, both the trial court and the Vermont Supreme Court rejected this account as a matter of fact.  In its decision on Wyeth's motion for judgment as a matter of law, the trial court found "no evidence in this record that either the FDA or the manufacturer gave more than passing attention to the issue of" IV-push v. IV-drip administration.  The Vermont Supreme Court likewise concluded that the FDA had not made an affirmative decision to preserve the IV-push method *or intended to prohibit Wyeth from strengthening its warning* about IV-push administration.  Moreover, *Wyeth does not argue that it supplied the FDA with an evaluation or analysis concerning the specific dangers posed by the IV-push method.  We accordingly cannot credit Wyeth's contention that the FDA would have prevented it from adding a stronger warning about the IV-push intravenous administration.*[167]

Here, Plaintiffs have presented evidence that Takeda resisted FDA efforts to require a stronger warning.  Plaintiffs presented evidence that not only did Takeda not supply the FDA with requested information that was evidence of a risk of bladder cancer with Actos® use, Takeda withheld that information even when requested to provide additional information.  This evidence, alone would act to undercut Takeda's erroneous legal argument, however, Takeda's argument is additionally flawed.

The impossibility doctrine asks whether the Defendants were able to comply with federal law and state law simultaneously.  The jury found that, pursuant to New York law, the

---

[166] 555 U.S. at 572, 129 S.Ct. at 1199.

[167] 555 U.S., at 572-73, 129 S.Ct., at 1198-99 (emphasis added).

Defendants failed to give Mr. Allen's physicians an adequate warning about the risk of bladder cancer associated with the exposure to Actos®.  In order to comply with New York law, Takeda would have had, at the very least, to have made full, complete, and forthright disclosure of the scientific data to the FDA and encouraged the FDA to include an adequate warning, and Lilly would have had to have disclosed the actual increased risk of bladder cancer faced by people who take Actos® to the doctors to whom it pitched Actos®.  The Plaintiffs presented evidence at trial that neither of the Defendants did these things, rather, Plaintiffs presented evidence that there was a concerted effort by Defendants to resist FDA overtures toward such a label change and to fail to provide information to doctors when marketing Actos®.

The Defendants, however, attempt to meet the demanding "impossibility" preemption standard, arguing that there is "clear evidence" that the FDA *would not have approved* an enhanced warning concerning bladder cancer on the Actos® label prior to 2011 arguing: (a) the fact that the label change in 2006 did not include a discussion of bladder cancer in the "Warnings" section of the label; (b) the fact that the FDA, in 2009, received information about increased bladder cancer risks reflected in the second interim KPNC analysis, but did not initiate a label change; and (c) the fact that the May 2009 Medication Guide and label for ACTOplus met XR did not include a discussion of bladder cancer in the "Warnings" section.[168]  In making this argument, the Defendants blindly ignore the evidence presented by the Plaintiffs that the FDA made overtures to include such a warning and Defendants resisted that overture.  Plaintiffs presented evidence that Takeda and Lilly initiated and engaged in a concerted, ongoing effort, from at least 2002, *to prevent the FDA from including any warning* about bladder cancer on the

---

[168] *See* Memorandum in Support, at 10.

Actos® label;[169] evidence that Takeda, with the knowledge and aid of Lilly, *engaged in substantial negotiations with the FDA **to prevent the inclusion** on the label of any warning about bladder cancer*[170] notwithstanding FDA overtures to explore the association between use of Actos® and bladder cancer.[171]   The fact that no warning about bladder cancer was included in the Actos® label, notwithstanding data to support such a warning, until 2011 nearing the end of the patent on Actos®, indicates that the Defendants' efforts were remarkably successful.   Thus, for Takeda and Lilly now, to argue the FDA *"would not have approved"* or *"would have prohibited"* Defendants from including an enhanced warning blatantly and distressingly ignores the evidence Plaintiffs presented of express FDA concerns and Takeda's concerted efforts to resist any such warning.   Again, this Court reminds of the procedural posture of this motion – *i.e.*, FED. R. CIV. P. 50 – and the task at hand.   It is not for this Court to substitute its judgment for the jury's or to weigh evidence, make credibility calls, or to select which interpretation of the evidence presented might be more desirable – rather, this Court is to look only to the legal sufficiency of the evidence presented and the interpretation of applicable law.   Defendants' arguments blindly ignore the evidence presented by the Plaintiffs on this issue and clearly misstate the applicable law and, therefore, are wholly unpersuasive.

Finally, in light of the evidence pointed to by Plaintiffs as presented at trial, this Court cannot find Defendants' argument that the FDA, *had it been presented with a complete, accurate, and forthright description of the evidence*, would have chosen to *hide* from the medical community and the general public the possibility of an increased risk of the very serious side

---

[169] *See* Plaintiffs' Opposition, at 21, *citing* Trial Tr. vol. X, at 1247-51; Trial Ex. P-459.   *See also* discussions found in Sections IV(A)(2)(c) and IV(B)(2), *supra*.

[170] *See* Trial Tr. vol. X, at 1284, 1287.

[171] *See* Trial Tr. vol. XI, at 1513; Trial Tr. vol. X, at 1281.

effect of bladder cancer by not allowing the very warning they made overture to explore, persuasive. Particularly as the warning ultimately included in 2011 once full information – which Plaintiffs presented evidence was available as early as 2002 and certainly 2004, per Dr. Kessler – was finally provided to the FDA by Takeda warned of that very risk – bladder cancer.

*Conflict Preemption*. The next preemption argument made by the Defendants is that the Plaintiffs are not empowered to enforce federal law through the mechanism of state law claims. Specifically, the Defendants argue that, "to the extent that the Plaintiffs' theory of liability is that the FDA 'got it wrong,'"[173] the Plaintiffs do not have the right to assert such a claim. Once again, the Defendants' argument is addressed to a position the Plaintiffs have not taken thus far in this litigation and one which, again, ignores the evidence already noted that Plaintiffs point to that Takeda orchestrated its negotiations with the FDA specifically to force the result they now characterize as erroneous by the FDA, *i.e.*, that which the FDA "got it wrong." The Defendants' argument in this regard is OVERRULED.

*Obstacle preemption*. Finally, the Defendants argue that the Plaintiffs' claims present an obstacle to the FDA's ability to regulate Actos® properly; in doing so, the Defendants betray no *hint* of an acknowledgement of the evidence Plaintiffs presented at trial of Defendants' years-long campaign(s) to withhold information from, delay the delivery of information to, and otherwise engage in obfuscation of the FDA's efforts to get to the bottom of the Actos®/bladder cancer connection. Again, this Court reminds of the task at hand and the standard under a Rule 50 motion; one cannot merely ignore that evidence with which they do not agree, when arguing under Rule 50. Rather, the Court must credit the non-moving party's evidence and disregard all evidence favorable to the movant which the jury is not required to

---

[173] Memorandum in Support, at 11-12.

believe.   Furthermore, the case cited by the Defendants as the source of the "obstacle preemption" doctrine – <u>Geier v. American Honda Motor Company</u>,[174] does not acknowledge the existence of the argued doctrine of "obstacle preemption"; to the contrary, it seems to undermine the existence of such a concept.

> This Court, when describing conflict pre-emption, has spoken of pre-empting state law that "under the circumstances of the particular case . . . stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" – whether that "obstacle" goes by the name of "conflict; contrary to; repugnance; difference; irreconcilability; inconsistency; violation; curtailment; . . . interference," or the like,"[175] but "[w]e see no grounds [] for attempting to distinguish among types of federal-state conflict for purposes of analyzing whether such a conflict warrants pre-emption in a particular case.[176]

Nonetheless, even if Defendants' argument were correct and "obstacle preemption" were to be found to exist – and the Defendants have not proven that it is a recognized jurisprudential doctrine – this Court would not find that the Defendants have carried their burden of proving that such preemption should be applied *under the facts of this case*.   Specifically, the Defendants argue that, "The evidence presented at trial showed that the FDA has always paid close attention to the potential risk of bladder cancer from Actos®, and used its expert judgment in determining when labeling changes should be made and the language that should be used for those labeling changes."[177]   This argument ignores the fact (as Takeda and Lilly openly acknowledged in the emails and other documents presented into evidence at trial), that the FDA's conclusions were strongly influenced by the information (and possible misinformation) presented by the

---

[174] 529 U.S. 861, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000).

[175] 529 U.S. at 873, 120 S.Ct. at 1921 (citations omitted).

[176] 529 U.S. at 874, 120 S.Ct. at 1921.

[177] Memorandum in Support, at 12-13.

Defendants, along with the Defendants' steadfast refusal to agree to place a bladder cancer warning on the label. Equally importantly, the Defendants have not made any showing that the Plaintiffs' lawsuit – which is merely an effort to enforce New York's requirement that pharmaceutical companies issue adequate warnings of the potential dangers presented by their products – have or had any potential to impact the FDA's ability to regulate Actos® in any way.

The Defendants' preemption argument in this regard is OVERRULED.

### C.      Insufficient Evidence: Lilly's Failure to Warn

The Defendants include, in the midst of their discussion of the *legal argument* of preemption, several statements alleging that there is insufficient *factual evidence*, in the trial record, to support the Plaintiffs' failure to warn claim against Lilly. In making this argument, the Defendants attempt to impose *upon the Plaintiffs* an obligation *to prove the content of all of Lilly's communications which actually occurred* between Lilly's representatives with both Dr. Reilly, personally and Dr. Lamb, personally, without themselves presenting evidence of what communications Lilly actually engaged in with these doctors. This argument does violence to the burden of each party and the inquiry under FED. R. CIV. P. 50. As noted above, the Plaintiffs' theory of liability is based upon Lilly's *failure to communicate* an adequate warning to Mr. Allen's physicians and Plaintiffs presented evidence Lilly marketed Actos® to Drs. Reilly and Lamb and the testimony of both Dr. Reilly and Dr. Lamb that they would not have prescribed Actos® to Mr. Allen had they known of the risk of bladder cancer and, yet, they both did prescribe Actos® to Mr. Allen. With that evidence, Plaintiffs provided the jury with sufficient, substantive evidence to support the reasonable inference that Lilly failed to communicate an adequate warning to Drs. Reilly and Lamb; Lilly had the opportunity at trial to provide opposing evidence, or evidence that made it impossible for the jury to infer that Lilly failed to

communicate adequately with Mr. Allen's physicians. However, Defendants did not do so, rather, they attempt to shift the focus and attempt to transform the Plaintiffs' burden of proof from one of establishing the *absence* of an adequate warning – *i.e.*, Lilly had a duty to warn Mr. Allen and his physicians; Lilly did communicate with Mr. Allen's physicians; neither physician has any memory of receiving the warning at issue, and both testified they would not have prescribed Actos® to Mr. Allen had they received a warning of the risks of bladder cancer – into an obligation for Plaintiffs to prove the content of Lilly's communications with Mr. Allen's physicians. The doctors' testimony establishes they did not know; Lilly presents no argument or evidence that the doctors did know and/or that knowledge came to the doctors by way of Lilly. Lilly's argument is particularly troublesome when, of those involved in the communication, only Lilly and the doctors would be in a position to know the nature of the communications and the doctors testified they did not receive such a warning or information. This argument begs the questions at hand.

Plaintiffs point to evidence, and the record is undisputed, that there were communications between Lilly's representatives and Mr. Allen's physicians, either personally or with the physicians' medical staff. Moreover, each physician testified they had *no memory of receiving any warning*, *in any fashion*, about the risk of increased risk of bladder cancer associated with Actos®. Thus, plaintiffs point to evidence presented at trial sufficient to permit the jury to conclude that Lilly **failed to provide an <u>adequate</u> warning** to Mr. Allen's physicians. Lilly's argument is particularly problematic in light of the fact that *Lilly did not respond at trial with any evidence* suggesting that it made any attempt to convey to Mr. Allen's physicians (or any other medical professional at their offices) *the information within its knowledge about the increased risk of bladder cancer.* Rather, Plaintiffs point to evidence of at least one instance in

which a Lilly sales representative (Gigi Chen) acknowledged an article in the *USA Today* which mentioned that "TZDs" have side effects that include potential risk of cancer, and specifically warned her co-workers not to mention this side effect in their visits with physicians.[179] Lilly's challenge to the sufficiency of the Plaintiffs' evidence against it is OVERRULED in this regard.

### D.  Insufficient Evidence: Specific Causation

As noted above, a motion for judgment as a matter of law based on alleged insufficiency of evidence cannot prevail *unless the evidence points so strongly and overwhelmingly in favor of one party that reasonable jurors **could not have arrived at** a contrary verdict.* And as noted above, this Court reminds, in making this determination the court ***must credit the non-moving party's evidence; must disregard all evidence favorable to the movant that the jury is not required to believe; must draw all reasonable inferences in favor of the nonmoving party; and may not make credibility determinations or weigh the evidence.***[180] The mere fact that Defendants, now, argue a different interpretation of the evidence presented, or the credibility of a witness, or wish to only focus upon select evidence presented, cannot form a basis for this Court to disregard the jury's finding. Rather, this Court is bound by the standard established by FED. R. CIV. P. 50.

Defendants first challenge the sufficiency of the evidence as to specific causation as to Mr. Allen. The primary evidence of *specific causation* as to Mr. Allen pointed to by the Plaintiffs involves the testimony (and associated exhibits) of Dr. Scott Delacroix, Urologic

---

[179] Trial Ex. P-7141.

[180] Kevin M. Ehringer Enterprises, 646 F.3d at 325 (*citing* Reeves v. Sanderson Plumbing Productions, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)); Brown, 675 F.3d at 477. This court uses the same standard of review articulated by the Fifth Circuit for its appellate review because the standards of review are identical. *See* Kevin M. Ehringer Enterprises, 646 F.3d at 324 ("We review denials of motions for judgment as a matter of law under Federal Rule of Civil Procedure 50 *de novo*, applying the same standard as the district court.") (citation omitted).

Oncologist.   This Court notes the law requires that when a plaintiff relies solely on expert opinion testimony to satisfy his burden of proof, it is important that the expert's opinion be founded on substantial evidence and not rely merely on his expertise.[181]

This Court notes that although Defendants challenge Plaintiffs reliance on Dr. Delacroix's testimony and exhibits relied upon within that testimony, Defendants do not reference any specific portion of Dr. Delacroix's actual testimony and exhibits presented at trial, nor, in fact, address his testimony in any way in their present motion.   Rather Defendants seem to challenge Dr. Delacroix, himself, and argue *an absence of support* for his testimony as given as a whole as a witness and challenge Plaintiffs' *reliance on* him as a witness.   In so doing, again, Defendants ignore the substance of the testimony actually given and the standard at play under Rule 50.

***Information Plaintiffs Point to Considered by Dr. Delacroix.***   Plaintiffs point to evidence Dr. Delacroix testified that he reviewed all available hospital and primary care records for Mr. Allen, together with pathology slides and CT scan reports.[182]   Dr. Delacroix met with Mr. Allen and obtained a complete medical history, and conducted a full physical examination.[183] Based on the information he collected, Dr. Delacroix prepared a detailed medical timeline fully setting forth Mr. Allen's family, social, and occupational history, as well as his medical, surgical, and medication history.[184]

And, as noted below, Plaintiffs point to evidence Dr. Delacroix, also, reviewed relevant

---

[181] Wackman v. Rubsamen, 602 F.3d 391, 400 (5th Cir. 2010); Guile v. United States, 422 F.3d 221, 227 (5th Cir. 2005); Genmoora Corp. v. Moore Business Forms, Inc., 939 F.2d 1149, 1163 (5th Cir. 1991).

[182] Trial Tr. vol. XVIII, at 2556.

[183] Id., at 2556-57.

[184] Id., at 2558, 2589.

scientific and medical studies and writings relating to bladder cancer and to Actos® use.

**Plaintiffs Point to Dr. Delacroix's Consideration of Risk Factors and Causative Factors.** Dr. Delacroix educated the jury on the distinction between "risk" factors for a disease and "causative factors."[185] He testified that, "[R]isk factors don't necessarily always cause the cancer. Risk factors are just that; they're factors that are associated with that endpoint, which here we're looking at bladder cancer."[186] Dr. Delacroix testified that, by contrast, a causative factor is something that actually causes the cancer. Explaining the difference by using a real world example, Dr. Delacroix testified that "[y]ou live in Egypt, you live next to the pyramids, you drink water that has a parasite in it, you get bladder cancer, not because of the risk factor of location but because of the causative factor that's behind that."[187] "[L]ocation could be a risk factor for getting a certain type of bladder cancer . . . The cause would be the parasite."[188]

Plaintiffs point to evidence that Dr. Delacroix testified that he considered each of the potential risk factors for bladder cancer that Defendants urged the jury to focus on:

- **Age**: Dr. Delacroix considered age and concluded that, while it is a <u>risk</u> factor for bladder cancer, it is not a <u>causative</u> factor.[189] He explained his thoughts, analysis, and conclusions in detail.[190]

- **Gender**: Dr. Delacroix explained that gender is a <u>risk</u> factor for bladder cancer, and that white males develop bladder cancer more often than do females; but he noted that most

---

[185] Trial Tr. vol. XVII, at 2499.

[186] Trial Tr. vol. XVII, at 2499.

[187] Trial Tr. vol. XVII, at 2399.

[188] Trial Tr. vol. XVIII, at 2600.

[189] Trial Tr. vol. XVII, at 2508.

[190] <u>Id.</u>, at 2499, 2507-08.

men do not develop the disease.[191]

- **Race**: Dr. Delacroix considered race, but ruled that factor out, as a <u>causative</u> factor, explaining that it is a <u>risk</u> factor; not a <u>causative</u> factor. While Caucasians have a higher incidence of bladder cancer than African-Americans, being Caucasian does not *cause* bladder cancer.[192]

- **Diabetes**: Dr. Delacroix testified that the evidence on whether diabetes is a <u>risk</u> factor for bladder cancer is in controversy.[193] He believes that diabetics represent a higher risk and, for that reason, diabetes is a <u>risk</u> factor for bladder cancer.[194] Dr. Delacroix noted, however, that all patients in the Actos® studies were diabetic.[195] Therefore, the diabetic condition was not significant to any of the study results he relied upon because everyone being studied had that same level of risk. Therefore, an elevated risk above the base line risk is significant.[196]

Plaintiffs point to evidence that in addition to these standard risk factors, Dr. Delacroix, also, considered and ruled out other potential non-causative risk factors for *Mr. Allen's* bladder cancer.[197] Thus, Plaintiffs point to evidence Dr. Delacroix fully considered Mr. Allen's complete medical history and examination in relationship to his Actos® use and Mr. Allen's bladder

---

[191] <u>Id.</u>, at 2496, 2505.

[192] <u>Id.</u>, at 2508-09.

[193] <u>Id.</u>, at 2496.

[194] <u>Id.</u>, at 2496-97.

[195] <u>Id.</u>, at 2497.

[196] <u>Id.</u>, at 2497.

[197] <u>Id.</u>, at 2503-04.

cancer when making his determinations.[198]

In addition to considering and addressing the risk factors and the causative factors, Dr. Delacroix testified that he considered other evidence, as well. For instance, he considered results from random control trials that had been conducted in association with studying Actos®,[199] testifying that he was very persuaded by the results of the PROactive clinical trial.[200] Furthermore, Dr. Delacroix testified that the "meta-analysis of all the randomized control trials that were done using Actos® . . . shows that Actos® causes bladder cancer and it is statistically significant."[201] He evaluated Mr. Allen's cumulative dose of Actos® and concluded that Mr. Allen's cumulative dose was sufficient to make *Actos® a substantial factor of causing Mr. Allen's bladder cancer.*[202] Dr. Delacroix considered the fact that Mr. Allen had not before experienced any clinically-significant events to suggest the presence of bladder cancer,[203] and considered the fact that Mr. Allen's tumor, at the time he was diagnosed, was "high grade," providing further evidence that Mr. Allen's cancer developed *after* an earlier urinary tract infection in 2006.[204]

Dr. Delacroix testified that in his opinion Actos® is a promoter and an initiator for bladder cancer, and concluded that Actos® does <u>cause</u> bladder cancer.[205] Dr. Delacroix testified

---

[198] Trial Tr. vol. XVIII, at 2562-63.

[199] Trial Tr. vol. XVII, at 2420, *et seq.*

[200] <u>Id.</u>, at 2429-30, 2480, 2497-98.

[201] Trial Tr. vol. XVII, at 2486.

[202] Trial Tr. vol. XVIII, at 2603-04.

[203] Trial Tr. vol. XVIII, at 2556-63, 2589.

[204] <u>Id.</u>, at 2563.

[205] Trial Tr. vol. XVII, at 2419, 2442.

that he had ruled out other potential risk factors as being the dominant causative factor in Mr. Allen's cancer and, further, **opined that Mr. Allen would not have developed bladder cancer if he had not taken Actos®.**[206] Plaintiffs point to evidence that Dr. Delacroix's testimony reflected a careful, thorough application of the scientific process and of his understanding and experience as to the causes of bladder cancer generally, and to the specific medical facts associated with Mr. Allen's experience with the disease.[207] Thus, Plaintiffs point to sufficient evidence presented at trial to support the jury's finding as to specific causation.

Again, Defendants do not present argument *as to the substance of* Dr. Delacroix's testimony, and as this Court finds that Plaintiffs have pointed to substantial evidence supporting Dr. Delacroix's opinions this Court finds Defendants' arguments unpersuasive and finds the jury was not unreasonable in relying upon Dr. Delacroix's testimony to find that Actos® caused Mr. Allen's bladder cancer. Again, the mere fact Defendants might disagree with Dr. Delacroix is not a basis to disregard his testimony under a Rule 50 challenge.

The Defendants do, however, also, present three arguments revolving around *the nature of* Dr. Delacroix's testimony and arguing, thus, that his testimony should be found insufficient to support the finding of specific causation, and that it represents *ipse dixit* conclusions: (a) Dr. Delacroix often sees other patients similar to Mr. Allen, but who have not taken Actos®, and who have developed bladder cancer nonetheless; (b) the "absolute risk" of bladder cancer is relatively low; and (c) Mr. Allen's bladder tumor probably looked like every other bladder tumor and, therefore, could not be distinguished on the basis of a visual inspection. Each of these arguments is addressed separately.

---

[206] Trial Tr. vol. XVIII, at 2600-01, 2529.

[207] Id. at 2529.

This Court notes it addressed several of these arguments when Defendants requested an order excluding Dr. Delacroix's testimony for failure to comply with the Federal Rules of Evidence and Daubert v. Merrell Dow Pharmaceuticals.[208] The Daubert motion is entitled "Defendants' Motion to Exclude Testimony of Plaintiffs' Expert Dr. Scott Delacroix."[209] As this Court's opinion on the admissibility of Dr. Delacroix's testimony has not changed, for the sake of completeness, this Court incorporates, as though set forth in its entirety, the Memorandum Ruling: Dr. Scott Delacroix, Urologic Oncologist.[210]

*Patients who are similar to Mr. Allen contract bladder cancer without exposure to Actos®.* The Defendants assert, in support of their argument, that Dr. Delacroix's testimony was insufficient, because Dr. Delacroix admitted he often sees patients similar to Mr. Allen, but who have not taken Actos®, and yet, present with bladder cancer. The record is replete with testimony that bladder cancer can be caused, also, by things other than Actos®, this fact is not disputed by Plaintiffs. Thus, it is, also, in no way disputed that people who are similar to Mr. Allen contract bladder cancer every year in the United States, and that Dr. Delacroix treats many such people. The Defendants do not explain the relevance of these undisputed facts in the face of New York Law which requires that a plaintiff seeking to establish a pharmaceutical company's liability for failure to warn need only prove that the failure to warn was *a substantial factor* in causing his personal injury.[211] The only potential relevance this Court can discern from Defendants' argument might arise if Dr. Delacroix or the Plaintiffs had argued that Actos® was

---

[208] 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

[209] Rec. Doc. 3463.

[210] Rec. Doc. 3779.

[211] Kush by Marszalek v. City of Buffalo, 449 N.E.2d 725, 729 (1983); New York Pattern Jury Instructions – Civil 2:70 (3d ed. 2013).

the only possible cause of Mr. Allen's bladder cancer – a finding not required by New York law. However, neither Dr. Delacroix nor the Plaintiffs have argued that Actos® is the *only* cause of bladder cancer for people similar to Mr. Allen, rather Plaintiffs point to evidence, primary of which is Dr. Delacroix's testimony, that Actos® *was a substantial factor* in causing Mr. Allen's bladder cancer, *which is the level of proof New York law requires*.  In the absence of such a faulty argument by Plaintiffs, or a different applicable legal standard, or persuasive argument as to why, either factually or legally, the presence of bladder cancer *caused by something other than Actos® in other patients than Mr. Allen* should nullify Dr. Delacroix's opinion that Actos® was *a substantial factor in causing Mr. Allen's* bladder cancer or why this Court should ignore applicable law and embrace a legal standard not embraced by New York Law, or why this Court could ignore the evidence presented, the issuance of a judgment as matter of law in the Defendants' favor under this argument must fail, and Defendants' motion on these grounds is OVERRULED.

　　　　*The absolute risk of bladder cancer is low.*  Although the Plaintiffs presented substantial evidence at trial that Actos® presents an increased risk of bladder cancer, the Defendants, nonetheless,  argue an interpretation of this evidence keying to the Defendants' interpretation of "absolute risk" as a shield and argue that term to mean that when considering the *entire pool* of patients who take (or have taken) Actos®, the risk of bladder cancer to the *entire pool* is relatively low; therefore, Takeda and Lilly were free to ignore those identifiable members of that pool for which the risk was not low.  Defendants argument is misleading as it does not address itself to the elevated risk run by any particular individual or any identifiable category of individuals taking Actos® whose risk is not low, nor does it address the increased risk presented to that identifiable individual or identifiable category of diabetic patients who already have

multiple *risk* factors for a certain disease – here bladder cancer.  Defendants' argument, in effect, engages, in effect, in statistical sleight of hand not found or compelled in the cases relied upon.

Dr. Delacroix testified at trial that some individuals already have elevated risks of bladder cancer and, for those individuals, taking Actos® is like applying a match to dry kindling and, therefore, it serves as a promoter of bladder cancer under certain circumstances.[212]

> A classic finding of a promoter is that when it does cause those cancers, it can cause those cancers in shorter periods of time.
>
> And I like to think of a promoter as – I like to – you have to think about the patient.  Let's just think about the patient's bladder that we went through yesterday.  There are going to be some patients whose bladders are old, seventy-year-old patient.  And we talked about that being a risk factor but not a causative factor.  There are going to be some patients who may be smokers.  You then have a –
>
> Think about it like a fireplace.  You have the kindling there, and Actos® or a promoter is the match.  So if you have really dry kindling trying to make a fire, it's really dry, the patient is old, the patient smoked.  They all have diabetes or they wouldn't be getting Actos®.  Maybe the patient worked in a [sic] oil refinery.  All those things, that's going to be a very dry fireplace.  You throw a match in that, it's not going to be surprising that you're going to get a bladder cancer in a relatively short period of time.  And that's the idea of a promoter.
>
> But for the use of Actos®, I don't believe Terry Allen would have gotten bladder cancer.[213]

The Defendants' attempt to dilute a known and identifiable risk within the waters of entire pool; Defendants' argument is flawed.  There might be a low overall risk within a general population for a specific occurrence, but, at the same time, a very real, identifiable, and significant risk of that occurrence to a significant, identifiable group within that population.  To accept Takeda's argument would suggest a drug company is absolved of granting warning to

---

[212] Trial Tr. vol. XVIII, at 2528.

[213] Id.

those with a significant risk of significant harm merely because when those <u>identifiable risks</u> for an <u>identifiable portion</u> of the target population are diluted into the entire pool, one can suggest the *overall risk* is low, – such as argument raises the spectre of Mark Twain and his oft quoted disdain for statistics.  The risk of bodily harm or death is a significant risk and evidence was presented that significant risk exists for an identifiable percentage of the target population, thus, the additional risk to those such as Mr. Allen is high, not low, and the consequence of that risk for those such as Mr. Allen is quite high - death.  A deliberate failure to warn those such as Mr. Allen of such dangerous risk, condemns those individuals to run the risk of death, when a simple warning could have prevented those, possibly fatal, consequences.  Takeda's argument is without merit on this point.

In the absence of any further explanation or any persuasive evidence to support Defendants' argued theory that an argued low *overall* "absolute risk" must <u>nullify</u> Dr. Delacroix's conclusion that Actos® was a ***substantial factor in causing*** of *<u>Mr. Allen's</u>* bladder cancer, the argument fails. Defendants' argument is unpersuasive, at best, and is OVERRULED.

*Mr. Allen's bladder tumor looks like every other bladder tumor.*  Plaintiffs point to evidence that upon questioning by defense counsel, Dr. Delacroix readily admitted that he would not be able to look at Mr. Allen's bladder tumor and, through visual inspection only, determine that the tumor was caused by Actos®, nor did he, in any way, suggest he could or should be able to accomplish such a medical feat.[215]  Once again, Defendants argue a fact which is undisputed as the basis for a straw-man argument which is wholly unpersuasive.  And again, this undisputed fact – without more – does not establish Actos® *could not have caused* Mr. Allen's bladder cancer; nor is it foundational, nor determinative of Dr. Delacroix's testimony *as to the actual*

---

[215] Trial Tr. vol. XIX, at 2806-07.

*basis of his opinion*.  Dr. Delacroix gave full explanation as to what <u>medical</u> factors, <u>patient</u> <u>history</u> and <u>examination findings</u> he relied on in making his <u>differential diagnosis of Mr. Allen</u>. Additionally, and perhaps more perplexing as to the relevance of this argument, Defendants present no evidence to suggest that such a visual difference can be *or has ever been found to be a medical feat accomplished by any physician*; no evidence was pointed to that suggests Actos® works on bladder tissue by changing its appearance; and no evidence was pointed to that suggests a visual inspection of the bladder tumor could, or should, identify its causal influence(s).  In the absence of any evidence or argument explaining why Mr. Allen's bladder tumor *should have looked different* than it did, the Defendants' argument is, <u>at best</u>, unpersuasive.  The argument is OVERRULED.

### E.   Plaintiffs Point to Evidence as to Breach of Implied Warranty of Merchantability

Takeda argues that it cannot be liable to the Plaintiffs because there is no evidence to support the jury's finding that Actos® is unfit for its intended purpose and that the evidence in the record demonstrates, to the contrary, that Actos® is fit for its intended purpose *and* that it is minimally safe.  In so arguing, Takeda presents a new and somewhat novel legal argument.  At no time prior to the instant motion has Takeda made the argument that the Plaintiffs should be required to prove *both* fitness *and* that Actos® is not minimally safe in order to recover on their breach of implied warranty claim.  Because Takeda's argument is founded on legal assumptions that are in conflict with this Court's determination of New York law and its <u>unobjected to</u> instructions given to the jury on this legal issue, this Court suggests Takeda is without right to raise this new legal argument at this late date.  However, out of an abundance of caution, this Court will address Takeda's argument and will begin with a more elaborate discussion of the applicable law.

The implied warranty of merchantability is codified as part of New York's enactment of the Uniform Commercial Code, specifically at § 2-314.

> (1)    Unless excluded or modified (Section 2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. . . .
>
> (2)    Goods to be merchantable must be at least such as . . . (c) are fit for the <u>ordinary purposes for which such goods are used</u>.[216]

In 1995 the Court of Appeals of New York issued an opinion in <u>Denny v. Ford Motor Company</u>,[217] in which it considered several certified questions posed by the United States Court of Appeals for the Second Circuit.   Mrs. Denny had been involved in a rollover automobile accident in a Ford Bronco and was severely injured.[218]   She and her husband sued, asserting claims for negligence, strict product liability, and breach of the implied warranty of merchantability.[219]   Ford objected to the Court's decision to present both the strict product liability claim and the breach of implied warranty of evidence of merchantability claim to the jury, arguing that the causes of action were identical.[220]   The jury found for Ford Motor Company on the product liability claim and for Mr. and Mrs. Denny on the implied breach of warranty claim.   The Court of Appeals concluded that the two causes of action are not identical under New York law, and took advantage of the occasion to provide a lengthy explanation of the theoretical background and historical development of both causes of action.   The Court discussed the standard of proof for breach of implied warranty as follows:

---

[216] NY CLS UCC § 2-314 (2014) (emphasis added).

[217] 87 N.Y.2d 248, 662 N.E.2d 730, 639 N.Y.S.2d 250 (NY 1995).

[218] <u>Id.</u> at 251.

[219] <u>Id.</u> at 251.

[220] <u>Id.</u> at 253.

Page 60

[T]he UCC's concept of a "defective" product requires an inquiry only into whether the product in question was "fit for the ordinary purposes for which such goods are used" (UCC 2-314[2][c]). The latter inquiry focuses on the expectations for the performance of the product when used in the customary, usual and reasonably foreseeable manners. The cause of action is one involving true "strict" liability, since recovery may be had upon a showing that the product was not minimally safe for its expected purpose – without regard to the feasibility of alternative designs or the manufacturer's "reasonableness" in marketing it in that unsafe condition.[221]

Takeda's argument rests on the idea that there are two separate standards – "fitness" and "not minimally safe" – that the Plaintiffs must prove, and that *a failure of proof on either element* precludes recovery.[222] Takeda relies solely on <u>Denny v. Ford Motor Company</u> for this idea. This Court disagrees with Takeda's interpretation of the language in <u>Denny</u>, primarily, for three reasons. First, the paragraph cited above is better interpreted as suggesting the "not minimally safe" language is merely a restatement of the statutorily-defined test of fitness. This interpretation is reinforced by a footnote in the above-quoted paragraph:

A warranty of fitness for ordinary purposes "does not mean that the product will fulfill a buyer's every expectation." Rather, it has been observed, such a warranty "provides for a minimal level of quality."[223]

The noted language does not imply, as Defendants argue, a two-prong analysis where the absence of either one precludes recovery, but appears to use the two formulations – "fitness for ordinary purposes" and "minimal safety" – interchangeably.

Second, the New York Court of Appeals did not explicitly state that the statutorily-defined standard of fitness – *i.e.*, fitness for ordinary purposes for which such goods are used –

---

[221] 87 N.Y.2d at 258-59 (emphasis added).

[222] *See* Memorandum in Support, at 15-16.

[223] 87 N.Y.2d at 258 n.4 (citations omitted).

was to be supplemented, as Defendants argue, with a second and obligatory element of proof.  In the absence of such an explicit description, and in the face of language suggesting the opposite, this Court will not attribute to the New York Court of Appeals an intent to create a second and independent, obligatory element of proof.

Third, the _Denny_ court gave every indication that it relied heavily on the New York Legislature's policy determinations in codifying the implied duty of merchantability.

> What the dissent overlooks is that, as long as the legislative source of authority exists, we are not free to merge the warranty cause of action with its tort-based sibling regardless of whether, as a matter of policy, the contract-based warranty claim may fairly be regarded as a historical relic that no longer has any independent substantive value.  Rather, we must construe and apply this separate remedy in a manner that remains consistent with its _current_ roots in contract law.[224]

The New York Court of Appeals' deference to the New York legislature persuades this Court that the correct standard of proof on a claim for breach of the implied warranty of merchantability is the one set forth in the statute itself and that which is reflected in this Court's jury instructions – which received no objection from Defendants.

Takeda's new arguments focus solely on a strained interpretation of certain "minimally safe" language and, in doing so, ignore the fact that the lack of an adequate warning can, under New York law, in fact, render a product unfit for its ordinary purpose.  Further support for this interpretation is clear when one considers that a product with an adequate warning can be both minimally safe and fit for its intended and ordinary use, whereas, the same product, lacking an adequate warning of the risks present, is neither; the warning granting both notice and expectation.  The role of adequate warnings under New York law is grounded in the "reasonable expectation" doctrine.

---

[224] 87 N.Y.2d at 259 (emphasis in original).

In 1974, a New York intermediate court of appeals – the First Department – adopted the "reasonable expectation" doctrine to a claim for breach of implied warranty of fitness in Stark v. Chock Full O'Nuts.[225]   In Stark, the plaintiff injured her tooth when she bit into a "nutted" cheese sandwich that was adulterated with a large piece of walnut shell.[226]   The court described the "reasonable expectation" doctrine as follows:

> Under this doctrine, a plaintiff can recover for breach of implied warranty of fitness if it is found that the natural substance was not to be reasonably anticipated to be in the food, as served.   As applied to an action for common-law negligence, the "reasonable expectation" test requires a restaurant owner to use ordinary care to remove from the food, as served, such harmful substance as the consumer would not ordinarily anticipate.[227]

The "reasonable expectation" doctrine is still applied in warranty cases as seen in Porrazzo v. Bumble Bee Foods, LLC[228] and includes consideration of whether a product was sold with the necessary warnings:

> The relevant question here, therefore, is whether the presence in mercury in Defendant's canned tuna, *without any accompanying warnings*, renders it not reasonably fit for the ordinary purpose for which it was intended.   In other words, **Plaintiff's claim for breach of implied warranty** turns upon whether: (1) the customary, usual, and reasonably foreseeable use of tuna fish includes the type of consumption Plaintiff engaged in – namely, eating approximately one to two cans of tuna fish daily for more than two years; and (2) Plaintiff reasonably expected mercury – which, when consumed in those quantities, could be poisonous – to be present in the fish.[229]

In light of this jurisprudence and the New York Courts' decision to apply the "reasonable

---

[225] 77 Misc.2d 553, 554, 356 N.Y.S.2d 403, 404 (Sup.Ct.App.Term 1st Dept. 1974).

[226] Id.

[227] 77 Misc.2d at 554.

[228] 822 F.Supp.2d 406 (S.D.N.Y. 2011).

[229] Id. at 421-22 (emphasis added).

expectation" doctrine to the implied warranty obligation, it would seem logic would dictate that a product that presents a known risk of serious bodily harm *can* be "minimally safe" with the necessary accompanying warnings, and, simultaneously, that same product unaccompanied by such necessary warnings would not be minimally safe.  Defendants' argument is unsupported by New York law, and is wholly unpersuasive particularly in the face of the well-established role an adequate warning plays in the common law and New York law in particular.

Neither Plaintiffs nor Defendants have pointed to any implied warranty cases involving *a pharmaceutical* challenge in which the question was presented of whether an allegedly inadequate warning could render a product unfit for its ordinary purposes, nor has this Court's independent research yielded any such jurisprudence.  On the other hand, Takeda has neither argued, nor suggested, that the reasonable expectation doctrine – with its accompanying requirement of adequate warnings of unexpected danger – does not apply to cases involving pharmaceuticals.  More importantly, all parties in this case agreed to the jury instruction given to the jury which expressly acknowledged that the implied warranty of merchantability can be breached by failing to issue an adequate warning.

> Now, because Takeda placed Actos® on the market, the applicable law dictates that Takeda has, therefore, provided a warranty that Actos® is reasonably fit for the ordinary purposes for which it is to be used.
>
> To prove a breach of the implied warranty claim, Terrence Allen must establish that, one, Takeda was a manufacturer, wholesaler, and/or retailer of Actos®;
>
> Second, that Actos® was not fit for its ordinary purposes which is the treatment of diabetes mellitus, because Actos® was not minimally safe;
>
> And third, Takeda's breach of the implied warranty was a substantial factor in causing Terry Allen's bladder cancer.
>
> Now Terrence Allen brings this claim against Takeda based on

Takeda's role in bringing Actos® to the market. *He alleges that Actos® is not fit for its ordinary purpose because Actos® can cause bladder cancer and because Takeda did not adequately warn the medical community of this potential danger.* Takeda denies that Actos® can cause bladder cancer and that, in any case, the warnings as to Actos® with regard to bladder cancer at the time of Terrence Allen's use of the drug were sufficient to render it minimally safe.[230]

Takeda did not object to this description of the applicable law, either at the final charge conference or again when asked when the charge was given at trial.[231]  Given the jurisprudential history described above, Takeda's multiple failures to lodge any objection to the foregoing instruction, and the unpersuasive nature of the legal argument Takeda now makes, this Court finds Takeda's present legal argument as to a new and, heretofore, unraised interpretation of New York law is without merit.

Takeda's arguments, however, also, ignore the *factual* evidence Plaintiffs point to that the warnings accompanying Actos®, at all relevant times, were inadequate.  In response to Takeda's motion, the Plaintiffs point primarily to the testimony of Dr. David Kessler, their expert on the FDA, labeling, the proper placement of a label, and of what should be in the label; the practices followed by Takeda with regard to the Actos® label; the interactions between Takeda and the FDA as they pertain to information contained in the label; negotiations; and the "workings over the issue of PPARs"[232] for evidence supporting their theory that the warnings accompanying Actos® were inadequate and support the jury's verdict that Actos® was unfit for its ordinary purpose.  The testimony of Dr. Kessler pointed to by Plaintiffs that whatever warning Takeda argues was issued as to Actos® prior to 2011 was inadequate, together with his support for that

---

[230] Transcript of Jury Trial (Vol. XXXVII) (Rec. Doc. 4210), at 6272-73 (emphasis added).

[231] *See* Transcript of Jury Trial Charge Conference (Vol. XXXVI) (Rec. Doc. 4209), at 6049; Transcript of Jury Trial (Vol. XXXVII) (Rec. Doc. 4210), at 6304.

[232] Trial Tr. vol. VIII, at 952.

opinion, is described more particularly in § IV(A)(2)(d), *supra*.  The evidence pointed to by the Plaintiffs is substantial and adequately supports the jury's factual conclusion that Actos® was not, as marketed, minimally safe due to the absence of an adequate warning to inform Mr. Allen's physicians, and thus, Mr. Allen, of the risk of bladder cancer.

Takeda, also, argues that it is entitled to judgment as matter of law because they argue that the ordinary purpose for which Actos® is used is to improve glycemic control in patients with Type 2 Diabetes Mellitus, and there is no evidence that Actos® is unfit for *that* purpose.  In making the latter point, it would seem logic, itself, would undercut Takeda's argument.  All approved drugs have a medical purpose, and most, if not all, drugs, also, have side effects requiring some sort of a warning.  The ordinary purpose of the drug is to *improve the patient's medical condition, not to kill the patient in the process,* if it can be avoided – particularly if it can be avoided by the mere addition of an adequate warning to those patients for whom the drug would be contraindicated.  This logic would seem to be without question and foundational within the fully accepted requirement for adequate warnings of risk a drug company knew or should have known existed which is and has been long embraced by the common law and New York law in particular.  Nonetheless, Takeda argues that the record, rather, requires a finding *of fitness* for its intended and ordinary use.  In so doing, Takeda ignores the evidence presented by the Plaintiffs of the risks inherent in Actos® use and presents, at best, a strained reading of Actos'® ordinary purpose.  Takeda, however, argues to support its argument:  (a) the FDA continues to approve the sale of Actos® for this purpose; (b) Mr. Allen's physicians continue to prescribe Actos®; and (c) the risk of bladder cancer caused by Actos® is low in absolute terms.  Again, in so doing Takeda wholly disregards the evidence Plaintiffs point to and presented at trial of the known risks of causing bladder cancer and the evidence presented of an absence of an adequate

warning of those risks until 2011, as well as the ultimate inclusion of such a warning in 2011, and Mr. Allen's doctors' testimony in particular.  Each point is addressed separately.

Takeda argues that:

**The FDA's approval of Actos® for sale in the United States remains in place.**  The record is undisputed that the FDA approved Actos® for sale in the United States in 1999 and that the approval has never been rescinded.  It is equally *undisputed Takeda added a warning to the warning section of the Actos® label as to the association of Actos®, its use and bladder cancer only in 2011.*  Takeda points out that in the intervening 15 years, the FDA has issued approval for several combination drugs and new forms of Actos®, but fails to mention the addition of a warning to Actos® products in 2011, or the evidence Plaintiffs point to that Takeda acted to withhold evidence from the FDA before 2011.[233]  It is equally undisputed that, throughout this time, Takeda has remained under an obligation – imposed at both the federal and state levels – to accompany every sale of Actos® with an adequate warning of the risks that the medication poses to people who take it and Plaintiffs point to evidence presented at trial that such a warning as to bladder cancer was not included before 2011, notwithstanding evidence supporting the need for such a warning as of 2002 or 2004.  As noted above, the parties asserted no objection to a description of the law stating that a product can be unfit for its ordinary purpose when not accompanied by a legally-required warning and Plaintiffs have presented evidence Defendants acted to resist such a warning and withheld and concealed information from the FDA.[234]  In light of the evidence that was presented, the FDA's continued approval of Actos® does not mandate the conclusion Defendants argue, *i.e.*, that Actos® was fit for its ordinary purpose *when no such*

---

[233] *See, e.g.*, Memorandum in Support, at 10, 12.

[234] *See* unopposed Jury Instruction on Claim for Breach of Implied Warranty of Merchantability, discussed *supra*, at pp 64-65.

*warning existed, but evidence suggests it was warranted.*  Plaintiffs, also, point to evidence that Takeda did not provide an adequate warning *to Mr. Allen's physicians at the time that it placed Actos® into the stream of commerce and Actos® was prescribed to Mr. Allen.*  Again, the mere fact Defendants might disagree with the evidence presented or the interpretation made of that evidence, is not a basis to overturn a jury's finding, under Rule 50.

   ***Mr. Allen's physicians continue to prescribe Actos®.***  As before, Takeda presents an argument that entirely ignores the mandatory role of an adequate warning, the ultimate inclusion of a warning in the Actos® label as of 2011 - once requested information was given to the FDA - and the absence of a warning having been given to Mr. Allen's doctors when Mr. Allen's physicians prescribed Actos® to Mr. Allen.  It is undisputed that since <u>2011</u> the FDA has required – and, to the best of this Court's knowledge having heard no evidence to the contrary, Takeda has complied with the obligation to provide – a so-called "black box" warning about the risk of bladder cancer to patients who take Actos®.  In light of this fact, an informed decision by Mr. Allen's physicians – *now that they have full and adequate warnings about bladder cancer to use in determining which of their patients should and should not take Actos®* – to prescribe Actos® to certain patients whose medical histories do not exhibit an increased risk for bladder cancer, and thus, does not contraindicate for Actos® use, and not for others, is neither relevant nor persuasive on the question of whether Takeda breached its duty of merchantability when it manufactured and sold Actos® *<u>without an adequate warning at the time Mr. Allen's physicians prescribed</u>* Actos® *to Mr. Allen.*

   ***The risk of Actos® causing bladder cancer is low in absolute terms.***  As noted above, Takeda argues a strained interpretation of "risk," here, the term "absolute risk," when judged within the context of the entire pool of patients who take (or have taken) Actos®, arguing the

risk of bladder cancer *to the entire pool is relatively low.*   Again, such an argument ignores the relatively high risk of egregious bodily harm or death to an identifiable and significant portion of the targeted diabetic population.   In making this argument, Takeda ignores the evidence in the record Plaintiffs point to that, for individuals who have several risk factors – such as Mr. Allen – the additional risk presented by Actos® is substantially higher than for those diabetics who do not begin with the same medical histories and risk factors.[235]   The jury was not mandated to accept the argument that Actos® presented a "low absolute risk" of bladder cancer for diabetics such as Mr. Allen, as Defendants argue, and Plaintiffs point to evidence to support the contrary argument and interpretation; thus, as noted above, Defendants' argument must fail.

Additionally, even were such a factual conclusion mandatory, this Court finds the jurisprudence cited by Takeda is not *legally* persuasive nor supportive of Takeda's interpretation and argument.   Specifically, as discussed in brief above, Takeda has cited this Court to two federal district court decisions out of the Southern District of New York – Daley v. McNeil Consumer Products Company[236] and Scheinberg v. Merck  Company, Inc.[237] – arguing that a low "absolute risk" of side effects, as that term is argued by Takeda, can render a product fit for its ordinary purpose.   The earlier of the two decisions, Daley, however, relies on two opinions issued by the New York Appellate Court, First Department: Kaempfe v. Lehn & Fink Products Corporation,[238] and Hafner v. Guerlain, Inc.[239]

---

[235] Trial Tr. vol. XVIII, at 2528.

[236] Daley v. McNeil Consumer Products Company, 164 F.Supp.2d 367 (S.D.N.Y. 2001).

[237] Scheinberg v. Merck & Co., Inc. (In re Fosamax Products Liability Litigation), 924 F.Supp.2d 477 (S.D.N.Y. 2013).

[238] 21 A.D.2d 197, 249 N.Y.S.2d 840 (1st Dept 1964).

[239] 34 A.D.2d 162, 310 N.Y.S.2d 141 (1st Dept. 1970).

In order to understand Takeda's legal argument, each of these cases must be discussed in some detail.  Kaempfe – a 1964 decision – involved a claim arising out of a rather undramatic allergic, individual, reaction to aluminum sulfate in a deodorant product.[240]  The fact that the plaintiff sought damages on the basis of the alleged allergic reaction played a pivotal, if not the controlling, role in the court's analysis and decision.

The court noted that Ms. Kaempfe had not asserted theories of negligence in manufacture, distribution, or use, because "generally speaking, [i]f the injuries were suffered by reason of the patron's allergy to the product or to its ingredients, no right of action exists in favor of the patron."[241]  In what appeared to be a case of first impression, the plaintiff sought relief under a theory of negligent failure to warn.  The Court described the analysis used in product liability cases to determine when a duty exists to warn a consumer of the potential for individual *allergic* reactions:

> **It is true that, where a particular product, though not poisonous or inherently dangerous, may become unreasonably dangerous in its use, a seller or manufacturer may be required to give directions or warning on the container as to the proper use thereof.**  In the case of the nonpoisonous and reasonably safe product in general use, *the duty to warn depends upon whether or not it was reasonably foreseeable by the supplier that a substantial number of the population may be so allergic to the product as to sustain an injury of consequences from its use.  If the danger of such an allergy is known or should be known to the maker, and if the consequences of the idiosyncrasy are serious enough*, reasonable care may well require the taking of some precaution **such as warning** and instructions for making tests.
>
> * * *
>
> So, according to the prevailing authority, the existence of a duty on the part of a manufacturer to warn **depends upon whether or not,**

---

[240] 21 A.D.2d at 198.

[241] Id. at 199 (internal quotation marks omitted).

> to his actual or constructive knowledge, *the product contains an ingredient to which a substantial number of the population are allergic, or an ingredient potentially dangerous to an identifiable class of an appreciable number of prospective customers*. If the allergy is one common to any substantial number of possible users, the **seller may be required at least to give warning of the danger**. On the other hand, in the ordinary case the maker may also assume a normal user; and *he is not liable where the injury is due to some allergy or other personal idiosyncrasy of the consumer, found only in an insignificant percentage of the population*.[242]

Thus, the <u>Kaempfe</u> court linked both its analysis and its conclusions very closely to the fact that the case was based on a rather undramatic *allergic reaction* to a consumer product and the presence or absence of a substantial number of the population likely to be so effected, and to the makers' knowledge or lack of knowledge of the risk. In its final statement of the holding of the case, the Court reiterated the importance of the fact that it was dealing with a claim *based on an allergic reaction*: "It has been universally held that a person, *who sustains harm due solely to an unusual hypersensitiveness to a reasonably safe product*, may not recover against the seller or manufacturer on such theory,"[243] and, once again, later: "Certainly, our conclusions are in accord with many decisions in this State denying recovery against the manufacturer or seller of the reasonably safe products for an *injury due solely to the rare allergic reaction or unusual idiosyncrasy of a particular individual*."[244] <u>Kaempfe</u>, by its own terms, does not apply to the facts of the instant case – which does not involve a consumer product, rather a medical drug; does not involve an allergic reaction, rather involves risk of death; does not involve one idiosyncratic person's hypersensitivity, rather involves an identifiable group of an appreciable

---

[242] <u>Id.</u> at 199-201 (internal quotation marks and citations omitted, emphases added).

[243] <u>Id.</u> at 203 (emphasis added).

[244] <u>Id.</u> at 204 (emphasis added).

number – *i.e.*, those diabetics whose medical histories and already existing risk factors for bladder cancer might argue against Actos® use; – and does not involve a maker arguably without knowledge of that risk, rather, evidence was presented supporting Defendants' knowledge of the risk; thus, Kaempfe does not apply to the facts at hand and does not persuade this Court Takeda's argument must prevail in the face of the evidence Plaintiffs point to to support the jury's determination that Actos® is not fit for its ordinary purpose.

Six years later, the same Court discussed above, turned to a very similar question in Hafner v. Guerlain, Inc.[245] Ms. Hafner had applied perfume before going out into the sun; the sun triggered a photosensitivity reaction – again, as with Kaempfe's allergic reaction, a relatively minor medical matter in no way life threatening due to an individual consumer's idiosyncratic sensitivities. An ingredient in the perfume generated red blotches that later gave way to brown spots that did not go away for several months.[246] *Her reaction was characterized as an "abnormal reaction" that could not possibly have been anticipated by the manufacturer.*[247] In her lawsuit, the plaintiff urged theories of breach of implied warranty of fitness, gross negligence, and recklessness in manufacturing an inherently dangerous product. The Court made short work of rejecting the tort-based theories of liability,[248] and thereafter, turned its attention to the implied warranty claim, and concluded that, "With a product such as this one, sold as widely as stated, and as easily purchased, the mere fact that an infinitesimal number experienced a discomforting reaction is not sufficient to establish that the product was not fit for the purpose

---

[245] 34 A.D.2d 162, 310 N.Y.S.2d 141 (1st Dept. 1970).

[246] Id. at 163.

[247] Id. at 163-64.

[248] Id. at 163-64.

intended," *citing* Kaempfe.[249]   Again, clearly, Hafner is not on point.   However, perhaps of greater import is the fact the Court did not hesitate to apply the factors identified in Kaempfe, which had been used to analyze a *tort-based* failure to warn claim, *to the contract-based implied warranty* of merchantability; however, in so doing the Hafner Court was careful to note the many factual similarities between the two cases.   Nonetheless, as noted as with Kaempfe, Hafner is factually distinguishable from the case at hand and does not provide the support for Takeda's argument sought.

Daley v. McNeil Consumer Products Company,[250] – which Takeda, also, cites for the proposition that there is no implied warranty for "low" risk products, again as that term is interpreted by Takeda – is clearly in line with the above  discussed New York state court jurisprudence that preceded it, were cited by it, and are fully discussed above.   Once again, the New York Court was presented with a factual scenario involving a relatively minor allergic reaction; this time, the product was Lactaid.[251]   Applying the principles established in Kaempfe, the Court dispatched the failure to warn claim by noting that the plaintiff had made no effort to establish that a sufficient number of allergic reactions had occurred that would justify imposing an allergy-based duty to warn on the manufacturer of Lactaid.[252]   Turning to the claim for breach of implied warranty of merchantability, the Court cited Hafner for the proposition that, *when considering a claim based on an allergic reaction*, the implied warranty "will not be breached if only a small number of people relative to the total number of persons using the product suffer an

---

[249] Id. at 164.

[250] 164 F.Supp.2d 367 (S.D.N.Y. 2001).

[251] Id. at 369.

[252] Id. at 373-74.

allergic reaction."[253]   Thus, the links between the nature of the claimed consequence, their medical significance, and the small number possibly involved, and the factual determination noted in deciding whether or not to impose liability on the defendant remained in place and were expressly acknowledged by the Court.   Specifically, the line of cases ending with Daley demonstrate that a manufacturer will not be held liable for failing to warn consumers of the potential for a relatively minor allergic or other idiosyncratic response that might trigger minimal discomfort in an infinitesimal number of users of the product.  These are not the facts at hand.

In the second case that Takeda cites to the Court – Scheinberg v. Merck & Co., Inc. (In re Fosamax Products Liability Litigation)[254] – the facts diverge significantly from the Daley line of cases discussed above.   First, Scheinberg does not involve a consumer product, but a highly regulated medication (i.e., Fosamax).  As such, the manufacture, marketing, and sale of Fosamax was closely regulated, and imposed a duty to warn that was triggered by each sale, irrespective of the number of people allegedly (or potentially) harmed by it.   Second, Scheinberg does not involve an allergic reaction such as temporary rashes, sensitivities, and discomfort, but a condition called osteonecrosis of the jaw ("ONJ"), a much more serious medical condition. Third, Scheinberg looks to the number of incidents of ONJ, compares that number to the number of prescriptions issued overall, and concludes that the drug is "minimally safe" as a matter of law, without considering or discussing the seriousness of the condition known as ONJ or any of the other factors that played such an important role in the analysis of, and conclusions reached by, the Kaempfe, Hafner, and Daley courts.  While this Court reads, and respectfully considers, all cited opinions, this Court is not bound by other district court opinions, rather, is mandated to

---

[253] Id. at 375.

[254] 924 F.Supp.2d 477 (S.D.N.Y. 2013).

conduct an independent analysis of the facts and law and reach its own conclusion.  In so doing, all district courts are free to and should determine how much light another district court's opinion can shed on this task at hand.  Although this Court finds the Scheinberg opinion helpful, it does not find the opinion controlling under the facts of this case.

As discussed above, the Kaempfe – Hafner – Daley line of cases – the latter of which was relied upon in Scheinberg – rested their findings of "low risk" – and their conclusions that no warnings were necessary – on facts that are highly distinguishable from the facts at bar.  For instance, again, the New York courts apparently found it persuasive that the products they considered had triggered rather undramatic allergic or other idiosyncratic responses that caused mere discomfort and those responses were experienced by very few people and seem to indicate that, therefore, the manufacturer did not or could not have anticipated the consequences.  By contrast, in the present case, the jury found that Mr. Allen experienced a very serious medical response – he developed cancer which carries the risk of death - one that thousands of people have alleged they, also, have experienced – and Plaintiffs point to evidence the response *was triggered by an attribute of the medication, rather than an abnormal, allergic response reflecting hypersensitivity on Mr. Allen's part*.  This Court finds the New York cases do not apply to exempt Takeda from the obligation to accompany Actos® with an adequate warning of the risk of bladder cancer as Takeda argues.

Takeda has argued, at best, a strained reading, factually and legally, of a line of New York cases addressing risk, to support its argument that the jury erred in finding Takeda breached its implied warranty of merchantability.  In response Plaintiffs have pointed to evidence granting factual support for the jury's finding, as required by FED. R. CIV. P. 50, thus Takeda's argument is not supported by the evidence in this matter, nor by the jurisprudence cited, and this

Court's independent research has not yielded additional guidance from the New York courts which would mandate or support Takeda's strained legal interpretation. The argument is OVERRULED.

### F.     Insufficient Evidence: Wanton and Reckless Disregard of Safety

The jury found, in answer to Question Nos. I and II on the page of the Jury Verdict Form entitled "Punitive Conduct," that each defendant had "acted with wanton and reckless disregard of the effects of its actions,"[255] and, therefore, the Defendants' actions subjected them to punitive damages. In making these findings, the jury was instructed to listen to the arguments of both parties and consider the evidence with which it had been presented during the 10-week trial and use that evidence to determine whether Lilly and/or Takeda had acted with the requisite "wanton and reckless disregard for public safety," in effect, *the mindset* with which Lilly and Takeda had taken the actions established by the evidence presented.

At trial, the Plaintiffs presented evidence that the Defendants were aware of the risk of death by way of bladder cancer associated with Actos® use and that they chose to conceal and obfuscate those risks in order to sell more product and to increase their profit. Plaintiffs point to a substantial amount of evidence in the record, as described more particularly in §IV(C), *supra* to support this finding. Specifically, the Plaintiffs have pointed this Court to substantial evidence presented at trial suggesting that both of the Defendants were aware of the potential danger of bladder cancer presented by Actos® use as early as 1999, 2002, and 2004, and have pointed to evidence that both of the Defendants engaged in concerted, sustained, deliberate, and coordinated efforts to conceal, withhold and obfuscate such information and knowledge from the public, the FDA, the medical community, and – most particularly, in this case – Mr. Allen's

---

[255] Rec. Doc. 4109, at 10.

physicians.

The Plaintiffs presented evidence that supports the interpretation of Takeda's conduct as demonstrating that Takeda knew or should have known of the risk of possible death and cancer for an identifiable number of their target population, a particularly vulnerable and identifiable group, of which Mr. Allen was one.  Plaintiffs presented evidence that Takeda intentionally chose not to adequately warn those individuals or their doctors of these risks and, in particular, intentionally failed to warn Mr. Allen's physicians of the risk that Actos® presented for Mr. Allen – all in pursuit of profit; Plaintiffs, also, presented evidence Mr. Allen contracted bladder cancer and that Actos® was a substantial cause of Mr. Allen's cancer.  Plaintiffs, also, presented evidence Takeda contracted with Lilly to provide marketing and sales (*i.e.*, "promotion") services from 1999 until 2006 and Plaintiffs presented evidence Takeda and Lilly both knew of the risks Actos® posed, that the Defendants shared information and collaborated on strategy and their approach to marketing, interactions with the FDA, and with the scientific community during that time.  Throughout that period, Lilly provided a direct connection between Takeda (as the developer and manufacturer of Actos®) and the U.S. physicians who were in a position to prescribe Actos® to their patients and at no time provided the information it had as to the risks inherent in the use of Actos® to those doctors.  Therefore, Plaintiffs point to evidence Lilly played an essential role in the distribution and marketing of Actos® in the United States for the relevant period of time and to Mr. Allen's doctors, in particular.  The Plaintiffs point to evidence that demonstrated Lilly – like Takeda – knew or should have known of the risk of bladder cancer that Actos® presented for certain, particularly vulnerable members of the population of diabetics.  Despite this knowledge, Plaintiffs point to evidence, noted herein, that Lilly intentionally failed to warn Mr. Allen's physicians of the risk that Actos® presented for him.

Beyond merely failing to warn, Plaintiffs presented evidence Takeda and Lilly obfuscated and worked to conceal relevant information from the scientific and medical communities, the FDA, the public, Mr. Allen's physicians, and Mr. Allen himself concerning an association between Actos® use and an increased risk of bladder cancer – again, all in the pursuit of profits. Plaintiffs presented evidence this intentional concealment of known health risks reflects a deliberate and conscious decision to wholly disregard the well-being of Mr. Allen and those within the target population like Mr. Allen, *i.e.*, diabetics for whom Actos® would likely be contraindicated.   Plaintiffs presented evidence that this intentional conduct reflects the Defendants' deliberate choice, in effect, to sacrifice an identifiable group of individuals in pursuit of profit, when a simple warning could have eliminated the risk of possible death for that identifiable group.  Had an adequate warning been given to physicians such as Mr. Allen's, the physicians would have had the information necessary to make an informed medical decision. Here, Mr. Allen's prescribing physicians were denied the information necessary to make a medically-informed decision as to whether it was medically prudent for someone such as Mr. Allen to take Actos®, therefore, Mr. Allen's doctors prescribed Actos®, Mr. Allen took Actos®, and Plaintiffs presented evidence Actos® was a substantial cause of Mr. Allen's cancer. Furthermore, Plaintiffs presented evidence neither of Mr. Allen's doctors would have prescribed Actos® to Mr. Allen had they known of the risks that Takeda and Lilly knew.  The Plaintiffs presented evidence Takeda and/or Lilly developed, promoted and marketed a drug to the general diabetic population which they knew or should have known posed a risk of serious bodily harm or death without an adequate warning of that risk – all in the pursuit of money.  Consequently, Plaintiffs presented evidence sufficiently substantial in nature upon which the jury could have relied to conclude that Takeda and Lilly exhibited a sufficiently callous attitude toward the well-

being of Mr. Allen and those like him, as well as the general public health, together with the conduct it inspired, the result of which was serious bodily harm and the possibility of death to Mr. Allen.   Thus, sufficient evidence was presented to support the "wanton and reckless disregard for public safety" standard required under New York law, particularly in light of the undisputed fact (as Takeda repeatedly acknowledged in its documents) that diabetics fighting for control over their disease had other viable alternatives in the form of Actos'® primary competition Avandia, or injectable insulin available to them.   Plaintiffs presented evidence both Takeda and Lilly acted to protect their sales and profits at the expense of Mr. Allen's, and others like him, health and life, with wanton and reckless disregard of the effects of their actions.

The Plaintiffs argue the jury properly evaluated *all of the evidence presented surrounding both Takeda's and Lilly's conduct and choices* and concluded that the Defendants' actions were not merely negligent, or distracted, or unknowing, but were prompted by a wanton and reckless disregard for the known risk that Mr. Allen and others such as Mr. Allen would develop bladder cancer and be forever changed or die – all in the pursuit of profit.   The Defendants, on the other hand, it would seem, ignore this evidence in their challenge to the sufficiency of the evidence Plaintiffs point to as supporting the jury's finding of a wanton and reckless disregard.   Again, the fact the Defendants might disagree with the evidence or interpretation of that evidence is not a legally significant basis to disregard the evidence presented.

During the trial, the Defendants argued to the jury that: the evidence simply does not support the conclusion that Actos® causes bladder cancer; they have acted responsibly at all times; their responsible behavior has included substantial, expensive testing; they allowed themselves to be guided by the FDA, as the law requires; their intentions have always been to provide this life-saving medication to as many people as possible who need it; and, therefore,

their actions have been the very *opposite* of wanton, reckless, or disregarding of the effects of their actions on Mr. Allen or anyone else.  Clearly, the jury did not accept their argument and Plaintiffs point to evidence presented to support Plaintiffs' argument as to Takeda's conduct as reflected above.

The Defendants' specific arguments on this issue begin with an effort to hold the Plaintiffs to a higher standard than the one required by applicable New York law, and to which the jury was instructed, with no objection to that aspect of the charge given.[256]  Specifically, the

---

[256] The punitive damages instruction given to the jury, in its entirety, reads as follows:

> Now, under the applicable law, in addition to awarding damages to compensate Terrance Allen for his injuries, you may, but you are not required to, award Terrance Allen what are called "punitive damages."  Now, in general, if you find that the Plaintiffs have proven, by a preponderance of the evidence, that the conduct of either Takeda and/or Eli Lilly was wanton – W-A-N-T-O-N – wanton and reckless with regard to Actos®, you may award punitive damages.

> Conduct is considered wanton and reckless when it demonstrates conscious indifference and utter disregard of its effect upon the health, safety, and rights of others and is deemed so outrageous as to allow an award.  Now, the purpose of what we call punitive damages is not to compensate the Plaintiff, but to punish either Takeda or Lilly, or both, for wanton and reckless acts and thereby discourage them and other companies from acting in a similar way in the future.  The law provides that you can find punitive damages are owed by a party, here such as Takeda or Eli Lilly, only if you have first found that party liable to the Plaintiffs on at least one of the Plaintiff's claims.  In other words, you must have found Takeda liable to Terrance Allen on at least one of his claims made against Takeda before you could award punitive damages against Takeda.

> Also, you must first have found Eli Lilly liable to Terrance Allen on at least one of his claims against Eli Lilly before you could award punitive damages against Eli Lilly.  Again, don't worry, the Jury Verdict Form is designed to ensure this, as I'll show you in a minute.  Thus, using the Jury Verdict Form, you will not be able to consider punitive damages unless you have first found that either Takeda or Eli Lilly, or both of them, is or are liable to Terrance Allen.

> Now, also, under the applicable law, neither Takeda nor Eli Lilly can be held liable for punitive damages unless the Plaintiffs have proven by a preponderance of the evidence that a "superior officer" of Takeda, as to Takeda's conduct, and of Lilly, as to Lilly's conduct, in the course of his or her employment, ordered, participated in, or ratified the relevant conduct.

> Now, who is a relevant "superior officer" under the law?  Under applicable law, a "superior officer" relevant to this inquiry is someone in management who has authorized, participated in, consented to, or ratified the conduct that led to the liability, or who was pursuing a recognized business system of Takeda, as to

Defendants argue that New York law permits punitive damages in only "singularly rare cases," can only be imposed when the challenged misconduct was "exceptional," and implies a "criminal indifference to civil obligations."[257]   Though given repeated opportunities to request that this heightened language be incorporated into the jury instructions, or to object to its absence from the jury instructions,[258] the Defendants neither made any such request prior to or during the final charge conference, nor objected to the foregoing instruction at the charge conference or as given, except that Defendants objected to the use of the "preponderance of the evidence" standard rather than the "clear and convincing evidence standard," – there being a split within the New York Courts on this legal issue - and the giving of an instruction as to punitive damages, in its entirety, arguing the evidence presented did not support the giving of any instruction, at all, as to

---

Takeda, or Eli Lilly, as to Eli Lilly.

Now, the term "superior officer" is more than an agent or "ordinary" officer or employee vested with just some supervisory or decision making responsibility, but must be someone whose actions can be equated with participation by the company.  However, a "superior officer" need not be someone located in the executive suite or the topmost reaches of the company, but he or she must have a high enough level of responsibility within the company that his or her participation in the wrongdoing renders the company blameworthy and arouses the "institutional conscious," for corrective action.

So, if you find that either the conduct of a "superior officer" of Takeda or the conduct of a "superior officer" of Eli Lilly does not meet the standard I have just explained, you will answer "no" on the Jury Verdict Form as to that company. On the other hand, if you find the Plaintiffs have proven, by a preponderance of the evidence, that the conduct of a "superior officer" of Takeda or the conduct of a "superior officer" of Lilly does meet the standard I have just explained, you should answer "yes" on the Jury Verdict Form.

Trial Tr. vol. XXXVII, at 6284-86.

[257] Defendants' Memorandum in Support, at 16-17, *citing*, Garrity v. Lyle Stuart, Inc., 353 N.E.2d 793, 797 (N.Y. 1976); Ross v. Louise Wise Services, Inc., 868 N.E.2d 189, 196 (N.Y. 2007); Marinaccio v. Town of Clarence, 986 N.E.2d 903, 906 (N.Y. 2013).

[258] *See* Parties' Joint Proposed Jury Instructions, submitted as Ex. 18 to PreTrial Order (Rec. Doc. 3841); Parties' Joint Proposed Jury Instructions, submitted as Ex. 43 to Revised PreTrial Order (Rec. Doc. 3923); Trial Tr. vol. XXXVI, at 5981; Trial Tr. vol. XXXVII, at 6336.

punitive damages.[259]   The current effort to, at this late date, argue a different and heightened legal standard or at least different language under New York law than the one to which the Plaintiffs were held at trial comes too late; to the extent the Defendants' argument represents a request to have these newfound standards applied to the facts of this case, the request was waived for failure to assert it in a timely fashion.[260]

## DEFENDANTS' REMAINING ARGUMENTS

The Defendants' arguments can be categorized as (a) those in which they discuss the Plaintiffs' evidence, and (b) a separate group containing a few brief, seemingly random and miscellaneous challenges not clearly falling into pure factual or legal challenge.

***Defendants' Discussion of the Plaintiffs' Evidence.***   The Defendants' first argument is that the failure to include a discussion of bladder cancer in the "Warnings" section of the Actos® label until 2011 does not reflect *their* wanton and reckless disregard, but the *FDA's preference* that the human bladder cancer data appear in the "Precautions" section of the label.[261]   While the Defendants clearly are correct that the FDA *approved* all of the labels that have accompanied sales of Actos®, Plaintiffs point to evidence that this happened only after and only because Takeda engaged in vigorous and obstreperous obfuscation within Takeda's negotiations with the FDA.   Consequently, this argument is dangerously close to disingenuous on the part of the Defendants in light of the abundant evidence Plaintiffs presented of deliberate, concerted, and

---

[259] Trial Tr. vol. XXXVI (Charge Conference), at 5979-81.

[260] This Court is aware of the possibility that the Fifth Circuit will find it necessary to conduct a plain error analysis of the Defendants' assertion of these additional elements of the standard of proof to which the Plaintiffs should be held.   In an abundance of caution, this Court has considered the Defendants' arguments, as well as the jurisprudence they cite.   Had the Defendants argued – as they do here – that the facts of this case are not sufficiently, "singularly rare," and not "exceptional," and do not imply a near-criminal indifference to civil obligation, and, thus, that punitive damages are precluded under New York law, this Court would have rejected the argument and would have found that the Plaintiffs had submitted sufficient evidence into the record to allow the matter to go to the jury.

[261] Memorandum in Support, at 20-21.

coordinated effort by Takeda and Lilly *to resist* all of the FDA's documented efforts to address concerns surrounding bladder cancer and to explore providing more substantial warnings about those increased risks of bladder cancer with exposure to Actos®, when viewed through the lens of the Rule 50 standard at play.[262]  Additionally, the theory of liability evidence presented by the Plaintiffs at trial was not limited to the failure to include a warning in the "Warnings" section of the label as Defendants' argument might suggest, rather extended to Takeda's and Lilly's failure to provide an adequate warning in any other location, or of any other kind, as well.  Plaintiffs presented evidence adequate to provide the requisite support for the jury to have concluded that the Defendants failed to provide adequate warning to Mr. Allen's physicians through any of the multiple communication mechanisms available to the Defendants, and used by them.[263] Plaintiffs, also, presented testimony and evidence that information and warnings are not limited to the insert label only.

Second, the Defendants argue that their decision to conduct the KPNC long-term epidemiological study demonstrates that they did not act with wanton and reckless disregard of the risk of bladder cancer, but that they were trying to obtain sufficient information to formulate an adequate and proper warning.[264]  It is undisputed that the KPNC study was relatively well-designed and that it yielded information that helped to bring about, in 2011, a black box warning concerning the increased risk of bladder cancer associated with exposure to Actos®. Defendants' argue their sponsorship of the KPNC study precludes a finding of wanton and reckless disregard of the risk of bladder cancer, however, the argument falls short because this

---

[262] The Defendants' argument blaming the FDA for the content of the label, where they are  fully aware of the amount, content, and scope of the evidence of their active intervention for the purpose of obtaining precisely this outcome, flies in the face of FED. R. CIV. P. 50 and is so disingenuous as to cause grave concern.

[263] See discussion in § IV(C), *supra*.

[264] Memorandum in Support, at 21-22.

was and is not the only piece of evidence presented to the jury for its consideration in determining whether the Defendants' actions were taken in wanton and reckless disregard for public safety, nor is Defendant's interpretation mandated.  For instance, the Plaintiffs argued Defendants deliberately protracted the interplay with the FDA and suggested a long term study in order to protect their financial interests in Actos® while their patent existed and only ultimately agreed to include the warning on the eve of their patent's expiring – some one year before - once faced with an inability to any longer hide the evidence of the association.  Plaintiffs argue Takeda's suggestion and embrace of *such a long term and protracted study* as the KPNC study, was calculated to maximize its profits up to the point in time its patent was about to expire.  The fact that Defendants can, and do, argue a different *interpretation* of the evidence of their conduct and intent does not mandate the jury to accept their interpretation, nor does it allow this Court to disregard the jury's findings and the evidence Plaintiffs presented at trial which could support the jury's findings.  That evidence, notwithstanding Defendants' preferred interpretation, forms a sufficient basis for the jury's findings under the low threshold of a Rule 50 challenge.

The jury acted within its role and discretion to attach whatever weight and make whatever reasonable inference it deemed appropriate when assessing the Defendants' conduct and intent in its sponsorship of the KPNC study, as well as whatever weight it chose to give Plaintiffs' arguments as to Takeda's intent in entering the KPNC study.  The evidence was presented at trial and cannot be disregarded; Defendants argue one interpretation; Plaintiffs another; however, *the evidence*, itself, cannot be overlooked nor was the jury mandated to accept the Defendants' interpretation of that evidence, as Defendants argument would require.   Under the standard imposed for Rule 50, it is not for this Court to determine which interpretation might be more persuasive – that is the purview of the jury and if sufficient evidence was presented

from which the jury could have properly based its determination, and a contrary finding is not mandated, the inquiry under Rule 50 is complete. Plaintiffs have pointed to evidence sufficient to support a finding the jury was reasonably justified in concluding that the Defendants' action as to the KPNC study does not undercut the jury's finding of wanton and reckless disregard, just as it might have been justified in finding that it did not. Also, one must bear in mind, the KPNC study is not, in and of itself, the only evidence Plaintiffs point to as presented at trial which supports the jury's findings. Defendants focus on this one piece of evidence is questionable, however, as noted, even this evidence is open to at least two not unreasonable interpretations. It is not for this Court to attempt to parse the jury's deliberations or to substitute Defendants' interpretation, or the Plaintiffs' interpretation, or the Court's interpretation, for the jury's findings, if the evidence presented can support such a finding, and here, the body of evidence can. Defendants' argument on this point must fail.

Third, the Defendants point, as faulty, to the Plaintiffs' argument that a meta-analysis ought to have been conducted in 2004 and that, had it been conducted, it would have yielded information about the increased risk of bladder cancer associated with Actos® and, therefore, would have led to more adequate warnings on Actos® labels much earlier than 2011. The Defendants' response to the Plaintiffs' meta-analysis argument is two-fold.

- First, they argue that the FDA conducted a "combined analysis" of two Actos® clinical trials in 2006, and that, despite conducting this "combined analysis," the FDA did not require a bladder cancer warning in 2006. However, Defendants ignore the fact that the jury was also informed of the substantial role that the Defendants played in persuading the FDA to ignore the statistically-significant results of the "combined analysis" and to conclude that no warning should be issued at that time.[265] In light of this evidence, the

---

[265] See, e.g., the July 28, 2006 approval package for Duetact, containing a copy of Takeda's submission to the FDA of a document entitled "Bladder Cancer – Executive Summary – June 1, 2006." (Trial Ex. P-1617-0007, et seq.) The report – relying in part on an analysis conducted by Dr. Droller (one of Takeda's experts at trial) – concludes as follows: "When reviewed in total, the analyses of the existing ACTOS post-marketing and clinical trial database, and the initial interim epidemiologic study report supports Takeda's position that there is no evidence of an increased risk of bladder cancer in pioglitazone-exposed subjects." (Trial Ex. P-1617-0026.)

jury was free to attach whatever weight or significance it deemed fit to the role and significance of the FDA's combined analysis in 2006 and to Takeda's decision _not_ to conduct a meta-analysis until 2011.

- Second, Defendants argue that when Takeda finally conducted a meta-analysis of all Actos® clinical trial data in 2011, at the behest of European regulators, and submitted that information to the FDA, the FDA did not order an immediate change to the Actos® label to include information from the meta-analysis.[266]  However, this Court finds this statement factually questionable.  There is no testimony or evidence cited by Defendants from the record that the meta-analysis _did not_ trigger the FDA's reconsideration of the label, and, considering the timing of the submission – which occurred a couple of months prior to the FDA's instruction to Takeda to change the content of the warning about bladder cancer – Plaintiffs point to evidence from which the jury could have made a reasonable inference of a connection between the two events even though the Defendants argue against such a reasonable inference of a temporal connection.

Again, Defendants' argument begs the question at hand under Rule 50 _and argues possible interpretations_ of the evidence presented.  Neither of these arguments render unreasonable the jury's conclusion in the face of the evidence presented, nor mandates a different result, and as such this Court, under Rule 50, must look to the evidence presented by the non-movant and finds Defendants' argument must fail.

Fourth, the Defendants _argue the interpretation of the evidence presented_ concerning ghostwriting of scientific articles, setting up a false argument that ghostwriting by their employees did not cause Mr. Allen's bladder cancer.  This point is both utterly undisputed and completely irrelevant to the current argument.  Plaintiffs did not argue ghostwriting caused Mr. Allen's cancer.  Rather, the Plaintiffs point to evidence concerning ghostwriting to support the jury's finding _as to the Defendants' **state of mind**_, and the nature of the Defendants' conduct, and the Defendants' ongoing mission to conceal evidence and information from and to misinform the public and the FDA as to the risks associated with use of Actos® and bladder cancer.  Plaintiffs never argued Takeda's ghostwriting caused Mr. Allen's bladder cancer and

---

[266] Memorandum in Support, at 23.

Defendants' argument implying such an argument was made, is quite disingenuous.

Fifth, the Defendants assert there is no evidence suggesting a link between the Cohen hypothesis and Mr. Allen's contracting bladder cancer. Again, this assertion is both blindingly true and completely inapposite. The Cohen hypothesis has not been alleged by the Plaintiffs to have caused any damage to Mr. Allen <u>directly</u>, but Plaintiffs argue it, again, illustrates Takeda's attempt to avoid providing an adequate warning by Takeda's steadfast reliance upon a theory called into such serious scientific question and direct doubt by the FDA. Again, Defendants' argued interpretation of this evidence is not a basis to prevail under a Rule 50 challenge.

Sixth, with regard to the evidence concerning Upjohn's decision, in 1993, not to proceed further with the joint venture to develop Actos®, the Defendants argue that this evidence cannot support the finding that Actos® causes bladder cancer. Again, <u>no such claim was made</u>; rather the Plaintiffs made clear to the jury that the decision by Upjohn was in no way related to the <u>cause</u> of bladder cancer, however was presented as evidence to support the Plaintiffs' argument as to Takeda's state of mind in their attempts to dissuade Upjohn from publicizing their stated safety concerns and thus, to conceal any such safety concern from the public. To argue this evidence as support of general or specific causation as to Mr. Allen's bladder cancer, again, borders on the disingenuous. Rather, Plaintiffs made clear the evidence was evidence of Takeda's argued attempt to conceal any evidence of or information concerning possible safety concerns associated with Actos® and, thus, was evidence Plaintiffs point to to help establish Takeda's intent. The evidence concerning Upjohn – as this Court has discussed, multiple times[267] – is not evidence of specific or even general causation, but evidence one could consider

---

[267] *See* Memorandum Opinion and Ruling (Rec. Doc. 3925); Amended Memorandum Opinion and Ruling (Rec. Doc. 3933); Final Memorandum Opinion and Ruling (Rec. Doc. 4326); Amended Final Memorandum Opinion and Ruling (Rec. Doc. 4330).

to determine whether Takeda acted to hide and dissemble (and to encourage others to do so, as well) in order to avoid having any hint, in the public record, of the fact that safety-related concerns had already arisen in 1993.

The Defendants correctly point out that the record, also, contained an email from Dr. Patricia Ruppel (then an employee of Upjohn),[268] perhaps supporting *a different interpretation* of the events and decision in 1993; however, again, the Court reminds of the task at hand under FED. R. CIV. P. 50 – it is not for this Court to attempt to determine which evidence should be given greater weight or which interpretation of that evidence should be embraced, or which witness might have greater credibility - rather, under Rule 50 this Court's task is only to determine whether sufficient evidence was presented to legally support the jury's finding. Defendants argue Dr. Ruppel stated that Takeda's request that Upjohn not list its "margin of safety" concerns publicly when explaining the decision to stop participating in the development of Actos®, accurately reflected the explanation given to Takeda by Upjohn in Osaka in September, 1993.[269] Plaintiffs presented evidence which called this into question.[270] The jury had all of the evidence on this point before it bearing upon Takeda's behavior and Takeda's intent underlying that behavior; the jury was not compelled or mandated to accept one piece of evidence to the exclusion of another, but was within its authority to weigh the entirety of the evidence and the credibility of the witnesses, and choose what and whom to believe; this task remains firmly within the jury's domain. Taken together with other evidence presented by the Plaintiffs at trial, Defendants' argument must fail. Plaintiffs argued Takeda's efforts to mislead

---

[268] Trial Ex. P-106.

[269] Id.

[270] Id.

the public were not inadvertent, but began with Upjohn and continued as part and parcel of a long-standing policy and this Court cannot find the evidence presented cannot support the jury's finding. Again, whether the jury chose to embrace this particular evidence at all, or to give it weight or not, is not for this Court to say, rather under a Rule 50 challenge, it is sufficient to determine Plaintiffs have pointed to sufficient evidence presented at trial to support the jury's finding. And, again, the fact that Defendants can and do argue a differing *interpretation* of certain and select pieces of evidence is, within a Rule 50 challenge, without moment.

Seventh, Defendants, again, raise a conflated argument as to evidence presented that Takeda destroyed files of key Takeda employees who were intimately involved in the development and marketing of Actos®, as spoliation, arguing a finding of spoliation was the basis for the jury's punitive damage finding. This Court clearly verified with the Defendants and Plaintiffs that no spoliation *tort* claim has been asserted in this matter. Any consideration of spoliation *as a matter of discovery* was addressed and considered by this Court in its two prior rulings, and any sanctions flowing from that matter were addressed by the Court – not the jury - in those rulings.[271] Moreover, this Court's ruling on the sanctions motion,[272] makes clear that **Takeda was not sanctioned with punitive damages for the spoliation this Court found to have occurred** in this case, nor did this Court give a mandatory jury instruction as to spoliation. The Defendants, nonetheless, argue that the jury was not justified in inferring that Takeda's failure to retain evidence covered by its 2002 legal hold is evidence of an effort to hide information of an association between Actos® and health risks, primarily bladder cancer, in order to protect their financial interests represented by their primary, if not sole, product,

---

[271] *See* Amended Memorandum Opinion and Ruling (Rec. Doc. 3933); Amended Final Memorandum Opinion and Ruling (Rec. Doc. 4330).

[272] Amended Memorandum Opinion and Ruling (Rec. Doc. 3933).

Actos®.   Again, Takeda's argument is flawed.   First, this Court will not debate a possible inference perhaps made by the jury and, second, even if there were evidence that such an inference was made by the jury, this Court's task is to determine whether any such inference would be reasonable in light of the evidence presented:

- Takeda argues that there was no evidence from which to conclude that it had any intent to hide scientific data because the evidence established that all scientific data was preserved. However, Plaintiffs point to evidence that this statement is a misrepresentation of the evidence in the record.  Ms. Calahan testified – the only person who testified at trial on these issues for Takeda – that she was unaware of what data had been destroyed.[273]  The jury was free to make its own inferences about the nature, and the scope, of the data Takeda admitted was destroyed or rendered otherwise unavailable.

- Second, the Defendants argue that any alleged design to hide evidence by destroying custodial files was itself so poorly thought-out that it cannot possibly justify an inference of intentional conduct.  The argument that the jury *was mandated* to believe that Takeda is too smart to have behaved in such a slipshod way is a novel one, however the Defendants have identified nothing in the record *that would mandate the conclusions argued* by Takeda and absent such a mandate to the jury, the jury was free to make whatever credibility determinations and give whatever weight it deemed appropriate to the evidence Plaintiffs presented as support for the jury's finding.

- Third, Takeda argues that the attempt to delete custodial files cannot possibly have led to permanent destruction because "it is common knowledge that deleting an email from a person's email files would not necessarily destroy that email permanently."[274]  However, this "common knowledge" did not prevent Takeda from asserting, repeatedly, that the files which should have contained data, including emails, were "unavailable" for production to the Plaintiffs in this case.[275]

- Fourth, Takeda asserts that the existence of retention tapes demonstrates that its intentions were good, and seeks to use those tapes' availability to mandate the jury to conclude that the missing custodial files do not reflect an intentional destruction of documents.  However, Plaintiffs presented evidence it was, at very best, questionable

---

[273] The jury would not have been unreasonable in concluding that there was a possibility scientific data was destroyed, as well, given the evidence, also, presented by Plaintiffs of the job titles of the employees whose files were destroyed.

[274] Memorandum in Support, at 30.

[275] The discovery dispute between Takeda and the Plaintiffs' Steering Committee is replete with failures on Takeda's part to produce the deleted documents, and to date Takeda still has not produced all the deleted files.  *See* Amended Memorandum Opinion and Ruling (Rec. Doc. 3933); Amended Final Memorandum Opinion and Ruling (Rec. Doc. 4330).

whether, and if, any such retention tapes existed, particularly in Japan, and whether they can or do provide the redundancy Takeda argues and note Ms. Calahan's testimony was, at best, unclear on this issue.

- Fifth, Takeda argues that, in the absence of a missing "smoking gun" document, the jury erred if it inferred that Takeda's efforts to destroy documents were intentional. This argument is not logical: it assumes that a party can be found to have had an intention to destroy documents only if it was <u>successful in destroying</u> those same important documents. However, such an argument begs the question, the *ultimate success* of a scheme of document destruction is not evidence of the party's intention, but simply reflects whether or not the party is any good at its job, and again, this Court reminds, the relevance of Takeda's destruction of documents and files is only one piece of evidence presented by Plaintiffs to help establish Takeda's intent when considering whether Takeda acted with the requisite disregard, *as to the punitive damage claim.*

Takeda's *admitted* deletion and destruction of files of key Takeda employees involved in the development and marketing of Actos® **is, in and of itself, evidence** which could be considered when determining Takeda's argued intent, pattern of conduct, and the nature of its conduct. Plaintiffs argued and presented additional evidence that Takeda's conduct was designed to conceal and obfuscate any information which could document a possible association between Takeda's primary, and at times sole, product, and the risk of cancer, in order to protect their extremely lucrative sales, reaching into the billions of dollars. The evidence of Takeda's destroying of files and why *is merely one piece of evidence* the jury could or could not have relied upon in making its determination as to the punitive damage claim made against Takeda.

*Miscellaneous Other Arguments.* The last of the Defendants' arguments on the subject of wanton and reckless disregard consists of a small group of discrete, short arguments. First, the Defendants state that the "Plaintiffs did not allege that the mere selling of Actos® constituted a wanton disregard for the safety of others."[276] The Defendants, again, falsely present argument as though the Plaintiffs had, in fact, taken such a position – the Plaintiffs did not – arguing that the "absolute risk" presented by Actos® is low and, therefore, the mere selling of the drug can

---

[276] Memorandum in Support, at 17.

not constitute a wanton or reckless disregard for public safety.  However, as the Defendants have already acknowledged, there is no dispute on this point.

Next, the Defendants claim they have been criticized for undertaking the KPNC study: "Plaintiffs also blasted Takeda for undertaking the KPNC study, and said that instead of doing a long-term epidemiological study like KPNC, Takeda should have undertaken and provided the FDA with a meta-analysis of the bladder cancer cases in all of the Actos® clinical trials because such a meta-analysis would have prompted the FDA to order Takeda to put human bladder cancer data in the Warnings section of the label."[277]  This assertion is without documentation or other citation to the record by Defendants; Plaintiffs, however, did argue that Takeda delayed conducting a meta-analysis until 2011 and embraced the KPNC study - a long-term study - to extend the discussion until the Actos® patent was about to expire in order to protect their profits. Again, the jury was not mandated to accept Defendants' argument or explanation of its conduct and, therefore, was free to rely on the evidence and argument presented by the Plaintiffs as to the nature, timing, and choice of the two studies.  The Defendants' straw-man argument – again raising an issue over the existence of evidence that is not in dispute, but whose interpretation is greatly disputed – is unpersuasive.  The jury was not mandated to accept Defendants' argument or evidence, rather was free to form its own opinion from all of the evidence presented, and this Court cannot substitute Defendants' in that stead.

Third, the Defendants argue that every Actos® label, from the initial label approved in 1999, to the currently-approved version, has contained "information" about bladder cancer and, therefore, Defendants cannot be accused of wanton and reckless disregard of the bladder cancer issue.  In support of this argument, the Defendants cite a number of cases suggesting that the

---

[277] Memorandum in Support, at 21-22.

mere inclusion of the words "bladder cancer" on a label preclude a finding of wanton and reckless disregard; however, the cited cases do not stand for this boldly-over-stated proposition. In every case cited by the Defendants, on pages 18-19 of their Memorandum in Support, the manufacturer in those cases had made some effort to advise patients, physicians, or customers of the relevant risk presented by the medication.[278]   By contrast, the Defendants deny that there is any increased risk of bladder cancer associated with taking Actos®.   Moreover, the Plaintiffs point to a plethora of evidence presented in this case from which the jury could have inferred the Defendants put considerable effort *into avoiding providing adequate warnings and information to the FDA and the medical community in general, as well as Mr. Allen's physicians in particular*.   Thus, the cases cited are factually distinguishable, and, again, the jury was not mandated to accept Defendants' argument and Plaintiffs presented evidence to support the jury's finding as to the Defendants' intent.

The Defendants are, however, correct that New York law does not require a warning to be located in the "Warnings" section of a medication label in order for the warning to comply with the duty to warn individuals considering taking the medication, or physicians considering prescribing the medication.[279]   However, Plaintiffs point to evidence presented that no warning was given anywhere else on the label, nor was a warning provided on or with any other written or verbal communications.   Dr. Kessler testified information does not equate to a warning, and

---

[278] *See* Scheinberg v. Merck & Company, Inc. (In re Fosamax Products Liability Litigation), 924 F.Supp.2d 477, 490 (S.D.N.Y. 2013); DeLuryea v. Winthrop Laboratories, Division of Sterling Drug, Inc., 697 F.2d 222, 230 (8th Cir. 1983); Kritser v. Beech Aircraft Corporation, 479 F.2d 1089, 1094 (5th Cir. 1973); In re: Levaquin Products Liability Litigation, 700 F.3d 1161, 1164 (8th Cir. 2012); Heston v. Taser International, Inc., 431 F.App'x 586, 589 (9th Cir. 2011); Dudley v. Bungee International Manufacturing Corporation, 1996 WL 36977, at *3 (4th Cir. 1/31/1996); Richards v. Michelin Tire Corporation, 21 F.3d 1048, 1059 (11th Cir. 1994); Toole v. McClintock, 999 F.2d 1430, 1436 (11th Cir. 1993); and West v. Goodyear Tire & Rubber Company, 973 F.Supp. 385, 388-89 (S.D.N.Y. 1997).

[279] *See, e.g.*, Martin v. Hacker, 83 N.Y.2d 1, 628 N.E.2d 1308, 607 N.Y.S.2d 598 (NY 1993).

Drs. Lamb and Reilly both testified had they known of the risk of bladder cancer they would not have prescribed Actos® to Mr. Allen, and Dr. Reilly testified he had read the entire label, while Dr. Lamb testified that she read the Warnings section, as well as unspecified other sections.[280] Thus, the jury was free to conclude whatever information was in the label did not constitute *an adequate warning,* as is required by New York law  Furthermore, the jury, relying on evidence pointed to, would not have been unreasonable to determine the information argued by the Defendants was equally as likely to have been part of an overall campaign designed to dissuade the FDA from forcing the issue of an adequate warning and was included and designed to obfuscate rather than its having been the good faith action Defendants argue.  The inescapable fact remains, Plaintiffs point to evidence presented from which the jury could have based its finding and point to the existence of sufficient evidence within the record to support the jury's finding.  The presence of sufficient evidence, and absence of a mandate, is what is required to defeat a challenge under Rule 50 on this point, *the argued interpretation of that evidence* is the purview of the jury and not of this Court.  The jury reviewed copies of the relevant labels on which the Defendants base their argument, heard Dr. Kessler's testimony, Drs. Reilly and Lamb's testimony, and had available the other evidence to which Plaintiffs have pointed in their brief.  It was within the jury's province to look at all of the evidence, to look at each label in its entirety, and to weigh all testimony and evidence presented, in order to determine whether the body of evidence presented supported the Plaintiffs' case or the Defendants'.  The jury was instructed as to the applicable New York law that "the warning provided must have been reasonable under the circumstances.  A warning for a prescription drug is reasonable and

---

[280] Trial Ex. P-7514A, at 22.

adequate if it provides specific detailed information on the potential risks of the drug,"[281] and, also, instructed that it could consider factors such as "whether the warning was accurate, clear, consistent on its face, whether it portrayed the sufficient intensity the severity of the potential risks involved in taking the drug."[282]  Plaintiffs have pointed to sufficient evidence from which the jury could have concluded that the "information" about bladder cancer contained in Actos® labels did not adequately warn of the increased risk of cancer.[283]

Plaintiffs point to more than sufficient evidence, which the jury had available for their review including the labels themselves, presented during the trial; the Court gave the jury full instruction as to how they could evaluate the adequacy of the warnings, and the "information" contained in those labels under New York law; and in light of the absence of an explicit warning,[284] this Court, therefore, cannot find the jury's conclusions were unreasonable or not reasonably supported by evidence pointed to by Plaintiffs in the record.

Again, and overall, Plaintiffs point to evidence presented that could support a finding that Takeda acted to conceal evidence of a risk of bladder cancer associated with its primary, and to a

---

[281] Trial Tr. vol. XXXVII, at 6270.

[282] Id.

[283] For example, the July, 1999 Actos® label, attached as Trial Ex. D-1067, mentioned bladder cancer in the following context:

> A two-year carcinogenicity study was conducted in male and female rats at oral doses up to 63 mg/kg (approximately 14 times the maximum recommended human oral dose of 45 mg based on mg/m²).  Drug-induced tumors were not observed in any organ except for the urinary bladder, benign and/or malignant transitional cell neoplasms were observed in male rats at 4 mg/kg/day and above (approximately equal to the maximum recommended human oral dose based on mg/m²).  The relationship of these findings in male rats to humans is unclear.  A two-year carcinogenicity study was conducted in male and female mice at oral doses up to 100 mg/kg/day (approximately 11 times the maximum recommended human dose based on mg/m²).  No drug-induced tumors were observed in any organ.

[284] See Trial Ex. D-1626, at D-1626-0016; Trial Ex. D-1916, at D-1916-0001, -0007.

Page 95

large degree, only, product, from the FDA, medical community, general public, and specifically Mr. Allen's physicians in the pursuit of financial gain with deliberate and callous disregard of the risks to which it was subjecting the general public and of the safety and well-being of Mr. Allen and those like him.  The fact that Defendants now take the same evidence – *argue a different interpretation* – and focus on what they argue is contradictory evidence, cannot gain the result desired under a Rule 50 challenge.  Again, this Court is mindful of the standard it must apply in a Rule 50 challenge: the court *must **credit the non-moving party's evidence**; must **disregard all evidence favorable to the movant that the jury is not required to believe**; must **draw all reasonable inferences in favor of the nonmoving party**; and **may not make credibility determinations or weigh the evidence.***[285]  The Defendants' argument is OVERRULED.

### G.    Punitive Damages: Lilly-Specific Arguments

In the final section of the Memorandum in Support, Lilly suggests three additional arguments in support of its request this Court issue judgment as a matter of law in favor of Lilly on the Plaintiffs' claim for punitive damages. The sufficiency of the evidence supporting the jury's imposition of punitive damages on Lilly has been addressed in an earlier section of this Memorandum Ruling, and will not be re-stated here.  Rather, the Court will adopt those earlier discussions as applicable here and simply address the remaining arguments presented in this section.

*Failure to make label changes.*  Lilly, again, argues it should not be penalized for failing to change the Actos® label as Lilly could not have done so.  However, this argument has been

---

[285] Kevin M. Ehringer Enterprises, 646 F.3d at 325 (*citing* Reeves v. Sanderson Plumbing Productions, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)); Brown, 675 F.3d at 477.  This court uses the same standard of review articulated by the Fifth Circuit for its appellate review because both standards of review are the same. *See* Kevin M. Ehringer Enterprises, 646 F.3d at 324 ("We review denials of motions for judgment as a matter of law under Federal Rule of Civil Procedure 50 *de novo*, applying the same standard as the district court.") (citation omitted).

fully addressed above and for those same reasons this Court find Lilly's argument is inapposite and, for those reasons, is OVERRULED.   The broader argument encompassing information beyond the insert label, itself, has been discussed above.

***Lilly's actions pursuant to the Co-Promotion Agreement.***   Lilly makes three separate arguments based on the Co-Promotion Agreement.

(i)   <u>Lilly as Co-Promoter</u>.   First, Lilly asserts a straw-man argument, suggesting that it should not, and cannot, be held liable based <u>solely</u> on its role as the contractual co-promotion partner of Takeda.   Irrespective of whether this bald statement is legally correct or not, it is factually erroneous.   It is clear the Plaintiffs, at no time, have asserted any claim against Lilly based <u>*solely*</u> on its status as a co-promoter.   To the contrary, Plaintiffs point to evidence in the record keying to Lilly's conduct demonstrating Lilly played an active and definite role in marketing Actos® and managing information about Actos® in concert with Takeda; Lilly's argument ignores that evidence.   Lilly's argument, also, ignores the evidence presented that upon Actos'® emergence into the U.S. market, Lilly was *essential* to the marketing, selling, and distribution of Actos® in the United States from 1999 to 2006, as it was Takeda's *<u>sole presence in the United States</u>* and *the <u>only</u> company selling and distributing Actos® within the United States at that early period*.   Lilly's argument similarly ignores the well-established common law principle, firmly established under New York law, that "anyone responsible for placing a drug in the marketplace for which there might be a risk and an inadequate warning"[286] can be held liable under New York product liability law.[287]

The Plaintiffs point to substantial evidence presented at trial, parts of which have been

---

[286] Trial Tr. vol. XXXVII, at 6266 (Rec. Doc. 4210).

[287] *See* <u>Brumbaugh v. CEJJ, Inc.</u>, 152 A.D.2d 69 (N.Y. App. Div. 3d Dep't 1989).

noted earlier within this ruling, regarding Lilly's active and essential role in marketing Actos®

and its interplay with Takeda during the early years of Actos®; the jury was free to embrace that

evidence. In the face of the evidence pointed to, it cannot be found that there was not sufficient

evidence to support the jury's finding. Whether Lilly *agrees* with the jury's *interpretation* of

that evidence, and the jury's determination or not, is not the question at hand, rather, the question

presented under Federal Rule of Civil Procedure Rule 50 is whether, under the standard set forth

under Rule 50, is there a sufficient basis for the jury's finding(?). Again, Plaintiffs point to

evidence presented sufficient to answer that question in the affirmative. In part, Plaintiffs point

to evidence that Lilly knew of the risks posed by Actos®, acted in concert with Takeda in

formulating strategy and conducting marketing which ignored and concealed those risks, and

provided no warning *of any nature* of those risks to the physicians to whom Lilly marketed

Actos® and specifically to Mr. Allen's physicians in particular. In the face of the evidence

pointed to by Plaintiffs as presented at trial, this Court cannot find the jury violated the

established evidentiary standard inherent in a Federal Rule of Civil Procedure Rule 50 challenge.

Lilly's argument is OVERRULED.

        (ii)    <u>Timing</u>. Second, Lilly argues that it cannot be held liable for

punitive damages because its involvement in the promotion of Actos® ended in March, 2006, a

month before Mr. Allen was first prescribed Actos®. Lilly made this argument in its motion for

summary judgment, thus, this Court has ruled on this issue before and adopts that portion of its

previous ruling. Lilly's argument in the instant motion presents no evidence or argument which

mandates a different result under a Rule 50 analysis. This Court's reasons and ruling on the

summary judgment motion – specifically the section entitled "(e) The effective term of the Co-

Promotion Agreement between Takeda and Lilly" – is directly on point and adopted and

incorporated herein as if set forth in its entirety.[288]   Additionally, Plaintiffs point to the marketing calls made by Lilly employees on Mr. Allen's physicians promoting Actos® *before they prescribed Actos® to Mr. Allen*.  No warning information concerning the risks of bladder cancer was given to Mr. Allen's doctors and as Gigi Chen, a Lilly sales representative who covered the relevant physician territory, indicated in her email of July 31, 2007 "Jason, the article you sent all of us regarding the side effect of cancer was even listed! Obviously, not something we would mention or bring up on our sales calls but just something to be aware of in case it is mentioned out in the field!."[289]  Lilly's argument is OVERRULED.

        (iii)   <u>Insufficient contact with physicians</u>.  Third, Lilly argues that it cannot be held liable for punitive damages because its contact with Mr. Allen's physicians was insufficient to support a conclusion of wanton and reckless disregard.  However, Plaintiffs point to evidence at trial which demonstrates that Lilly's involvement with Actos® was not limited only to its contact with Mr. Allen's physicians, but included evidence that Lilly worked closely with Takeda for several years, developing strategic marketing; that Lilly knew of the risk of bladder cancer; and that Lilly hid that knowledge from Mr. Allen's physicians throughout dozens of contacts with their offices made prior to their prescribing Actos® to Mr. Allen.  Consequently, this Court cannot find that the evidence pointed to by the Plaintiffs – described in detail in §IV(B)(2) and above – is not sufficient to support the jury's conclusion under a Rule 50 analysis.  Moreover, this Court, also, finds that Lilly has not identified any legal or factual basis for finding that Lilly is protected from liability for punitive damages *as a matter of law* under the evidence presented at trial or the law argued, particularly in light of the evidence pointed to by the

---

[288] Rec. Doc. 3817, at 14-15.

[289] Trial Ex. P-7141.

Plaintiffs in opposition to the instant motion.  Lilly's argument is OVERRULED.

*Evidence as to Spoliation*.  In the first phrase, in the first sentence, of Lilly's final argument of its brief, Lilly identifies it argument to be without merit.  Lilly once again presents a straw-man argument, and frames the jury's decision incorrectly:  "even assuming *arguendo* that a finding of spoliation could form the basis of a punitive damage award."[290]  Lilly misstates the legal reality - *there has been no finding of spoliation against Lilly in this case by the jury* for punitive damages or otherwise.  Moreover, the finding of *spoliation* was made by this Court **as to Takeda** as a matter of **Takeda's discovery conduct** and the sanctions **imposed were against Takeda** and *did not include punitive damages*.[291]  Again, there **was no tort claim made or argued against Lilly (or Takeda) based upon spoliation** and Lilly's false argument suggesting otherwise is very ill advised.  Next, the mere fact that Takeda's conduct in destroying files of key employees involved in the development, marketing, and management of Actos® could be *one fact* the jury might have considered in assessing Takeda's intent does not equate to nor support Lilly's conflated straw-man argument in any fashion.  Furthermore, neither the Plaintiffs by way of argument, nor the Court by way of jury instruction, suggested Lilly engaged in the destruction of files and data and Defendants argued this distinction to the jury.  Lilly's present attempt to establish a false assumption as the basis for its argument is quite distressing and wholly unavailing.

The punitive damages award against Lilly was granted by the jury – who heard no evidence or argument that Lilly destroyed files relating to Actos® – and Lilly has presented this

---

[290] Memorandum in Support, at 32.

[291] The sanctions imposed on Takeda by this Court as a result of the spoliation ruling are described in this Court's Amended Memorandum and Ruling (Rec. Doc. 3933), at 72, and Amended Final Memorandum and Ruling (Takeda Only) (Rec. Doc. 4330), at 112-15.

Court with no persuasive argument that the jury lacked evidence for its determination made against Lilly; to the contrary, Plaintiffs point to evidence sufficient to support the jury's finding as to Lilly under the Rule 50 standard.  In the absence of any persuasive argument, and in the face of the evidence pointed to by Plaintiffs of Lilly's conduct, this Court cannot *merely assume* that there is not a sufficient factual basis for the jury's verdict when evidence exists which could support that finding, nor shall this Court assume the jury embraced an argument *never made by the Plaintiffs* and inapposite to the instructions given.

Furthermore, this Court notes that at no time before or during the trial did Lilly request a limiting instruction or otherwise bring to the attention of this Court any concern which is inherent in the argument Lilly *now* makes as to evidence of <u>Takeda's</u> destruction of data, nor did Lilly, at any time, request a separate trial from Takeda.  Lilly's failure to raise this issue during the period of time when it could have been addressed, reinforces the false nature of the argument now made.  Lilly's strategic choice made during trial cannot, now, be ignored after the fact simply because the outcome of that choice is unpalatable.  Lilly's argument is OVERRULED.

## VI.     CONCLUSION

For the foregoing reasons, the Defendants' Rule 50(b) Motion for Judgment as a Matter of Law shall be DENIED in its entirety.

THUS DONE AND SIGNED in Lafayette, Louisiana, this 28th day of August, 2014.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE