RECEIVED

OCT 2 7 2014

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| IN RE: ACTOS® (PIOGLITAZONE) PRODUCTS LIABILITY LITIGATION | MDL No. 6:11-md-2299 |
| | JUDGE DOHERTY |
| This Document Applies To: *Allen et al. v. Takeda Pharmaceuticals North America, Inc. et al.* Case No. 6:12-cv-00064-RFD-PJH | MAGISTRATE JUDGE HANNA |

## MEMORANDUM RULING:
## DEFENDANTS' RULE 59 MOTION FOR NEW TRIAL
## (REC. DOC. 4348)

### INTRODUCTION

Pending before this Court is the Defendants' Rule 59 Motion for a New Trial,[1] filed on behalf of all Defendants.[2] The Defendants have moved, pursuant to Rule 59 of the Federal Rules of Civil Procedure, for a new trial on all of the Plaintiffs' claims and/or argue for reduction of the punitive damages award.[3] Briefing in this matter now being complete, the matter is ripe for ruling.[4] For the following reasons, the motion will be GRANTED IN PART and DENIED IN PART.

---

[1] Rec. Doc. 4348.

[2] The Defendants joining in this Motion are: Takeda Pharmaceutical Company, Limited, Takeda Pharmaceuticals U.S.A., Inc., Takeda Pharmaceuticals International, Inc., Takeda Pharmaceuticals LLC, Takeda Development Center Americas, Inc., Takeda California, Inc. (referenced collectively as "Takeda"), and Eli Lilly & Company ("Lilly"). The term "Defendants," as used in this Memorandum Ruling, refers to both Takeda and Lilly. While each of these named entities has joined in the instant Motion, it is of note that the parties have stipulated that only two Takeda entities respond to the Judgment in the case at bar, namely Takeda Pharmaceutical Company Limited and Takeda Pharmaceuticals U.S.A. (Rec. Doc. 3380).

[3] Although arguments for a new trial are the primary focus of Defendants' Motion, at four separate places Defendants raise the issue of remitting the punitive damages award, and suggest that it should be reduced to the amount of the compensatory award. *See* Motion for New Trial, Rec. Doc. 4348 at 1; Memorandum in Support, Rec. Doc. 4348-1 at 1, 15, and 23.

[4] The Defendants' Memorandum in Support of their Motion is found at Rec. Doc. 4348-1. The Plaintiffs' Opposition is found at Rec. Doc. 4467. The Defendants' Reply Brief in support of their Motion is included in Rec. Doc. 4491.

### PROCEDURAL HISTORY

These proceedings were instituted by the Judicial Panel on Multidistrict Litigation by order dated December 29, 2011.[5]  After little more than a year of litigation, upon request and agreement of the parties, this Court scheduled the trial in "Allen v. Takeda Pharmaceuticals North America, Inc.," Civil Action No. 12-0064, as an early trial or bellwether trial.  The trial began on January 27, 2014; eleven weeks later, on the last day of trial, this Court gave the following instruction to the jury to guide its determination of whether the factual predicate for punitive damages existed in this case, *i.e.*, whether the jury found that Defendants had engaged in wanton and reckless disregard of the effects of their actions.[6]

> Now, under the applicable law, in addition to awarding damages to compensate Terrance Allen for his injuries, you may, but you are not required to, award Terrance Allen what are called "punitive damages."  Now, in general, if you find that the Plaintiffs have proven, by a preponderance of the evidence, that the conduct of either Takeda and/or Eli Lilly was wanton – W-A-N-T-O-N – wanton and reckless with regard to Actos®, you may award punitive damages.

> Conduct is considered wanton and reckless when it demonstrates conscious indifference and utter disregard of its effect upon the health, safety, and rights of others and is deemed so outrageous as to allow an award.  Now, the purpose of what we call punitive damages is not to compensate the Plaintiff, but to punish either Takeda or Lilly, or both, for wanton and reckless acts and thereby discourage them and other companies from acting in a similar way in the future.  The law provides that you can find punitive damages are owed by a party, here such as Takeda or Eli Lilly, only if you have first found that party liable to the Plaintiffs on at least one of the Plaintiffs' claims.  In other words, you must have found Takeda liable to Terrance Allen on at least one of his claims against Takeda before you could award punitive damages against Takeda.

---

[5] Transfer Order (Rec. Doc. 1).

[6] This Court bifurcated deliberation and instruction of the punitive damages issue to avoid any possible prejudice to Defendants within the trial process.

Also, you must first have found Eli Lilly liable to Terrance Allen on at least one of his claims against Eli Lilly before you could award punitive damages against Eli Lilly. Again, don't worry, the Jury Verdict Form is designed to ensure this, as I'll show you in a minute. Thus, using the Jury Verdict Form, you will not be able to consider punitive damages unless you have first found that either Takeda or Eli Lilly, or both of them, is or are liable to Terrance Allen.

Now, also, under the applicable law, neither Takeda nor Eli Lilly can be held liable for punitive damages unless the Plaintiffs have proven by a preponderance of the evidence that a "superior officer" of Takeda, as to Takeda's conduct, and of Lilly, as to Lilly's conduct, in the course of his or her employment, ordered, participated in, or ratified the relevant conduct.

Now, who is a relevant "superior officer" under the law? Under applicable law, a "superior officer" relevant to this inquiry is someone in management who has authorized, participated in, consented to, or ratified the conduct that led to the liability, or who was pursuing a recognized business system of Takeda, as to Takeda, or Eli Lilly, as to Eli Lilly.

Now, the term "superior officer" is more than an agent or "ordinary" officer or employee vested with just some supervisory or decision-making responsibility, but must be someone whose actions can be equated with participation by the company. However, a "superior officer" need not be someone located in the executive suite or the topmost reaches of the company, but he or she must have a high enough level of responsibility within the company that his or her participation in the wrongdoing renders the company blameworthy and arouses the "institutional conscience" for corrective action.

So, if you find that either the conduct of a "superior officer" of Takeda or the conduct of a "superior officer" of Eli Lilly does not meet the standard I have just explained, you will answer "no" on the Jury Verdict Form as to that company. On the other hand, if you find the Plaintiffs have proven, by a preponderance of the evidence, that the conduct of a "superior officer" of Takeda or the conduct of a "superior officer" of Lilly does meet the standard I have just explained, you should answer "yes" on the Jury Verdict Form.[7]

---

[7] Trial Tr. vol. XXXVII (Rec. Doc. 4210), at 6284, *et seq.*

After due deliberation, the jury found that both Takeda and Lilly had engaged in wanton and reckless disregard of the effects of their actions.[8]  Once this factual predicate for the award of punitive damages had been found, this Court asked the jury to return to open court and only then provided the jury with the following additional instruction to guide its determination of the amount of the punitive damage awards:

> Ladies and gentleman of the jury, you have now found that punitive damages are owed by Takeda and Lilly.  As I instructed you earlier, punitive damages are designed to punish the Defendants for wanton and reckless outrageous conduct, and thereby punish Takeda and Eli Lilly and thereby discourage the Defendants and other companies from acting in a similar way in the future.  You must now decide the amount of punitive damages to be awarded.  In deciding upon that amount, you should consider the nature and the reprehensibility of the Defendants' conduct in this case.  You should consider the character of the wrongdoing you have found occurred in this case.
>
> For instance, the degree to which the Defendants, both plural possessive, conduct demonstrated an indifference to or a reckless disregard of the health, safety, or rights of others; the degree to which the conduct was done with an improper motive or vindictiveness; the degree to which the act or acts constituted – as I was saying, the degree to which the acts or acts constituted outrageous or oppressive intentional misconduct; how long the conduct went on, how long the conduct went on; the degree to which the Defendants, plural, were aware of what harm the conduct caused or was likely to cause; whether the harm caused was physical as opposed to economic; the degree of concealment or covering up of the wrongdoing; the actual and potential harm created by the Defendants', plural, conduct including the harm to Terrance Allen.
>
> However, although you may consider harm to individuals or entities other than Terrance Allen in determining the degree to which the Defendants', again, plural, conduct was reprehensible, you may not add a specific amount to your punitive damages award to punish Takeda and Lilly for any harm they might have caused to others who are not parties in this case.  In other words, a defendants' [sic] dissimilar acts independent from the acts upon

---

[8] Jury Verdict (Rec. Doc. 4109), at 10.

which liability was premised may not serve as the basis for punitive damages. Takeda and Lilly should be punished for the conduct that harmed Terrance Allen, not for being unsavory businesses.

The amount of punitive damages that you award must be both reasonable and proportionate to the actual and potential harm suffered by Terrance Allen and to the compensatory damages you awarded Terrance Allen. The degree of reprehensibility of Takeda's and Lilly's conduct is an important factor in deciding the amount of punitive damages that would be reasonable and proportionate in view of the harm suffered by Terrance Allen and the compensatory damages you have awarded.

Now you may also consider Takeda's and Lilly's financial condition and the impact your punitive damages award will have on Takeda and Lilly.[9]

This Court, also, instructed the jury that the parties had reached certain stipulations of fact, that those stipulations had been accepted by the Court, and, therefore, that the jury was required to accept these facts as proven. The stipulations of fact agreed to by the parties are as follows:

The parties stipulate to the following financial data for Takeda and Eli Lilly & Company.

The net worth for Takeda in fiscal year 2013 totaled $23,652,755,000 dollars. In fiscal year 2013, Eli Lilly's net worth totaled $17,631,000,000 U.S. dollars.

The net sales of Actos® in the United States – Your Honor, we've stipulated to individual amounts that we can put into the record that the jury can see, but in the interest of time, they range from [$]582 million in the early going, to by the year 2002, [$]1.1 billion; by the year 2006, [$]2.1 billion; by the year 2009, [$]2.7 billion; 2010, [$]3 billion; 2011, [$]2.6 billion; and then it tales [sic] back to [$]815,000 for 2012, for a total Actos® net sales between 1999 and 2012 of $24 billion dollar.

The total Actos® prescriptions written as of June 15, 2011, is more than 100 million. The total number of patients that were prescribed Actos® as of June 15, 2011, is more than 10 million.

---

[9] Trial Tr. vol. XXXVII (Rec. Doc. 4210), at 6319, *et seq.*

And that concludes the stipulated tender.[10]

The trial ended on April 7, 2014 when the jury issued its complete verdict.[11]   After finding in favor of the Plaintiffs on all factual and causation questions, the jury made the following compensatory damage awards:

| | |
|---|---|
| To Terrence Allen: | $1,150,000 |
| To Susan Allen: | $ 325,000 |
| Total Compensatory Damages Awarded: | $1,475,000[12] |

The jury allocated liability for the compensatory damages among the Defendants as follows:

| | |
|---|---|
| Takeda | 75% (or $1,106,250) |
| Lilly | 25% (or $368,750) |

After finding that both Defendants had engaged in wanton and reckless disregard of the effects of their actions, the jury imposed the following punitive damages awards:

| | |
|---|---|
| Takeda | $6,000,000,000 [reflecting a ratio of 1:5424 compensatory damages to punitives] |
| Lilly | $3,000,000,000 [reflecting a ratio of 1:8136 compensatory damages to punitives] |

The Defendants have not challenged the compensatory damage awards as excessive. Rather, the Defendants' motion focuses primarily on punitive damages awards.   As the Defendants seek, on the basis of the punitive damages, either a new trial or a reduced punitive

---

[10] Trial Tr. vol. XXXVII (Rec. Doc. 4210), at 6323-24.  *See also* Stipulation Regarding Financial Data of Takeda and Eli Lilly (Rec. Doc. 4110).

[11] Jury Verdict Form (Rec. Doc. 4109).

[12] For reasons peculiar to New York law, the parties have entered into a stipulation that the judgment should reflect compensatory damages in the amount of $945,000 for Terrence Allen and $325,000 for Susan Allen rather than the sums reflected on the Jury Verdict Form.  *See* Compensatory Damages Stipulation (Rec. Doc. 4329). By agreement of the parties, these amounts will be paid in a lump sum to the Plaintiffs – rather than as an annuity, as contemplated by New York law – if the judgment in their favor becomes final.  However, in evaluating the jury's punitive damages awards, this Court will not use the negotiated sums reflected on the Stipulation entered by the parties after the trial was over, but will use the actual awards granted by the jury at the close of the trial.

damages award, the arguments on each of those points will be addressed in turn.

## *STANDARD OF REVIEW*

The Federal Rules of Civil Procedure grant district courts the authority to order a new trial under certain circumstances.

> The court *may*, on motion, grant a new trial on all or some of the issues – and to any party – as follows:
>
> (A)     after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . .[13]

A new trial may be granted when a district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course.[14]   Additionally, courts have ordered new trials after finding that juries have awarded excessive punitive damages awards; evidentiary errors have been committed; and instructional errors have occurred.[15]   "Courts do not grant new trials unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done."[16] The movant bears the burden of proving that harmful error has occurred.[17]   A motion for a new trial based on evidentiary grounds should not be granted unless the jury's verdict is "against the great – not merely the greater – weight of the evidence."[18]

---

[13] Fed.R.Civ.P. 59(a)(1) (emphasis added).

[14] Weckesser v. Chicago Bridge and Iron, 447 Fed.Appx. 526, 529 (5th Cir. 2011), *citing* Smith v. Transworld Drilling Company, 773 F.2d 610, 613 (5th Cir. 1985).

[15] *See* Auster Oil & Gas, Inc. v. Stream, 835 F.2d 597, 603 (5th Cir. 1988); Willitt v. Purvis, 276 F.2d 129, 132 (5th Cir. 1960); Aero International v. United States Fire Insurance Company, 713 F.2d 1106, 1113 (5th Cir. 1983).

[16] Sibley v. Lemaire, 184 F.3d 481, 487 (5th Cir. 1999), *quoting* Del Rio Distributing, Inc. v. Adolph Coors Co., 589 F.2d 176, 179 n. 3 (5th Cir.1979).

[17] Sibley, 184 F.3d at 487.

[18] Winter v. Brenner Tank, Inc., 926 F.2d 468, 471 (5th Cir. 1991), *quoting* Scott v. Monsanto Co., 868 F.2d 786 (5th Cir.1989).

## LAW AND ANALYSIS

Before considering the constitutional crux of the Defendants' motion, several secondary arguments will be addressed briefly.

## I.     The Court's Alleged Errors

The Defendants have alleged that this Court made several errors in ruling on evidentiary and legal matters prior to, and during, the trial.  Each is addressed below.

## A.     Spoliation

Takeda attempts to, once again, re-litigate the spoliation issue, arguing that this Court erred in its ruling on the Plaintiffs' Motion for Sanctions:

- in finding that Takeda owed a *duty to preserve documents* beginning in July, 2002.  Takeda does not present new evidence or argument, but re-states the same position it took in earlier briefs (including the Rule 50(b) motion) and argument.  For the reasons more fully set forth in this Court's Amended Memorandum Opinion and Ruling[19] and Amended Final Memorandum Opinion and Ruling (Takeda Only),[20] both of which are incorporated herein as though fully set forth, Takeda's argument is overruled.

- in finding that Takeda had acted in *bad faith* in failing to preserve documents.  Takeda does not present new evidence or argument, but re-states the same position it took in earlier briefs (including the Rule 50(b) motion) and argument.  For the reasons more fully set forth in this Court's Amended Memorandum Opinion and Ruling[21] and Amended Final Memorandum Opinion and Ruling (Takeda Only),[22] both of which are incorporated herein as though fully set forth, Takeda's argument is overruled.

- in finding that the *Plaintiffs were prejudiced* by Takeda's failure to preserve documents.  Takeda does not present new evidence or argument, but re-states the same position it took in earlier briefs (including the Rule 50(b) motion) and argument.  For the reasons more fully set forth in this Court's Amended

---

[19] *See* Rec. Doc. 3933, at 29-44.

[20] *See* Rec. Doc. 4330, at 12, 36.

[21] *See* Rec. Doc. 3933, at 53-69.

[22] *See* Rec. Doc. 4330, at 109-12.

Memorandum Opinion and Ruling[23] and Amended Final Memorandum Opinion and Ruling (Takeda Only),[24] both of which are incorporated herein as though fully set forth, Takeda's argument is overruled.

- in sanctioning Takeda by *allowing the Plaintiffs to present spoliation evidence to the jury* and in issuing a *permissive instruction* (once again demonstrating the point that this Court has made repeatedly over the past nine months, Takeda's argument seems to deliberately mischaracterize this Court's instruction to the jury by suggesting that an adverse inference instruction was given; rather this Court issued a permissive inference instruction in which the jury was told that they should interpret the evidence and make any inferences they deemed appropriate).[25]   Takeda does not present new evidence or argument, but re-states the same position it took in earlier briefs (including the Rule 50(b) motion) and argument.  For the reasons more fully set forth in this Court's Amended Memorandum Opinion and Ruling[26] and Amended Final Memorandum Opinion and Ruling (Takeda Only),[27] both of which are incorporated herein as though fully set forth, Takeda's argument is overruled.

- in failing to issue *limiting instructions to the jury to protect Lilly* from the effects of the spoliation evidence and permissive inference instruction.  As noted by this Court in the Memorandum Ruling on the Defendants Rule 50(b) Motion,[28] **Lilly never requested such a limiting instruction** and has not carried its burden of proving that error occurred by not granting a limiting instruction which was never requested or that Lilly was prejudiced by the lack of any such instruction.  Lilly's argument is overruled.

**B.    Punitive Damages Standard of Proof**

As this Court has noted from the outset of preparation for the <u>Allen</u> trial, New York law is unclear as to the applicable standard of proof – there being a split in the lower courts and no determination by New York's highest court – to which a plaintiff seeking punitive damages must

---

[23] *See* Rec. Doc. 3933, at 46-53.

[24] *See* Rec. Doc. 4330, at 23-24.

[25] Trial Tr. vol. XXXVII (Rec. Doc. 4210), at 6277-79.

[26] *See* Rec. Doc. 3933, at 68-72.

[27] *See* Rec. Doc. 4330, at 37-45.

[28] Rec. Doc. 4619, at 100-01.  *See also* Final Amended Memorandum Ruling: Defendants' Rule 50(b) Motion for Judgment as a Matter of Law (Rec. Doc. 4648), at 100-01.

be held.  Before and during the preliminary charge conference, the parties engaged in full argument and briefing on the legal question, and after hearing all and reviewing all, this Court considered the parties' arguments and ruled that the preponderance of the evidence standard would be applied in this case as would have been the case had the trial been tried in New York in the proper New York venue.[29]  The Defendants now argue that this Court erred in its ruling.  In doing so, the Defendant do not present new arguments or evidence, but simply incorporate their earlier briefing and arguments.  For the reasons more fully set forth by this Court on the record during the preliminary charge conference,[30] which are incorporated herein as though fully set forth, Takeda's augment is overruled.

### C.    *Daubert* Motions

Prior to trial, the Defendants filed 11 <u>Daubert</u> motions challenging various aspects of the Plaintiffs' expert testimony.  All of the motions were ruled on prior to trial and were denied in whole or in part.  The Defendants now urge this Court to reconsider its rulings on the motions challenging the opinion testimony of Drs. Delacroix, Kessler, Southgate and Schneeweiss.  Once again, the Defendants present no new argument or evidence in support of their position, but simply request this Court to conclude that the earlier denials were in error.  For the same reasons set forth in this Court's earlier rulings,[31] all of which are incorporated as though fully set forth herein, the Defendants' request is overruled.

---

[29] Transcript of Court's Rulings and Charge Conference (1/31/2014) (Rec. Doc. 4172), at 60-64.

[30] <u>Id.</u>

[31] Memorandum Ruling: Dr. Scott Delacroix, Urologic Oncologist is found at Rec. Doc. 3779; Memorandum Ruling: David A. Kessler, M.D. is found at Rec. Doc. 3855; Memorandum Ruling: Jennifer Southgate, Ph.D. is found at Rec. Doc. 3819; and Memorandum Ruling: Sebastian Schneeweiss, M.D., S.M., S.C.D., F.A.C.E., F.C.P., F.I.S.P.E. is found at Rec. Doc. 3829.

### D.    Bladder Cancer Causation Theory

The Defendants rest their theory of this case, in large part, on a factual conclusion that bladder cancer *cannot* occur within one year of exposure to a causative agent.  This factual conclusion is central to the defense and, had the Defendants been able to persuade the jury on this point, several important scientific studies relied upon by the Plaintiffs might have been rendered impotent, and Defendants might have had much more success in the liability determination.  The importance of this issue led the Defendants to file, prior to trial, a Motion to Exclude Testimony of Plaintiffs' Experts that Actos® Can Cause Bladder Cancer Within One Year of Use, arguing this Court should exclude any evidence and testimony suggesting that bladder cancer could be caused by less than one year of exposure to a toxic agent.[32]  After review of all briefings, this Court denied the motion.[33]  The Defendants argue that this Court erred when it denied their limine motion and allowed the Plaintiffs' evidence on this point into the record.  In doing so, the Defendants present neither new evidence nor new argument in support of their present request for relief.  For the same reasons set forth in this Court's rulings on the motion in limine,[34] which are incorporated as though fully set forth herein, the Defendants' request is overruled.

## II.    The Constitutional Challenge

The overarching challenge now mounted by Defendants keys to a constitutional challenge, housed within the Due Process Clause.  First, this Court notes this case comes before the Court on diversity jurisdiction; the parties agree that New York law controls the Plaintiffs'

---

[32] Rec. Doc. 3466.

[33] Memorandum Ruling: Development of Bladder Cancer Within One Year of Exposure, Rec. Doc. 3771, at 31.

[34] Rec. Doc. 3771.

claims.   Moreover, the parties agree that New York law permits Plaintiffs to recover punitive damages under certain circumstances.   After the close of the evidence at trial, this Court instructed the jury on the law applicable to their determination of whether punitive damages should be awarded.[35]   The jury was asked, on the Verdict Form, to answer the following question as to both Defendants:

> Do you find, by a preponderance of the evidence, that [Defendant] acted with wanton and reckless disregard of the effects of its actions, as defined in the instructions you have been given?[36]

Only after the jury had found in the affirmative as to both Defendants did the second phase of the trial begin, during which the jury was to determine the amount of punitive damages. As noted, the Court bifurcated the trial in this manner to avoid prejudice to Defendants.

Thereafter, counsel for the Plaintiffs and the Defendants presented evidence in the form of a "Stipulation Regarding Financial Data of Takeda and Eli Lilly,"[37] following which each presented his or her oral argument to the jury concerning the amount of punitive damages that should be awarded.   While the jury was deliberating during this second phase of the trial, the jury sent the following question to the Court: "Can we have guidance on what is proportionate?"[38] After reading the note to counsel, this Court responded to this request – having proposed this response to the parties and received no objection[39] – as follows: "I have instructed you as to the law.   You have a copy of that instruction.   I must ask you to please make your determination

---

[35] Trial Tr. vol. XXXVII (Rec. Doc. 4210), at 6284-86.

[36] Rec. Doc. 4109, at 10.

[37] Rec. Doc. 4110.

[38] Trial Tr. vol. XXXVII (Rec. Doc. 4210), at 6337.

[39] Trial Tr. vol. XXXVII (Rec. Doc. 4210), at 6337.

within the instructions that have been given as to the applicable law."[40]

As noted above, the jury imposed $6 Billion in punitive damages on Takeda and $3 Billion in punitive damages on Lilly.  The Defendants now urge this Court to find that the jury acted out of passion and prejudice *or*, alternatively, that the sums awarded in punitive damages are grossly excessive in violation of the Due Process Clause.  The Defendants argue that they are entitled to a new trial or, alternatively, that the punitive damages award must be remitted.

### A.  New York Law

The Defendants argue (and the Plaintiffs do not disagree) that the New York courts have adopted, as their own, the United States Supreme Court's Due Process Clause test for excessiveness as to  punitive damages awards.[41]   As New York law on the question of excessiveness is identical, for all intents and purposes, to the United States Supreme Court jurisprudence, this Court, therefore, need only analyze the Defendants' excessiveness arguments under federal law.

### B.  Constitutional Jurisprudence and Theory

The Defendants – relying primarily on the United States Supreme Court's decision in State Farm Mutual Automobile Insurance Company v. Campbell[42] – make a relatively straight-forward argument that the punitive damages awards are grossly excessive and, therefore, unconstitutional, and consequently, they are entitled either to a new trial or to a reduction in the size of the punitive damages award.  While the Defendants accurately describe those portions of

---

[40] Id. at 6338-39.

[41] See, e.g., Western New York Land Conservancy, Inc. v. Cullen, 66 A.D.3d 1461, 1463-64, 886 N.Y.S.2d 303 (Sup. Ct. – App. Div. 4th Dept. 2009); Guariglia v. Price Chopper Operating Co., Inc., 38 A.D.3d 1043, 1044, 830 N.Y.S.2d 871 (Sup.Ct. – App. Div. 3rd Dept.), lv. denied 9 N.Y.3d 801, 840 N.Y.S.2d 566, 872 N.E.2d 252 (N.Y. 2007); Sawtelle v. Waddell & Reed, 304 A.D.2d 103, 108-09, 754 N.Y.S.2d 264 (Sup. Ct. – App. Div. 1st Dept. 2003).

[42] 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003).

<u>Campbell</u> that they rely on, their discussion of the issues is nonetheless incomplete. The current state of the jurisprudence on excessive awards when analyzed under the Due Process Clause is much broader, and much less clear, than the Defendants' argument suggests, and requires a full analysis by this Court.

Over the past two decades, the United States Supreme Court has developed the theory that the Due Process Clause limits the amount of punitive damages that may be awarded in a given case. In view of the magnitude of this issue, and the importance of the Defendants' challenge, this Court will discuss the Supreme Court jurisprudence in some detail.[43]

### Pacific Mutual Life Insurance Company v. Haslip

With its decision in <u>Pacific Mutual Life Insurance Company v. Haslip</u>,[44] the Supreme Court began forming its modern constitutional theory that the Due Process Clause limits the size of punitive damages awards. In that case, the named Plaintiff, Ms. Haslip, was an employee of Roosevelt City, Alabama.[45] Her health insurance premiums, and those of several other employees, were misappropriated by the city's insurance agent; their health coverage lapsed; and they incurred economic damages when they could not pay hospital and doctor bills after payment was refused by Pacific Mutual.[46] Ms. Haslip and the others brought suit in Alabama State Court, asserting claims for fraud and *respondeat superior*. After a trial on the merits, Ms. Haslip was

---

[43] While both the New York state courts and the United States Court of Appeals for the Fifth Circuit have issued opinions addressing claims of alleged excessive awards – *see, e.g.*, <u>Wellogix, Inc. v. Accenture, L.L.P.</u>, 716 F.3d 867 (5th Cir. 2013); <u>Equal Employment Opportunity Commission v. Service Temps Incorporated</u>, 679 F.3d 323 (5th Cir. 2012); <u>Rain Bird Corporation v. National Pump Company</u>, 144 Fed.Appx. 373 (5th Cir. 2005); <u>Watson v. Johnson Mobile Homes</u>, 284 F.3d 568 (5th Cir. 2002); <u>Rosenberg, Minc & Armstrong v. Mallilo & Grossman</u>, 8 Misc.3d 394 (Sup. Ct. 2005) – in none of those cases are the factual circumstances comparable to the facts of this case; therefore, none is controlling as to whether the punitive damages awards in this case are excessive and therefore will not be discussed in great detail.

[44] 499 U.S. 1, 111 S.Ct. 1032 (1991).

[45] 499 U.S. at 4, 111 S.Ct. at 1036.

[46] 499 U.S. at 4-5, 111 S.Ct. at 1036.

awarded $1,040,000; the Court presumed that the total award was allocated as $200,000 in compensatory damages and $840,000 in punitive damages (a ratio of 1:4.2).[47]   The trial court found that the insurance agent's conduct "evidenced intentional malicious, gross, or oppressive fraud, and found the amount of the award to be reasonable in light of the importance of discouraging insurers from similar conduct."[48]   The case was appealed to the Alabama Supreme Court, which affirmed the trial court's judgment.   The U.S. Supreme Court granted writs to consider the defendant's argument that the verdict was the "product of unbridled jury discretion and [] violative of its due process rights."[49]

After briefly discussing the previous decisions in which the Court had acknowledged that the Due Process Clause might impose limits on the size of punitive damages awards,[50] the Court confirmed that the punitive damages concept comports with the Due Process Clause of the Fourteenth Amendment.

> Punitive damages have long been a part of traditional state tort law.[51] . . . Under the traditional common-law approach, the amount of the punitive award is initially determined by a jury instructed to consider the gravity of the wrong and the need to deter similar wrongful conduct.  The jury's determination is then reviewed by trial and appellate courts to ensure that it is reasonable.[52]

The Court described the common-law development of punitive damages and concluded that both the availability of punitive damages and the common-law method by which they are awarded,

---

[47] 499 U.S. at 6 n.2, 111 S.Ct. at 1037 n.2.

[48] 499 U.S. at 23, 111 S.Ct. at 1046 (citations and internal quotation marks omitted).

[49] 499 U.S. at 7, 111 S.Ct. at 1037.

[50] 499 U.S. at 9-12, 111 S.Ct. at 1038-40.

[51] 499 U.S. at 15, 111 S.Ct. at 1041 (citations omitted).

[52] 499 U.S. at 15, 111 S.Ct. at 1042.

comport with the requirements of the Due Process Clause.

> In view of this consistent history, we cannot say that the common-law method for assessing punitive damages is so inherently unfair as to deny due process and be *per se* unconstitutional.  If a thing has been practiced for two hundred years by common consent, it will need a strong case for the Fourteenth Amendment to affect it.  As the Court in Day v. Woodworth, 13 How. 363 (1852), made clear, the common-law method for assessing punitive damages was well established before the Fourteenth Amendment was enacted.  Nothing in that Amendment's text or history indicates an intention on the part of its drafters to overturn the prevailing method.[53]

The Court, nonetheless, made it clear that constitutional limitations on the scope of punitive damages *do* exist.

> One must concede that unlimited jury discretion – or unlimited judicial discretion for that matter – in the fixing of punitive damages may invite extreme results that jar one's constitutional sensibilities.   We need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case.  We can say, however, that general concerns of reasonableness and adequate guidance from the court when the case is tried to a jury properly enter into the constitutional calculus.[54]

Having addressed the constitutionality of the common law approach to awarding punitive damages, the Court proceeded to address the question of whether *Alabama's particular procedural practices* for awarding, and limiting, punitive damages comported with the procedural limitations inherent in the Due Process Clause.  The Court noted that, in the State of Alabama, punitive damages are specifically linked to two particular purposes (retribution and deterrence);[55] jury instructions are used to impose meaningful limitations on the jury's

---

[53] 499 U.S. at 17-18, 111 S.Ct. at 1043 (citations and internal quotation marks omitted).

[54] 499 U.S. at 18, 111 S.Ct. at 1043 (citations omitted).

[55] 499 U.S. at 19, 111 S.Ct. at 1044.

discretion;[56] mandatory post-trial scrutiny by the trial court requires consideration of specific factors;[57] and the Alabama Supreme Court both conducts a comparative analysis and considers specifically-identified criteria for determining whether the purposes of the punitive damage award were served by the jury's decision.[58]   The Court approved of Alabama's procedural framework because it "imposes a sufficiently definite and meaningful constraint on the discretion of Alabama factfinders in awarding punitive damages.   The Alabama Supreme Court's postverdict review ensures that punitive damages awards are not grossly out of proportion to the severity of the offense and have some understandable relationship to compensatory damages."[59]

Having conducted a detailed review of Alabama's procedures for limiting the size of punitive damages, the Court found that those procedures had proven effective.  In its discussion, the Court noted that the punitive damages award in Haslip was more than four times the amount of the compensatory damages, and that this "may be close to the line,"[60] but declined to make a substantive ruling.  Additionally, when discussing the sanctions that would be available to punish the type of insurance fraud found to have occurred, the Court did not describe those penalties, but simply noted that the punitive damages actually imposed on the defendants – representing more than 200 times the out-of-pocket expenses the plaintiffs incurred – is "much in excess of the fine that could be imposed for insurance fraud" under Alabama law, however, the Court allowed the award to stand.[61]  Finally, the Court made a passing reference to the possibility that

---

[56] 499 U.S. at 19-20, 111 S.Ct. at 1044.

[57] 499 U.S. at 20, 111 S.Ct. at 1044.

[58] 499 U.S. at 20-22, 111 S.Ct. at 1045-46.

[59] 499 U.S. at 22, 111 S.Ct. at 1045.

[60] 499 U.S. at 23, 111 S.Ct. at 1046.

[61] 499 U.S. at 23-24, 111 S.Ct. at 1046.

the Due Process Clause might impose *substantive limits* on punitive damage awards, but declined to reduce the punitive damages award because "the award here did not lack objective criteria."[62]

### TXO Production Corporation v. Alliance Resources Corporation

Having firmly established, in Haslip, the framework for addressing the *procedural* due process concerns that punitive damages awards can trigger, the Supreme Court decided TXO Production Corporation v. Alliance Resources Corporation[63] two years later and opened the door to placing *substantive* due process limits, as well, on punitive damages awards.

TXO Production Corporation ("TXO") made an offer to Alliance Resources Corporation to purchase mineral rights for $20 per acre in cash, 22% of oil and gas revenues in royalties, and a promise to pay all development costs.[64]   Shortly after executing the "phenomenal" lease with Alliance, TXO apparently had second thoughts and began a campaign to break the contract by impugning Alliance's title to the mineral rights that it had just leased to TXO.   TXO's efforts included paying a third-party $6,000 for a quitclaim deed that was designed to suggest – falsely – that the mineral rights were owned by a third party instead of Alliance,[65] along with an attempt to induce Alliance's predecessor in interest to execute a false affidavit indicating that Alliance did not own the mineral rights it sold to TXO.[66]

Armed with these questionable documents, TXO brought a declaratory judgment action against Alliance seeking a ruling that Alliance's title in the mineral rights had failed.   In

---

[62] 499 U.S. at 23, 111 S.Ct. at 1046.

[63] 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d. 366 (1993).

[64] 509 U.S. at 447, 113 S.Ct. at 2715.

[65] 509 U.S. at 449, 113 S.Ct. at 2715.

[66] 509 U.S. at 449, 113 S.Ct. at 2715-2716.

response, Alliance asserted a common-law action for slander of title.[67]   TXO's declaratory judgment action was tried on briefs, and the Court found in Alliance's favor.   After the declaratory judgment action was denied, Alliance's counterclaim for slander of title was tried to a jury.   The jury found in favor of Alliance.   The jury found that Alliance had incurred $19,000 in actual damages in defending the declaratory judgment action.[68]   The jury, also, awarded $10 million in punitive damages,[69] a ratio that sometimes is characterized as 526:1 ratio of punitive damages to actual damages,[70] and other times has been characterized as less than 10:1 punitive damages to compensatory damages.[71]

The trial court refused to reduce the punitive damages awarded by the jury, and the West Virginia Supreme Court of Appeals affirmed the award.   In so doing, the Court found that the pertinent title made it "perfectly clear" that Alliance owned "all the oil and gas underlying" the relevant property.[72]   The West Virginia courts concluded that, despite the unambiguous deed, "TXO knowingly and intentionally brought a frivolous declaratory judgment action when its real intent was to reduce the royalty payments under a 1,002.74 acre oil and gas lease, and thereby increase its interest in the oil and gas rights" at issue.[73]   The West Virginia Supreme Court

---

[67] 509 U.S. at 446, 113 S.Ct. at 2714.

[68] Id.

[69] Id.

[70] 509 U.S. at 459, 113 S.Ct. at 2721.

[71] See BMW of North America, Inc. v. Gore, 517 U.S. 559, 581, 116 S.Ct. 1589, 1602, 134 L.Ed.2d 809 (1996) ("Thus, in upholding the $10 million award in TXO, we relied on the difference between that figure and the harm to the victim that would have ensued if the tortious plan had succeeded.   That difference suggested that the relevant ratio was not more than 10 to 1.").

[72] 509 U.S. at 448, 113 S.Ct. at 2715.

[73] 509 U.S. at 449, 113 S.Ct. at 2716 (internal quotation marks omitted).

referred to TXO's efforts as "nothing less than an attempt to steal Alliance's land."[74]  The United States Supreme Court granted writs to decide "whether th[e] punitive damages award violates the Due Process Clause of the Fourteenth Amendment, either because its amount is excessive or because it is the product of an unfair procedure."[75]

Only three justices joined the Opinion of the Court in its entirety.  Normally, Supreme Court plurality opinions are limited in their binding effect.[76]  However, the TXO opinion has been cited authoritatively numerous times by the Supreme Court because the plurality opinion is in the unusual position of having the three dissenting justices agree with the plurality's analysis and rationale (but not the actual holding), while, also, having the three concurring justices agree with the holding that the lower court's ruling would be upheld.  In this way, almost every aspect of the TXO plurality opinion carries a majority of the votes on the Court, although different groups of justices adopted different aspects of the majority opinion.  Ultimately, a majority of the Court voted to uphold the amount of the punitive damages award.

First, a majority of the Court (both the plurality and the dissenting justices) agreed that the Due Process Clause of the Fourteenth Amendment imposes *substantive* limits on punitive damages awards.[77]  Indeed, the TXO Court's formulation of the constitutional standard for determining whether a punitive damages award is excessive – "whether a particular award is so 'grossly excessive' as to violate the Due Process Clause of the Fourteenth Amendment"[78] – has

---

[74] 509 U.S. at 449, n.6, 113 S.Ct. at 2716, n.6. (internal quotation marks omitted)

[75] 509 U.S. at 446, 113 S.Ct. at 2714.

[76] *See, e.g.,* Marks v. US, 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed. 2d 260 (1977) (*quoting* Gregg v. Georgia, 428 U.S. 153, 169 n.15, 96 S.Ct. 2909, 2923, 49 L.Ed. 2d 859 (1976)).

[77] 509 U.S. at 453-54, 479-80, 113 S.Ct. at 2718, 2731.

[78] 509 U.S. at 458, 113 S.Ct. at 2720.

been fully accepted by a majority of the Court.[79]   Moreover, the T̲X̲O̲ Court reiterated the position previously stated in H̲a̲s̲l̲i̲p̲ that rigid formulas for determining constitutionally-acceptable punitive damages awards are not possible: "We need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case.   We can say, however, that a general concern of reasonableness properly enters into the constitutional calculus."[80]   As will be seen shortly, the Court continues to adhere to this refusal to set hard-and-fast rules for determining whether a punitive damages award is excessive under the Due Process Clause of the United States Constitution.

The plurality declared that the courts "have eschewed an approach that concentrates entirely on the relationship between actual and punitive damages.   It is appropriate to consider the magnitude of the *potential harm* that the defendant's conduct would have caused to its intended victim if the wrongful plan had succeeded, as well as the possible harm to other victims that might have resulted if similar future behavior were not deterred."[81]   The plurality noted that *the $10 million punitive damages award was dwarfed by the potential income that Alliance would have earned had TXO performed fully, in good faith, on the mineral lease.*[82]   The plurality considered the following factors in justifying the size of the punitive damages award: *(a) the*

---

[79] *See* B̲M̲W̲ ̲o̲f̲ ̲N̲o̲r̲t̲h̲ ̲A̲m̲e̲r̲i̲c̲a̲,̲ ̲I̲n̲c̲.̲ ̲v̲.̲ ̲G̲o̲r̲e̲, 517 U.S. 559, 562, 116 S.Ct. 1589, 1592, 134 L.Ed.2d. 809 (1996).

[80] 509 U.S. at 458, 113 S.Ct. at 2720, *quoting* H̲a̲s̲l̲i̲p̲, 499 U.S. at 111, 29 S.Ct. at 227.

[81] 509 U.S. at 460, 113 S.Ct. at 2721-22 (emphasis in original).   The role of potential harm to third parties is one of the subjects on which the plurality was not able to persuade a majority of the other justices.   The Court has, since T̲X̲O̲, addressed at some length the role that such potential harm can – and cannot – play when a jury is considering punitive damages.   Thus, while the quoted language in T̲X̲O̲ is very broad, the Court in P̲h̲i̲l̲i̲p̲ ̲M̲o̲r̲r̲i̲s̲ U̲.̲S̲.̲A̲.̲ ̲v̲.̲ ̲W̲i̲l̲l̲i̲a̲m̲s̲, 549 U.S. 346, 353-54, 127 S.Ct. 1057, 1063, 166 L.Ed.2d 940 (2007), addressed the subject at length and narrowed the role that such potential harm can play in determining punitive damages, as will be discussed below.

[82] 509 U.S. at 451, n.10, 113 S.Ct. at 2717, n.10; 509 U.S. at 462, 113 S.Ct. at 2722.

*amount of money potentially at stake; (b) the bad faith of petitioner; (c) the fact that the scheme employed in the case was part of a larger pattern of fraud, trickery and deceit; and (d) TXO's considerable wealth.*

Ultimately, <u>TXO</u> affirmed a punitive damages award that was significantly greater than the compensatory damages award.[83] The plurality dismissed the "dramatic disparity" between compensatory damages ($19,000) and punitive damages ($10 million) as not controlling in light of the *"amount of money potentially at stake, the bad faith of petitioner, the fact that the scheme employed in this case was part of a larger pattern of fraud, trickery and deceit, and petitioner's wealth."*[84] The concurring justices were not willing to join this broad statement, but Justice Kennedy, in his concurrence, expressly acknowledged that he felt the malice exhibited by TXO justified the punitive damages that had been awarded.[85]

In her dissent, Justice O'Connor began setting the tone of concern that eventually would become integral to the Court's analysis of the problem of large punitive damages awards. She described "what is rapidly becoming an arbitrary and oppressive system" resulting in "monstrous" awards,[86] and acknowledged the fast pace of change in the size of punitive damages awards being issued:

> As little as 30 years ago, punitive damages awards were "rarely assessed" and usually "small in amount." Recently, however, the frequency and size of such awards have been skyrocketing. One commentator has observed that "hardly a month goes by without a multimillion-dollar punitive damages verdict in a product liability case." And it appears that the upward trajectory continues

---

[83] 509 U.S. at 453, 113 S.Ct. at 2718.

[84] 509 U.S. at 462, 113 S.Ct. at 2722 (emphasis added).

[85] 509 U.S. at 468, 113 S.Ct. at 2726.

[86] 509 U.S. at 473, 113 S.Ct. at 2728.

unabated.[87]

### Honda Motor Company, Limited v. Oberg

The following year, in Honda Motor Company, Limited v. Oberg,[88] the Court returned to *procedural* due process issues while reviewing a punitive damages award.

Mr. Oberg was driving a three-wheeled all-terrain vehicle that overturned while he was driving it, causing him severe and permanent injuries.[89] Mr. Oberg sued Honda Motor Company, the manufacturer and seller of the all-terrain vehicle, alleging that Honda knew or should have known the vehicle had an inherently and unreasonably dangerous design.[90] After trial, the jury found Honda liable and awarded both compensatory and punitive damages to Mr. Oberg. The jury awarded the Plaintiff compensatory damages in the amount of $909,390.39 and punitive damages in the amount of $5 million. Thus, the jury created a ratio of 1:5.4 compensatory damages to punitive damages. The district court reduced the compensatory damages award by 20%, to account for Mr. Oberg's own negligence, resulting in an ultimate compensatory damages award of $735,512.31. However, as the court did not, also, reduce the punitive damages award in a similar proportion, the final ratio of compensatory damages to punitive damages in the district court judgment was 1:6.8. The United States Supreme Court granted writs to decide whether Oregon's *procedural* framework – which prohibited judicial review of the amount of punitive damages awarded by a jury "unless the Court can affirmatively say there is no evidence to support the verdict" – are consistent with the Due Process Clause of

---

[87] 509 U.S. at 500, 113 S.Ct. at 2742 (O'Conner, J., dissenting)(citations omitted).

[88] 512 U.S. 415, 114 S.Ct. 2331, 129 L.Ed.2d. 336 (1994).

[89] 512 U.S. at 418, 114 S.Ct. at 2334.

[90] 512 U.S. at 418, 114 S.Ct. at 2334.

the Fourteenth Amendment.[91]

In Oberg, it became clear that, in the three years since Haslip, a majority of the Court had fully accepted the existence of a *substantive* limit – founded in the Due Process Clause – on the size of punitive damages awards.[92]   The Court, once again, stated its position that there are no absolutes in determining whether a punitive damages award is excessive: there is no "mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable."[93]   However, the Oberg Court was not "directly concerned with the character of the standard that will identify unconstitutionally excessive awards; rather, we are confronted with the question of what procedures are necessary to ensure that punitive damages are not imposed in an arbitrary manner."[94]   Therefore, the Court limited its discussion – beyond the fundamentals addressed above – to the question of whether Oregon had adopted the minimum constitutionally-required procedural protections against unreasonable jury decisions.

The Court concluded that *a procedural framework that does not include the possibility of reduction of excessive punitive damages awards does not comport with the Due Process Clause of the Fourteenth Amendment.*

> Punitive damages pose an acute danger of arbitrary deprivation of property.   Jury instructions typically leave the jury with wide discretion in choosing amounts, and the presentation of evidence of a defendant's net worth creates the potential that juries will use their verdicts to express biases against big businesses, particularly those without strong local presences.   Judicial review of the amount awarded was one of the few procedural safeguards which the common law provided against that danger.   Oregon has

---

[91] 512 U.S. at 418, 114 S.Ct. at 2334.

[92] 512 U.S. at 420, 114 S.Ct. at 2335.

[93] 512 U.S. at 420, 114 S.Ct. at 2335, *quoting* TXO, 509 U.S. at 458, 113 S.Ct. at 2720; Haslip, 499 U.S. at 18, 111 S.Ct. at 1043.

[94] 512 U.S. at 420, 114 S.Ct. at 2335.

removed that safeguard without providing any substitute procedure and without any indication that the danger of arbitrary awards has in any way subsided over time.  For these reasons, we hold that Oregon's denial of judicial review of the size of punitive damages awards violates the Due Process Clause of the Fourteenth Amendment.[95]

Oberg is addressed and included primarily for its historical context, as *procedural* due process is not challenged by the Defendants.

### BMW of North America, Inc. v. Gore

In BMW of North America, Inc. v. Gore,[96] the developing constitutional analysis resulted in a ruling, for the first time in the modern era,[97] that a punitive damage award was excessive and, thus, in violation of the Due Process Clause of the Fourteenth Amendment.  In so doing, the Court grappled with the questions raised by this new substantive constitutional theory and adopted a more sophisticated analysis of the excessiveness issue.

The plaintiff (Dr. Gore) purchased a new black BMW sports sedan, at considerable expense, from an authorized BMW dealer in Birmingham, Alabama.[98]  Approximately nine months later, Dr. Gore was informed by a third party that the car had been repainted before he purchased it.[99]  Dr. Gore brought suit in state court in Alabama.[100]  The jury awarded Dr. Gore $4,000 in actual damages (representing the loss in value of the vehicle that resulted from the re-painting), together with $4 million in punitive damages, after determining that BMW's policy of

---

[95] 512 U.S. at 432, 114 S.Ct. at 2340-41.

[96] 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d. 809 (1996).

[97] 517 U.S. at 586 n.41, 116 S.Ct. at 1604 n.41.

[98] 517 U.S. at 563, 116 S.Ct. at 1593.

[99] Id.

[100] Id.

non-disclosure of such repairs to new cars constituted "gross, oppressive or malicious" fraud.[101]

On appeal, the Alabama Supreme Court reduced the $4 million punitive damages award to $2 million after finding that the jury improperly had computed the amount of punitive damages by multiplying Dr. Gore's compensatory damages by the number of similar sales in other jurisdictions.[102] In making this award, the Alabama Supreme Court "did not indicate whether the $2 million figure represented the court's independent assessment of the appropriate level of punitive damages, or its determination of the maximum amount that the jury could have awarded consistent with the Due Process Clause."[103] The United States Supreme Court granted writs, noting it "believed that a review of this case would help to illuminate 'the character of the standard that will identify unconstitutionally excessive awards' of punitive damages."[104]

The Supreme Court began by reiterating the constitutionality of punitive damage awards generally and, significantly, endorsed the TXO formulation of the standard for determining whether a punitive damages award is excessive under the Due Process Clause of the United States Constitution.

> [P]unitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition.[105]
>
> * * *
>
> *Only when an award can fairly be categorized as "grossly excessive" in relation to [the interests of punishment and deterrence] does it enter the zone of arbitrariness that violates the*

---

[101] 517 U.S. at 565, 116 S.Ct. at 1593-94.

[102] 517 U.S. at 567, 116 S.Ct. at 1595.

[103] 517 U.S. at 567 n.10, 116 S.Ct. at 1595 n.10.

[104] 517 U.S. at 568, 116 S.Ct. at 1595 (citation omitted).

[105] 517 U.S. at 568, 116 S.Ct. at 1595 (citation omitted).

*Due Process Clause of the Fourteenth Amendment.*[106]

The Court focused on the importance of fairness to the Due Process analysis: "Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose."[107]   The Court then articulated the three factors that must be considered when determining whether a particular punitive damages award is "grossly excessive."

    (1)    the *degree of reprehensibility* of the nondisclosure;

    (2)    the *disparity between the harm or potential harm suffered* by Dr. Gore *and his punitive damages award*; and

    (3)    the difference between this remedy and the civil penalties authorized or imposed in comparable cases.[108]

The Supreme Court discussed these guideposts in detail and applied them to the facts of that case.

    *Degree of Reprehensibility:*   The most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct.[109] Exemplary damages imposed on the defendant should reflect "the enormity of his offense."[110]

> This principle reflects the accepted view *that some wrongs are more blameworthy than others*.   Thus, we have said that "nonviolent crimes are less serious than crimes marked by violence or the threat of violence."   Similarly, "trickery and deceit" are more reprehensible than negligence. . . . *[T]he principle [is] that*

---

[106] 517 U.S. at 568, 116 S.Ct. at 1595 (citations omitted)(emphasis added).

[107] 517 U.S. at 574, 116 S.Ct. at 1598.

[108] 517 U.S. at 574-75, 116 S.Ct. at 1598-99 (emphasis added).

[109] 517 U.S. at 575, 116 S.Ct. at 1599.

[110] Id. (citations omitted)

punitive damages may not be "grossly out of proportion to the severity of the offense."[111]

The Court went on – for the first time – to identify aggravating factors that can be associated with particularly reprehensible conduct: (1) *whether the harm is purely economic*; (2) the *nature of the damage/injury*; (3) whether there is any *indifference to or reckless disregard for the health and safety of others*; (4) whether the act was *done intentionally through an affirmative act of misconduct*; (5) the *vulnerability of the target*; (6) whether the *defendant is a recidivist* (who may be punished more severely than a first offender because repeated misconduct is more reprehensible than an individual instance of malfeasance); and (7) whether *the defendants' actions involved deliberate false statements, acts of affirmative misconduct, or concealment of improper motive*.[112]   Applying these factors to the circumstances in <u>Gore</u>, the Court found that none of these factors weighed in favor of upholding the amount of the jury's punitive damages award.

*Proportionality/Ratio:*   "The second and perhaps however, most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff.   The principle that exemplary damages must bear a 'reasonable relationship' to compensatory damages has a long pedigree."[113]   The Supreme Court's decisions "endorse[] the proposition that a comparison between the compensatory award and the punitive award is significant."[114]

In <u>Haslip</u> we concluded that even though a punitive damages award of "more than 4 times the amount of compensatory

---

[111] 517 U.S. at 575-56, 116 S.Ct. at 1599 (citations omitted)(emphasis added).

[112] *See* 517 U.S. at 576-77, 579, 116 S.Ct. at 1599-1600, 1601 (emphasis added).

[113] 517 U.S. at 580, 116 S.Ct. at 1601 (citations omitted).

[114] 517 U.S. at 581, 116 S.Ct. at 1602.

damages" might be "close to the line," it did not "cross the line into the area of constitutional impropriety." <u>TXO</u>, following *dicta* in <u>Haslip</u>, refined this analysis by confirming that the proper inquiry is "whether there is a reasonable relationship between the punitive damages award and *the harm likely to result* from the defendant's conduct as well as the harm that actually has occurred." Thus, in upholding the $10 million award in <u>TXO</u>, we relied on the difference between that figure and the harm to the victim that would have ensued if the tortious plan had succeeded. That difference suggested that the relevant ratio was not more than 10 to 1.[115]

The Court, nonetheless, again, rejected the idea that a bright-line rule can be established to determine whether a punitive damages award is excessive under a due process analysis, while simultaneously finding that the 500:1 ratio between punitive damages and compensatory damages was too high under the facts presented in that case.

*Sanctions for Comparable Misconduct:*   The third guidepost identified by the Supreme Court calls for a comparison between the punitive damage award by a civil jury and the potential civil or criminal penalties that could have been imposed on the defendants for the same conduct. "Comparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct provides a third indicium of excessiveness."[116]   In conducting this comparison, "a reviewing court engaged in determining whether an award of punitive damages is excessive should accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue."[117]

---

[115] 517 U.S. at 581, 116 S.Ct. at 1602 (some emphasis added) (citations and internal quotation marks omitted).  The <u>Gore</u> Court's discussion, retroactively, of the <u>TXO</u> ratio, perhaps, reveals a discomfort with the degree of proportionality that the <u>TXO</u> plurality, together with the concurring justices, found acceptable under the facts of that case.  While this Court sympathizes with a distaste for the oft necessarily-messy process of developing a new body of law from cases with very different factual contexts, over the course of years, if not decades, the process and evolution must, nonetheless, be honored and examined.

[116] 517 U.S. at 583, 116 S.Ct. at 1603.

[117] <u>Id.</u> (internal quotation marks omitted)

The more thorough analysis, guideposts, and factors identified by Gore contributed greatly to making the jurisprudence more sophisticated. This increasingly sophisticated analysis seems to have been accompanied by an increased level of attention to the concerns Justice O'Conner had expressed years earlier in her TXO dissent. The characterization of the grossly excessive punitive damages award in Gore as "tantamount to a severe criminal penalty,"[118] signaled a shift in focus from the harm the Plaintiffs experienced at the hands of the Defendants to the harm experienced by the Defendant at the hands of the jury.

### State Farm Mutual Automobile Insurance Company v. Campbell

Seven (7) years later, the Supreme Court addressed punitive damages in State Farm Mutual Automobile Insurance Company v. Campbell.[119] Campbell presents an arguably more conservative approach to the punitive damages issue, accompanied by a firmer tone.[120] The Court used language suggesting the possibility of the existence of a practical ceiling over potential punitive damages awards, but did not abandon its express refusal to draw any bright-line substantive rule, nor did it suggest that any such rule did or could exist.

Mr. Campbell was driving on the wrong side of the highway when he was involved in an automobile accident in which the other driver was killed and a passenger was permanently disabled.[121] Petitioner (State Farm, Mr. Campbell's insurer) misled Mr. Campbell into believing

---

[118] 517 U.S. at 585, 116 S.Ct. at 1604.

[119] 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d. 585 (2003).

[120] See, e.g., 538 U.S. at 418, 123 S.Ct. at 1520-21 ("Exacting appellate review ensures that an award of punitive damages is based upon an 'application of law, rather than a decisionmaker's caprice'. . . . [T]his case is neither close nor difficult."). See also Justice Ginsburg's observation that the Court, in order to justify the "neither close nor difficult" conclusion in Campbell, omitted large portions of the facts on which the reprehensibility analysis was grounded. 538 U.S. at 431, 123 S.Ct. at 1527 (Ginsburg, J., dissenting).

[121] 538 U.S. at 412-13, 123 S.Ct. at 1517.

Page 30

that the Plaintiffs' claims presented no risk of an excess judgment;[122] advised Mr. Campbell to try to sell his home in order to pay the excess judgment that eventually (almost inevitably) was awarded to the Plaintiffs;[123] refused to post a *supersedeas* bond to support Mr. Campbell's appeal of the excess judgment;[124] and spoliated evidence in an effort to avoid being cast with liability for these actions.[125]   Mr. Campbell sued State Farm and, after a trial, the jury awarded him $2.6 million in compensatory damages and $145 million in punitive damages.   The trial court reduced these amounts to $1 million and $25 million respectively.[126]   The Utah Supreme Court, however, reinstated the $145 million punitive damages award.[127]   The United States Supreme Court granted writs to address the question of "whether, in the circumstances we shall recount, an award of $145 million in punitive damages, where full compensatory damages are $1 million, is excessive and in violation of the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States."[128]

The Court presented a thorough analysis of the constitutional issue, beginning with a discussion of the purposes served by compensatory and punitive damages in the civil justice system.

> [I]n our judicial system compensatory and punitive damages, although usually awarded at the same time by the same decisionmaker, serve different purposes.   Compensatory damages "are intended to redress the concrete loss that the plaintiff has

---

[122] 538 U.S. at 413, 123 S.Ct. at 1518.

[123] Id.

[124] Id.

[125] 538 U.S. at 419, 123 S.Ct. at 1521.

[126] 538 U.S. at 415, 123 S.Ct. at 1519.

[127] Id.

[128] 538 U.S. at 412, 123 S.Ct. at 1517.

suffered by reason of the defendant's wrongful conduct." By contrast, punitive damages serve a broader function; they are aimed at deterrence and retribution.[129]

The imposition of punitive damages, while discretionary, is limited *by both procedural and substantive due process.*

> While States possess discretion over the imposition of punitive damages, it is well established that there are procedural and substantive constitutional limitations on these awards. The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor. The reason is that "elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." To the extent an award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property.[130]

The Court discussed its concerns about the need for placing effective limits on juries' discretion.

> We have admonished that "punitive damages pose an acute danger of arbitrary deprivation of property. Jury instructions typically leave the jury with wide discretion in choosing amounts, and the presentation of evidence of a defendant's net worth creates the potential that juries will use their verdicts to express biases against big businesses, particularly those without strong local presences." Our concerns are heightened when the decisionmaker is presented, as we shall discuss, with evidence that has little bearing as to the amount of punitive damages that should be awarded. Vague instructions, or those that merely inform the jury to avoid "passion or prejudice," do little to aid the decisionmaker in its task of assigning appropriate weight to evidence that is relevant and evidence that is tangential or only inflammatory.[131]

Reviewing courts considering excessiveness challenges to punitive damage awards are instructed to consider three guideposts:

---

[129] 538 U.S. at 416, 123 S.Ct. at 1519 (citations omitted).

[130] 538 U.S. at 416-17, 123 S.Ct. at 1519-20 (citations omitted).

[131] 538 U.S. at 417-18, 123 S.Ct. at 1520 (citations omitted).

(1) *the degree of reprehensibility of the defendant's misconduct;* (2) the *disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award;* and (3) *the difference between the punitive damages awarded by the jury and the civil* penalties authorized or imposed in comparable cases.[132]

The guideposts are designed to assist courts with the due process excessiveness analysis, which "must be implemented with care to ensure both reasonableness and proportionality."[133]  The "reasonableness" goal (which focuses primarily on the reprehensibility guidepost) requires a subjective focus on the jury's actions, its reasoning, the evidence before it, the facts it found, the overall justification for its decision about the punitive damages awards.  By contrast, the "proportionality" goal (which focuses more on the ratio and comparison guideposts) introduces a component of objectivity into the analysis.

   *Degree of Reprehensibility:*  The first of the guideposts is the most important one, and the one that requires the most attention.

   The most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct.  *We have instructed courts to determine reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.*  The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect.  It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions

---

[132] 538 U.S. at 418, 123 S.Ct. at 1520 (emphasis added).

[133] 538 U.S. at 428, 123 S.Ct. at 1525-26.

to achieve punishment or deterrence.[134]

The Court specifically noted that in considering the propriety of the jury's decision-making and the evidence presented at trial, evidence concerning the scope of the harm that could have resulted from the Defendants' actions can be probative on the issue of reprehensibility, even if it should not be directly relevant to the size of the punitive damages award.

> Lawful out-of-state conduct may be probative when it demonstrates the deliberateness and culpability of the defendant's action in the State where it is tortious, but that conduct must have a nexus to the specific harm suffered by the plaintiff. A jury must be instructed, furthermore, that it may not use evidence of out-of-state conduct to punish a defendant for action that was lawful in the jurisdiction where it occurred. A basic principle of federalism is that each State may make its own reasoned judgment about what conduct is permitted or proscribed within its borders, and each State alone can determine what measure of punishment, if any, to impose on a defendant who acts within its jurisdiction.[135]

The Court, also, reminded its readers that the jury punished State Farm (as did the Utah Supreme Court, by reinstating the jury's award) for activities that were dissimilar from those that had harmed the Campbells:

> The [lower] courts awarded punitive damages to punish and deter conduct that bore no relation to the Campbells' harm. A defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages. A defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business. Due process does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against a defendant under the guise of the reprehensibility analysis, but we have no doubt the Utah Supreme Court did that here. Punishment on these bases creates the possibility of multiple punitive damages awards for the same conduct; for in the usual case nonparties are not bound by the

---

[134] 538 U.S. at 419, 123 S.Ct. at 1521 (citations omitted) (emphasis added).

[135] 538 U.S. at 422, 123 S.Ct. at 1522-23 (citations omitted).

judgment some other plaintiff obtains.[136]

These principles were violated by the lower courts when they considered evidence of acts dissimilar to the ones that had harmed the Campbells:

> Although evidence of other acts need not be identical to have relevance in the calculation of punitive damages, the Utah court erred here because evidence pertaining to claims that had nothing to do with a third-party lawsuit was introduced at length. . . . For example, the Utah Supreme Court criticized State Farm's investigation into the personal life of one of its employees and, in a broader approach, the manner in which State Farm's policies corrupted its employees. The Campbells attempt to justify the courts' reliance upon this unrelated testimony on the theory that each dollar of profit made by underpaying a third-party claimant is the same as a dollar made by underpaying a first-party one. . . . [T]his argument is unconvincing. *The reprehensibility guidepost does not permit courts to expand the scope of the case so that a defendant may be punished for any malfeasance.*[137]

The Court listed the factors that must be considered by a court trying to determine the degree of reprehensibility of a defendant's actions.

> We have instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.[138]

As noted above, the Court, also, instructed lower courts to presume that "a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or

---

[136] 538 U.S. at 422-23, 123 S.Ct. at 1523(citations omitted).

[137] 538 U.S. at 423-24, 123 S.Ct. at 1523-24 (citations omitted)(emphasis added).

[138] 538 U.S. at 419, 123 S.Ct. at 1521.

Page 35

deterrence."[139]

    *Proportionality/Ratio:*  The second guidepost in the constitutional excessiveness analysis is proportionality or "ratio."  The Court reiterated, in <u>Campbell</u>, its reluctance to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award, noting its preference, instead, for discussing the principles and general limits to be applied in the proportionality analysis.

> We decline again to impose a bright-line ratio which a punitive damages award cannot exceed.  Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process. . . . Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in the range of 500 to 1, or, in this case, of 145 to 1.[140]

>          \* \* \* \*

> Nonetheless, because there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those we have previously upheld may comport with due process where "a particularly egregious act has resulted in only a small amount of economic damages."  The converse is also true, however.  When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee.  *The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff.*[141]

The Court warned that in determining whether a punitive damages award is reasonable and proportionate, a court must look at the larger context.

> In sum, courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff

---

[139] 538 U.S. at 419, 123 S.Ct. at 1521.

[140] 538 U.S. at 425, 123 S.Ct. at 1524 (citations omitted).

[141] 538 U.S. at 425, 123 S.Ct. at 1524 (citations omitted) (emphasis added).

and to the general damages recovered. In the context of this case, we have no doubt that there is a presumption against an award that has a 145-to-1 ratio. The compensatory award in this case was substantial; the Campbells were awarded $1 million for a year and a half of emotional distress. This was complete compensation. The harm arose from a transaction in the economic realm, not from some physical assault or trauma; there were no physical injuries; and State Farm paid the excess verdict before the complaint was filed, so the Campbells suffered only minor economic injuries for the 18-month period in which State Farm refused to resolve the claim against them. The compensatory damages for the injuries suffered here, moreover, likely were based on a component which was duplicated in the punitive award. Much of the distress was caused by the outrage and humiliation the Campbells suffered at the actions of their insurer; and it is a major role of punitive damages to condemn such conduct. *Compensatory damages, however, already contain this punitive element.*[142]

The Court concluded that the 1:145 ratio of compensatory damages to punitive damages did not pass constitutional muster under the facts of that case and noted the compensatory damages award was substantial, the case involved only minor economic damages that lasted for 18 months and the compensatory damages award seemed to address the same emotional distress that the punitive damages award was designed to do.[143] In reaching this conclusion, the Court declared that the "wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award."[144]

*Comparable Penalties:* "The third guidepost in Gore is the disparity between the punitive damages award and the civil penalties authorized or imposed in comparable cases."[145] The existence of a criminal penalty reflects the seriousness with which a state views the wrongful action, but that sum can have less utility when used to determine the dollar amount of a

---

[142] 538 U.S. at 426, 123 S.Ct. at 1524-25 (emphasis added).

[143] 538 U.S. at 426, 123 S.Ct. at 1524-25.

[144] 538 U.S. at 427, 123 S.Ct. at 1525.

[145] 538 U.S. at 428, 123 S.Ct. at 1526 (quotations omitted).

punitive damage award.  "Great care must be taken to avoid use of the civil process to assess criminal penalties that can be imposed only after the heightened protections of a criminal trial have been observed, including, of course, its higher standards of proof.  Punitive damages are not a substitute for the criminal process, and the remote possibility of a criminal sanction does not automatically sustain a punitive damages award."[146]  The Court noted that the State of Utah had enacted a statutory penalty of $10,000 per incident of fraud, a sum dwarfed by the punitive damages award.

### Philip Morris USA v. Williams

Finally, the Court decided Philip Morris USA v. Williams in 2007.[147]  Jesse Williams had been a heavy smoker for much of his life.[148]  After his death from smoking-related causes, Mr. Williams' widow sued Philip Morris, the manufacturer of Marlboro, his preferred brand of cigarettes.[149]  After a trial, the jury found that Mr. Williams' death had been caused by smoking, that he had smoked because he thought it safe to do so, and that Philip Morris had falsely led him to believe that he could smoke without endangering his health.[150]  The jury awarded Mr. Williams' estate $821,000 in compensatory damages and $79.5 in punitive damages, a ratio of

---

[146] 538 U.S. at 428, 123 S.Ct. at 1526.

[147] 549 U.S. 346, 127 S.Ct. 1057, 166 L.Ed.2d. 940 (2007).  The Court has, more recently, addressed the question of punitive damages in the maritime context in Exxon Shipping Company v. Baker, 554 U.S. 471, 128 S.Ct. 2605, 171 L.Ed.2d 570 (2008).  However, in that case, the Court directed its effort toward finding the upper limits for punitive damages awards in maritime cases alone, *see* 554 U.S. at 513, 128 S.Ct. at 2633, and expressly acknowledged that this inquiry was very different from the type of due process review at issue in the current motion.  554 U.S. at 501-02, 128 S.Ct. at 2626.  Moreover, the Court carefully noted that the upper limit it was establishing was relevant only to cases "without earmarks of exceptional blameworthiness within the punishable spectrum (cases like this one, without intentional or malicious conduct, and without behavior driven primarily by desire for gain, for example) and cases (again like this one) without the modest economic harm or odds of detection that have opened the door to higher awards."  554 U.S. at 513, 128 S.Ct. at 2633.  For these reasons, Exxon has only limited relevance to the current ruling; therefore, this Court will not engage in a detailed analysis of the decision.

[148] 549 U.S. at 349, 127 S.Ct. 1060.

[149] 549 U.S. at 349, 127 S.Ct. 1060.

[150] 549 U.S. at 349-50, 127 S.Ct. 1060-61.

97:1 punitives to compensatory damages.[151]   The trial judge reduced the punitive damages award, but the award was reinstated by the Oregon Court of Appeal, and upheld by the Oregon Supreme Court.[152]   The United States Supreme Court described its purpose in granting writs and its holding:

> We are asked whether the Constitution's Due Process Clause permits a jury to base that award in part upon its desire to *punish* the defendant for harming persons who are not before the court (*e.g.*, victims whom the parties do not represent).  We hold that such an award would amount to a taking of "property" from the defendant without due process.[153]

The Court began by reiterating much of the fundamental analysis described above, then addressed the role of alleged harm to "strangers to the litigation."

> In our view, the Constitution's Due Process Clause forbids a State to use a punitive damages award to punish a defendant for injury that it inflicts upon nonparties or those whom they directly represent, *i.e.*, injury that it inflicts upon those who are, essentially, strangers to the litigation. . . . [A] defendant threatened with punishment for injuring a nonparty victim has no opportunity to defend against the charge, by showing, for example in a case such as this, that the other victim was not entitled to damages because he or she knew that smoking was dangerous or did not rely upon the defendant's statements to the contrary.[154]

Nonetheless, the Court's ruling clarified that evidence of harm to third parties can be relevant to a court's determination *of the reprehensibility of the defendant's actions*.

> At the same time we recognize that conduct that risks harm to many is likely more reprehensible than conduct that risks harm to only a few.  And a jury consequently may take this fact into

---

[151] 549 U.S. at 350, 127 S.Ct. 1061.

[152] 549 U.S. at 350, 352, 127 S.Ct. 1061-62.

[153] 549 U.S. at 349, 127 S.Ct. at 1060 (emphasis in original).

[154] 549 U.S. at 353-54, 127 S.Ct. at 1063.

account in determining reprehensibility.[155]

\* \* \* \*

> Evidence of actual harm to nonparties can help to show that the conduct that harmed the plaintiff also posed a substantial risk of harm to the general public, and so was particularly reprehensible – although counsel may argue in a particular case that conduct resulting in no harm to others nonetheless posed a grave risk to the public, or the converse. Yet for the reasons given above, a jury may not go further than this and use a punitive damages verdict to punish a defendant directly on account of harms it is alleged to have visited on nonparties.[156]

The Court returned to the question of "potential" harm – which the Oregon courts had used to justify allowing punitive damages to punish Philip Morris for harm to "strangers to the litigation":

> We have said that it may be appropriate to consider the reasonableness of a punitive damages award in light of the *potential* harm the defendant's conduct could have caused. But we have made clear that the potential harm at issue was harm potentially caused *the plaintiff*.[157]

The Court, also, encouraged lower courts to minimize the risk of an excessive award by providing proper legal guidance to juries considering punitive damages.

> Given the risks of unfairness that we have mentioned, it is constitutionally important for a court to provide assurance that the jury will ask the right question, not the wrong one. And given the risks of arbitrariness, the concern for adequate notice, and the risk that punitive damages awards can, in practice, impose one State's (or one jury's) policies (*e.g.*, banning cigarettes) upon other States – all of which accompany awards that, today, may be many times the size of such awards in the 18th and 19th centuries – it is particularly important that States avoid procedure that unnecessarily deprives juries of proper legal guidance. We therefore conclude that the Due Process Clause requires States to

---

[155] 549 U.S. at 357, 127 S.Ct. at 1065.

[156] 549 U.S. at 355, 127 S.Ct. at 1064.

[157] 549 U.S. at 354, 127 S.Ct. at 1063 (emphasis in original).

provide assurance that juries are not asking the wrong question, *i.e.*, seeking, not simply to determine reprehensibility, but also to punish for harm caused strangers.[158]

As is typical when new constitutional theories are being developed, the Supreme Court's jurisprudence, in some respects, is clear and unequivocal.   There are other respects of the doctrine, however, that require further attention and development from the Court.   This case highlights many of those unresolved aspects of the Due Process substantive review of the excessiveness doctrine and demonstrates the need for further comment and guidance by the Courts who review this Court's decisions.   Having completed its review of the most pertinent and most current jurisprudence, this Court is now prepared to discuss the parties' specific arguments and, to the best of its ability, apply the precepts described above to the facts of this case and invites Courts higher than this one to provide greater clarity and guidance for lower Courts such as this one when faced with facts such as those found in this case.

## C.      *Analysis*

The Supreme Court's excessiveness analysis requires this Court to consider three guideposts (degree of reprehensibility, ratio, and comparable civil penalties) to draw conclusions about the jury's findings that will then be used when considering the two overarching aspects of the analysis on which constitutional excessiveness ultimately turns: the reasonableness and proportionality of the punitive damages award.   In conducting this analysis, this Court keeps in mind the two purposes that punitive damages are to serve: punishment and deterrence.

### 1.      Guideposts

Each of the three guideposts will be considered and discussed separately.

---

[158] 549 U.S. at 355, 127 S.Ct. at 1064 (citations omitted).

### a.      Degree of Reprehensibility

The single most important indicator of the reasonableness of a punitive damages award is the degree of reprehensibility of the Defendants' conduct. "Reprehensibility" is, by its nature, and much like obscenity, found in the eye of the beholder.  In this matter Defendants remain convinced their conduct is in no way reprehensible.[159]   The Plaintiffs, on the other hand, are equally convinced the Defendants' conduct is without question reprehensible and argue the Defendants' behavior as part of a pattern of conduct causing a "massive swath of death and injury" throughout this country that is "absolutely stunning."[160]   Much as with obscenity, the Supreme Court has not clarified which facts a Court should focus on in order to determine the *relevant degree of reprehensibility* of a Defendant's conduct when considering whether an award is excessive under a constitutional analysis.  The jury – having heard all the evidence and having been instructed to consider the factors that can define *the degree* of reprehensibility – issued a verdict that could hardly have embraced the Plaintiffs' theory of the case or favored the Plaintiffs' theory of the case any more than it did, and this Court has found the jury's verdict was sufficiently supported by substantial evidence such that the Defendants' Rule 50(b) motion was denied in its entirety.[161]   Thus, the issue at hand rests firmly within the constitutional, legal analysis.  As noted, the Supreme Court has not yet addressed the complicated question of which facts are to be focused upon in a constitutional excessiveness analysis.  In the absence of such guidance, this Court will approach the factual aspect of the analysis as follows:

- First, all facts found by the jury will be accepted as true and correct.

---

[159] *See, e.g.,* Memorandum in Support, at 3, *et seq.*

[160] Opposition Memorandum, at 39.

[161] Rec. Doc. 4648.

- Second, this Court will presume that the jury followed this Court's instructions, Defendants having presented no evidence to the contrary.[162]

- Third, this Court will accept as true and correct all facts that necessarily underpin, or are otherwise implicit in, the jury's findings.

- Fourth, only to the extent necessary to the core analysis at hand, will this Court reference other relevant facts or evidence presented at trial.

The Jury Verdict Form makes it clear, the jury found that both Takeda and Lilly failed to provide adequate warnings of a risk of bladder cancer associated with Actos®, and that Takeda breached its implied warranty of merchantability as to its product, Actos®.  Furthermore, the Jury Verdict Form is clear, the jury found that both Lilly and Takeda committed these acts with a wanton and reckless disregard for the results of their actions.  The jury found that Takeda's and Lilly's actions were substantial factors in the decisions of Mr. Allen's physicians to prescribe Actos to him, and that taking Actos was a substantial factor in causing Mr. Allen's bladder cancer.[163]  Given the evidence presented at trial, the majority of which this Court has previously addressed in its ruling on Defendants' Rule 50(b) motion – which this Court adopts and incorporates herein – and, therefore, will not reiterate at this juncture, this Court finds that the jury's verdict, also, can be supported by the following rendition of the facts presented at trial.

The evidence supports that from the beginning of their commercial alliance, Takeda and Lilly were aware of the possibility that Actos® posed an increased risk of bladder cancer. Despite having information that drove other competitors with Actos®, and potential competitors to Actos®, out of the relevant diabetes driven market, during the relevant time period Takeda and Lilly chose to move forward and acted to avoid full disclosure of that and other relevant

---

[162] *See, e.g.*, <u>Shannon v. United States</u>, 512 U.S. 573, 584-585, 114 S.Ct. 2419, 2427, 129 L.Ed. 2d 459 (1994); <u>Richardson v. Marsh</u>, 481 U.S. 200, 206, 107 S.Ct. 1702, 1706-07, 95 L.Ed. 2d 176 (1987).

[163] Trial tr. vol. XXXVII (Rec. Doc. 4210), at 6271; Rec. Doc. 4109, at 3-8.

information to the FDA; to refuse to include adequate warnings on the label, or to otherwise provide adequate warnings to physicians; to carefully avoid creating or acknowledging any evidence that might draw attention to the bladder cancer risk; and to claim, at all times, and in all relevant venues, that there was insufficient information to permit the conclusion that Actos® could cause or pose an increased risk of bladder cancer. In selling Actos® to millions of people throughout the world without providing adequate warnings of the increased risk of bladder cancer, Takeda and Lilly deprived physicians of the information necessary to perform their function in our medical care system and in so doing effectively wrote off an identifiable and significant, and perhaps, the most vulnerable segment of the population of diabetics – those whose blood glucose levels were out of the control and who for other medical reasons were vulnerable to an increased risk of bladder cancer – and consistently disregarded, denied, obfuscated and concealed that risk. The facts support that Takeda's and Lilly's willingness to callously allow their customers to ignorantly increase their risk of dying prematurely or significantly negatively impacting their health and well-being as a result of taking Actos®, by way of bladder cancer, is particularly reprehensible in light of the fact that (as Takeda repeatedly acknowledged in their documents), diabetics fighting for control over a very dangerous disease had viable alternatives available to them which did not carry the increased risk of bladder cancer in the form of Takeda's and Lilly's competitor, Avandia, or injectable insulin, and evidence presented supports Plaintiffs' arguments that Takeda and Lilly acted out of desire for and of profit.

The evidence supports a finding Takeda and Lilly resisted all efforts for them to place an adequate warning on the label, and otherwise refused to provide proper information and warnings to the medical community and particularly to Mr. Allen's physicians; Takeda and Lilly

consistently demonstrated their sales, competitive edge, and profits were more important to them than their most vulnerable customers or than providing those most vulnerable of their customers with realistic, trustworthy information about the risks they might be running by taking Actos®. Thus, there is clear evidence, as already determined in the Rule 50 Ruling to support the jury's findings, that Takeda's and Lilly's conduct was reprehensible, however that does not end the pertinent inquiry.

As is evident from a careful reading of the Supreme Court's jurisprudence formulating the evolution of this legal analysis, certain identified factors should be considered when looking to the *degree of* reprehensibility at play when evaluating whether an award is excessive under a constitutional analysis. After a careful analysis of the evidence presented when viewed in light of the jury's findings, this Court finds that all of the factors identified by the Supreme Court as reflecting *enhanced* reprehensibility, also, exist in this case:

- *Physical Harm*: The jury was instructed as to this factor and there is no evidence they did not consider this factor. This Court notes that in this case, the harm caused by the Defendants' actions was physical, not "merely economic," and extraordinarily serious as it encompassed risk of premature death and serious bodily harm. Mr. Allen now suffers from bladder cancer, a grievous disease which required major surgery, repeated painful procedures, diminishment of his control over his bodily functions and sexual abilities, and he will remain at risk and subject to those procedures and continued deterioration of control for the rest of his life. He, also, remains at some risk of recurrence and possible premature death as a result of his bladder cancer.

- *Wanton or Reckless Disregard*: The jury found that the Defendants acted with wanton and reckless disregard. The Defendants' behavior did not merely endanger the health and safety of Mr. Allen; their conduct showed a total disregard of and for the general welfare and the health care system – more than 10 million, as of the time of the trial, had taken Actos® without full knowledge of its risks – during the relevant period when Takeda and Lilly refused to warn their users and/or their physicians of the known risk of developing bladder cancer associated with the use of Actos®. In our health care system, physicians are to play an active role. Only when provided with accurate information as to risks and benefits of a drug can they properly play their role. Takeda and Lilly withheld pivotal information from physicians,

and in particular Mr. Allen's physicians, thus, disabling the operation of the health care system serving diabetics.

- *Physical Vulnerability of the Target Population*:[164] The evidence established Actos® was designed to be used by those individuals who were not successfully controlling their blood glucose levels through the use of less extreme medical interventions.  These are people (and their physicians) for whom the available medical interventions were dwindling and who, therefore, were especially vulnerable to the blandishments of sales representatives whose efforts focused heavily on the benefits of the drug with little or no mention of the risks of the drug, and who were given little or no information by Takeda or Lilly with which to provide adequate warnings of the risks associated with the drug to the physicians to whom they promoted the drug, Actos®.  Thus, the target population of Takeda's and Lilly's conduct was a particularly fragile, and vulnerable one.

- *Repeated Action*:  Of necessity, the jury's findings are based on their acceptance of the Plaintiffs' evidence that the Defendants engaged in a concerted, long-term effort to conceal and obfuscate information about the true risk of bladder cancer associated with Actos®.  Complete information and warnings were withheld from the FDA, the medical profession generally, the public, and Mr. Allen's physicians in particular.  The Defendants' campaign persisted over many years and encompassed many skirmishes with the FDA and other regulatory agencies which had raised the question and possible need for a warning.  This Court finds it significant that the evidence supports a finding the course of conduct was repeated over such a long period of time until, ultimately, Takeda adopted a warning as to the relationship between Actos® and bladder cancer in 2011.

- *Trickery or Deceit, Rather Than Mere Negligence or Mistake*:  The Plaintiffs' theory of liability – which the jury verdict establishes was clearly accepted by the jury – is that the Defendants' campaign to conceal the complete truth from all of the relevant and interested parties included both withholding information and, also, creating misleading evidence through the use of compensated experts, compensated physicians, and a careful, concerted, and orchestrated manipulation and attempt to control all the information to be provided to the public, medical community, and regulatory agencies in the United States and abroad, about Actos®. Thus, this factor is clearly met.

---

[164] In each of the Supreme Court cases in which the vulnerability of the plaintiff is discussed, the type of harm claimed by the plaintiff in those cases is *economic* harm.  For this reason, the Supreme Court has always discussed this factor – the plaintiffs' vulnerability – in economic terms.  However, in this case, the Defendants' threat to Mr. Allen was the physical threat of bodily harm.  Therefore, the discussion of vulnerability is presented in terms of vulnerability to the specific harm represented by the Defendants' actions, *i.e.*, vulnerability to the threat of bladder cancer and resultant death.

- ***Profit Motive***:   In the Exxon v. Baker decision, the Supreme Court, in discussing punitive damages generally, noted that actions "taken or omitted in order to augment profit represents an enhanced degree of punishable culpability."[165]   Implicit in the jury's finding and the evidence presented by Plaintiffs of the Defendants' wanton and reckless disregard for the results of their actions, is the conclusion that the jury, also, accepted the evidence presented at trial that the Defendants, time and again, placed a higher priority on protecting their brand, their sales, and their income, than on protecting the vulnerable population who were helping to create those very profits.   The evidence presented supports a finding Takeda and Lilly put profit above the health, well-being, and lives of a significant portion of their target sales population.

- ***Hard-to-Detect Wrongdoing***:   In Exxon v. Baker[166] the Supreme Court noted that a defendant who engages in wrongdoing that is easier to get away with is deserving of more punishment.   "Regardless of culpability, however, heavier punitive awards have been thought to be justifiable when wrongdoing is hard to detect (increasing chances of getting away with it)."[167]   As described above, implicit in the jury's finding is the jury's acceptance of the evidence demonstrating that the Defendants were the ones in possession and control of the pertinent information and without which the risk was unknown, and both Defendants engaged in activities designed to conceal that information and those risks known only to them, from regulators, the medical community, the public at large, and Mr. Allen's physicians.   The regulatory process involved in the area of pharmaceuticals during the relevant time period relied heavily, if not exclusively, upon the good faith compliance of regulated drug companies which engaged in the testing and development of the drugs to self-report the information needed to evaluate the safety and efficacy of the drugs.   When a company such as Takeda concealed and withheld the information required to adequately evaluate and thus, regulate a drug, it, by the very self-reporting nature of the process that governed, makes the wrongdoing – here failure to adequately warn of a known risk – hard, if not impossible to detect at the time of the conduct at play.

- ***Effect on "Strangers to the Litigation"***:   In failing to provide an adequate warning to Mr. Allen and his physicians, the Defendants necessarily failed to provide adequate warnings to the general public, medical community and their target population - the millions of others who took, were taking, or had taken Actos®, as well.   The Supreme Court has recognized that "conduct that risks harm to many is likely more reprehensible than conduct that risks harm to

---

[165] Exxon Shipping Company v. Baker, 554 U.S. 471, 494, 128 S.Ct. 2605, 2622, 171 L.Ed. 2d 570 (2008).

[166] Id.

[167] Id.

only a few."[168]   A jury determining punitive damages is free to take this elevated degree of reprehensibility of the Defendants' conduct into account when making its punitive damages award, however cannot compensate for those absent, rather are to only consider this conduct when determining the degree of reprehensibility.   Takeda's and Lilly's conduct impacted not only Mr. Allen and Mrs. Allen, but, also, the general public and its health care system thus, the millions who were prescribed Actos® and took Actos® over the more than ten years that Defendants failed to adequately warn of the risks of an association between taking Actos® and bladder cancer.   Thus, the general public and welfare, as well as the medical system and those within it who suffered from diabetes, were equally disregarded by Takeda and Lilly when they chose not to provide an adequate warning.

As pharmaceutical companies, the Defendants were aware they were obligated to provide adequate warnings about their product to physicians of all "**potential** dangers" associated with Actos®, a common law precept specifically embraced by New York law.   The jury verdict establishes that the jury found that this obligation was violated by both Takeda and Lilly. Implicit in the jury's finding is the conclusion that both Takeda and Lilly failed to provide an adequate warning of all *potential dangers* and, also, that in so doing both engaged in willful and wanton conduct.   Inherent in that finding, and supported by the evidence presented at trial, is the finding Takeda and Lilly engaged in grievously reprehensible behavior, with their knowing and deliberate efforts to avoid providing adequate information and warnings to prescribing doctors and unsuspecting patients, and their willingness to allow those particularly vulnerable patients to, therefore, run a higher risk of bladder cancer and death, with no advance warning, all in the blind pursuit of profit.   The record is replete with evidence to support a finding of callous disregard of and for Mr. Allen, as well as general human life and well-being, and a deliberate effort to conceal, obfuscate, and manipulate known relevant information from the very agency charged with regulating drug companies for the benefit of and in order to protect the public safety and welfare, and from the physicians who relied upon such information in order to perform their role

---

[168] Philip Morris, 549 U.S. at 357, 127 S.Ct. at 1065.

within the health care system and the public trust.  The evidence supports a conclusion Takeda and Lilly, in the name of and in pursuit of profits reaching into the billions of dollars, chose to hide the information which would have allowed the FDA and the physicians to play their vital role to assess the risk and benefit of drugs, here Actos®, in order to regulate and selectively prescribe in the manner contemplated by the system of health care, and in so doing Defendants knowingly condemned an identifiable, and significant segment of the population to increased risk of death and/or grave bodily harm.  Thus, this Court finds the evidence supports a finding Takeda's and Lilly's conduct meets the criteria for an increased degree of reprehensibility.

**b.      Ratio.**

Next, this Court must look to the second guidepost: the ratio between the actual harm inflicted to the Plaintiffs and the punitive damages awarded by the jury.  In <u>Gore</u>, the Supreme Court described this guidepost as follows:

> The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff.  The principle that exemplary damages must bear a reasonable relationship to compensatory damages has a long pedigree.[169]

The "actual harm inflicted" on Mr. Allen in this case is bladder cancer and all that entails as well as the resultant increased risk of recurrence and possible premature death.  Cancer is a disease that strikes fear into the heart of its victims, can leave the body ravaged and a shadow of its former self, and often, as with Mr. Allen, necessitates painful, debilitating, medical treatment and reduction of control over and the enjoyment of one's life.

In discussing this guidepost, the Supreme Court directs, in essence, that punitive damages awards are to be linked to the size of the harm inflicted by the defendant whose actions are under

---

[169] <u>Gore</u>, 517 U.S. at 580, 116 S.Ct. at 1601 (citations and internal quotation marks omitted).

scrutiny. Although not technically synonymous, the money awards granted by juries, especially for non-specific damages such as pain and suffering and loss of enjoyment of life or function, are society's and the judicial system's poor, but best available, attempt to quantify that which defies quantification. The Supreme Court, it would appear, suggests that the "actual harm" in this formulation is best reflected in the amount of compensatory damages awarded.[170] This Court notes there are good reasons, arising out of the very different natures and purposes served in compensatory damages versus punitive damages, for avoiding establishing such a link between these two very different inquiries. Compensatory damages – focused primarily on the Plaintiffs and the harm done them – are designed to make the Plaintiffs whole for the out-of-pocket costs they incurred as a result of the Defendants' actions, as well as to compensate them for the physical, mental, emotional, and other harm they have experienced as a result of the Defendants' actions. Punitive damages, on the other hand, do not focus on the Plaintiff's harm, rather focus on the Defendant's conduct and the need to punish and deter the Defendants. Punitive damages are designed to inflict punishment on the Defendants and to ensure that the punishment is sufficiently harsh so that the Defendants will refrain from similar wrongdoing in the future. Thus, an analytical link between the amount of compensatory damages and the amount of punitive damages would appear to be dissonant, however, it is, perhaps, the Court's best available attempt to find an objective anchor for an analysis that is otherwise grounded in the more esoteric waters of doctrine or legal theory. Consequently, and, nonetheless, it would appear the Supreme Court has espoused a ratio link between the harm suffered – practically illustrated by the amount of compensatory damages – and the amount awarded in punitive

---

[170] *See, e.g.*, Campbell, 538 U.S. at 425, 123 S.Ct. 1524 ("Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio *between punitive and compensatory damages*, to a significant degree, will satisfy due process.") (emphasis added).

damages, and this Court feels compelled to follow this linkage, no matter how seemingly dissonant, in its analysis.

This Court notes, however, that the lower courts have not received the degree of definitive guidance from the Supreme Court on *how to determine* the *proper* ratio cut-off in an excessiveness analysis as might be desired.   While sometimes declaring that certain compensatory-to-punitive ratios are "close to the line,"[171] the Supreme Court has time and again specifically, and rightfully, refused to set a bright-line rule, or a rigid mathematical formula, to limit the acceptable scope of punitive damages and has not, yet, chosen to rule directly on substantive excessiveness in a case where personal injury and not mere economic loss was the underlying injury.[172]  Perhaps the Court, in its wisdom, has chosen to preserve the lower courts' ability to apply the relevant jurisprudential *principles and precepts* to new – and potentially ever differing – degrees and nature of reprehensible conduct and damage wrought, and to the infinite factual scenarios which life and litigation can present.

In case after case, the Supreme Court has noted that the guidance it has offered – a ratio of 1:4 of compensatory damages-to-punitive damages awarded may be "close to the line,"[173] or 1:500 is entirely too high a ratio,[174] or 1:145 is excessive,[175] etc. – is limited to the *specific facts of each case* and the Court has taken pains to discuss those facts which are present and which might be absent from that case being discussed.  Time after time, the Court has delivered the

---

[171] Haslip, 499 U.S. at 23, 111 S.Ct. at 1046.

[172] Haslip, 499 U.S. at 18, 111 S.Ct. at 1043; TXO, 509 U.S. at 458, 113 S.Ct. at 2720; Gore, 517 U.S. at 582-83, 116 S.Ct. at 1602-03.

[173] Haslip, 499 U.S. at 23, 111 S.Ct. at 1046.

[174] Gore, 517 U.S. at 583, 116 S.Ct. at 1603.

[175] Campbell, 538 U.S. at 429, 123 S.Ct. at 1526.

message to lower courts: the limit identified here is a suggestion only, and is offered for these facts alone, and lower courts considering this precedent must keep in mind that numerous factors affecting the degree of reprehensibility are relevant and all must be taken into account.

This Court notes that the case at bar presents the very type of scenario the Court has been foreshadowing: one where each of the factors identified by the Court as present or absent, at different times, but which, heretofore, never existed all in one case, are now all present, in one case. The evidence supports that Defendants' deliberate conduct threatened the operation of the medical care system and thus, the millions of people who found themselves in that system as diabetics, and those diabetics taking Actos® over that twelve year period, and caused egregious bodily harm to Mr. Allen, and harm to Mrs. Allen. The evidence supports that this harm resulted not from mere negligence, but from a deliberate and sustained campaign to deceive and conceal information from the regulatory agency tasked with regulating drug companies and protecting the public health and welfare from just such risks and harm; and to deliberately withhold necessary warnings from the physicians and the medical community at large who, within our system of medical care, are tasked with evaluating that very information in order to assess risks and benefits and, thus, provide health care to their patients; and to withhold necessary information and warnings from the most vulnerable of the diabetic population, the general public, and the medical community which should have been engaged in the broader operation of the medical care system. The Defendants' campaign extended over twelve years and encompassed multiple and repeated acts. The Supreme Court's warnings have been clear: its decisions to date should not be taken to define the reasonableness of punitive damages under a set of facts which embrace previously-absent factors. Here, the heretofore absent factors are present, and thus, all the enumerated factors employed within the analyses of the various cases

co-exist at one time and within one set of facts.[176]  To date, the Supreme Court has not addressed substantive Due Process excessiveness in a comparable case.

The Supreme Court's tendency to list the reprehensibility factors that are missing from a given case, rather than to provide specific and direct guidance, can leave lower courts rudderless when all of those absent factors are found in one case.[177]  Such aversion, perhaps, creates a risk of constitutional shipwreck, allowing the vagaries of unbridled judicial subjectivity.   Several justices have indicated their awareness of this danger created by the Court's declaration that "excessive" punitive damages are substantially unconstitutional, and their simultaneous failure to offer clear guidance for determining *if* or *when,* and *how* an award is *so large* to be deemed so excessive that it "jar[s] one's constitutional sensibilities."[178]  Justice Kennedy, in his concurrence in TXO, acknowledged the issue directly:

> To ask whether a particular award of punitive damages is grossly excessive begs the question: excessive in relation to what?  The answer excessive in relation to the conduct of the tortfeasor may be correct, but it is unhelpful, for we are still bereft of any standard by which to compare the punishment to the malefaction that gave rise to it.  A reviewing court employing this formulation comes close to relying upon nothing more than its own subjective reaction to a particular punitive damages award in deciding whether the award violates the Constitution.  This type of review, far from imposing meaningful, law-like restraints on jury excess, could become as

---

[176] Recognizing this point, for instance, the plurality opinion in TXO declared that, "[b]ecause no two cases are truly identical, meaningful comparisons of such awards are difficult to make." 509 U.S. at 457, 113 S.Ct. at 2720.

[177] *See, e.g.,* Campbell, 538 U.S. at 426, 123 S.Ct. at 1524-25 ("The harm arose from a transaction in the economic realm, not from some physical assault or trauma; there were no physical injuries; and State Farm paid the excess verdict before the complaint was filed . . ."); Gore, 517 U.S. at 576, 116 S.Ct. at 1599 ("In this case, none of the aggravating factors associated with particularly reprehensible conduct is present.  The harm BMW inflicted on Dr. Gore was purely economic in nature.  The presale refinishing of the car had no effect on its performance or safety features, or even its appearance for at least nine months after his purchase.  BMW's conduct evinced no indifference to or reckless disregard for the health and safety of others . . .").

[178] Haslip, 499 U.S. at 18, 111 S.Ct. at 1043.

fickle as the process it is designed to superintend.[179]

Justice O'Connor, in <u>TXO</u>, expressed her concerns, as well:

> As an initial matter, constitutional judgments should not be, or appear to be, merely the subjective views of individual Justices. Without objective criteria on which to rely, almost any decision regarding proportionality will be a matter of personal preference. One judge's excess very well may be another's moderation.   To avoid that element of subjectivity, our judgments should be informed by objective factors to the maximum possible extent.[180]

Three years later, in <u>Gore</u>, Justice Breyer made a similar point:

> This constitutional concern, itself harkening back to the Magna Carta, arises out of the basic unfairness of depriving citizens of life, liberty, or property, through the application, not of law and legal processes, but of arbitrary coercion.   Requiring the application of law, rather than a decisionmaker's caprice, does more than simply provide citizens notice of what actions may subject them to punishment; it also helps to assure the uniform general treatment of similarly situated persons that is the essence of law itself.
>
> Legal standards need not be precise in order to satisfy this constitutional concern.   But they must offer some kind of constraint upon a jury or court's discretion, and thus protection against purely arbitrary behavior.[181]

Justice Ginsburg, in acknowledging the point, minced no words:

> What is the Court's measure of too big?  Not a cap of the kind a legislature could order, or a mathematical test this Court can divine and impose.   Too big is, in the end, the amount at which five Members of the Court bridle.[182]

Justice Scalia observed in <u>Gore</u> that, despite the discussion by Justices Kennedy and

---

[179] 509 U.S. at 466-67, 113 S.Ct. at 2724-25.

[180] 509 U.S. at 480-81, 113 S.Ct. at 2732 (internal quotation marks and citations omitted).

[181] <u>Gore</u>, 517 U.S. at 587-88, 116 S.Ct. at 1605 (Breyer, J., concurring)(internal quotation marks and citations omitted).

[182] <u>Gore</u>, 517 U.S. at 613 n.5, 116 S.Ct. at 1617 n.5.

O'Connor three years earlier, no further guidance was forthcoming:

> [T]he application of the Court's new rule of constitutional law is constrained by no principle other than the Justices' subjective assessment of the "reasonableness" of the award in relation to the conduct for which it was assessed.[183]

> \* \* \*

> [The Court's] opinion provides virtually no guidance to legislatures, and to state and federal courts, as to what a "constitutionally proper" level of punitive damages might be.[184]

This Court agrees with Justices Kennedy, O'Connor, Breyer, Scalia and Ginsburg; there is need for some objective anchor to which to link the evaluation of punitive damages awards. Without some type of objective criteria, the analysis is forever subject to the storms of individual judicial emotion, and the hidden currents of personal preference and is, therefore, subject to crashing upon the jagged rocks of individual judicial filters and sensibilities. What that objective anchor can and should be, however, is a question without clear answer and has proven particularly elusive for the Court and for this Court, as well.

The analysis of, not procedural, but *substantive* due process to punitive damage awards is, at present, in evolution, and reminds of the United States Supreme Court's somewhat similar struggle when attempting to formulate an analysis within the context of the tension between free expression and obscenity. Both analyses seem to attempt to reconcile, at their core, incompatible goals. Specifically, within the present analysis, one of the two declared purposes served by punitive damages is deterrence. Deterrence, to be effective, must create a *sufficient disincentive* that it curbs the same behavior in the future. If the goal is to deter and punish, it would seem the amount awarded must be large enough to make such conduct economically and financially

---

[183] 517 U.S., at 599, 116 S.Ct., at 1611 (Scalia, J., dissenting).

[184] 517 U.S., at 602, 116 S.Ct., at 1612.

undesirable – *for the particular and the specific company involved*.  In this day and age of corporations being governed by stockholders, and having sales reaching into the billions, and reaping profit in the billions of dollars each year and thus, creating corporate worth for their stockholders in the multiples of billions each year – here Takeda and Lilly, over the relevant period, had sales from Actos® of over $24 billion[185] – it would seem an award designed to deter must be commensurate with the income derived from the conduct to be deterred.  However, the Supreme Court has clearly signaled its displeasure with large punitive damages awards and has specifically noted that a defendant's wealth should not govern the amount of the punitive damages award.[186]  Furthermore, the Supreme Court has, it would seem, also, implied that large compensatory damages, which have already compensated the Plaintiff, should act to effectively limit the acceptable size of punitive damages awards made against the corporate actor and has made, at least in one case, mention of ratios of 1:10 (or fewer).[187]  This approach, however, seems to bring into direct conflict the two goals; the stated need to punish and deter the wrongdoing, and the need to compensate the injured party for only the injury sustained – what will accomplish one is not necessarily what will accomplish the other and in accomplishing one, the goal of the other is weakened.  Such a conflation of two such differing goals is, it would seem, perhaps, problematic.

When, as here, two defendants have been found to have engaged in conduct of a high degree of reprehensibility and put not only the Plaintiffs, but the public health and welfare at risk, all in order to generate tens of billions of dollars in sales, an award large enough to

---

[185] Rec. Doc. 4110; Trial Tr. vol. XXXVII (Rec. Doc. 4210), at 6323.

[186] Campbell, 538 U.S. at 427-28, 123 S.Ct. at 1525.

[187] Campbell, 538 U.S. at 425, 123 S.Ct. at 1524.

sufficiently punish in order to effectively deter such conduct would seem to be warranted.  Thus, a 1:1 or 1:10 ratio to Mr. Allen's compensatory damages to punitive damages, as argued by Defendants would, it would seem, be so negligible under the financial realities of Takeda and Lilly as to be easily absorbed and thus, have the perverse effect of *reinforcing* the wrongdoing rather than deterring it by merely defining an acceptable cost of doing business which can be factored into a business model and adopted as a "cost of doing business."  When such great wealth is at risk, factoring in a negligible additional possible cost could be easily embraced and yet, Mr. and Mrs. Allen, it would also seem, were adequately compensated for *their actual* damages, arguing for a lesser punitive damages award.  Consequently, to link these two differing goals seems ill advised.  However, this Court notes that up to this point, the Supreme Court seems to have made just such a link.  However, and perhaps significantly up to this point, also, the Supreme Court has not been presented with a factual scenario such as this, that might force a court to choose between the two seemingly incompatible goals which have been espoused: either effective deterrence, which by necessity must consider the financial realities involved, or limited punitive damages if tied to the amount of compensatory damages awarded.

While the Supreme Court has not issued definitive guidance about how to determine the cutoff *for the ratio* between acceptable compensatory and punitive damages, it has made strong statements, however, in cases *without personal injury or bodily harm*, that provide some possible insight.

> Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, a few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.  In Haslip, in upholding a punitive damages award, we concluded that an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety.  We cited that 4-to-1 ratio again in Gore.  The Court further referenced a long

legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish. While these ratios are not binding, they are instructive. They demonstrate what should be obvious: Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1, or, in this case, of 145 to 1.[188]

The Campbell Court went farther and created a presumption under the facts of that case – one, again, without personal injury or bodily harm:

In the context of this case, we have no doubt that there is a presumption against an award that has a 145-to-1 ratio.[189]

However, regrettably, after having completed a close and exhaustive review of the Supreme Court's jurisprudence, this Court is no closer to knowing if there is, or should be, a definitive substantive ceiling to punitive damages awards whether linked to compensatory damages or not. Nor is it clear, if so, specifically, how one should determine that ceiling beyond, as with obscenity – knowing it when one sees it. However, this Court need not make that troublesome determination and can leave that clarification to courts higher than this one, as it does seem clear that a ratio of compensatory-to-punitives of 1:5424 for the award against Takeda and 1:8136 for the award against Lilly – even in a case involving personal injury and bodily harm and a high degree of reprehensible conduct, might "jar[] one's constitutional sensibilities."

### c.    Statutory Penalties

The third guidepost identified by the Supreme Court requires this Court to compare the punitive damage award to statutory or other similar civil penalties, or fines, that the State of New York would impose on the Defendants for such behavior. The parties are in agreement that New

---

[188] 538 U.S. at 425, 123 S.Ct. at 1524 (citations omitted).

[189] 538 U.S. at 426, 123 S.Ct. at 1524.

York does not have the potential to impose penalties or fines on Takeda or Lilly for the actions they have taken in these matters. Therefore, this guidepost cannot shed any light on the reasonableness and proportionality of the punitive damages.

### 2. Reasonableness and Proportionality

Having examined the guideposts in the context of this case, this Court now turns its attention to the two overarching factors the Supreme Court has indicated govern the constitutionality of punitive damages awards: reasonableness and proportionality.[190]

### a. Reasonableness

The reasonableness factor calls for a review of the evidentiary and factual justification, or underpinning, of the jury's decision to make a large punitive damages award. This factor calls for a *subjective* look at the decision from the jury's perspective keying, primarily, but not exclusively, to the *nature of the Defendants' conduct*.

In this case, the jury was faced with evidence of two multi-national companies with a stipulated combined total worth of $41 billion, who together had sold $24 billion of a drug over the previous twelve years during which time they concealed a risk of developing bladder cancer associated with the use of that drug from the population to whom they sold the drug and from that population's physicians, in order to protect that, their primary product, and the enormous sales generated from that drug, and thus, put at risk of death or grievous bodily harm not only Mr. Allen but, also, the general welfare and safety of those similar who were operating within the health care system. For all of the reasons more fully set forth in the discussion of the degree of reprehensibility guidepost, *supra*, this Court concludes there is sufficient evidence to support

---

[190] The Supreme Court has not used this precise approach to the excessiveness analysis in any one case. However, this Court has closely studied the jurisprudence and believes that the corpus, particularly as it has developed over time, lends itself to this formulation of the analysis.

the jury in its finding that Takeda and Lilly engaged in grievously reprehensible behavior and that the jury were guided by a desire to make an award sufficiently large so as to deter similar such conduct in the future.   The jury was presented with sufficient evidence to permit the conclusion that sizable punitive damages awards would be necessary to capture the attention of the two Defendants given their size and the financial realities at play.   Consequently, the question presented by the reasonableness factor here is this: If the goal is to punish and deter, when faced with companies of this size who generated sales, in the billions, *off of the very product they hid the risk of, over the very period they hid that risk,* was the jury *unreasonable* to fashion its award reflecting those realities?   This Court finds they were not.

With companies of this size, and with such startling amounts at play, a small punitive damage award – as that argued by Defendants – could be easily paid and easily forgotten – and could, in fact, as noted earlier, merely be factored in as a mere cost of doing business and thus, have the perverse effect of *reinforcing* the very behavior to be deterred rather than deterring it. Regrettably, when such large amounts are at stake, history has shown companies have merely factored in lesser awards as a necessary cost of doing business.   History has, also, shown, when the financial gains are so large, lesser awards can become merely an entry on a balance sheet. Moreover, the jury was aware, from Defendants' questioning, that both Takeda and Lilly are still in the business of developing and/or selling pharmaceuticals throughout the world.   If their effort to hide the risk of bladder cancer associated with Actos® proves successful, arguably there could be little, if any, incentive not to repeat their pattern of conduct in the future.   The Defendants argue vehemently there is no pattern of egregious conduct; that Actos® cannot cause bladder cancer; and in particular that Actos® did not cause Mr. Allen's bladder cancer, and presented evidence and argument to this effect – the jury's verdict leaves no doubt, however, that the jury

rejected Takeda's and Lilly's argument and interpretation of the evidence, and embraced the Plaintiffs' argument and interpretation of the evidence.   Defendants' core outrage with the award is grounded, it would seem, in this context – in effect Defendants continue to argue the jury was just wrong and thus, their award, of course, therefore, cannot be reasonable.   However, the findings of the jury and the facts and evidence presented that support the jury's findings render this basis for argument invalid and cannot be ignored merely because one choses to disagree.

Just as there is sufficient evidence to support the jury's findings, there is sufficient evidence, presented at trial, to support an award large enough to, as Plaintiffs argued, "send some kind of a message"[191] to the corporate headquarters that such conduct in the future would not be in their best corporate financial interest – *if* the goal is to deter and punish.   Based upon the evidence presented, this Court finds it was not *unreasonable* for the jury to have determined that to make an award not sufficient to capture the attention of these two huge firms would not have created an effective deterrence for future similar conduct.   Thus, this Court cannot find the award *was not reasonable* when viewed within the light of the Defendants' size, the $24 billion dollars generated by Takeda off of the sales of Actos®, alone, over the period of time Takeda and Lilly failed to adequately warn of the risks of contracting bladder cancer with the use of Actos®, and Takeda's and Lilly's deliberate disregard of such a vulnerable target population and of Mr. Allen in particular.

The evidence at trial demonstrated Takeda's and Lilly's wrongdoing, the fact that they derived tremendous sales – which might justifiably be described as "ill-gotten gains" – off of conduct embracing a risk of serious harm or death to members of an extremely vulnerable population, and that they caused significant harm to Mr. and Mrs. Allen cannot be overlooked or

---

[191] Trial Tr. vol. XXXVII (Rec. Doc. 4210), at 6328.

ignored, as Defendants' arguments suggest.  As discussed more particularly above, all of the factors suggesting enhanced reprehensibility are, for the first time, present in one case.  In this day and age it is becoming more and more commonplace for settlements, civil fines, and penalties imposed on such large corporations to range in the billions of dollars, when dealing with billion dollar corporations.  Rarely has a week gone by over the past year without a public announcement of some extremely large fine, penalty, or settlement (often reached with the agreement of the corporation who will be paying) made necessary by public wrongdoing, in the financial, medical, energy, or other sector of the national or world economy.  While punitive damages in the amounts of $6 billion and $3 billion still loom large in the public imagination, they are no longer as shocking in the context of settlements, sums of money, fines, penalties, and sales of today's multi-national and multi-billion dollar corporations as, perhaps, they once might have been.  Defendants, nonetheless, continue to argue the award cannot be reasonable and must, merely on its face, be the result of some ill-defined violation, constitutional or otherwise, on the part of the jury.

When discussing the Defendants' request for a new trial, *infra*, this Court will set forth more completely its reasons for concluding that the jury did not, as Defendants, argue, act out of passion or prejudice in this case.  For the time being, suffice it to say, the evidence is present to support that the jury perceived extremely reprehensible conduct, a need to deter such conduct which had caused physical harm to Mr. and Mrs. Allen, and which had put the medical care system and, thus, a very vulnerable population at risk of death or bodily harm over an extended period of time.  The Defendants made sales reaching into the billions from their conduct, and although now warning the medical community and diabetic population of the risk of bladder cancer, refused to do so until the eve of the sunset of their exclusive patent on Actos®, and also,

still continue to develop, sell, and market new drugs, and thus, are fully able to continue to engage in the same or similar conduct in the future.  Was it unreasonable for the jury, under the unique facts and circumstances presented in this case, to award an amount sufficiently large so as to not only punish the Defendants for the harm they caused the Allens but, also, sufficiently large *to deter such conduct in the future* which might impact, yet, other vulnerable populations and, again, handicap an effective operation of our health care system?  This Court cannot say, under these factual circumstances, the jury's award was *unreasonable*.

### b.    Proportionality

However, this, also, does not end the inquiry.  The second prong of the excessiveness analysis suggested by the Supreme Court requires a shift from the <u>subjective</u> perspective to a more <u>objective</u> gauge, of the "proportionality" of the punitive damages awards, *e.g.*, whether the punitive damages are proportionate to the Plaintiffs' harm, which has been conflated into the amount of the actual damages awarded under the facts of a given case.  This inquiry, also, shifts from the *subjective perspective* of the jury attempting to gauge the level of reprehensibility of the Defendants' conduct - and the need to assure deterrence of that type of conduct in the future – to a *more objective perspective* inquiry of whether the punitive damages award was proportionate to the harm, or risk of harm, caused the Plaintiffs.  Thus, the inquiry no longer is viewed from the perspective of the Defendants' conduct and the *reasonableness* of the jury's award, but shifts to the perspective of protection of the Defendants and the taking of Defendants' property and need for notice thereof.  This more objective inquiry of "proportionality," which through lower court application has become a ratio between *the dollar amount* of the punitive damages awarded and *the dollar amount* of the compensatory damages awarded, has been embraced by lower courts.  As noted above, the United States Supreme Court has not provided strong guidance in

this arena – beyond indicating that the ratio is perhaps the best available way to provide a flexible, yet, also, more objective, anchor for a proportionality determination.   However, a careful review of the jurisprudence and the admonition of the Supreme Court reveals a number of relevant areas of inquiry beyond a rigid and rote mathematical application that should be considered by a court conducting this analysis.   Each of these subjects will be discussed below.

_The Role of Potential Harm to "Strangers to the Litigation," and the Current Procedural Framework._   First, the unique procedural posture of this case must be noted.   The Allens' claims do not come to this Court within the context of a single, freestanding claim, however, neither do they come to this Court as a part of a class action where all or most impacted individuals are before the Court as a collective whole, all who would benefit from the punitive damages award, and for which the Defendants would be liable, in large part, only the once and thus, the _procedural nature of the claim_ would act, to some degree, to limit the Defendants' possible liability for punitive damages for the litigated conduct.   Rather, this case presents the claim of one injured individual, but within the somewhat and relatively new and unique procedural context of the role played by an early or bellwether case within a multidistrict litigation of some almost 4,000 cases, brought together for pretrial determination, but subject to individual trial.[192] Although coming before this Court in the much broader "MDL" context, Mr. and Mrs. Allen's case is still, nonetheless, but one and only one of the some almost 4,000 individual cases now before this Court for handling of _pretrial_ matters.   Mr. and Mrs. Allen's case is, again, but a single case, however, it, also, is playing the agreed upon role of the one of a select number of early or bellwether cases, in which only one set of Plaintiffs – out of thousands – has been tried,

---

[192] "When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings." 28 U.S.C. § 1407(a).

thus far, within the MDL proceedings.  Although this procedural context is not a class action in which the Defendants will be punished by this jury only the once for all of their relevant egregious conduct, neither is it only a single case with no larger role to play within the MDL.  It was selected by the parties, within a process of selection, for early trial.  Here, in theory, almost 4,000 federal cases[193] will follow Mr. and Mrs. Allen's suit to trial, whether before this Court, by agreement, or before the transferor courts, placing the Defendants at repeated risk and examination for and of their conduct.  Although, theoretically, granting insight, the Defendants, nonetheless, remain at repeated risk and thus, the award made on Mr. and Mrs. Allen's case should not be designed to punish Defendants, once and for all, or to encompass those not before the Court in Mr. and Mrs. Allen's case.

> Punishment [of "strangers to the litigation"] creates the possibility of multiple punitive damages awards for the same conduct; for in the usual case nonparties are not bound by the judgment some other plaintiff obtains.[194]

This point was specifically addressed by the Supreme Court in Philip Morris, where the Court specifically held a punitive damages award cannot be made for or in reliance upon possible harm to those not before the Court.[195]  The United States Supreme Court makes the clear choice that one injured party should not be allowed to inflict the punishment for all who might have been harmed by the Defendants' acts where he or she will be under no obligation to share those sums with the others who were harmed; however, this admonition, nonetheless, must also, comport with the need to adequately deter when other Plaintiffs might or might not be able to establish

---

[193] It is important to remember that only the federal cases are gathered together in the multidistrict litigation.  At last count, there were almost an additional 4,000 cases pending in state courts throughout the country.  See Transcript of Proceedings for Status Conference held on August 21, 2014 (Rec. Doc. 4659), at 10.

[194] Campbell, 538 U.S. at 423, 123 S.Ct. at 1523.

[195] 549 U.S. at 349, 127 S.Ct. at 1060 ("such an award would amount to a taking of 'property' from the defendant without due process.").

harm to themselves, and this juxtaposition was not addressed by the Supreme Court. Nor did the Court address the practical business reality of today's corporate risk assessment. With some almost 8,000 cases now pending against Takeda and Lilly in federal and state courts across the country, whether either corporation, or any such corporations, might engage in a corporate risk assessment factoring in an award of punitive damages – of whatever size – against the number of expected cases brought under states' laws allowing for punitive damages, and the statistical percentage of possible success or failure, in order to factor that into their future planning, has not been mentioned or explored by the Supreme Court or any lower court – perhaps, because only with the unique procedural context of a large MDL is the question clearly presented.

Nonetheless, the Supreme Court is clear – *punishment* cannot reach out to benefit those not before the Court. Here, only Mr. and Mrs. Allen are before this Court.

*Consequences for Defendants.* Fundamental fairness, it would seem, should, also, dictate that the amount of the punitive damage award should not be so large as to trigger bankruptcy, or come without sufficient notice, or wholly discourage companies from engaging in the necessary commerce within which they are engaged – here developing and producing needed drugs for the health care system. Sums such as those awarded by the jury in this case could easily foreshadow the dark specter of withdrawal from the otherwise valid and needed market or of bankruptcy for some within the business community no matter what volume of sales might – in the past – have been garnered. Although neither Defendant has mentioned, **not so much as a whisper**, such a foreshadowing and thus, this Court can only assume both Takeda and Lilly are fully financially sound and viable and fully capable of responding to the jury's award without any such concern, and harbor no thoughts of withdrawing from the pharmaceutical market, the *general question* of proportionality to the corporations' financial ability to pay and continued financial viability and

Page 66

participation in the market, it would seem, should be a legitimate concern. However, once again, this Court need not consider any such concerns as neither Takeda nor Lilly has, in any way, presented any argument or evidence of any kind on either point, nor addressed either point in their briefs submitted in support of their motion, therefore, this Court can only assume there is no need for any such consideration or concern in this case and this Court will pay none. Rather, this Court raises the issue only as a general matter, and, again, can only assume these factors are not applicable under the facts of this case.

_High Damages/Low Ratio._  The Supreme Court has made clear its belief, _in cases not involving personal injury_, that, as a general matter, large compensatory damages should, at times, act to limit the size of allowable punitive damages awards, in part because, the Court intimates the Plaintiff has already been compensated. Again, such a conflation of two differing goals, again, seems at odds, as the court's language in <u>Campbell</u> illustrates:

> _When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee._ **The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff.**[196]

In this case, Mr. and Mrs. Allen's compensatory damages award was not for mere economic harm, but was for personal injury and was not "large" given the nature and extent of the harm they suffered, however, could, perhaps be considered "large" when compared to the _economic loss_ in the existing Supreme Court jurisprudence. Whether the distinction between personal injury awards and awards for only economic loss will be significant remains to be seen, however, is clearly a distinction to be noted.

---

[196] <u>Campbell</u>, 538 U.S. at 425, 123 S.Ct. at 1524 (emphasis added).

*A Clear Downward Trend.*  The discussion of the Supreme Court's jurisprudence, *supra*, also, reveals a clear trajectory favoring smaller punitive damages awards (at the very least, smaller ratios) than were accepted when the Supreme Court first began developing this doctrine of Due Process excessiveness over 20 years ago.  The focus of the Court's attention in <u>Gore</u> and the later cases has shifted from a focus on punishment and deterrence, to a focus on protection of the Defendants' property and the need for notice, in large part, and has contained longer and longer discussions centering upon questions of notice, fundamental fairness, and other defendant-focused concepts.  This clear trend, and the Court's attempt to qualify and limit <u>TXO</u> in <u>Gore,</u> calls into serious question a ratio even as large as the largest approved by the Court in the past – *i.e.*, that in <u>TXO</u>, of a ratio of 526:1.

*Acting in the Absence of Clear Guidance.*  As has been discussed, the Supreme Court has refrained, thus far, from providing clear, objective guidance to lower courts as to how to analyze and how to determine the proportionality prong of a substantive due process analysis.  In attempting to proceed in the absence of such guidance, lower courts have, perhaps out of necessity, conflated the broad concept of harm into the dollar award made for compensatory damages, and, also, reduced the broad constitutional issues to a mere rigid mathematical ratio between the punitive damages and compensatory damages awards.  Many lower courts have given in to the seduction of the simplicity offered by using such a rigid ratio, and in particular, a 1:1 or 10:1 ratio as a *de facto* "bright-line test" using *dicta* from the Supreme Court, perhaps divorced from the context of the fact-based discussion of the Court as their support.  This Court, however, believes it would be short sighted to give into the seductive lure of the siren of simplicity and merely embrace a rigid mathematical ratio in substitution for a genuine constitutional analysis grounded within the specific facts of the case.

The United States Supreme Court has been adamant there is, and cannot be, any such bright-line, rigid mathematical test and offers, and thus instructs, a full discussion of the *factual context* of each case, which notes the existence or absence of certain factors found in each case, and that heralds back to the Gore factors most predominantly used when determining if punitive damages are justified. In its jurisprudential evolution, the United States Supreme Court has often declared adoption of a certain ratio *under the facts of a given case* as being acceptable or not acceptable, and at the same time, has taken great pain to describe the risk of a bright-line test, and rather, pointed out that certain aggravating factors were absent or present under the facts of a given case. Thus, this Court is of the opinion, the Supreme Court has clearly declared there is, and can be, no bright-line test or magic mathematical ratio that is mandated by the United States Supreme Court, and succumbing to the seductive simplicity of adopting any such application of a ratio would be violative of the clear admonition of the United States Supreme Court. Rather, a more nuanced, factually based inquiry is required.

Notwithstanding that this Court is of the firm opinion proportionality cannot be conflated into a rigid bright-line mathematical ratio, as many lower court decisions suggest, no matter how seductive the simpler result, neither is this Court of the opinion that the proportionality prong or consideration of a ratio can be disregarded, or the instruction of the Supreme Court be ignored. It would seem the proportionality prong is, perhaps, the Court's attempt to interject, if not an anchor, certainly a rudder, into the perilous voyage through the subjective waters of a substantive due process analysis without which, one would be open to the jarring of an individual judge's constitutional sensibility being used as the rudder and thus, placing the voyage on a clear path to analytical wreckage.

Although this Court has some concern when the anchor or rudder chosen is at odds in purpose, it does in no way question the clear need for such an anchor or rudder, and recognizes the United States Supreme Court has embraced as that rudder, a focus on the proportionality of the actual or possible harm inflicted, on, only, the Plaintiff before the Court and the punitive damages award made. Consequently, this Court will, also, embrace the noted ratio as its rudder.

Thus, this Court must, now, attempt to reconcile what under the unique set of facts presented seems to be somewhat incompatible prongs of the analysis – reasonableness – which focuses, primarily, on the degree of reprehensibility of Defendants' conduct, and proportionality – which focuses, primarily on the ratio between the Plaintiffs' compensatory damages award and the punitive damages award. The Supreme Court, as noted above, has identified a series of factors relevant to the determination of the degree of reprehensibility of a Defendant's actions. Also, as noted above, this Court – consistently with the jury's findings – has found the evidence presented supports all of the aggravating factors reflecting enhanced reprehensibility (physical harm, wanton or reckless disregard of public safety, the physical vulnerability of the target population, repeated actions extending over time, trickery or deceit, etc.). In light of the Supreme Court's suggestion that a high degree of reprehensibility justifies a larger punitive damages awards, this Court will look to a higher ratio than that argued by Defendants. However, a total ratio of 6,101 to 1, does not, on its face, argue to be proportionate to the harm caused to, only, Mr. and Mrs. Allen. Thankfully, Mr. Allen is alive – Takeda and Lilly did not cause his death. Only Mr. and Mrs. Allen are before this Court and only Mr. and Mrs. Allen can be compensated through this Court. Mr. and Mrs. Allen were reasonably compensated for their injuries by the jury. Consequently, argument certainly can be made against the amount of the punitive damages award when viewed under this analysis of the proportionality prong.

However, the Supreme Court has, as of yet, granted little guidance to lower courts, such as this one, when it reaches this intersection of the two somewhat competing analyses which should prevail and why?  If the goal is to deter and punish, the award should be large enough to meet this goal, however, if the goal is proportionality between the award made for compensatory damages and the award made for punitive damages, the award should be small enough to meet that goal.  And, in the end, it would seem, this Court is left with the question of whether an award can, in and of itself and on its face, be violative of the Due Process Clause, *merely because of its large amount* and the large ratio between the compensatory damages and punitive damage awards – in other words what is <u>mandated</u> to be <u>proportional</u> or not <u>proportional, reasonable or not reasonable, *under a given set of facts*</u>.  When faced with this unenviable set of unanswerable questions, this Court will be guided, not by its subjective individual constitutional sensibilities, but by the more objective criteria embraced by my sister district courts and discussed by the Supreme Court – the proportionality of the punitive damages award *to the harm* caused *to the Plaintiffs*.  Again, this Court reminds that the "harm caused" is not necessarily synonymous with or even always well reflected by the dollar award granted for compensatory damages, however this Court, too, is at a loss to find a better indicator.  Here, Mr. Allen lives to be able to continue to love his wife and children, to work to some degree, and will, hopefully, be able to kiss and hold his future grandchildren.  He, no doubt, also, lives under the dark cloud of possible recurrence and perhaps premature death and has endured and will continue to endure unspeakable damage to his human dignity, quality of life, as well as reduced control over the most intimate of his bodily functions, and challenges to his marriage and relationships with his wife and children.  Yet, thankfully he lives, as does his marriage to Mrs. Allen and his relationships with his children.  Thus, this Court finds an overall ratio of 6,101 to 1 between the

total compensatory damages awards and the total punitive damages awards is so large as to be violative of substantive due process. However, yet again, this finding does not end the inquiry. Rather, it is only half of the equation required and takes the Court, only, to the next question – what award would <u>not</u> be violative of substantive due process, and whether this Court has the legal authority in the face of the Seventh Amendment to make such an award, itself? This Court now turns its attention to specific arguments made by the parties and, ultimately, to its determination.

### 3.    Defendants' Arguments

The Defendants' arguments on the issues of whether or not the punitive damages award is constitutionally excessive, first, focus predominantly on the reprehensibility guidepost. Specifically, the Defendants argue that none of the factors reflecting reprehensible behavior was shown to exist in this case. However, the jury heard all of the evidence presented and were expressly instructed as to this guidepost. Furthermore, the instruction actually given to the jury was one the <u>Defendants</u> drafted and proposed, and the jury was instructed as to the applicable law with as much clarity as was available. The instruction addressed both the proportionality and reprehensibility factors. Once properly instructed, this Court is required to presume that the jury followed its instructions. The Defendants have produced no evidence to overcome the presumption the jury followed the instructions given; that the jury found the Defendants' actions were extremely reprehensible is obvious. This Court, as noted above, will accept the jury's findings for the purpose of conducting this excessiveness analysis.

The Defendants' arguments suggesting the jury overreached – the suggestions that the jury inappropriately considered third-parties' claims, notwithstanding specific instruction to the

contrary[197] and Defendants' repeated argument as to the spoliation evidence as to both Takeda and Lilly – are unpersuasive, at best.  Moreover, those arguments were addressed by this Court in its Memorandum Ruling on Defendants' Rule 50(b) motion; the issue will not be addressed again fully in this Ruling, rather this Court adopts those portions of that Final Amended Memorandum Ruling addressing these points.[198]  Similarly unpersuasive is Lilly's argument that it should not be subject to punitive damages because it had no authority to change the Actos® package label – which this Court, also, fully addressed in its Final Amended Memorandum Ruling on the Defendants' Rule 50(b) Motion and adopts those relevant portions herein.[199]  Also, Lilly's argument that the jury should have imposed the same ratio of punitive damages on Takeda and Lilly as it used when allocating liability for the compensatory damages, is equally unpersuasive as each inquiry is examining a different and distinct legal issue and specific culpability, and Lily's argument conflates the two separate and distinct legal theories as discussed.

### III.    The Defendants' Request for a New Trial

The Defendants first argue reduction is not sufficient, rather a new trial is mandated under the law – as a *legal matter,* their argument on this issue rests upon a *factual matter* having already been argued and addressed within the Rule 50(b) motion and which was previously ruled on by this Court.  The Defendants, in essence, again, argue that the facts do not support the jury's award and/or that there are circumstances in which an award is so excessive, on its face, that it must constitute *per se* and *irrebuttable* evidence that the award was a product of passion or

---

[197] Trial Tr. vol. XXXVII (Rec. Doc. 4210), at 6320.

[198] Rec. Doc. 4648.

[199] Rec. Doc. 4648.

prejudice, and when an award is the product of passion or prejudice, the Defendants assert, reduction is an insufficient remedy and a new trial must be held, at least on the issue of punitive damages. Defendants continue their argument, also, suggesting that the multiple issues at play within the compensatory damages award and the punitive damages award are inseparable, and therefore, it is not possible to hold a new trial on only one issue, and consequently, a new trial on all issues is required.

The Defendants argue that the sheer magnitude of the punitive damages award to Mr. and Mrs. Allen is irrebuttable, *per se* evidence that the award must have been the product only of passion and prejudice and, therefore, a new trial is required. Also, according to the Defendants, and more succinctly stated, the same evidence was used by the jury to decide the issues of compensatory liability and punitive damages, thus, those two issues are inseparable, and, thus, both must be retried. Defendants therefore seek a new trial of all issues.[200]

### A.   Applicable Law, New Trial

The Supreme Court has not granted full guidance on Defendants' *legal* arguments made, but has long held, as has the Fifth Circuit, that reduction, more often in a non-constitutional challenge context, is by way of remittitur[201] and is appropriate when a damage award is so large as to be excessive or contrary to right reason, while an award that resulted from "passion or prejudice" on the part of the jury should be remedied by way of a new trial.[202] The Defendants

---

[200] Memorandum in Support, at 13-15.

[201] None of the cases discussed in this section involved constitutionally excessive damage awards. Therefore, the Fifth Circuit's discussion of the remittitur alternative is unquestionably appropriate. For that reason, this Court's references to remittitur in this section do not conflict with, or undermine, its conclusion that a reduction in punitive damages – not a remittitur of them – is appropriate in the context of a finding of unconstitutional excessiveness.

[202] *See, e.g.,* Consolidated Companies, Ltd. v. Lexington Insurance Company, 616 F.3d 422, 435 (5th Cir. 2010); Brunnemann v. Terra International, Inc., 975 F.2d 175, 178 (5th Cir. 1992); Wells v. Dallas Independent School District, 793 F.2d 679, 683-84 (5th Cir. 1986); Westbrook v. General Tire & Rubber Company, 754 F.2d

argue, however, that the case of <u>Wells v. Dallas Independent School District</u>,[203] together with the Fifth Circuit's decision in <u>Auster Oil & Gas, Inc. v. Stream</u>,[204] add a new element – in effect a presumption, and per Defendants' argument it would have to be an irrebuttable presumption – to this longstanding formulation of the test for determining how to remedy an excessive damage award.  Specifically, the Defendants argue that it is possible for an award to be "so exaggerated as to indicate bias, passion, [or] prejudice,"[205] *i.e.* that the size of an award, without more, not only indicates, but is irrebuttable proof of, bias, passion, or prejudice.  Defendants argue, in effect, that a simple view of the bare amount of a punitive damages award, particularly when viewed along with the compensatory damages award, without more, can and here must, trigger a Court's <u>obligation</u> to grant a new trial.  A closer look at the jurisprudence, however, reveals that an overly broad reading by Defendants and a much more nuanced understanding is required - Defendants' argument is so overreaching as to be fatally flawed.

In <u>Wells</u> – the earlier of the two cases upon which the Defendants rely – the plaintiff was a public servant whose employment was terminated without notice or a chance to present a defense.[206] By using this method of termination, the defendant effectively deprived the plaintiff of his property interest in his employment and, thus, violated his constitutional rights.[207] After trial, the jury awarded Mr. Wells $1.9 million *in compensatory damages*.[208]  The district court

---

1233, 1241 (5th Cir. 1985).  *See also* <u>Oberg</u>, 512 U.S. at 418, 114 S.Ct.at 2334 (holding that the Due Process Clause requires effective judicial review of jury verdicts).

[203] 793 F.2d 679 (5th Cir. 1986).

[204] 835 F.2d 597 (5th Cir. 1988).

[205] <u>Wells</u>, 793 F.2d at 684, *quoting*  <u>Caldarera v. Eastern Airlines</u>, 705 F.2d 778, 784 (5th Cir.1983).

[206] 793 F.2d at 681.

[207] <u>Id.</u>

[208] <u>Id.</u> at 683.

found that the compensatory damages award was impermissibly high and granted a genuine remittitur.[209]

On appeal, the Fifth Circuit reversed the order granting remittitur *of the compensatory damages* award and granted a new trial instead.  The Court reasoned that, "at some point…an excessive award becomes so large that it can no longer be considered merely excessive."[210] In reaching this conclusion, the Court did not provide a detailed explanation for this seeming expansion of the test for determining whether lower courts must grant a new trial or are permitted to remit an excessive damage award, or when that "some point" is reached, rather seems to operate from the unspoken conclusion the jury's award, in fact, was the result of passion and/or prejudice.

> In this Circuit, *when a jury verdict results from passion or prejudice*, a new trial, not remittitur, is the proper remedy.  On the other hand, damage awards which are merely excessive, that is, so large as to be contrary to right reason, are candidates for remittitur.  However, at some point on the scale an excessive award becomes so large that it can no longer be considered merely excessive.  At that point, when an award is "so exaggerated *as to indicate bias, passion, prejudice, corruption, or other improper motive*," a remittitur is inadequate and the only proper remedy is a new trial.[211]

Thus, the Court first acknowledged the prevailing Circuit rule for determining the proper remedy for a jury's excessive award – and giving no indication that the Circuit was abandoning that longstanding test – the <u>Wells</u> Court presented, without citation, a new gloss on the "passion or prejudice" test, *i.e.*, "at some point" the damages are sufficiently excessive, and one should conclude on that fact alone, that the jury was *per se* operating out of passion or prejudice.  In the

---

[209] <u>Id.</u> at 684.

[210] <u>Id.</u>

[211] <u>Id.</u> at 683-84(citations omitted)(emphasis added).

absence of any rationale or further explanation, however, this Court is unclear on how to determine the "some point" at which an excessive damage award might become *per se* proof of passion or prejudice on the part of the jury, and whether this should be the case when, as in this matter, there is clear evidence granting a rational basis for the jury's award, and when, as in this case, evidence exists to suggest the jury's approach was reasonable under the factual circumstances of this case. In the absence of any guidance from the Fifth Circuit, and given Defendants' clear expansion and over reading of the dicta in Wells, this Court is reluctant to embrace Defendants' expansive reading of the Wells court as creating the argued mandatory and irrebuttable, *per se* presumption of passion or prejudice, particularly in the face of evidence to the contrary. To embrace Defendants' flawed argument would, in effect, go well beyond even the Wells case and would be directly violative of the United States Supreme Court's instruction to engage in the full factual and legal analysis required by the Due Process Clause and focus upon the specific facts of the case, and, in effect, would substitute a new amorphous "bright-line test" to the excessive damage analysis, which would, on its face, mandate a complete disregard for the evidence which supports a jury award. To do so, would be violative of the Supreme Court's caution against "bright-line tests" and "mathematical formulas" and would cast this and other district courts even more adrift in the dangerous waters of personal subjectivity and force the Court to search for that amorphous "some point on the scale," when an award is just too large to be allowed - notwithstanding evidence supporting the award and a reasonable basis for that award. In effect, such an interpretation of Wells – as argued by the Defendants – would have the practical effect of, by mere subjective edict, substituting a plethora of individual subjective opinions of various district court judges for the collective reasoning of the jury, in the face of reasonable support for the jury's award. Certainly, this was not the intent of the Fifth Circuit in

Wells and the Defendants over-read the language of Wells. This Court notes that its rejection of the Defendants' overly broad reading of Wells is bolstered by the fact that the Fifth Circuit does not seem to have adopted Wells, whether read narrowly or so broadly as Defendants argue, since its writing.

The only Fifth Circuit decision to even mention this aspect of the Wells decision in any substantive fashion is Auster Oil & Gas, Inc. v. Stream[212] – the second case cited by the Defendants in support of their argument that this Court is legally mandated to grant Defendants a new trial. In that case, the issue was not compensatory damages as in Wells, but the punitive damages awards (multiple awards for multiple claims) which were reduced by the district court from $5 Million to $650,000.[213] The Fifth Circuit granted the Defendant's request for a new trial, quoting the Wells decision:

> Appellants contend that, under this court's decision in Wells v. Dallas Independent School District, the jury's $5,000,000 verdict on punitive damages was so excessive as **to indicate** inherent passion and prejudice, and it was, therefore, an abuse of discretion for the district court to order a $4,350,000 remittitur rather than grant a new trial. We agree.

> In Wells, the court held:

> . . . **when a jury verdict results from passion or prejudice**, a new trial, not remittitur, is the proper remedy. On the other hand, damage awards which are merely excessive, that is, so large as to be contrary to right reason, are candidates for remittitur. However, at some point on the scale an excessive award becomes so large that it no longer can be considered merely excessive. At that point, when an award is "so exaggerated as **to indicate** bias, passion, prejudice, corruption, or improper motive," remittitur is inappropriate and the only proper remedy is a new trial.

---

[212] 835 F.2d 597 (5th Cir. 1988).

[213] Id. at 600.

> The court concluded that an award so large that it compelled the district court to reduce it by a factor of seven was inherently indicative of passion or prejudice, and a new trial was ordered.
>
> Such is the case here.  The ratios of the punitive damage awards to remittiturs in this case ranged from 5 to 1 for Carmouche to a stunning 50 to 1 for Mrs. Stream.  Even after the remittitur, a punitive damage award of $650,000 **in a case such as this** appears excessive.  **These facts,** _**along with our review of the record in this case**_, leave us with the **inescapable conclusion that the jury was motivated by passion and prejudice** in their award of punitive damages.  Therefore, we hold that a new trial is required on this issue as well.[214]

The emphasized language demonstrates that, while the Defendants argue the <u>Auster</u> Court stands for the proposition that on its face, and alone, the amounts involved mandated a new trial, and thus, the facts and record are to be disregarded when some amorphous bright-line ratio is breached or some subjective line crossed – <u>Auster</u> does not stand for that <u>legal</u> proposition.  The Court in <u>Auster</u>, _**reviewed the record and evaluated the facts**_ to reach its conclusion in that case and **it was upon that review of the record and the facts of that case** that the Court made its determination that, _**under the facts of that case**_ remittitur was not sufficient.  Notwithstanding Defendants' argument inferring to the contrary, in <u>Auster</u> the ratios were not considered alone, and on their face, and alone, they themselves, did not compel the result argued by Defendants.  Rather, _a review of the larger context provided by the record_ in <u>Auster</u>, informed the conclusion that the ratio between the amount awarded by the jury and the amount awarded upon remittitur, was evidence of passion and prejudice.  Here, a review of the record results in the opposite conclusion.  Here, there is evidence supporting the punitive damages award, as discussed above.  Thus, this case is not governed by <u>Auster</u> as Defendants argue.  This Court, also, notes that, and specifically, that the <u>Auster</u> Court began with the <u>Wells</u> rule that excessively large damages

---

[214] 835 F.2d at 603-04 (citations omitted) (emphasis added).

awards create a suspicion of passion or prejudice on the part of the jury, then explored that suspicion *with a review of the record, before concluding* that the jury had "run amok" on the issue of punitive damages,[215] a matter Defendants' argument seems to overlook.

Rather, the Auster court, itself, pointed out that a court considering possible remittitur, should consider the award in relation to other evidence within the record supporting the evidentiary basis of the jury's award. Thus, contrary to Defendants' argument, Auster does not demonstrate or create a mandatory application of an irrebuttable *per se* presumption and doctrine, but, rather, demonstrates the application of the longstanding principle that jury verdicts borne out of passion and prejudice or other impermissible motive cannot stand.

This Court has closely reviewed the Fifth Circuit's jurisprudence since Auster and found no evidence that the Court intended (or intends) to embrace Defendants' broad over reading of Auster and Wells nor evidence the Court intended, as Defendants argue, to promulgate a third, irrebuttable *per se* prong of the analysis that lower courts have long used to determine when a new trial is mandatory as a result of an excessive jury award. To the contrary, taken together, Wells,[216] and Auster,[217] illustrate that, in the Fifth Circuit, the determination that an award was the product of passion or prejudice requires consideration of the kind and size of the award, the amount by which it was reduced, and the relationship between the size of the award to the evidence adduced in support of it, together with any other relevant facts contained in the record. Applying these broader considerations to the punitive damage awards made here reveals that the award was not a product of passion or prejudice, rather was one grounded in evidence presented

---

[215] 835 F.2d at 603 n.5.

[216] 793 F.2d 679 (5th Cir. 1986).

[217] 835 F.2d 597 (5th Cir. 1988); *See also supra* note 202.

at trial – as discussed above – and reflected in the record.  This Court finds Defendants' heralding of a new, irrebuttable presumption mandating a new trial is supported neither by a close reading of the applicable law, nor the record in this case.

**B.     New Trial Analysis**

Notwithstanding Defendants' overly-broad argument, however, existing jurisprudence, as noted, does require examination of the amount of a challenged punitive damages award, if reduced.  Preliminarily, it is unclear what ratio of reduction Defendants offer as mandating a *per se* finding that the jury acted with passion or prejudice. The courts in Auster and Wells based their finding of passion or prejudice, in part, on consideration of the amount by which each punitive damages award was reduced by the district court.[221]   At the time that the Defendants' motion was filed, *this Court had neither declared nor proposed a reduced punitive damages figure, so the Defendants' argument would seem to have been premature as it lacked a requisite prong of the legal argument made.*  In order to move past this analytical flaw, Defendants argue, with little sound basis in fact or law, that a one to one ratio of compensatory damages to punitive damages is correct and therefore, should be imposed and, therefore, the missing requisite prong of their legal argument is found.  For reasons noted above and more fully addressed below, this Court rejects Defendants' one to one ratio of compensatory damages to punitive damages as lacking either factual or legal support.  However, and perhaps more importantly to Defendants' immediate argument, Defendants' argument, as made is, also, analytically flawed.  Defendants argue the ratio *between the compensatory and punitive awards, but that ratio is not the one discussed in the cases they cite*, rather, the courts in the cases cited explore the *degree of remittitur, i.e.*, the ratio or relationship between *the amount of the jury award and the amount of*

---

[221] *See* Auster, 835 F.2d at 603-04; Wells, 793 F.2d at 684.

*the remitted award*; Defendants argue the ratio between the compensatory damages award and the punitive damage award. Thus, Defendants' legal argument, on its face, lacks validity. Thus, once again, Defendants' legal argument on this point is flawed.

Nonetheless, this Court notes that even without embracing a possible reduction, based upon the evidence presented at trial, the evidence can, in no manner, suggest the compensatory damages award was driven solely by passion or prejudice. The jury awarded a total of $1.475 million in compensatory damages to Mr. and Mrs. Allen together.[222] This sum is in line with numerous damage awards issued in Louisiana cases involving toxic exposure and resulting serious illness.[223] This consistency demonstrates the jury was not acting beyond reason, nor with prejudice against Defendants, nor were they motivated by passion or prejudice when determining the amounts of compensatory damages to award.

Second, Defendants' argument the jury should be found to have been acting out of passion or prejudice is undercut by the very nature and goal of punitive damages, themselves,[224] and the instructions given the jury. The jury was instructed, in part, that punitive damages are intended in part to punish a particular tortfeasor sufficiently to deter similar conduct in the future.[225] It would do little good to require but a dollar from a man who has a million dollars. As noted above, punitive damages are a well-established and long embraced part of the common

---

[222] *See* Jury Verdict (Rec. Doc. 4109), at 13-15.

[223] *See, e.g.*, Guilliot v. Daimlerchrysler Corp., 2008-1485 (La.App. 4 Cir. 9/24/10), 50 So.3d 173; Hymel v. HMO of Louisiana, Inc., 2006-0042 (La.App. 1 Cr. 11/15/06), 951 So.2d 187; David v. Our Lady of Lake Hospital, Inc., 2002-1945 (La.App. 1 Cir. 6/27/03), 857 So.2d 529; Warren v. Sabine Towing & Transportation Company, 2001-0573 (La.App. 3 Cir. 10/30/02), 831 So.2d 517; Abadie v. Metropolitan Life Insurance Company, 00-344 (La.App. 5th Cir. 4/11/01), 804 So.2d 11; Slavich v. Knox, 99-1540 (La.App. 4 Cir. 12/15/99), 750 So.2d 301; Begnaud v. Department of Transportation & Development, 95-714 (La.App. 5 Cir. 2/14/96), 679 So.2d 113.

[224] Campbell, 538 U.S. at 416, 123 S. Ct. at 1519.

[225] Trial Tr. vol. XXXVII (Rec. Doc. 4210) at 6284, 6319.

law, the purpose of which is *to provide genuine deterrence* and to indicate clear condemnation for sufficiently reprehensible behavior. Historically, large discretion has been given to the collective wisdom of a jury in determining the amount necessary to achieve those ends.[226] In this case, the jury was presented with evidence that two multi-national pharmaceutical companies poured considerable effort, for longer than a decade, into preventing evidence of a causal link between bladder cancer and Actos® from being explored and, once identified, from being disseminated to those parties, physicians, and the regulatory agency, who depend upon that information to play a pivotal role in the health care system within this country, as well as to the general public at large, in an age when drugs are heavily marketed to the general public through aggressive advertising. Evidence established sales of Actos® reached into the billions during this time frame.

Under New York law both Takeda and Lilly owed a duty, throughout the relevant time period, to inform and warn of all potential dangers associated with Actos®, so that physicians could play their essential role in the health care system and patients make informed choices. The evidence fully supports the finding that neither of Mr. Allen's treating physicians had received adequate warning or information before prescribing Actos® to him. The medical community at large and the regulatory agency, the FDA, were kept equally ignorant and, thus, were rendered, in effect, impotent in performing their essential roles of weighing the risks and benefits of a given drug for a given patient when evaluated against a given patient's current medical condition and medical history, and the regulating agency tasked with regulating drug companies was equally thwarted at each juncture. In so doing, the Defendants' conduct not only severely impacted Mr. Allen, but also, acted to handicap the regulation of the drug and operation of the

---

[226] Haslip, 499 U.S. at 15-17, 111 S. Ct. at 1041-43.

medical system it purported to serve, by withholding the very information and warnings required for physicians and regulators to be able to make the medical judgments our health care system depends upon.

Defendants presented evidence that both of these companies are still developing and/or marketing drugs; Takeda is still selling the same drug and/or derivatives thereof throughout the world; and both continue to hold to their position that Actos® can neither cause nor contribute to the development or promotion of bladder cancer – a position with which the jury clearly and vehemently disagreed. In essence, Defendants' argument ignores the finding of the jury as well as their *duty under New York law to warn of "all potential risks"*[227] of Actos®, seemingly arguing for a different standard, and ignores the jury's clear rejection of their interpretation of the evidence. The State of New York made a policy choice to err on the side of an informed medical community and greater safety when it mandated warnings not only of known, or established and accepted risks, but also, of all **potential** risks.[228] Defendants' argument seems to ignore this legal reality and is founded upon their continued argument that Actos® cannot, in fact, contribute to or cause cancer – however, Plaintiffs' experts did not and do not share this belief, but more importantly, New York law has spoken – pharmaceutical companies such as Takeda and Lilly must warn of all potential dangers – not only of the causal connections a given drug company might believe to have been proven to their satisfaction– and our medical system depends upon the medical community being well informed of all **potential risks** so that the very system upon which the public health and welfare depends, can operate effectively.

---

[227] Trial Tr. vol. XXXVII (Rec. Doc. 4210), at 6267, 6269.

[228] Id.

If the sole opinion(s) of one biased actor within that complex system can govern and control the nature, timing, and dissemination of information, and warnings, the system breaks down. Furthermore, if a given actor can conceal scientific information suggestive of genuine risk – merely because that actor disagrees with *an interpretation* to be made from the scientific information – our health care system fails. This institutional danger to the general public health and safety is only enhanced when it is the very actor who possesses and who conceals the information needed by the regulatory agencies charged with regulating those actors and the information needed by the physician in order for both to play their essential role of assessing the risks and benefits of a given drug. And when, as here, there is evidence to support a finding, that the drug company concealed and manipulated this necessary information and warning from and within the medical and regulatory community and intentionally and actively resisted warning physicians and patients of the known risks associated with the use of their drug, all, as here, in pursuit of profit, putting at risk not only individuals, but the operation of the entire system, this Court does not believe that the jury's award can be said to have been borne out of blind passion and prejudice, rather notes the evidence that supports a factual basis for the award.

Third, the jury's conduct during its deliberations on punitive damages provides strong evidence that passion and prejudice were not the driving forces behind the awards. After having been instructed that punitive damages must be "proportionate to the actual and potential harm suffered by" Mr. Allen,[229] the jury asked this Court for guidance "on what is proportionate."[230] In doing so, the jurors clearly demonstrated they were conscientiously performing their task, considering the law and instruction, and were fully willing to be constrained by the law as

---

[229] Trial Tr. vol. XXXVII (Rec. Doc. 4210), at 6321.

[230] Trial Tr. vol. XXXVII (Rec. Doc. 4210), at 6337.

instructed by the Court and, therefore, were not operating out of passion and prejudice. This jury, throughout the 36-day trial, were at all times attentive, engaged, and in serious service of the task at hand, and their seizing upon the very question long grappled with by the courts in this area of the law in no way suggests a jury controlled by passion or prejudice. To the contrary, their insightful inquiry evidences the level of perception and intelligence at play in their deliberations. Unlike the court in Auster, the jury in this case in no way "ran amok,"[231] rather, was in serious pursuit of the task at hand. The record here, together with the jury's actions, show that this jury took a measured and reasoned approach to its duties, and in no way acted out of prejudice or passion.

Fourth, the amount of the awards imposed against Defendants are not beyond reason when compared to the gains that the Defendants accrued *through the very conduct at issue* – the evidence supports a deliberate failure to provide adequate warning about the risk of bladder cancer until the eve of the sunset on their patent on Actos®. As noted above, the jury was instructed that the punitive damages must be proportional to the actual and potential harm suffered by Mr. Allen.[232] Although, within our system, it is not possible to determine with any certainty, *how or why* the jury reached the awards they imposed, it is certainly possible to demonstrate, from the record, what evidence was presented to support a jury's finding. Here there is evidence that the Defendants' efforts to keep bladder cancer warnings off the Actos® label yielded substantial sales during that period that they might not have earned had they been providing full and fair warnings about bladder cancer all along.[233] Additionally, taken together,

---

[231] 835 F.2d at 603 n.5.

[232] Trial Tr. vol. XXXVII (Rec. Doc. 4210), at 6321.

[233] *See, e.g.*, Stipulation Regarding Financial Data of Takeda and Eli Lilly (Rec. Doc. 4110), demonstrating that fiscal year 2012 sales dropped by more than 2/3 from the previous year, when the bladder cancer warning was finally added to the Actos® label.

the punitive damage awards against both Defendants, amount to slightly more than one third of the total sales income generated by the sale of Actos® over the time the Defendants failed to adequately warn of the risks.  Reason and the common law suggest that a wrongdoer should not be allowed to benefit from his or her wrongdoing;[234] thus, a punitive damage award that amounts to a fraction of the sales that the jury could have found constitutes the ill-gotten gains which resulted from the reprehensible conduct is not, therefore, in and of itself, so outside the limits of rationality as to mandate a new trial.  The Stipulation submitted into the record by the parties shows that the annual sales of Actos® increased virtually every year from 1999 through 2010 – all before the warning was added in 2011.  The following year (2011) – when the bladder cancer warning first appeared on the label – there was a 15% decline in sales, and the next year sales dropped another 69%.[235]  Although it is impossible for this Court to determine whether this decline was due solely or even primarily to the addition of a warning of a risk of bladder cancer or was due to other factors, including the ultimate and later loss of its patent on Actos® in January of 2011; taken together, this Court cannot find the punitive damages award was the product of passion or prejudice on the part of this jury; to the contrary, this Court notes the record supports a basis other than passion and prejudice for the award made.

Finally, at this stage of economic commerce, more and more corporations are becoming multi-national and are engaged in multi-billion dollar financial endeavors and have annual public financial disclosures that boast of multi-billion dollars' corporate worth.  Consequently, within the context of this financial reality, and when repeatedly fines, penalties, and settlements calling for the payment of billions of dollars by these huge multi-national companies are a financial

---

[234] *See* Haslip, 499 U.S. at 54, 111 S.Ct. at 1032 ("[P]unitive damages are a quasi-criminal punishment") (O'Connor, J., dissenting).

[235] Rec. Doc. 4110, at 1-2.

reality – it would be shortsighted not to recognize that corporations boasting sales of one product of almost $24 billion and a value of some $40 billion are financially capable of simply absorbing losses that might seem large to the lay public, but are, in fact, small when compared to the profits made and degree of wealth involved.  Thus, the argument that this jury's award of slightly more than 1/3 of sales of the drug at issue made over a twelve-year period, made against two such large multi-national companies whose stipulated value reached above $40 billion, is on its face, and merely because of the size in and of itself, irrebuttably the product of prejudice and passion, is unpersuasive; it can be equally argued such an amount is reflective of the modern financial reality existing today and with Takeda and Lily and the jury's desire to punish Takeda and Lily sufficiently to deter such conduct in the future from corporations whose values were measured in the billions.

Though the punitive damages awarded in this case are admittedly and without question large, they are not, under the facts and record, so large as to mandate an irrebuttable *per se* presumption or even evidence of passion or prejudice when viewed against the evidence and record.  Nor do they mandate a finding of passion or prejudice, as Defendants argue.  The jury was asked by Plaintiffs to send a message to the Defendants sufficient to deter, by imposing punitive damages large enough to capture the attention of multi-billion dollar companies, and they clearly decided to do so.  The jury had ample evidence from which to find that Defendants' financial situations and the degree of reprehensibility of their conduct required an award large enough to achieve that goal.

Lastly, the jury's actions and questions clearly showed they considered the applicable law and were willing to be guided by the instruction of the Court, thus, providing the strongest evidence that the jury was not motivated by passion or prejudice in making the punitive damages

awards, but by a serious desire to follow the law.  For the foregoing reasons, this Court finds that the Defendants have not proven that the jury was motivated by passion or prejudice, nor that the jury's award must fall on that basis, or as a matter of law, nor that a new trial must be afforded. Therefore, the Defendants' Rule 59 Motion for New Trial shall be DENIED.[236]

## IV.    Reduction

This Court, however, has found for the reasons given, that the punitive damages awards made by the jury were excessive and thus, violative of the Due Process Clause of the United States Constitution.  The Defendants are entitled to a remedy for this constitutional violation. Defendants sought a new trial; however, that request is denied for the reasons set forth above. The Defendants' alternative request for reduction, however, will be granted, although not in the terms that they have proposed or for the reasons argued.

First, this Court questions the doctrinal correctness of the use of remittitur under the facts of this case.  The excessiveness review mandated by the Due Process Clause is fundamentally different from the type of correctness review permitted by the common law within remittitur, and this Court's authority is, also, in either event, severely limited by the Seventh Amendment.[237] The United States Supreme Court has not directly addressed the distinction between an award which is constitutionally valid, but requiring remittitur, and an award that is constitutionally invalid and thus, must fail, although there are hints in the jurisprudence that the highest Court is

---

[236] Because the Court finds that the punitive damage award need not be retried, this ruling does not address the issue of retrying all issues.

[237] *See, e.g.,* Hetzel v. Prince William County, Virginia, 523 U.S. 208, 211, 118 S.Ct. 1210, 1211, 140 L.Ed.2d 336 (1998) (finding that the Seventh Amendment precludes federal courts from entering "absolute judgment for any other sum than that assessed by the jury" because compensatory awards represent factual findings by the jury); Cooper Industries v. Leatherman Tool Group, Inc., 532 U.S. 424, 437, 121 S.Ct. 1678, 1686, 149 L.Ed.2d 674 (2001) (finding that punitive damages awards are not really facts found by the jury, thus, "appellate review of the district court's determination that an award is consistent with due process does not implicate the Seventh Amendment concerns raised by respondent.").

aware that an issue exists.[238]  This Court, also, has searched the jurisprudence of the Fifth Circuit for an answer to this question or, alternatively, for whatever guidance can be gleaned.  As with much else in this case, this Court has found hints in jurisprudence, but no direct answers. Specifically, in two decisions, the Fifth Circuit has found itself faced with defense appeals of punitive damages awards, defense demands for remittitur, and plaintiffs' failure to provide substantive briefing on the question of the proper remedy for the excessive awards that had been issued by two juries.

In Deffenbaugh-Williams v. Wal-Mart Stores,[239] an employment discrimination case, the jury awarded $19,000 in compensatory damages and $100,000 in punitive damages.[240]  Noting the brevity of Wal-Mart's argument on the excessiveness of punitive damages, the Court noted that, while the argument was presented in terms of the Gore guideposts (which, of course, were articulated in the context of a constitutional challenge), Wal-Mart had failed to include any meaningful discussion of the *constitutional aspect* of the appeal.[241]  The Court concluded that

---

[238] *See, e.g.*, Campbell, 538 U.S. at 429, 123 S.Ct. at 1526 (remanding the case to the Utah courts with no mention of remittitur or a new trial); Gore, 517 U.S. at 586, 116 S.Ct. at 1604 (remanding the case, while noting that "[w]hether the appropriate remedy requires a new trial or merely an independent determination by the Alabama Supreme Court of the award necessary to vindicate the economic interests of Alabama consumers is a matter that should be addressed by the state court in the first instance.")  This Court is aware that both Campbell and Gore are appeals from state courts, whose systems might call for different procedural approaches than a federal court, and, therefore, that the Court's choices in those cases are not necessarily indicative of how they see the issue before this Court.  Nonetheless, the implicit recognition that the remittitur/new trial paradigm is not automatically the correct remedy for a constitutionally excessive punitive damages award reinforces this Court's question about approaching this issue in the more traditional manner.

[239] 156 F.3d 581 (5th Cir. 1998). Deffenbaugh-Williams was vacated upon the Fifth Circuit's grant of rehearing en banc, 169 F.3d 215 (5th Cir. 1999), however, the panel opinion was reinstated, except as to the issue of punitive damages.  182 F.3d 333 (5th Cir. 1999).  On remand, the panel subsequently held that its original decision as to the size of the punitive damages award remained appropriate.  188 F.3d 278, 286 (5th Cir. 1999).  Although Deffenbaugh-Williams boasts a convoluted procedural history, nonetheless, it would seem the premise noted remains valid, particularly when one notes the Fifth Circuit, as will be discussed below, adopted the Deffenbaugh-Williams analysis in its entirety and applied it in a later case.

[240] Id. at 586.

[241] Id. at 595.

Wal-Mart had not "come close to presenting, much less developing, those [constitutional] considerations here."[242]   Moreover, neither did Deffenbaugh respond to Wal-Mart's uninformative "remit or remand" demand.[243]   In the absence of a fully-realized constitutional challenge by the defense, and in the absence of any input from the plaintiff, the Fifth Circuit elected to address the excessiveness challenge pursuant to the standards established for *common law* judicial review.   The Court drove home the point that it was not evaluating the punitive damage award in constitutional terms – "again, we are not examining a constitutional challenge"[244] – and remedied the excessive punitive damages award with a traditional remittitur, together with instructions to the trial court, on remand, to offer the plaintiff the remittitur or, alternatively, a new trial.[245]

Two years later, in Rubinstein v. Administrators of the Tulane Educational Fund,[246] the Fifth Circuit found itself in the identical situation and declared that "the reasoning of Deffenbaugh-Williams [is] instructive on the issue of excessiveness, given the critical similarities between these cases, and we apply its reasoning *in toto*, and similarly conclude that a more fully developed approach to assessing the constitutionality of a punitive damages award awaits a future day."[247]   The Rubinstein Court did not stop there, however, but obliquely recognized the question which this Court now considers by noting that, as with Deffenbaugh-Williams, "special consideration must be given to Rubinstein's failure to respond to the remand

---

[242] Id.

[243] Id. at 596.

[244] 156 F.3d at 598.

[245] Id.

[246] 218 F.3d 392 (5th Cir. 2000).

[247] 218 F.3d at 407.

or remit issue. *He simply offers us no guidance as to whether if we deem the award excessive he is entitled to a new trial on this issue, or whether, as an alternative, we should remit the award or leave it to the district court for further consideration.*"[248] In light of this brief, but interesting, oblique reference to the question of the proper remedy for an excessive punitive damages award, when couched factually versus constitutionally, this Court has searched for any further indication from the Fifth Circuit and has found no jurisprudence that sheds any additional light. However, other circuits have had the opportunity to address the question directly and have found that remittitur, in its traditional formulation, is neither required nor appropriate when a court finds a punitive damages award to be *constitutionally* excessive.

The most comprehensive discussion of the issue this Court has found is provided by the Eleventh Circuit in <u>Johansen v. Combustion Engineering, Inc.</u>[249] In that case, the trial court had reduced the jury's punitive damages award from $45 million to $4.35 million, without granting the Plaintiffs a choice between accepting the reduced amount or requiring a new trial.[250] On appeal, the Court concluded that "Plaintiff's consent is irrelevant if the Constitution requires the reduction."[251] In elaborating on this conclusion, the Court began with the conceptual question and concluded, based on the fact that a reduction under these circumstances is fundamentally different than a traditional remittitur:

> A constitutionally reduced verdict, therefore, is not really a remittitur at all. A remittitur is a substitution of the court's judgment for that of the jury regarding the appropriate award of damages. The court orders a remittitur when it believes the jury's award is *unreasonable* on the facts. A constitutional reduction, on

---

[248] 218 F.3d at 407 (emphasis added).

[249] 170 F.3d 1320 (11th Cir. 1999).

[250] 170 F.3d at 1327.

[251] 170 F.3d at 1331.

the other hand, is a determination that the law does not permit the award. Unlike a remittitur, which is discretionary with the court and which we review for an abuse of discretion, a court has a mandatory duty to correct an unconstitutionally excessive verdict so that it conforms to the requirements of the due process clause.

*We conclude that, upon determination of the constitutional limit on a particular award, the district court may enter a judgment for that amount as a matter of law.*[252]

Both the Third Circuit, in Cortez v. Trans Union, LLC,[253] and the Eighth Circuit, in Ross v. Kansas City Power & Light Company,[254] have agreed with the Johansen Court on this point.

In Cortez, the Court described the issue simply:

The remedies available to a court when reducing a jury award based upon due process concerns are not necessarily the same as those available when a court exercises its discretion because it believes the amount of the award is inconsistent with the evidence in a case. The latter is conditional, and the court must offer a new trial as an alternative to a reduction in the award in order to avoid depriving the plaintiff of his/her Seventh Amendment right to a jury trial. *See* Hetzel v. Prince William County, 523 U.S. 208, 211, 118 S.Ct. 1210, 140 L.Ed.2d 336 (1998).

In Hetzel, the Court explained that when a trial court determines that the evidence does not support the jury's general damages award, it "has no authority . . . to enter an absolute judgment for any other sum than that assessed by the jury . . . without allowing petitioner the option of a new trial." Id. (quotation omitted) Thus, a court must afford a plaintiff the option of a new trial when it attempts to reduce a jury award because it believes the amount of the verdict is not supported by the evidence. These reductions are frequently referred to as conditional remittiturs. The same is not true when a court must reduce a damages award to avoid a denial of due process. In that case, the award is reduced as a matter of law and there is no interference with the Seventh Amendment right to have a jury make findings of fact. Gore, 517 U.S. at 585-86.[255]

---

[252] 170 F.3d at 1331 (citations omitted) (emphasis in original).

[253] 617 F.3d 688 (3rd Cir. 2010).

[254] 293 F.3d 1041 (8th Cir. 2002).

[255] 617 F.3d at 716.

Unlike the <u>Ross</u> Court – which agreed with <u>Johansen</u> that the act of reducing an unconstitutionally excessive punitive damages award is not a "remittitur"[256] – the <u>Cortez</u> Court balked at changing the name of the act:

> Despite the differences between a constitutionally reduced verdict and a remittitur, it is misleading to suggest that a constitutionally required reduction in an award "is really not a remittitur at all" because numerous courts, including the Supreme Court, refer to it as such.[257]

Whether identified with the traditional term "remittitur" or, as this Court has done, as a *reduction* in the punitive damages award, the <u>Johansen/Cortez/Ross</u> effect is the same: a plaintiff facing a smaller punitive damages award because the jury's award is *constitutionally excessive* is not entitled (or condemned, as the case may be) to an opportunity to choose between a reduced punitive damages award and a new trial. Using this approach, once the district court's decision on the constitutional challenge is made, the aggrieved party (or parties) may appeal without any confounding question of agreement to complicate their effort to get a full and fair review of the decision.

This Court is aware, of course, that the Fifth Circuit, likely, will be reviewing this decision and, thus will have an opportunity to decide whether it agrees with the analysis of the <u>Johansen</u> Court or, alternatively, if it agrees with its brethren in the Second and Tenth Circuits,[258] that any sort of reduction of a punitive damages claim – whether based on constitutional or common law findings – requires the <u>Hetzel</u> approach, *i.e.*, an offer to the plaintiff of a remittitur

---

[256] "[W]hile perhaps labeled as such, the action the district court took was not actually a remittitur, but instead was simply a reduction of the excessive punitive damages award in conformity with the constitutional limits." 293 F.3d at 1049.

[257] 617 F.3d at 716 (citations omitted).

[258] *See* <u>Johansen</u>, 170 F.3d at 1332, *discussing* <u>Continental Resources, Inc. v. OXY USA, Inc.</u>, 101 F.3d 634 (10th Cir. 1996); <u>Lee v. Edwards</u>, 101 F.3d 805, 813 (2d Cir. 1996).

or, alternatively, a new trial or should be entered as a matter of law and thereby not necessitate the selection between a new trial, or acceptance of the remitted amount by Plaintiffs. This Court notes, however, that even in the event the Fifth Circuit interprets <u>Hetzel</u> as requiring the more traditional approach here, the Fifth Circuit's "maximum recovery rule" would, in that instance, require a remittitur in precisely *the same amount* as determined by this Court, albeit differing in the procedural process employed:

> We determine the size of the remittitur in accordance with this circuit's "maximum recovery rule," which prescribes that the verdict must be reduced *to the maximum amount the jury could properly have awarded.*[259]

Consequently, if the traditional remittitur were employed, this Court is instructed by the Fifth Circuit that this Court must reduce the verdict "to the maximum amount the jury could properly have awarded." In this instance, that amount is the maximum amount allowed by the Due Process Clause. Therefore, the *amount of* a remittitur is the *same amount* allowed by the constitutional limitation – leaving the Plaintiffs with "Sophie's Choice" mandated under a traditional remittitur, but absent from a constitutional reduction. This procedural difference, under this ruling, is the primary distinction relevant under these unique facts and circumstances, between a traditional remittitur and a reduction.

This Court, also, notes after having considered both analyses, that certain, perhaps unintended consequences might flow from forcing Plaintiffs to make such a choice without first knowing such a selection or agreement is legally required. Therefore, as the constitutionally mandated reduction is, upon operation of the maximum recovery rule of the Fifth Circuit, the same reduction under a traditional remittitur, this Court will not require the Plaintiffs to make

---

[259] <u>Brunnemann v. Terra International, Inc.</u>, 975 F.2d 175, 178 (5th Cir. 1992) (citation omitted) (emphasis added).

such a selection at this juncture; however, notes that if this matter were remanded to this Court to grant the Plaintiffs the traditional remedy of remittitur, the Plaintiffs would be offered remittitur in the sums listed below, or the maximum amount determined to be allowed by the Due Process Clause, and would be instructed to make their selection between acceptance of the full amount allowed by the Constitution or a new trial at that time, unless the Fifth Circuit were to instruct otherwise.

Once again, this Court invites those Courts higher than this, to address these pressing and fascinating legal issues and will await those Courts' guidance, however, must, at this time, make its monetary determination.

### A.    Amount of Reduction

In determining the highest level of punitive damages consistent with the Due Process Clause, this Court is left with no case directly on point for the particular factual scenario at hand and with guidance that is less than clear for a case with this particular factual scenario. After evaluating and analyzing each of the suggested factors and constitutional limitations one comes to the unenviable situation of having to rely on this Court's "constitutional sensibilities,"[260] and an undefined degree of, or lack thereof, of proportionality being the primary arbiters. Much like those concurring and dissenting justices, noted above, such a nebulous and subjective situation gives this Court great pause, and, once again at this juncture this Court specifically invites the reviewing Courts to take this opportunity to provide greater clarity and guidance for the lower Courts in this area of the law. Nonetheless, at the end of this day, this Court must make its best determination armed with the guidance at hand and the facts as they were presented. Therefore, after having given full and complete consideration to the law, the jury's verdict, the evidence and

---

[260] Haslip, 499 U.S. at 18, 111 S.Ct. at 1043.

the arguments presented by counsel, this Court makes the following findings and legal observations as to what the ratio and award of punitive damages should be under the facts of this case, as guided and limited by existing jurisprudence.

The evidence presented which this Court finds to be most relevant to the legal inquiry in this case – in addition to ratio – as required by the substantive Due Process clause are:

- The Defendants in this matter knew or should have known that their product increased the risk of bladder cancer for an identifiable and extremely vulnerable group to whom they marketed their product;

- The Defendants undertook a twelve-year-long effort to hide the evidence of and information relating to the risk of bladder cancer link from the public, physicians, and the FDA and to avoid providing an adequate warning of that risk;

- The Defendants' conduct caused personal injury, bodily harm, and the risk of premature death to Mr. Allen and injury to Mrs. Allen.

- The Defendants engaged in numerous acts, over the course of more than a decade, in pursuit of their goal of manipulating, hiding and obfuscating evidence of the bladder cancer connection and information relating thereto;

- The Defendants obfuscated and hid relevant information from the FDA, whose role and purpose is to regulate drug companies on behalf of the public in this country, thus, handicapping the regulatory agency;

- The Defendants handicapped physicians who were attempting to fulfill their role in the health care system and, thereby, impacted the general health and welfare in this country as well as significantly harming Mr. Allen's health;

- The Defendants benefitted greatly from these activities and generated huge sales of Actos® for more than a decade even after they had acquired the knowledge at issue in this case; and

- The Defendants effectively wrote off the public health and welfare and the health and lives of the most vulnerable of their target population, such as Mr. Allen, and chose, instead, to honor their own pursuit of profit.

- The Defendants' sales of Actos® during the relevant time frame reached into the many of billions of dollars and began a precipitous slide once they added a warning in 2011.

- The Defendants' net worth reached into the billions and sales of Actos® over the relevant time period reached to $24 billion.

This Court, consequently, finds with full consideration of the limited guidance available, the jury's punitive damages awards were not, on their face, unreasonable given the evidence presented of a high degree of reprehensibility of the Defendants' conduct and the need to adequately deter such conduct in the future. However, this Court, also, finds the ratio of the harm actually caused to Mr. and Mrs. Allen and the total punitive damages, awarded of 1:5424 for Takeda and 1:8136 for Lilly, cannot withstand the more objective proportionality analysis under the now existing jurisprudence. However, as no previous case has presented with all of the factors now presented in this case, and as the United States Supreme Court has clearly stated no bright-line test exists and no mathematical formula should be employed, this Court must make its determination within the limited guidance available and the facts at hand. Thus, this Court clarifies it is this Court's intention to tailor the punitive damages awards in accordance with the Fifth Circuit's "maximum recovery rule" and, also, in order to honor the requirements of the Seventh Amendment and, therefore, awards punitive damages in an amount this Court determines is the maximum amount allowed by the substantive prong of the Due Process Clause under the facts of this case. This Court makes this determination with full recognition of the unique procedural nature of this case, coming before the Court as only one of some, almost, 4,000 cases within this Multidistrict Litigation, but also, as a single, selected early trial or bellwether trial and representing only Mr. and Mrs. Allen's interests. This Court is equally aware of the risks espoused by the concurring and dissenting justices who have grappled with this legal issue, but finds it must reach, at the end of the day, a monetary determination, if for no

other purpose than to provide those Courts higher than this one the opportunity to grant clarity and instruction in this important area of the law.

Therefore, this Court finds, for all the reasons noted above, that a ratio of 1:25 (in whole) of compensatory damages to punitive damages, creating an award of punitive damages against Takeda in the amount of $27,656,250.00, and a punitive damages award against Lilly in the amount of $9,218,750.00, totaling $36,875,000.00 should flow.

Because the jury awarded punitive damages in excess of this amount, this Court finds the punitive damages awards made by the jury must bow to the weight of the Due Process Clause.

This Court, also, feels it is worthy of note that these sums, however, represent only:

- 1/1,120 of the 2013 stipulated net worth of Takeda and Lilly combined.

- 1/656 of the total sales of Actos® reported to the jury.

- 1/453 of the $16,695,876,180.00, which represents only 69% of the total sales of Actos® reported to the jury. This percentage reflects the reduction in sales between 2011 and 2012, the year during which the bladder cancer warning was added to the label.

- 1/244 of the total punitive damages awarded by the jury.

- a small portion (approximately, only, 1/49) of $1,820,912,000.00, the 1-year reduction in sales that occurred the year after Takeda was forced to provide a warning about the bladder cancer risk associated with Actos®.

This Court finds that this ratio – representing substantial punitive damages awards in one case out of almost 8,000 pending throughout the United States – is, when reviewed within that context of possibility, large enough to accomplish the jury's clear aim: to send a message to the Defendants that their wrongdoing must stop and must not be repeated when reviewed within the financial realities at play. Constitutionally, it, also, places the Defendants squarely on notice that, should they return to this type of behavior in the future, they are at risk of substantial punitive damages awards, which could be adopted in those future cases brought under States'

laws which allow punitive damages and for which specific causation liability might be found. That notice – allows the Defendants, as well as any the leadership of any other corporate entity who might read, or hear about, this punitive damages award – to engage in the type of risk analysis that is standard for large, multi-billion dollar corporations, allowing the underlying rationale and purpose of deterrence to be met, if not by a single award given in one case, but by a constitutionally-valid award in one case which could be, therefore, projected out over the large number of other cases presenting similar risks.   In other words, this award is made with consideration being given to the financial reality of the risk benefit analysis often engaged in by most large corporations and the fact this award provides notice, opportunity, and warning to Defendants and other corporations to consider a prospective risk-benefit analysis to determine whether they want to engage in similar conduct given the very real risks of substantial punitive damages awards in a possible plethora of cases.   And if the amount of "x" in punitive damages that is awarded in this case were to be multiplied by the number of possible cases that have arisen, and/or might arise, within which there might be specific liability and brought under states' laws that allow for punitive damages, then caution should ensue.   With this award, this Court makes clear that any corporate entity should consider themselves on notice as to the full and likely consequence of its actions so that  the need for deterrence can be met, and yet, only the case presented and those Plaintiffs now before the court are compensated within the award made.

## V.   CONCLUSION

For the foregoing reasons, the Defendants Rule 59 Motion for a New Trial shall be GRANTED IN PART AND DENIED IN PART.

Having completed a full explanation of the multiple legal issues inherent in this motion, and the facts of this case, this Court invites the Appellate Court, and, perhaps, the Supreme Court, to provide more particularized guidance as to these legal issues and in particular as to whether there is, in this day and age of multi-national, billion-dollar corporations, a constitutionally mandated mathematical upper limit for punitive damages awards when a jury has found, on substantial evidence, that those corporations have engaged in seriously reprehensible behavior.

THUS DONE AND SIGNED in Lafayette, Louisiana, this ___27___ day of October, 2014.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE