RECEIVED

JUL 1 7 2017

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA

IN RE ACTOS (PIOGLITAZONE)               MDL No. 6:11-md-2299
PRODUCTS LIABILITY LITIGATION

                                         JUDGE DOHERTY
This Document Applies to:
All Cases                                MAGISTRATE JUDGE HANNA

## CONTENTS

I.     FACTUAL AND PROCEDURAL BACKGROUND ...................................... 5

       A.   Prior to Establishment of MDL 2299 .............................................. 5

       B.   Establishment of MDL 2299 ......................................................... 7

       C.   State Court Proceedings ............................................................. 11

       D.   Procedural History Prior to Bellwether Trial ................................. 13

       E.   Discovery, Preparation for the Bellwether Trial, *Allen v. Takeda* ......... 17

       F.   The Master Settlement Agreement ............................................... 30

       G.   Implementation of the Settlement ................................................ 39

       H.   The Initial Hold-Back on Settlement Payments ............................. 43

       I.   Nationwide Settlements .............................................................. 45

       J.   Additional Comments on Common Benefit Efforts ........................ 45

II.    COMMON BENEFIT FEE AND EXPENSE REVIEW PROCESS ............... 49

III.   METHODOLOGY FOR CALCULATING AGGREGATE FEE AWARD ................. 56

       A.   Distinction between Reasonable Hourly Rates in Multidistrict Litigations and
            Class Actions ............................................................................ 56

       B.   Calculating the Aggregate Fee Award ........................................... 65

IV.    REASONABLENESS ANALYSIS ............................................................ 67

       A.   Valuation of the Benefit Obtained ................................................ 67

       B.   Benchmark Percentage ............................................................... 68

       C.   *Johnson* Factors ......................................................................... 71

            1.   Novelty and Difficulty of the Issues (Factor 2); The Skill Required to
                 Perform the Legal Service Adequately (Factor 3); and The Experience,
                 Reputation, and Ability of the Attorneys (Factor 9) ................................. 74

2.  Time and Labor Required (Factor 1); Preclusion of Other Employment (Factor 4); Time Limitations Imposed by the Client or the Circumstances (Factor 7)......................................................................................... 75

3.  The Amount Involved and the Results Obtained (Factor 8) ...................... 78

4.  Nature and Length of the Professional Relationship with the Client (Factor 11) ........................................................................................................... 79

5.  The Customary Fee for Similar Work in the Community (Factor 5), Whether the Fee is Fixed or Contingent (Factor 6), Awards in Similar Cases (Factor 12) ........................................................................................................... 81

6.  The Undesirability of the Case (Factor 10) ................................................ 82

7.  Conclusion: *Johnson* Factors ................................................................... 83

V.   ALLOCATION OF COMMON BENEFIT FEES AND EXPENSES ........................... 84

VI.  CONCLUSION ........................................................................................................ 116

## MEMORANDUM RULING
### (Common Benefit Fees and Allocation)

Early in this MDL, and with the input of the plaintiffs' counsel and the Special Masters, this Court established a system to maintain ongoing records of all common benefit time and expense – *i.e.*, time and expense incurred for the benefit of all plaintiffs, rather than any individual plaintiff alone.[1]  According to that protocol, only certain kinds of time and expense would be allowed to be incurred for the common benefit, and any attorney who wished to perform common benefit work was required to submit a request to do so to the Plaintiffs' Steering Committee, which, along with the Court, was vested with the authority to approve or deny such requests with the instruction of the Court that all otherwise qualified attorneys who desired to perform common benefit work be allowed to do so.  Furthermore, any approved common benefit time or expense that was incurred, also, would be submitted to Deputy Special Master DeJean, who was tasked with reviewing all such submissions on an ongoing basis, and either approving them, rejecting them, or returning them to the submitter for clarification or to address any deficiencies in the submission.  A Master Settlement Agreement ("MSA") [2] was executed on April 28, 2015, and provided, in part, that participating claimants and their counsel agreed to submit a portion of each of their recoveries to compensate the common benefit expense and fees incurred, respectively.[3]  On September 1, 2015, the Court entered a preliminary order setting aside a percentage of all

---

[1] *See* Case Management Order: PSC's Management of Timekeeping, Cost Reimbursement and Related Common Benefit Issues [Rec. Doc. 1357], Case Management Order: Claims for Common Benefit Fees and Expenses [Rec. Doc. 2356].

[2]   A   copy   of   the   MSA,   together   with   its   attachments,   may   be   found   at http://www.lawd.uscourts.gov/resources-state-court-actos-judges#SETTLEMENT PROGRAM.

[3] MSA § 10.04.

recovery in anticipation of a final order establishing a common benefit fund and distribution.[4] Thereafter, by Order dated August 7, 2015,[5] this Court instructed Deputy Special Master DeJean to gather information relevant to this Court's decision of how best to allocate the common benefit fees generated as a result of the MSA and the Assessment Order, among Participating Counsel and the PSC,[6] and to provide that information to the Court. Subsequently, on September 1, 2015, this Court issued a "Case Management Order: Holdback Order" [Rec. Doc. 5850], ordering that funds be withheld from settlement payments in order to compensate common benefit attorneys' fees and expenses and/or costs, should a common benefit fund prove necessary. For the reasons given below, this Court (1) finds that a common benefit fund is necessary, (2) finalizes the amounts provided in the Holdback Order and "Case Management Order: Assessment of Common Benefit Fees and Expenses and/or Costs" [Rec. Doc. 6238], and (3) determines the amounts that will be allocated among participating firms and attorneys. In order to comply with this Court's Order to provide it with the information necessary to make informed allocation decisions, Deputy Special Master DeJean has submitted a Report and Recommendation, which is attached to this Ruling (Attachment A). For the reasons that follow, this Court adopts and incorporates herein Deputy Special Master DeJean's Report and Recommendation, and issues the following ruling on common benefit fees, their necessity, and their allocation, as well as common benefit expenses.

---

[4] Rec. Doc. 5850.

[5] Rec. Doc. 5801.

[6] Rec. Doc. 6238.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     Prior to Establishment of MDL 2299

This multidistrict litigation concerns Pioglitazone (marketed in several formulations and under several brand names, but known by the commercial name and referred to herein as Actos®), which was approved for sale in the United States in 1999.[7] Actos® was developed and produced by Takeda Pharmaceutical Company Ltd. (a Japanese company with several subsidiaries in the United States, which, here, will be referred to collectively as "Takeda") and was marketed in the United States for a portion of time by Eli Lilly and Company ("Eli Lilly"); Actos® was available in the United States as early as 1999.[8] The plaintiffs allege that in June, 2011, regulators in Europe, Canada, and the U.S. took action to warn the public that Actos® might increase the risk of bladder cancer in humans.[9] According to the first Motion to Transfer filed with the Judicial Panel on Multidistrict Litigation ("JPML"), as of August 31, 2011, there were at least eleven (11) actions pending in eight (8) district courts alleging injury from usage of Actos® and seeking recovery from Takeda and Eli Lilly.[10]

Shortly after certain governmental warnings were issued, attorneys who would eventually become Lead Counsel, members of the Plaintiffs' Steering Committee ("PSC"), and other Participating Counsel[11] began to file actions and to coordinate with one another, not only for the

---

[7] See Trial Transcript (Vol. II), Rec. Doc. 4173, at 73.

[8] See Trial Transcript (Vol. II), Rec. Doc. 4173, at 73.

[9] See Complaint at 6-7, Allen, et al. v. Takeda Pharmaceuticals North America, Inc., et al., No. 6:12-cv-00064 (W.D.La. July 29, 2011), ECF No. 1.

[10] See Schedule of Actions, IN RE: Actos (Pioglitazone) Products Liability Litigation, MDL No. 2299 (JPML August 31, 2011), ECF No. 1-2.

[11] "Participating Counsel" as used herein refers broadly to those counsel who were approved to perform common benefit work, and is defined as "the Court-appointed Plaintiffs' Steering Committee

protection of their own individual clients, but with an eye towards the advancement and protection of the common and collective interests of others who were likely to become litigants at some point in the future.

Attorneys, many of whom ultimately became members of the PSC, performed extensive legal and factual research in an effort to evaluate potential MDL locations and to prepare to litigate these matters. Counsel, also, poured a great deal of effort, time, and expertise into the extensive and challenging organization required to mount a complex and large, collective of cases, including case and leadership strategy, identification of potential experts, researching case-related science, and documenting potential injuries allegedly associated with the use of Actos®. A group of litigation leaders ultimately stepped forward and made multiple presentations throughout the country to educate and inform other already involved attorneys about Actos® and their theory of causation. As the cases were filed and were being brought to the attention of the JPML, these case leaders engaged in extensive coordination and communication with involved attorneys throughout the country. Thus, the organization and administration skill of the leadership proved of exceptional value to the litigation.

In the meantime, these attorneys, also, had begun the daunting task of learning the complex and extensive science underlying these claims and finding and hiring experts in the scientific, regulatory, and clinical arenas to educate, inform, and in some instances possibly testify on behalf of all plaintiffs. As described below, developing an understanding of the complex scientific aspect of the plaintiffs' theory of the cases required an intensive investment of time, expertise, and effort,

---

(along with members of their firm and staff), any other counsel authorized by the Executive Committee or Co-Lead Counsel who desire to be considered for common benefit compensation, or counsel who have been specifically approved by this Court as Participating Counsel prior to incurring any such cost or expense." Rec. Doc. 1357, p. 1.

on the part of counsel, especially given the very short time frame this MDL followed. Due to the heavy reliance on sophisticated scientific knowledge required to move this litigation forward, those attorneys and firms, who provided the requisite expertise in the sciences, came to provide exceptional value to the PSC.

### B.    Establishment of MDL 2299

Once lawsuits began being filed throughout the country, a number of plaintiffs, through their counsel, together with the defendants, through their counsel, moved to have the JPML consolidate the Actos®-related lawsuits into an MDL; the JPML consolidated the Actos® cases and selected the Western District of Louisiana, Lafayette Division, and Judge Rebecca F. Doherty, to handle all pre-trial matters. The order establishing MDL 2299 ("In Re: Actos® (Pioglitazone) Products Liability Litigation") was issued by the JPML on December 29, 2011.[12] Just over two years later – on January 27, 2014 – jury selection began in the first, and what ultimately would become the only, bellwether trial conducted in these proceedings. The intervening two years were an incredibly active time for involved counsel and the Court.

On April 11, 2012, this Court appointed a Special Master and two Deputy Special Masters to assist in managing these proceedings, each with his or her specific responsibilities, all designed to avoid any unnecessary overlap of effort or duties. Special Master Gary Russo was appointed with overall responsibility over case management in the MDL; Deputy Special Master Kenneth DeJean was appointed to manage and oversee matters related to the PSC, especially to oversee the ongoing submissions for common benefit fees and expenses; Deputy Special Master Carmen Rodriguez was appointed with primary responsibility over matters related to the law and legal

---

[12] Rec. Doc. 1.

analysis, especially with regard to avoiding disputes over or the need for issuing of formal rulings or contested motions.[13] In addition, the parties made the crucial agreement that the Special Masters could communicate *ex parte* with any party or attorney so long as it did not involve substantive legal issues filed and pending before the Court.[14] In combination, these aspects of the team of Special Masters and the agreement of the parties, made it possible for counsel for the parties to work closely with the Special Masters and, ultimately, the Court, to either resolve or avoid many disputes that threatened, and historically within MDLs have acted, to slow or stop the progress of the MDL. For example, no substantive discovery or dispositive motions were *formally* filed until June of 2013, approximately eighteen (18) months after the MDL was created; rather, those disputes were resolved by way of the Court through the Special Masters and the parties' agreement by way of counsels' full involvement, requiring constant, ongoing, and extensive involvement by the PSC leadership and the Court.

Shortly after receiving the MDL assignment, and after having done its due diligence, this Court appointed the PSC by order dated April 13, 2012.[15] The Court assigned the PSC tasks that were both detailed and wide-ranging.

> The PSC shall take the lead in litigating these matters on behalf of all plaintiffs, meaning that they shall play the lead role in making strategic, practical, and procedural decisions on behalf of the plaintiffs' counsel and *pro se* plaintiffs.
>
> [T]he PSC shall be responsible for coordinating the plaintiffs' responses to the orders of the Court, for coordinating the presentation of issues to the Court for its consideration, and for overseeing the progress of these proceedings toward final resolution.

---

[13] Rec. Doc. 532.

[14] Rec. Doc. 532, at 4-5.

[15] Rec. Doc. 563.

The PSC shall have the responsibility for assigning litigation-related tasks to counsel who provide indication of their willingness to work for the common benefit of all plaintiffs in the case. The committee are encouraged to distribute assignments among counsel who wish to work for the common benefit, taking into consideration the particular strengths and weaknesses of counsel requesting such assignments.

The PSC shall act as the first resource for counsel or parties with questions, comments, concerns, recommendations, or requests, and for transmitting to plaintiffs' liaison counsel or co-lead counsel any such questions, comments, concerns, recommendations, or requests that should come to the attention of the Court.

The PSC shall have responsibility for recommending the approval or denial of any claim made by an attorney for common benefit credit. Specifically . . . the PSC shall review such claims and shall provide guidance to Special Master DeJean with regard to the propriety, fairness and reasonableness of such claims.

In the event of a global settlement, the PSC shall have the primary responsibility, with guidance and oversight by the Court through the Special Masters for management and oversight of the process of distributing funds, reimbursing fees and expenses incurred for the common benefit, and for distributing the remaining fees to all plaintiffs' counsel.[16]

In addition to establishing the PSC, the Court, also, formed an Executive Committee of the PSC and assigned additional duties to the Executive Committee members: co-lead counsel were appointed; liaison counsel was appointed; state court liaison counsel was appointed; and a science coordinator was appointed.[17] Certain additional attorneys were appointed to the PSC as the MDL progressed, or were appointed to the Executive Committee from within the PSC as it became clear that their contributions and/or expertise brought exceptional value to the PSC.[18] For instance, Mark Lanier was appointed to the Executive Committee from the PSC and selected as trial counsel

---

[16] Rec. Doc. 560, at 4-6.

[17] Rec. Doc. 560, at 6-7.

[18] Rec. Docs. 2320, 2856.

later in the litigation; the value of his contribution to the collective trial effort is illustrated by the verdict ultimately received.

Even prior to the formal appointment of the PSC, certain counsel – many of whom would ultimately, also, become PSC members – had collected contact information from numerous involved plaintiffs' attorneys, and had begun to develop e-mail group service lists, which were constantly being tracked, supplemented, and updated.[19] The involved firms established and organized file materials, and began the process of arranging for IT services and personnel, which and who would be necessary in such a far reaching and complex matter. Co-lead counsel and other members of the PSC worked with defense counsel and the Court to lay the foundations for what would become the essential administrative and procedural frameworks for the litigation – this Court having adopted a "bottom up" approach allowing, and at times, requiring, counsel's involvement in all aspects of the case.   The accomplishments obtained and the innovations employed by counsel in this matter – some initiated by this Court and others initiated by the PSC or defense counsel, but all created with active attorney participation – include, but are by no means limited to:

- use of lead counsel for plaintiffs and strategic and managerial leadership, while allocating communication responsibility to liaison counsel; and thus, relieving the Clerk of Court and its servers of part of the burden of disseminating the overwhelming amount of information created;

- allowing all plaintiffs' counsel who requested to work as Participating Counsel and who were qualified to do the requested work, to work as Participating Counsel;

- establishment of the duties of the Plaintiffs' Executive Committee ("PEC");

- adoption of a direct filing order;

---

[19] This Court ultimately ordered that all plaintiffs' counsel maintain current e-mail addresses with the PSC in Court Order: Contact Information [Rec. Doc. 2515].

- adoption of bundled complaints;

- a *workable* remote participation system for status conferences via telephone allowing all counsel and all state court judges who wished to participate to do so;

- adoption and implementation of predictive coding;

- exploration of proposed summary jury trials;

- exploration of a proposed expert round table;

- use of live trial witnesses via satellite transmission;

- creation of a process for selection of and the selection of a bellwether trial that occurred less than 2 years after appointment of PSC;

- a protocol which allowed the Court to preside over perpetuation depositions in a manner that significantly reduced the time required for resolution;

- a remand plan designed to circumvent the common experience of the remand "black hole";

- a privilege log best practices protocol involving *in camera* review by the Special Master of challenged documents, thus avoiding tremendous time and dispute;

- appointment of a *Pro se* Liaison for unrepresented plaintiffs, including those who are or were incarcerated;

- involvement by plaintiff and defense counsel in the negotiation and drafting of multiple Case Management Orders;

- establishment of document repositories and other file sharing programs; and

- State-Federal liaison efforts that included providing this Court with an overview of trial settings, verdicts, and activity in Actos® cases going forward in state courts across the country, and keeping those state courts apprised of what was occurring in this MDL.

## C.      State Court Proceedings

In addition to the cases filed in federal courts that were consolidated in the MDL, approximately an equal number of cases were filed in state courts throughout the United States. Particularly large numbers of cases were filed in some states, especially those in Illinois and

California, which raised the possibility of employing those state courts' special procedural devices to manage the caseloads.

The Illinois Supreme Court, in response to a Motion to Transfer and Consolidate, determined the approximately 4,000 Actos® cases filed in Illinois state court would be complex and would share common issues, and recommended they be consolidated before one court for coordinated pretrial proceedings. The Coordinated Proceedings were given the title *In Re* Actos® Related Cases, No 2011 L 010011, and were consolidated in the Circuit Court of Cook County, Illinois, County Department, Law Division, before the Honorable Deborah Dooling as coordinating trial judge (hereinafter "the Illinois coordinated proceeding").

The Los Angeles Superior Court, similarly, conducted a hearing on a Petition for Coordination of the Actos cases filed in California. As a result of that hearing, the Honorable Carl West deemed the Actos® cases to be complex and to share several common issues, and recommended the cases be consolidated before the Los Angeles Superior Court, Central Civil West, pursuant to California Code of Civil Procedure section 404.3 and Rule 3.540 of the California Rules of Court. The Actos® cases filed in California were consolidated under the title In Re Actos® Product Liability Cases Coordinated Proceedings, JCCP 4649, before the Honorable Kenneth Freeman (hereinafter "the California coordinated proceeding"). Later in the proceedings, The Honorable William MacLaughlin, also, was appointed to assist the coordinated proceeding with the management of certain specific issues.

The remaining state court Actos® cases, being more widely dispersed among state courts across the country, were handled in their respective courts according to those states' normal procedures. Ultimately, each of the eligible claimants in state court Actos® cases was given the

opportunity to voluntarily participate in the Settlement Program established by the MSA in this MDL, and more than 99% of the eligible claimants chose to do so.

### D.    Procedural History Prior to Bellwether Trial

As early as possible, this Court endeavored to work with counsel to ensure that the extraordinary documentation that was expected to be involved in this MDL would be handled in the most efficient and cost-effective manner possible.  To that end, Magistrate Judge Hanna took a primary role working with the Clerk of Court, in coordinating with the PSC, defense counsel, and with Tony Moore, the Clerk of Court for the Western District of Louisiana, to establish special filing procedures to be employed in the Actos litigation.  One such procedure, adopted with assurances acquired by agreements between and among the parties, was this Court's order that plaintiffs be allowed to file their Actos® claims in the Western District of Louisiana directly, whatever the district of origin, without requiring each case be transferred through the JPML, within certain stated limitations.[20]  Additionally, attorneys with multiple Actos® claims were allowed to file "bundled" complaints, which allowed counsel to drastically reduce expenditures on filing fees.[21]  These two protocols allowed for a much more streamlined and efficient filing process, allowing the matter to move forward more rapidly than might otherwise have been the case, and reflected the active negotiation and participation by the PSC and defense counsel.

In order to ease the complexity of any possible, ultimate, remand of any individual case(s), Magistrate Judge Hanna and the Clerk of Court worked with this Court to implement a "spread-texting" protocol for the Western District of Louisiana's CM/ECF system, which required training

---

[20] Rec. Doc. 1538.

[21] Id.

13

and mastery by the PSC and all involved counsel.  Under this protocol, the MDL was provided a single "umbrella" civil action number and docket sheet, in addition to each member suit in the MDL having its own separate civil action number and docket history.  Any documents that applied only to a member case were filed only in that case's docket, and any that applied to all cases in the MDL were filed in the umbrella docket and "spread" to the dockets of all member cases.  In this way, the filing attorneys and the Clerk of Court could ensure that the docket sheet for any member suit would include only the entries specific to that case, but also, the entries that apply to all cases in the MDL could be found in one central location and could be easily accessed by all counsel and a transferor judge, if remand were required.  In this way, a transferor judge who might receive a remanded case could easily access only those docket entries that apply to the remanded case, and not be confronted with the entire MDL docket sheet (which, as of this writing, comprises more than 6,800 entries), but will, also, have ready access to the entire "umbrella" docket.  The leadership for the plaintiffs voluntarily took on the task, along with this Court's Clerk of Court, to train filing attorneys on how to file within and how to navigate within this system.

As the MDL progressed and grew to include more than 4,000 individual member cases, the number of individual counsel involved who might require notice, created extraordinary strain on the ability of this Court's CM/ECF system to send Notices of Electronic Filing ("NEFs").  To alleviate that strain, the plaintiffs' leadership agreed, and, thus, this Court ordered, NEFs would be sent only to the Special Masters, the PSC, Defense Lead Counsel, and the leadership, particularly liaison counsel.  Liaison Counsel for both sides took on the responsibility to disseminate those entries to all involved attorneys, creating a much greater administrative demand on the PSC, and in particular liaison counsel, Patrick Morrow, as well as upon defense counsel.  Liaison counsel for plaintiffs, and defendants, at no small expense, generously agreed to establish their own

systems for forwarding each NEF to all counsel who required notice.[22]  To ensure the integrity and transparency of this system, liaison counsel agreed to, and thus, were ordered to, file monthly notices setting out (1) which NEFs had been forwarded in the previous month, and (2) the list of attorneys and email addresses to which each NEF had been sent.[23]  These notices have been filed monthly since November, 2013, and each notice is, and has been, made fully available on the MDL 2299 website.[24]  Additionally, this Court reminded individual counsel during each monthly status conference – at which all individual counsel could participate, whether in person or by phone by way of the innovative system provided by plaintiffs' leadership – of their duty to maintain current contact information both with the Court and with liaison counsel to ensure the NEF system remained functional throughout the duration of the MDL.[25]  The PSC, and in particular, Liaison Counsel, assured such compliance by following up with contemporaneous notice of all relevant activity and quick response to all inquiries.  Each of these systems allowed all plaintiffs' counsel to more efficiently lodge their cases with this Court, and allowed the Court to receive filings and communicate with the parties much more efficiently than would otherwise have been possible, all acting to benefit the common good of all the plaintiffs, and all as a result of plaintiffs leadership, and in this instance, Liaison Counsel, Patrick Morrow.

While discovery went forward in the MDL, and after consultation with the Special Masters and counsel for both parties, this Court, along with the PSC and defense counsel, created a Pilot

---

[22] Rec. Doc. 3398.

[23] Id.

[24] Copies of the monthly NEF Reports and Service Lists can be viewed online at http://www.lawd.uscourts.gov/nef-reports-service-lists.  This Court at the outset created a website open to all counsel and has kept the website updated and revised throughout the litigation.

[25] As noted above, this Court ordered that all plaintiffs' counsel maintain current e-mail addresses with the PSC in Court Order: Contact Information [Rec. Doc. 2515].

Bellwether Program.  The PSC and defense counsel worked to adopt an agreeable process and ultimately, the Court fashioned a process under which the parties were to choose at least two cases that would be tried before this Court as bellwether cases.  On February 19, 2013, this Court entered a Scheduling Order setting the first bellwether trial, *Allen, et al. v. Takeda Pharmaceuticals North America, Inc., et al.*, for trial on January 27, 2014.[26]  The often exhausting and hard work of plaintiffs' and defense counsel, and the unique structure created and employed in this MDL, along with the involvement of the Special Masters, contributed to the extraordinary feat noted above, *i.e.*, coming to a jury verdict within two (2) years of the appointment of the PSC, with few formal substantive discovery or dispositive motions having been filed until June, 2013, when those in preparation for the first bellwether trial were filed.  During the roughly six months before the bellwether trial began, a plethora of formal dispositive and discovery motions were filed and resolved, including more than forty (40) motions *in limine*, at least nine (9) formal *Daubert* motions, and a plethora of objections to proposed depositions of experts based not only on *Daubert* but, also, on foundational weakness.  Also, exhaustive interaction with the Court and exhaustive discussion and briefing on the application of New York law was had.  For the plaintiffs' counsel, the entire human resources of the trial team were brought to bear to obtain this result, and to, at the same time, prepare for the actual trial.  Intense judicial involvement and review was required, which, also, necessitated extensive counsel involvement.

An MDL of this scope has many sub-issues that must be managed and resolved while the overall process is ongoing in order for the entire matter to move forward efficiently, and counsel were intimately involved with the Special Master and Deputy Special Masters and the Court in management and resolution of these sub issues.  Merely one such exemplary sub-issue was how

---

[26] Rec. Doc. 2359.

the claims of litigants appearing *pro se*, and particularly those who were incarcerated, were to be addressed and handled. The Court tasked the PSC, along with Magistrate Judge Patrick Hanna, with taking lead on this task, and a special *Pro se* Liaison was appointed. Thus, a selected member of the PSC was appointed to be the *Pro se* Liaison, and tasked to maintain contact with all of the plaintiffs in the MDL who were or became unrepresented. Pursuant to order of the Court, the *Pro se* Liaison was not to represent any unrepresented litigant, but was to make himself available to provide information, explanation, and any other appropriate assistance needed to *pro se* litigants; especially those who were incarcerated and might have limited access to the internet and, thus, might require additional information. This role, also, included providing information as to possible participation in the Settlement Agreement.[27] By all accounts, the *Pro se* Liaison, Willie Singleton, assisted by Magistrate Judge Hanna and this Court when necessary, has proven to be yet another important contribution of the PSC here, ensuring the informed participation of unrepresented claimants within these MDL proceedings.

### E.    Discovery, Preparation for the Bellwether Trial, *Allen v. Takeda*

Discovery in this MDL was dual-tracked and staggered, requiring contemporaneous dual tracking for counsel: one track and group was dedicated to the overall litigation strategy against the defendants, *i.e.*, general causation; the second, and parallel, track and group, was staggered and dedicated to the case specific discovery for the bellwether cases, *i.e.*, individual causation. From March 22, 2012 until the Master Settlement Agreement was executed in April, 2015, the PSC, Participating Counsel, and defense counsel operated on these dual tracks. In order to facilitate this complex tracking, this Court held monthly status and working conference(s) at which PSC

---

[27] Rec. Doc. 2294.

members physically appeared and reported to the Court and to all individual plaintiffs' counsel as to the ongoing progress of the matter, and, also, participated in working group meetings with the Special Master(s) and defense counsel and/or the Court in order to keep the litigation moving forward efficiently. Which plaintiffs' counsel, beyond the leadership, participated in the various working group meetings varied according to the issues to be discussed at each meeting, however, trial counsel and lead counsel were required at each meeting in order to create an institutional memory. Other working group meetings were also scheduled and often weekly telephone conferences were conducted as needed, as well. This Court meet weekly with the Special Masters to address and discuss specific issues and for resolution of problems. At the first overall status conference for all, this Court informed all counsel they had four years to complete these MDL pretrial proceedings and, therefore, they should anticipate they should plan to either settle these cases, prepare for their remand, or resolve them by motion or trial, within that time. In an effort to facilitate this deadline, Special Master Russo and Deputy Special Master Rodriguez, also, presided over weekly telephone discovery conferences when needed, where Lead Counsel and other Participating Counsel worked collaboratively with defense counsel to resolve hundreds of scheduling, discovery, privilege, and other pretrial issues and disputes. Counsel wrote scores of letter briefs to Special Master Russo and/or Deputy Special Master Rodriguez and/or opposing counsel; communicated daily with each other and with the Special Masters via e-mail regarding production and other logistical issues; and otherwise worked to either resolve old issues or follow-up on new ones. And, as noted, the Special Masters met weekly or monthly, depending upon need, with the Court in order to obtain the Court's involvement and to keep the Court informed. Additional unscheduled conferences with the Special Masters and/or with the Court, and counsel were held as needed. Thereafter, at the monthly status conferences, involved counsel reported on

their work to the Court, and all counsel received new input and guidance from the Court, were able to raise issues to the Court, and fully report to all plaintiffs' counsel.

With an eye to the necessary resolution, whether by remand or other procedure, counsel, along with the Court considered all viable possibilities for resolution. After fully considering summary jury trials and other innovative approaches for handling these proceedings, the PSC and defense counsel ultimately settled on using bellwether trials as the preferred manner to move forward toward resolution, and began the arduous task of full trial preparation of the bellwether cases. After extensive attorney negotiation and recommendation, this Court ordered two bellwether trials would be held, with the first plaintiff to be chosen by the PSC and the second plaintiff to be chosen by the defendants, and, thereafter, the Court, with full input from counsel, established the process to be used for selection of those two cases.

During the run up to the first bellwether trial, the parties produced and reviewed millions of pages of documents, which were necessary to perform depositions, prepare experts, and conduct the necessary scientific and regulatory research. As noted in Deputy Special Master DeJean's Report and Recommendation, throughout this MDL, with special emphasis on trial preparation, more than *32 million pages of documents have been produced, organized and reviewed*; approximately *one hundred and thirty depositions have been taken*; plaintiff's leadership designated *seventeen experts* in their Rule 26 Disclosure, and presented seven at trial; the defendants designated *thirteen experts* in their Rule 26 Disclosure, and presented five at trial. As is the case in any litigation, each of the experts offered by the parties needed to be deposed, needed to submit reports, and had to be prepared for trial. Furthermore, as noted by Deputy Special Master DeJean, "the PSC and other Participating Counsel collected, indexed, and produced an incalculable number of articles, science materials, and regulatory documentation, as well as voluminous

scientific and corporate documents, in association with the Phase One expert reports and discovery." All of this documentary material had to be located, reviewed, processed, organized and stored in a manner to allow ready access, and this daunting task was performed for the plaintiffs, by the PSC and Participating Counsel.

Preparing for the first bellwether trial presented a myriad of complex legal, organizational, logistical, scientific, factual, and discovery-related issues, all of which needed to be addressed simultaneously due to the short trial deadlines this Court had established in its First Scheduling Order.[28] By way of single example, perhaps, the New Drug Application, which, itself, was hundreds of thousands of pages in length, ultimately became a subject of dispute. The original production was done informally, however, objections were made to the first manner of production and were such that in order for a realistic review, this Court ordered a second, formal, production; however, some dispute and further resolution continued among the parties, and, ultimately, some one year after the PSC had begun review of the earlier informal production, the formal production was completed. The unfortunate, "staggered" production created additional work and, to some degree, a more complicated and time consuming review of this one item. As discovery proceeded along the multiple paths noted, simultaneously requiring extensive PSC involvement and extensive man and woman power, counsel were also actively and continuously involved in the work of developing this MDL. The factual and regulatory issues were multitudinous, complicated, and complex, and included such matters as toxicology, pharmacovigilance, marketing, epidemiology, experimental research (pre-clinical trials, clinical trials, and epidemiological/observational studies), regulatory, labeling, general causation, and specific causation, all areas requiring unique expertise and encyclopedic knowledge that the PSC, and particularly all involved trial counsel,

---

[28] Rec. Doc. 2359.

would have to master. The parallel track of cases presented as many differing legal issues as there were active cases – the MDL included(s) cases from almost every jurisdiction in the United States, each governed by that state's substantive law – and thus, required tremendous threshold legal research on a number of legal issues as wide-ranging as service of process, state product liability statutes, punitive damages, attorney-client privilege, causation standards, adequate warning standards, historical development of the defendants' various associated business entities, spoliation, the impact of *Lexecon, Inc. v. Milberg, Weiss, Bershad, Hynes & Lerach*[29] on this Court's jurisdiction, and the scope of authority of this Court for contempt of court, and preemption, among others. All, again, requiring extensive and exhaustive work by the PSC, and calling upon the unique expertise of the PSC and Participating Counsel.

As foreshadowed, discovery in these proceedings was extremely intense and involved a plethora of legal and factual questions – both general and specific in nature. Also, the tremendous number of documents involved created the need for an in-depth scientific understanding, as well as an efficient factual focus and organization, requiring counsel to create a document repository, and to develop creative analytics and unique search algorithms, as well as other advanced technological mechanisms, to organize the plethora of information into a useable and meaningful repository. In part, in response to this daunting task, counsel set about to adopt and implement predictive coding for application and use in this MDL, which will be discussed in greater detail below.

The PSC, also, worked tirelessly to control the scope and pace of discovery along with defense counsel and the Court – working toward a balance that allowed all to prepare for the first bellwether trial, while also, discovering the general corporate causation information, with an eye

---

[29] 523 U.S. 26, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998).

to the *Allen* trial, as well as later trials to come. Intense coordination and co-operative scheduling among all involved counsel was required to keep the general causation discovery ever moving forward, all the while proceeding toward the specific discovery required for the bellwether trials, all under a schedule designed to keep the matter moving ever forward. Plaintiffs' leadership took on the tasks for plaintiffs required to develop, not only, the law and evidence to prove general causation, but also, the law and facts inherent in proving specific causation within the first bellwether case, with an eye to the second bellwether case, as well as to develop defendants, Takeda's and Eli Lilly's knowledge concerning the alleged increased cancer risk associated with Actos® generally, and as to the specific individual claimants, all simultaneously -- no small feat. The task undertaken was at times daunting and at all times challenging. The PSC's efforts, it should be noted, were at all times being opposed by an equally resolute and vigorous defense team, large in number and unflagging in determination, who provided an aggressive defense of their clients at every turn, led by Sara Gourley. The multiple tracks of discovery and the vigorous responses and defenses mounted by defense counsel, required not only the time, but also, the expertise of the PSC to effectively meet. Often multiple assignments within the PSC were required and often the process consumed all available man and woman power, and all of a firm's resources; the process becoming all consuming, thus, severely limiting or prohibiting the PSC firms from taking on other cases or certainly from taking on leadership roles in other large cases. As noted, once discovery was sufficiently completed in order to mount their case in the first bellwether trial, the PSC, also, began preparing for the specific tasks involved in mounting and trying the first bellwether trial, *i.e.*, finalizing and preparing their experts for producing reports and testifying at trial, preparing to defend experts' depositions and trial testimony, and preparing to introduce their experts' opinions at trial, as well as preparation of and for factual and medical witnesses, all the

while responding to this Court's orders as to substantive legal issues, and mounting a full attack on spoliation. Again, the tasks were demanding and, at times, all consuming.

This Court notes there were several other tangential issues that could have caused significant delay and could have negatively impacted the expected timeframe for the MDL to be completed, which the PSC and defense counsel, along with the Special Masters and the Court, met head on and ultimately resolved efficiently. Principal among those was the historically daunting issue of privilege, which has proven to be an inescapable morass in past MDLs. As the immense amount of discovery became clear, the parties suggested there might, ultimately, be more than 100,000 privilege claims. Considering the extraordinarily large number of privileges that might be asserted – a number that admittedly seemed to grow and contract over time and with the telling – no matter the actual number, the privilege issue had the potential to derail or cause a significant delay in the bellwether trial and thus, the overall litigation. The Court, consequently, instructed the parties to confer with Special Master Russo to determine if a more reasonable manner to resolve the massive number of privilege claims could be devised. The PSC and defense counsel spent much time and energy on this issue along with Special Master Russo, and ultimately, guided by Special Master Russo, negotiated and agreed to a new and unique privilege review process that involved submission by the defendants of select, specific documents for *in camera* review by the Special Master, allowing for due process review and appeal to the Court, and integrating a random selection of the remaining privilege claims for *in camera* review by the Special Master, again, allowing for due process review and appeal to the Court. The process created by Special Master Russo and the parties' counsel provided a truncated but, also, meaningful process to address this possibly overwhelming issue, and the possible privilege issue was managed and addressed, causing no undue delay in the process.

Specifically, the parties set up, with the Special Master, a process whereby the Special Master was provided two hundred (200) allegedly privileged documents at a time, with a spreadsheet designed specifically for this privilege resolution process. The Special Master issued preliminary rulings as to privilege assertions, and provided a period for the parties to respond with additional argument before making final rulings as to the assertions. The evolving predictive information created by this process allowed the Court and the parties to facilitate a negotiated resolution of the entire privilege process in a relatively short time. The PSC worked tirelessly along with discovery counsel to resolve this seemingly insurmountable privilege review on a very timely basis, ultimately resolving *more than 22,000 assertions* of privilege in a manner that allowed the litigation and the bellwether trial to move forward as scheduled.

The PSC and defense counsel, also, devoted a significant amount of time, energy, and expertise to setting up the systems that were used for document production. This MDL was one of the first to allow the use of a "predictive coding"[30] system to aid the discovery process and the production of relevant documents.[31] The predictive coding process required a significant amount of attorney time at the outset to devise and implement, and required the creation of an agreed to strict set of procedural and process safeguards, due to its relative novelty. Despite the initial "front loaded" investment of time required, the predictive coding system provided a unique way to, in part, realistically manage the immense amount of information needed to be produced and reviewed

---

[30] Predictive coding refers to the use of dynamic algorithms which are trained to review electronically stored information ("ESI") and to pick out which of it is likely relevant to requested discovery. Such algorithms are trained by human programmers, who provide collections of ESI that is known to be relevant and irrelevant, then who monitor the algorithm's attempts to sort relevant from irrelevant information when given unsorted ESI, and to adjust the algorithm with each attempt creating a collective working memory. Over time, predictive coding algorithms can learn to find relevant documents within a given percentage range of reliability, upon which the parties must agree. *See* Rec. Doc. 1539.

[31] Rec. Doc. 1539.

in this MDL. The predictive coding system, although not perfect or fully realized, nonetheless, provided an innovative efficiency to the discovery process when compared to the existing, prevailing methods of review. Although a process not yet fully mature, the PSC and defense counsel expended tremendous time, and computer and legal expertise, to harness this technological possibility with quite positive, if not complete, result. As this area involved cutting edge technology, those counsel who could bring their unique expertise and skill to the task were exceptionally valuable to the PSC.

While the journey through discovery and pre-trial preparation was smoother than expected (there were a few *sets* of significant and aggressively disputed discovery-related cross-motions prior to the bellwether process), the parties, nonetheless, in conjunction with the bellwether trial, filed a plethora of pre-trial motions addressing both specific and general causation, including motions *in limine*, *Daubert* motions, motions for summary judgment, and motions for editing of and challenges to experts' depositions, and arguments of spoliation, all of which inured to the benefit of all plaintiffs and required tremendous attorney time and resource on the part of the PSC.

The PSC and defense counsel, also, met the strict standards established and expected by the Court as to trial preparation, including direct involvement with each other and the Court in producing proposed jury instructions as to applicable New York law – an area of law not fully resolved by the New York Courts. The parties – with the plaintiffs led by the PSC – poured considerable effort into producing, discussing with the Court, and exploring, along with defense counsel, proposed jury instructions that met this Court's high expectations. The selected bellwether case, as was ultimately determined, was to apply New York law to each of the substantive legal issues, spawning a variety of legal issues, which, as noted, many were not clear or fully resolved under New York law. All such questions had to be fully briefed to the Court

before jury instructions could be determined by the Court.  The legal research and briefing required from counsel were both extensive and complex.

The PSC's efforts to vet and identify their first bellwether case – a process that had involved a great deal of discussion, evaluation, review of medical records, conferences with prescribing physicians, etc. – ultimately led to the trial of *Allen, et al. v. Takeda Pharmaceuticals North America Inc., et al.*, which began on January 27, 2014 and ended on April 7, 2014.[32]  Preparation for this trial, as noted, was an exhaustive, and demanding process for all; trial of this matter was even more so given the vigorous and aggressive defense mounted by defense counsel.  The PSC and the trial team utilized focus groups, mock trials, and planned a trial strategy which called upon almost the entirety of all of the PSC firms' human resources, as well as the full support capabilities of those firms.  The PSC and defense counsel each set up a "war room" in the courthouse and manned their respective war rooms continuously, almost 24 hours a day, and 7 days a week, throughout the trial; a trial process which brought to bear the entire human resource and collective expertise of the PSC – their firms' support staff – and all counsel of the trial team and their firms' support staff.

Additionally, and simultaneously, requiring yet another PSC task force, on the basis of information revealed during the discovery process, the PSC mounted a concerted effort to present and pursue a motion for sanctions against the defendants for alleged spoliation of evidence – an issue that, also, impacted the impending trial strategy.  The PSC vigorously pursued and defendants vigorously defended, the spoliation issue, and ultimately, this Court determined spoliation had

---

[32] *See* Rec. Docs. 4171, 4210.

occurred, thus requiring a time consuming and expertise intensive shift in the final trial strategy;[33] again requiring all the trial team to re-evaluate and, perhaps, adjust their trial preparation.

As noted above, the trial, itself, was an intense and exhaustive process for all involved. In order to facilitate the efficient trial of the matter, this Court established a contemporaneous process for the speedy resolution of any, heretofore, unexpected factual trial deposition objections, which could not have been resolved before trial – experts having for the most part already been preliminarily addressed by counsel and the Court – including those disputes over how depositions that had been videotaped ahead of time and now would have to be used at trial, should be edited for presentation at trial.   Defense counsel and the PSC appointed Sherry Knutson for the defendants, and Neil Overholtz for the plaintiffs, to contemporaneously address the large number of deposition objections made and anticipated at or during trial, but not within the trial proceeding, and thus, to address the contested admissibility of certain deposition testimony contained within the depositions the parties now sought to admit at trial.   Consequently, these objections could be determined in a manner so as not to delay the trial.  The PSC and defense counsel, with the Special Master presiding and with ready access and contemporaneous input from the Court, worked through a multitude of objections to a multitude of depositions, again, with full and contemporaneous input from the Court, before, and in some instances when required by time and circumstances, during the trial.  These disputes continued to arise and to be decided up to and actually through the first several weeks of the bellwether trial.  The extensive time and energy committed by the PSC, the trial team, defense counsel, Special Masters, and the Court to the resolution of these disputes allowed the bellwether trial to proceed without delay.  The same procedure utilizing PSC representatives, defense counsel, and the Special Master, with review to

---

[33] Rec. Doc. 4330.

the Court, was utilized in resolving several late arising motions *in limine*. Also, the innovation of plaintiffs' counsel to employ a recently added rule to the Federal Rules of Civil Procedure allowing for live transmission of remote witnesses during the trial, under specific circumstances, similarly, illustrated the expertise of the PSC, and the trial team in particular, and allowed the case to move forward without undue delay. Again, all involved counsel had to work with the Court to ensure all safeguards were met, and the unique process required counsel's technological expertise to work with this Court's capable information technology staff to set up the necessary technological requirements for real time remote transmission of the live testimony.

During thirty-seven days of actual trial, the PSC trial team presented eighteen witnesses, the defendants presented eleven witnesses, and more than four hundred exhibits were admitted. The jury's deliberations led to a verdict for Mr. and Mrs. Allen in the amount of $1.5 million in compensatory damages, and $9 billion in punitive damages.[34] Post-trial motions were filed by the defendants and responded to by the PSC; the Court denied in part, and the Court granted in part.[35] The defendants appealed the *Allen* judgment to the Fifth Circuit[36] requiring the PSC to prepare appellate briefing and cross appeals;[37] however, ultimately, the appeal(s) was/were withdrawn in conjunction with the global settlement reflected in the MSA process.

---

[34] Jury Verdict, *Allen, et al. v. Takeda Pharmaceuticals North America, Inc., et al.*, No. 6:12-cv-00064 (W.D.La. April 7, 2014), ECF No. 639.

[35] *See* Final Amended Memorandum Ruling: Defendants' Rule 50(B) Motion for Judgment as a Matter of Law, *Allen, et al. v. Takeda Pharmaceuticals North America, Inc., et al.*, No. 6:12-cv-00064 (W.D.La. September 5, 2014), ECF No. 716; Memorandum Ruling: Defendants' Rule 59 Motion for New Trial, *Allen, et al. v. Takeda Pharmaceuticals North America, Inc., et al.*, No. 6:12-cv-00064 (W.D.La. October 27, 2014), ECF No. 729.

[36] Rec. Doc. 4884.

[37] The parties ultimately withdrew all appeals in light of settlement agreement.

Almost immediately after the *Allen* trial was completed, and contemporaneously with the appellate process in *Allen,* members of the PSC and other Participating Counsel shifted focus to begin preparing for the expected second bellwether trial – a process that included additional case specific discovery and new legal research as New York law no longer would be the applicable law – and addressing a number of issues that had become relevant during and after the *Allen* trial (*e.g.*, new scientific developments, discovery as against Eli Lilly, in-depth legal research as to a different state's law, strategic discussions, restoration of backup tapes inherent in the spoliation issues, and potential trial strategy for a new litigation). After the *Allen* verdict was rendered, serious settlement negotiations began, in conjunction with and under the guidance of Special Master Russo, and upon request, the Court, at that point, suspended further bellwether trials and thus, suspended the case specific discovery in order to provide the opportunity for settlement success. Thus, the PSC and defense counsel, at that point, had to again shift their focus, now to the equally complex task of settlement negotiations and creation of the MSA document and Settlement Program – again, no small task.

Thus, this Court notes that throughout this entire process, in addition to the rigorous in-court and out-of-court trial demands, the PSC teams and their staffs, also, provided logistical and administrative assistance for the collective plaintiff effort, for the Clerk of Court, and for the parties as a whole as discussed earlier. Also, in addition to fully staffing a trial "War Room" almost twenty-four hours a day, and almost seven days a week, for and during the entire *Allen* trial, the PSC tracked the admission status of all exhibits and demonstrative aids for future use, and coordinated with all counsel and the Court regarding all submissions. During the trial, the PSC trial team participated in nightly conferences to review admitted evidence needed for and to be produced each day, and took lead responsibility for conferences with the Court on unanticipated

evidentiary disputes.  As noted, the PSC created a multilayered, expertise diverse trial team to

assist the two trial co-counsel and the team, along with co-trial counsel and their firms' staff, spent

extensive time revising, updating, assimilating, and indexing the significant evidence to be used

in the *Allen* trial, and for potential use as a "Trial Package" and resource, for test cases in the MDL

or for any possible unresolved transferred or remanded cases.  Thus, the expenditure in time, effort,

and resources by the PSC, trial co-counsel, and the trial team and their firms was extensive and at

times, all consuming.

### F.    The Master Settlement Agreement

After the defendants filed their appeal of the *Allen* judgment and various related orders of

the Court, as noted, with the help of the Special Master and Magistrate Judge Hanna – this Court

being of the opinion that to avoid any possible future conflict, it should not be intimately involved

in the forging of a settlement the Court might be called upon to interpret or enforce - the parties

entered into extremely complicated, multi-sided settlement negotiations.  The MSA that was

ultimately agreed to, drafted, and executed was negotiated by Doug Marvin, representing Takeda

("settlement counsel") and various plaintiffs' counsel that ultimately became the Plaintiffs'

Settlement Review Committee ("PSRC").

As noted, in order to avoid the possibility of future conflict were this Court to have to

address interpretation of, or enforcement of the settlement itself, this Court distanced itself from

settlement negotiations, and instructed Special Master Russo and Magistrate Judge Hanna to assist

the parties in their efforts to obtain a global settlement agreement, if possible or if needed.  Both

Magistrate Judge Hanna and Special Master Russo have reported to this Court that the time,

expertise, and commitment of the PSC leadership was exemplary, extensive, and, again, at times

all consuming.  It is of note that the initial status conference the Court conducted with counsel was

on March 22, 2012; the Master Settlement Agreement ("MSA") that ultimately resulted in the global settlement of approximately 11,000 claims for $2.4 billion was signed and submitted to the Court by the parties on April 28, 2015; an, heretofore, unheard of accomplishment in an MDL of this size.  This result is due in no small part to the commitment and work of all involved, and in particular the PSC and its leadership, and co-lead counsel, Richard Arsenault and Paul Pennock.

The MSA, itself, was the product of extensive, complex, and intensive negotiations among counsel and was executed by representatives of the PSC and the defendants.  Although the MSA, itself, did not settle any claims outright, it did create a complete Settlement *Program* whereby all aspects of all the individual claims and claimants, who could provide sufficient documentation of a history of Actos® usage and a proper diagnosis of bladder cancer, would be eligible to apply to receive compensation, and would agree to dismiss any pending Actor®-related suits they might have against the defendants if their claim was accepted.

The Settlement Program was intended, and was designed to be, global in nature, or, at least, to be available to as many claimants in the United States as possible – state and federal.  To that end, the Settlement Program was made open to enrollment to two broad groups of claimants or potential claimants nationwide: (1) claimants who had filed a case – whether in federal or state court – as of the date the MSA was executed, alleging (a) use of Actos® prior to December 1, 2011, and (b) a diagnosis of bladder cancer; and (2) claimants with no case pending as of the date the MSA was executed, but (a) a retainer agreement to receive representation in an Actos® suit signed on or before May 1, 2015, and (b) allegations of Actos® usage prior to December 1, 2011 and diagnosis of bladder cancer prior to the date the MSA was executed.[38]  As a result, as of this writing, approximately 99.4% of the approximate 11,000 claimants known to have cases alleging

---

[38] MSA, § 2.01.

bladder cancer across the United States due to Actos® usage – or who have representation to bring such a case – have voluntarily agreed to and are participating in the Global Settlement Program created by the MSA.[39]

The global acceptance of the negotiated Settlement Program was vital to the success of the MSA; the MSA provided the defendants would have the right not to participate in the Settlement Program unless certain thresholds of participation were met. These thresholds included 95% of all "Eligible Enrollees" (*i.e.*, claimants either with a suit alleging bladder cancer caused by Actos® pending as of April 28, 2015, or with a retainer agreement for such a suit signed as of May 1, 2015).[40] Furthermore, while the MSA called for aggregate settlement funds of $2.37 billion, the agreed to settlement, also, provided the defendants would increase the total to $2.4 billion should the participation threshold exceed 97% of all Eligible Enrollees.[41] Thus, the created MSA was intended to be global in scope, included both "a carrot and a stick," and was designed to encourage the maximum level of participation.

The procedural aspects of the MSA settlement were and remain complex and involved. Thus, Claims Administrators were selected, have worked with all, and have reported to the Court and the parties, throughout the process as to the administration involved, and reported in April,

---

[39] 10,782 claimants alleged that they developed bladder cancer caused by Actos. Of this number, 10,722 enrolled in the Settlement Program, or nearly 99.45% of those eligible. Most of the claimants who did not enroll in the settlement have since voluntarily dismissed their claims, ostensibly because they were unable to produce evidence of Actos use or bladder cancer as an injury. Indeed, only a handful of individual claimants remain. Accordingly, as the Settlement Program winds down, more than 99.99% of the claims have been resolved. And, as of this date, approximately $2,300,000,000, or more than 96% of the settlement funds, has been paid out or is in the process of being paid. The remaining less than 4% is earmarked for (a) claimants who are resolving issues involving the authorization to receive funds (*e.g.*, securing releases, obtaining clearances from bankruptcy trustees), (b) payments to lienholders, or (c) the Extraordinary Injury Fund.

[40] MSA, § 5.02.

[41] MSA, § 10.01.

2016 that not only had the 95% participation threshold been met – guaranteeing that the Settlement Program would go into effect – but the 97% participation threshold had also been met and surpassed, ensuring the increased funding of the settlement fund. This remarkable rate of participation is a testament to the ability and hard work of all involved, especially the PSC and co-leadership and their firms' work explaining the benefits, transparency, and operation of the Settlement Program to all plaintiffs' counsel, so those counsel could fully inform their clients and meet their ethical responsibilities. Also of note is the expertise of the Program's Administrators to oversee a large and complex claims evaluation process efficiently and transparently, and the ongoing involvement of the Special Masters, Magistrate Judge Hanna and the PSC leadership, co-lead counsel, and defense counsel.

As the PSC and defendants, with help from Special Master Russo and Magistrate Judge Hanna, had created an MSA that had created an opt-in Settlement Program, claimants were required, through their attorneys, to affirmatively choose to take part in the process by providing a Notice of Intent to Opt-in, a release of all related Actos® claims, and a signed Stipulation of Dismissal.[42] In this way, the MSA addressed the possibilities of spurious claims attempting to enroll and diminishing the results for the legitimate claimants, eliminating such claims. Also, once enrolled, claimants were required, again, through their attorneys, to submit Claim Packages containing the relevant medical records for review by the Claims Administrator. The parties selected the firm of BrownGreer PLC to be the Claims Administrator, and by all accounts BrownGreer has done excellent, and outstanding work in that role. Per the terms of the MSA, part of the duties of the Claims Administrator is to review all provided documentation, to determine whether that documentation is complete or deficient, and to provide an opportunity for claimants,

---

[42] MSA, § 2.02.

through their attorneys, to correct any deficiencies found. The Claims Administrator, upon review, either rejected or accepted the claim as eligible and issued a Points Award for each claim. In the event a claim was determined to be ineligible by the Claims Administrator, the claimant had the right to appeal that decision to an Eligibility Committee ("EC") composed of members of the Plaintiffs' Settlement Review Committee ("PSRC") and counsel for Takeda. The regular meetings of the Eligibility Committee, and the assistance of the PSC leadership, were instrumental in resolving these eligibility appeals. At the direction of this Court, Special Master Russo attended these EC meetings in order to ensure the Settlement Program did not become unnecessarily slowed by this appeal process or reflect bias of any nature. This Court received regular updates from Special Master Russo, which made clear the PSRC and/or members of their firms regularly attended these EC meetings, and were thoroughly prepared in order to resolve all appeals of eligibility decisions in an efficient, unbiased and timely fashion.

Once review and approval of a claim were completed, the Claims Administrator assigned each claimant a number of points, according to a matrix agreed to by the parties.[43] The Points Matrix allotted points according to the level of injury and age of the claimant, with adjustments according to cumulative dosage and a set of agreed risk factors.[44] The value of each point would ultimately depend on the total number of points, compared against the total amount of funding provided. The total dollar value of each point could not be determined until the enrollment and evaluation processes had been completed, however, because total settlement funding was dependent on reaching certain participation thresholds, as noted above, and the final valuation could not be ascertained until the total settlement funding was final.

---

[43] MSA, § 6.02.

[44] *See* MSA, App'x. J.

In addition to regularly attending and participating in meetings of the EC, members of the PSRC, also, participated in the process devised to address certain claimants seeking extraordinary injury fund ("EIF") payments, pursuant to Section 7.02 of the MSA. The EIF was established to enhance payments for claimants with minor children, substantial economic loss attributable to their injury, or medical complications from bladder cancer not otherwise covered by the Master Settlement Program. The same group of PSRC members who attended the EC meetings, also, attended these EIF meetings. At the request of this Court, Special Master Russo, also, attended these EIF meetings, and/or had Ms. Katie Darden attend on his behalf. Special Master Russo and Ms. Darden provided periodic reports to the Court on the progress of the EIF meetings, and again it was clear to this Court that PSRC members regularly attended the meetings, were prepared, and were instrumental in determining whether or not claimants were eligible for EIF payments in an unbiased fashion.

Because the MSA created by the parties, by necessity, included full due process review and the time delay a due process review entails, the MSA created additional procedures to ensure claimants received proper, efficient, but also, timely compensation. The Settlement Program included a system of interim payments, which could be and were made prior to the final completion of the Program, based on estimated point valuations.[45] As noted above, the MSA, also, created an Extraordinary Injury Payments procedure, whereby certain qualifying claimants were found to be entitled to additional recovery based on the severity of their injury.[46] Additionally, a procedure designed to find, evaluate, and satisfy private and public liens was put into place, which will be

---

[45] MSA, § 7.01.

[46] MSA, § 7.02.

discussed in greater detail below.[47]  Thus, the input and value brought to the benefit of all by those involved PSC members, again, cannot be understated.

The MSA, also, took special care to ensure claimants had recourse to challenge the decisions being made regarding their cases as the Settlement Program carried forward, in light of their agreement not to further pursue their cases in court.  At every stage of the submission and evaluation process, each claimant had the right to request reconsideration by the Claims Administrator, ask that the Administrator's decision be reviewed by a body created by the parties' counsel comprised of counsel selected by and from both parties, as discussed above, and/or ask the Special Master of the MDL to review those decisions.[48]  All challenged decisions by the Claims Administrator were appealable to Special Master Russo and/or Katie Darden, and have been reviewed and disposed of.  These due process procedures were built into the process and guaranteed that claimants and their counsel had multiple opportunities to contest decisions they might think improper, and to have full, adequate, impartial, and almost contemporaneous review of all decisions.

Pursuant to the operation of the MSA and this Court's orders, as of this date, approximately 90% of the money set aside to satisfy claims in the Settlement Program has been paid.  Again, the breadth, completeness, and success of the MSA, also, reflect the superior expertise of those involved in its creation.

Especially relevant to this ruling, the created and agreed to MSA, also, required all claimants – as to expenses – and their counsel – as to fees – to agree to relinquish a portion of their respective recoveries to compensate the expenses – as to claimants – and fees – as to attorneys –

---

[47] MSA, Art. XIII.

[48] *See* MSA, Secs. 3.01, 3.05, 4.02, 6.02, 7.02, 9.01, 9.03, and 14.03.

that were incurred in the MDL on behalf of all plaintiffs; counsel to relinquish common benefit fees from their fees; **claimants to be responsible _only_ for a percentage of the common benefit expenses**. Section 10.04 of the MSA is entitled "Common Benefit Fees and Reimbursement of Litigation Costs," and reflects the following agreement:

> 10.04 To ensure that common benefit attorneys (hereinafter referred to as "Common Benefit Attorneys") are fairly compensated and that their fees are reasonable, an assessment of Common Benefit Attorneys' fees will be imposed on counsel for each Claimant in accordance with the amount set by Order of the Honorable Rebecca F. Doherty to be entered in the MDL ("Assessment"). By opting into the Program, Program Participants and their counsel agree to, and waive, the right to any appeal of any order entered by the MDL court associated with the settlement. Any sum paid as a common benefit fee shall be deducted from the total amount of counsel fees payable under individual plaintiffs' counsel's retainer agreement.
>
> (A) In addition to those amounts provided above, Common Benefit Attorneys shall also be entitled to reimbursement of their reasonable common benefit expenses. Reimbursement of these expenses shall be deducted from the clients' net recovery. The amount of common benefit expenses shall be determined by Order and entered in the MDL, which sum will be deducted from the Settlement Funds deposited into the QSF.[49]

Pursuant to this portion of the MSA, each *claimant* who agrees/agreed to participate in the Settlement Program agrees/agreed to submit a portion of his or her recovery under the program to compensate for _only_, *expenses* incurred on behalf of all claimants, and agrees/agreed not to appeal this Court's orders related to the settlement. Also, each claimant's *counsel*, furthermore, agrees/agreed to submit a portion of **his or her *fees*** to compensate for a percentage of the *fees* incurred on behalf of all claimants, and, also, agrees/agreed not to appeal this Court's orders related to the settlement. **It should not be overlooked that any amount this Court might allocate as**

---

[49] MSA, at 35-36.

**common benefit *fees*, does <u>not</u> come from any individual claimants' recovery, rather it *comes from the amount the claimant <u>had already agreed to pay to his or her attorney</u> when he or she agreed to representation*. Thus, common benefit *fees* are taken from the <u>original attorneys'</u> compensation – <u>not</u> the claimants' MDL recovery. *Expenses*, however, are taken from the *claimant's* recovery – <u>much as with any single claim which is not within an MDL</u>.**

As is reflected in this Court's orders this Court has, from the outset of this MDL, expected to compensate common benefit work, and early on established procedures designed to keep ongoing records of approved common benefit work and common benefit expenses and for regular and ongoing review and evaluation of that work and those expenses within the MDL.[50] Therefore, claimants now choosing to participate in the Settlement Program, and their counsel, have had full knowledge and notice from the outset of what would be required from them should they wish to participate in a global settlement and equally so, any attorney who might have desired to perform or claim compensation for work performed was given full notice of the applicable requirements. By voluntarily participating in the MSA, all have voluntarily agreed to abide by the procedures established and decisions made by this Court governing the compensation for common benefit work, *i.e.*, fees and expenses.

As noted above, many of the participants in the *global* Settlement Program do not, and did not, have cases pending in the MDL, rather had cases pending in various state courts. However, by virtue of the choice to participate in the Settlement Program, each individual claimant and his or her respective counsel, agreed to abide by this Court's decisions as to the amounts that might be retained to compensate the work done for common benefit of all and the expenses incurred for

---

[50] *See* Rec. Doc. 2356.

38

the benefit of all, as well as to this Court's decisions determining allocation of any amount among counsel.

## G.    Implementation of the Settlement

As described above, the MSA included an enhanced recovery for all participants in the settlement if 95% or more of those eligible to participate agreed to do so. Once the MSA was agreed to, the PSC leadership spent significant time and resource traveling around the country to explain the terms of the MSA to all involved counsel, meeting with various individual plaintiffs' counsel in the MDL, as well as meeting with those plaintiffs' counsel who had cases filed in state courts across the United States. The Special Master attended at least one of those meetings, held in California, and reported to the Court. The Special Master, also, received reports on a regular basis concerning other meetings that were being conducted throughout the country and reported to this Court on those meetings as well. These educational meetings, although both time consuming and perhaps costly, provided the needed detailed information to individual claimants' counsel to allow for informed consent, fulfillment of their ethical responsibilities, and for the extraordinary success of the Settlement Program. The success of the settlement program and almost complete participation is due in large part to the work and expertise of the PSC leadership, Special Master Russo, and settlement counsel for the defendants. Additionally, and perhaps uniquely, the PSC leadership has continued to lend their time, expertise, and finances to preparing and presenting the program even after the MSA has been executed and it is in no small part due to their time and commitment to the MSA and settlement process that has made it an unqualified success.

As a result, the Settlement Program has been extremely and uniquely successful. At this writing, approximately 99.4% of the eligible claimants, nationwide, have opted into the

settlement.[51] The percentage is expected to increase once the settlement process is fully completed and approach the unheard of 100% of all eligible individual claimants nation-wide, once all ineligible claims are removed. This rather unprecedented settlement success on the part of plaintiff participation, in part, is, again, a direct result of the PSC leadership's continued vigilance in handling issues arising after creation of the MSA process, as they have arisen, whether of the MSA, or other residual matters, along with the Special Masters' continued facilitation. Here, the PSC leadership did not abandon the process once the MSA was signed, which can so often, and regrettably, be the case. Their continued commitment and work has acted to the tremendous benefit of all.

The first interim payment made to any claimants elected by the Settlement Process through the Claims Administrator, was announced on June 30, 2016, and the payment process began with the first payment being made to a claimant on July 20, 2016. The settlement process, much like the litigation, has been efficiently handled by the PSC leadership, along with the administrators, the Special Masters and defense settlement counsel – again, not without great expenditure of time and resource. This Court has kept in close communication with the Special Master and continued to monitor, guide, and oversee the progress of this matter, and is convinced that due, in large part, to the continuing administration, oversight, and management by the Special Master, PSC leadership and defense settlement counsel, all working closely with BrownGreer, that the settlement process has been a model of efficiency. The Special Master has reported that calls have been conducted each week by all involved, *i.e.,* select PSC members, Takeda, and the Settlement Program's Administrators to make sure any issues which arose were and are resolved promptly. This dedication of continuing time and resources by the PSC leadership and defense settlement

---

[51] *See* fn 37.

counsel to the settlement process, even after the MSA was entered, has contributed in large part to the unprecedented success of the MSA.

Also, as a part of the implementation of the MSA, it was necessary to work with and address parties who withheld or had legal claims to liens, *i.e.*, primarily, both public and private medical providers. This Court requested Magistrate Judge Hanna take the lead to assist the parties and settlement administrators with addressing those liens as he has developed a special expertise in this area. Magistrate Judge Hanna met regularly with the PSC leadership and defense counsel and the Lien Resolution Administrator[52] to create a fair and effective lien resolution process, and to help resolve all issues that have arisen in moving the settlement forward on this front. As with the Claims Administration process, the Lien Resolution Administration process was negotiated, and agreed to by the parties, here with the help of Magistrate Judge Hanna and, again, is unique and has proven quite effective. The medical lien resolution in all personal injury cases has proven, historically, to be problematic. With Magistrate Judge Hanna's leadership, the expertise of the counsel involved, and the operation of the Lien Resolution Administrator, resolution of all liens has progressed at an extraordinary pace.[53] The created process has employed unique and creative solutions heretofore not employed in an MDL of this size and has been, and continues to be, effective, transparent, and fair. According to all sources, the Garretson Group ("Garretson"),

---

[52] Per the terms of the MSA, the Claims Administrator was not to serve as the Qualified Settlement Fund Administrator (whose duties are to oversee the receipt, maintenance, and distribution of settlement funds paid by the defendants). MSA, § 8.02. In this MDL, BrownGreer was selected to be the Claims Administrator, and the Garretson Group, who was selected to be the Lien Resolution Administrator, who was selected and agreed to, also, administer the Qualified Settlement Fund.

[53] As of this writing, more than 98% of the 18,671 liens initially identified have been resolved. The remaining liens are unresolved only due to data discrepancies or to the time it takes for plans and agencies to communicate with Garretson. Garretson is expeditiously addressing the remaining liens on a case-by-case basis.

which was selected by the PSC and defense counsel to be the Lien Resolution Administrator, also, has been integral to the success, not only of the lien resolution program, but, also, integral to the success of the Settlement Program as a whole, as the settlement could not go forward without resolution of all outstanding liens. Thus, again, the expertise of involved counsel has acted to the benefit of all.

In connection with Magistrate Judge Hanna, counsel, and Garretson, a lien resolution protocol was created, which, again, the parties negotiated and agreed to, under which Garretson has reached out to all private and public medical providers that had asserted liens on payments to claimants in the Settlement Program. Garretson has successfully reached agreements with each of the identified lienholders for resolution of their liens. The Court understands Garretson did most, if not all, of the work of locating, auditing, and valuing the liens in conjunction with the PSC, defense counsel, and Magistrate Judge Hanna. This process, while exhaustive and quite involved, was necessary to make it possible for Garretson, BrownGreer, and counsel to estimate the amount that would be needed to be withheld from each claimant's recovery and to ultimately facilitate pay outs to the individual claimants. This, in turn, again, helped ensure individual plaintiffs' counsel could have the necessary information required to engage in a thorough and meaningful discussion of the costs and benefits of the Settlement Program with their clients, before each client made his or her choice to enter or reject the proposed settlement. Thus, the work of the PSC leadership, again, allowed all counsel to meet their ethical obligations to their clients and the Court. This process operated with full transparency which, also, has helped the parties reach the required participation thresholds to allow the Settlement Program to proceed. Finally, and in some instances related to the lien resolution process, special attention has been paid to create an additional process for addressing those claims which might be affected by ongoing bankruptcies,

and the specialized interaction with bankruptcy trustees and courts. Those counsel who lent their expertise to this issue have, also, been of great value to the litigation.

Altogether, the MSA created by counsel using their expertise, the tremendous effort and commitment of time and resource involved by counsel, BrownGreer, Garretson, the Special Master, and Magistrate Judge Hanna, and the oversight of the Court has created a model of efficiency in the advancement of the Settlement Program, and have kept this matter moving ever forward to final completion at an unprecedented pace. According to estimates now available, at the current rate of progress, final payments could be completed as early as the end of 2017, which would represent approximately six years from inception of this MDL to resolution of the Settlement Program, resolving more than 99% of all cases in the MDL, and, also, resolving almost 11,000 eligible claims nationwide, which, in and of itself, is an extraordinary feat within the world of MDLs. This success is in large part attributable to the involvement of the Special Masters, the PSC leadership and defense settlement counsel involved, and to the PSC's able leadership, exceptional expertise, and the tireless work done on behalf of all plaintiffs.

## H.    The Initial Hold-Back on Settlement Payments

From the inception of these proceedings, based on historical precedent, this Court had anticipated that, in the event of a global settlement, those attorneys who had worked for the common benefit of all plaintiffs would need to be compensated for their work.[54] As noted above, the parties' counsel – out of whose recovery the fees will come – themselves, anticipated this Court would award common benefit fees and expenses and agreed to that award.[55] After the MSA was

---

[54] Rec. Doc. 1357.

[55] MSA, § 10.04.

executed, this Court was repeatedly urged to give the participants in the Settlement Program a *preliminary indication* of the amount that *might be used* to compensate the PSC and Participating Counsel, so that individual counsel could effectively communicate with and inform their clients, as part of their ethical responsibilities; for that reason, this Court entered *the preliminary* Holdback Order on September 1, 2015, instructing the Settlement Program Administrators to, at that time, withhold 8.6% of any payments made pursuant to the terms of the MSA in order to have a preliminary amount available to compensate for common benefit fees, and to withhold $25 million to address common benefit expenses.[56]  By Order dated February 16, 2016, the Court notified counsel and all parties to this proceeding that it would issue a *final assessment* order for common benefit fees and expenses in the amounts described in its Holdback Order, and provided full opportunity for all to object to any such assessment.[57]  No objection(s) were lodged.[58]  Thereafter, the Court entered its Case Management Order: Common Benefit Fees and Costs, assessing the amounts described in the Holdback Order.[59]  The hold-back amount remains available for release, and this Court now enters its final Common Benefit Ruling allocating those amounts.

---

[56] Rec. Doc. 5850.

[57] Rec. Doc. 6215.

[58] While no objections were lodged within the deadline provided therefor, this Court received a notice of comment or opposition by a claimant to the amount assessed for common benefit attorneys' fees by a plaintiff *on December 27, 2016*, through that claimant's counsel.  The Court would point out that the "objection" is not timely, and that the Court's final decision to compensate common benefit attorneys' fees requires a reduction in **only** the fees awarded to each original **counsel** pursuant to each claimant's individual retainer agreement **and does not act to reduce a given claimant's award**.  However, the Court, also, would draw the involved claimant's attention to this ruling, which lays out the reasoning behind this Court's decision to assess part of the attorney's fees for compensation of common benefit work.

[59] Rec. Doc. 6238.

I.       **Nationwide Settlements**

There were approximately 4,500 Actos®-related lawsuits filed in (or removed to) federal district courts throughout the nation, that were transferred into (or filed in) these proceedings. Another approximately, 6,500 were filed in (and remained pending in) state court systems throughout the country.   As noted above, the MSA specifically permitted plaintiffs whose claims were in state court to participate in the MDL Settlement Program, should they so desire, and they have done so in almost all cases.   This exemplary result is in no small part the result of the expertise, work, and time expended by the PSC leadership and defense settlement counsel; thus, the PSC has performed the extraordinary service of, also, providing settlement opportunities to more than twice as many state court claimants, a group above and beyond whose interests they were explicitly and formally obligated to protect, thus, providing exemplary benefit to all claimants and to the public.

J.       **Additional Comments on Common Benefit Efforts**

The descriptions provided above address many, but certainly not all, of the common benefit services provided by the PSC and Participating Counsel; this Court should, also, note, it does not, however, address several discrete aspects of these proceedings that might help to further illuminate the full scope of the common benefit delivered to all of the claimants participating in the Settlement Program.

First, the very large number of cases in this MDL, together with the large number of cases filed in state court, required an extraordinary level of organization, coordination, and cooperation among the PSC and all plaintiffs' counsel, *i.e.*, among MDL plaintiffs' attorneys *as well as* between MDL plaintiffs' attorneys and plaintiffs' attorneys in the thousands of state court matters, and that cooperation, coordination, and expertise was supplied by the leadership of the PSC and

45

the plaintiffs' state court liaison, Dawn Barrios, and defense team state court liaison, Sherry Knutson. The fact that the MDL cases did not overtake, step on, or otherwise interfere with the state court cases (including the Illinois and California coordinated proceedings), *and* that defendants were not overwhelmed by the sheer number of cases that might have remained in state courts throughout the country, is due in large part to the tremendous effort of the PSC and defense counsel – for the plaintiffs, by co-lead counsel, Richard Arsenault and Paul Pennock, by the state court liaison, Dawn Barrios, and their coordination with the Special Master and the Court. The ability to keep all sets of cases proceeding in parallel, without each tripping over the other, contributed immensely to the common benefit of all MDL plaintiffs and the public at large, and this Court wishes to acknowledge that fact. Co-lead counsel, Richard Arsenault and Paul Pennock, displayed an extraordinary talent and ability for organizational and administrative skill underlying true leadership ability. State court liaison for the PSC, Dawn Barrios, along with the state court liaison for defendants, Sherry Knutson, kept not only this Court, but all state courts, updated and informed as to the plethora of issues and matters involved as this MDL and those in the state courts as those cases moved forward, with full respect shown and given to all courts involved. Such coordination and communication were often nuanced, complex, and time intensive and were integral to the overall success achieved, as illustrated by the level of participation reached among claimants with cases in state courts.

Second, a very important aspect of this litigation that might not be obvious to the casual observer is this: the PSC and Participating Counsel were working within cutting edge science, requiring rigorous research and investigative science; counsel education and mastery, and specialized expertise and training were required at every step along the way to resolution; thus, requiring highly capable counsel with unique and specialized talents working in tandem with

46

highly capable staff and with identified outside medical and regulatory experts.  The breadth of the necessary scientific knowledge required to identify the biological mechanisms that might contribute to the argued elevated carcinogenic risk alleged, required mastery of and development of multiple scientific theories across many scientific disciplines and within multiple regulatory environments.  The grasp of the discrete subject matter required not only review of hundreds of thousands of scientific articles and treaties and documents, but, also, innumerous tutorials in order to understand, yield, and present in a manner lay jurors could grasp, what the PSC and their experts believed to be the three plausible biological mechanisms for Actos®-induced cancer ultimately presented at trial, within the complex and idiosyncratic regulatory context of those theories. Additionally, one must always be aware the PSC, at every step, had to meet an equally vigorous, and scientifically prepared, defense mounted by an equally prepared and aggressive defense team. Thus, in an area of cutting edge science and great regulation, extensive and specialized expertise, education, and research were required and presented a particular challenge for counsel; one, the trial result and settlement amount would argue, the PSC met.  These efforts – developing *de novo* theories of general causation and applying those general causation theories to specific cases, and exploring and understanding the complex regulatory apparatus involved over some twenty plus years, made possible the result(s) obtained and came at a documented and expensive cost in time, resource, and expertise.

Furthermore, those counsel who had the needed organizational, administrative and leadership skills, as well as those who had the needed specialized scientific expertise, along with those with the needed technological expertise, proved of immense value to the process.

Additionally, the ability to translate a complex, nuanced, body of evidence into an understandable whole capable of being presented to and swaying lay jurors cannot be understated.

The trial counsel – Mark Lanier and Richard Arsenault, supported by an ever present PSC trial team, performed in exemplary fashion, all the while being met and challenged by an aggressive defense trial team.  The trial result is a testament to the work expended and the ability of the PSC trial team.

Finally, as noted above, this Court – at the outset – imposed on all Participating Counsel the obligation to monthly submit fee and expense claims to the PEC and the Deputy Special Master and imposed on the PEC, particularly, the obligation to audit those time and expense claims before allowing them to be submitted to Deputy Special Master DeJean.  The PEC's willingness to perform this auditing service added an entirely new layer of responsibility on top of the customary obligations of PSC and PEC attorneys.  A task in large part assumed by Richard Arsenault's firm through the ever available attorney, Jennifer Hoekstra, as overseen by Richard Arsenault, which and who acted to make the final resolution of these proceedings significantly more efficient than might otherwise have been the case.  The regular and ongoing submission and review of time and expenses submitted by all Participating Counsel, *i.e.*, Participating Counsel and the PSC, to both the PEC and the Deputy Special Master, has been pivotal to the success of the unique process instituted by this Court to deal with the historically thorny problem of common benefit compensation and has acted to avoid the historical delay and, often conflict ridden process, inherent in common benefit fee allocation.  Without the PSC, PEC, and all Participating Counsels' agreement to and actual participation in and compliance with this rather unique approach to time and expense accountability, the superb work of Richard Arsenault's firm, and in no small part Jennifer Hoekstra, as well as the capable and even-handed review of Deputy Special Master DeJean, the more transparent and more objective process of fee allocation could not have existed, moved forward as timely, accurately, or fairly as it has, nor could it have addressed the thorny

issue of common benefit award in as transparent and efficient manner as it has. Thus, the PSC, PEC and Participating Counsel, again, expended considerable time, and expense, to the benefit of all.

## II.   COMMON BENEFIT FEE AND EXPENSE REVIEW PROCESS

As noted above, and referenced by the Report and Recommendation of Deputy Special Master DeJean, at the outset, this Court chose to approach one of the most problematic aspects of an MDL – common benefit determination and allocation among attorneys – in a unique and more objective and transparent fashion and, thus, instituted a policy, procedure, and organizational process, to attack this historically problematic aspect of MDLs. The Court, with hands-on input from the PSC leadership, and with the input of the Special Masters, issued multiple orders to create and implement a new and unique approach to common benefit allocation, requiring all who wished to contribute or become Participating Counsel to obtain prior approval for work from the PSC, PEC, or co-lead counsel, within the context of this Court's order that all who requested work and were qualified, should receive work; for all those accepted as Participating Counsel and for the PSC to maintain current records of their time and expenses for each approved task; having the PEC review those submissions, and thereafter, having Deputy Special Master DeJean review all submissions; and establishing a due process review by the Special Master and, ultimately, by the Court for all objections. *See* Rec. Docs. 1357, 2356. In conjunction with the noted orders of the Court, Deputy Special Master DeJean was tasked with the initial Court oversight of all submissions for common benefit time and expense made by the PSC and other Participating Counsel, with opportunity for objection and appeal by counsel to the Special Master and, ultimately, the Court.[60]

---

[60] *See* Rec Docs. 532, 1357, & 2356.

As noted, the actual process Deputy Special Master DeJean was to follow for receiving common benefit time and expense was established by this Court, but was implemented through the submission and review of time and expense records of all Participating Counsel.[61]  Initially, also, in conjunction with this Court's orders, the PSC was tasked with instituting a specific procedure whereby all common benefit work was to be assigned by co-leads and/or the PEC to all qualified attorneys who either were assigned work as members of the PSC, or who applied for and received prior approval to and performed work as, "Participating Counsel."[62]  The PSC was directed to set up a procedure whereby all PSC members and/or Participating Counsel who performed common benefit work and/or who incurred approved common benefit expense would monthly submit their time and expense to the PEC for initial compilation and approval.  Upon completion of this task, the protocol set up by the Court required the audited compilation of time and expense to be sent to Deputy Special Master DeJean for review to either accept, reject, or request additional information to cure any deficiencies he might find, and allowed for a multilayered due process appeal to Special Master Russo and ultimately to the Court.[63]

If deficiencies were found in any of the submissions for common benefit time and/or expense, Deputy Special Master DeJean was to issue a deficiency notice to the attorney submitting the claim.  To date, Deputy Special Master DeJean has reviewed approximately 4,500 pages of submissions for common benefit time and expense, has sent out more than 13,000 common benefit time deficiency inquiries, and has sent out more than 30 common benefit expense deficiency notices since he began his review of common benefit claims, ultimately omitting certain time and

---

[61] *See* Rec Docs. 560, 1357, & 2356.

[62] Rec Docs. 1357 & 2356.

[63] *See* Rec Docs. 560, 1357, & 2356.

expense requests. The issued notices granted their recipients fourteen (14) days to correct deficiencies or to request additional time to respond. Upon receipt of all necessary information and documentation, Deputy Special Master DeJean then made a determination as to whether the expense and/or time had been approved by the PEC, PSC, co-lead counsel, or the Court, as required by the process,[64] whether the deficiencies had been corrected, and whether the common benefit time and expense was or was not presumed sufficiently reasonable and thus, was approved or disapproved by Deputy Special Master DeJean. By the agreed to Order of the Court, once this determination was made, a period for appeal to Special Master Russo was allowed and full opportunity to be heard by Special Master Russo was provided, and thereafter, ultimately, full review by and full opportunity to be heard by this Court. If no appeals were taken, by the agreed to Order of the Court, a presumption as to the validity and reasonableness of the submission operated as to the final determination of the Court.[65] To date, there are no remaining objections to decisions on common benefit time and expenses made by any Participating Counsel.

Deputy Special Master DeJean has performed the explained audit procedure throughout the life of this MDL and now, as this matter approached its final resolution, was authorized by the Court to, also, conduct interviews, make inquiry, and gather the information necessary for this Court to make its determination as to the total of the reported submissions for common benefit fees and expense approved and/or requested to the Court and to recommend as to the allocation among counsel.[66] During May and June of 2016, pursuant to the directive of the Court, Deputy Special Master DeJean conducted sworn interviews of all counsel who had submitted common

---

[64] *See* Rec Doc. 2356.

[65] *See* Rec Docs. 1357 & 2356.

[66] *See* Rec Doc 5801.

benefit time and expense claims and who wished to be heard. The interviews addressed the nature

of the work and contribution performed by the submitting attorney and/or firm, as well as a review

guided to some degree by those factors enumerated in *Johnson v. Ga. Highway Express, Inc.*, 488

F.2d 714, 717-19 (5th Cir. 1974)[67] as they might have related to the work of the submitting attorney

and/or firm. During the interviews, each PSC member, PEC member, and/or Participating

Counsel, who elected to be interviewed, had full opportunity to comment on the work done by

others, explain the nature and perceived value of the work done by him or her or their firm and to,

also, comment on what, if any, resources and work might have been used in bringing this matter

to resolution or had to be foregone in order to serve this MDL. All who were interviewed verified

that the only resources, information, or results used in the management, trial, and settlement of

these proceedings, were those of the PSC, PEC, and Participating Counsel who had followed this

Court's ordered protocol; in other words, all verified the PSC used no attorney work product or

input beyond that created within the MDL, to move this matter forward to its ultimate resolution.

Although, perhaps, adding time and expense for Participating Counsel, the PSC, and PEC,

at the early stages and along the progression of the case, the described protocol has proven

wonderfully effective in removing the often extensive unwarranted time, expense, and dissonance

of fee allocation, by documenting the time and expense incurred on an ongoing basis throughout

the litigation, and thus, provided a valuable objective foundational platform for one of the most

contentious aspects of MDLs – namely, fee allocation. Furthermore, the PEC, through Richard

---

[67] As will be discussed in greater detail below, the *Johnson* factors are: (1) the time and labor required; (2) the novelty and difficulty of the issues; (3) the skill required to perform the legal service adequately; (4) the preclusion of other employment by the attorney because he accepted this case; (5) the customary fee for similar work in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

Arsenault's firm, the selected accounting firm of Arsement, Redd, and Morella, and Deputy Special Master DeJean performed ongoing and final cross checking of all submitted requests, approvals and costs to ensure accuracy and transparency – all at no small cost in time and expenditure. Again, note should be made of the unyielding work of Jennifer Hoekstra of Richard Arsenault's firm and Deputy Special Master DeJean and his staff in implementing and facilitating the complex and comprehensive process employed.

It is, also, of note that this Court instructed the co-lead counsel and the PSC that *all attorneys who requested work and who were qualified and capable to do that work, were to receive work*, and the submission process and Deputy Special Master DeJean's Report and Recommendation, reflect this to have been the case; the process requiring pre-approval of all work by the PSC, PEC, or co-lead counsel, with appeal available to the Court, therefore worked to the benefit of all plaintiffs. The interview process conducted by Deputy Special Master DeJean, overall, confirmed the PSC was a well-organized, well led, and efficiently functioning group, and that all outside counsel who followed the established protocol and submitted official requests to the PSC to perform common benefit work were provided with the opportunity. Further, Deputy Special Master DeJean's Report and Recommendation shows the interviews established that the structure of the PSC was such that not only were members of the PSC, but also, all plaintiffs' counsel throughout the country, given full notice of the process in time to fully comply with it, but that all attorneys were kept informed of all developments in the MDL by either co-lead and/or liaison counsel. Again, Deputy Special Master DeJean's Report and Recommendation shows there was unanimity in all interviews conducted that the duties and work of the co-lead and liaison counsel were extremely beneficial to not only the PSC, but, also, to all individual counsel involved in these proceedings.

The foregoing procedures resulted in attorneys' fee claims being submitted in regularly as the litigation progressed and approved, clarified, or rejected on a regular and ongoing basis by Deputy Special Master DeJean, with appeal rights to Special Master Russo and ultimately to this Court. With this unique innovation, once the case has been settled, plaintiffs' counsel are better able to turn their attention away from the often lengthy and contentious matter of fees, to the equally necessary, but often neglected, task of assisting in the administration of the settlement and making the settlement process more effective and efficient. Again, counsels' time and focus throughout the litigation upon documentation of their time and expense expended have allowed counsel, at this stage, to turn their attention to full and effective completion of the core matters at hand. Counsel were freed from the time consuming task of attempting to recreate and to evaluate their past time and resources expended, all of which would have occurred much earlier, in order to make an effective and supportable claim for attorneys' fees and expenses and/or costs. Under the protocol in place, and due in no small matter to the work of counsel, the Neblett, Beard and Arsenault firm, and Deputy Special Master DeJean, that task of *reporting* has already been completed and this Court has already approved objective data from which to work.

Additionally, in an MDL of this size and complexity, the obligation to keep all counsel contemporaneously informed of all processes and relevant developments is taxing; one requiring tremendous time and computer expertise and capacity, and in this matter the Court was relived of that almost overwhelming task by the PSC beautifully, in particular by liaison counsel Patrick Morrow, through tremendous time and effort, and at no small expense. Liaison Counsel Patrick Morrow embraced an, heretofore, undefined new role of liaison counsel and performed this demanding role seamlessly. The contemporaneous notice and reporting to all counsel was instrumental to the transparency of the process and thus, to the involvement of all counsel and,

also, merits special note.  Only with transparency and understanding could all involved counsel meet their ethical responsibilities to their clients, respond to the Court, and work toward and not against the collective good.

It should, also, be noted, the PSC leadership expended significant time, resources, effort, and expertise negotiating a settlement and establishing a settlement process that is global in nature, embracing not only all MDL, but also, state court litigants.  The able assistance and involvement of the state courts involved, also, cannot be understated.  The Honorable Kenneth Freeman and the Honorable William MacLaughlin in California and the Honorable Deborah Dooling in Illinois in particular, contributed greatly to the efficient resolution and management of the global resolution of these claims and of issues related to attorneys' fees and expenses, thus inuring to the benefit of all the claimants whether federal or state.  This Court wishes to take this opportunity to express its genuine appreciation to all the state court judges who helped to resolve these cases, and in particular, to Judges Dooling, Freeman, and MacLaughlin for their exceptional cooperation and professional skill.

This Court was advised certain agreements as to the distribution of common benefit fees and expenses and/or costs, separate from the MSA, were entered into between the PSC and the lead counsel of the Illinois and California coordinated proceedings with the oversight of Judges Dooling and Freeman or MacLaughlin.[68]  This Court was not privy to the details or formation of any such agreements, as this Court played no role in their negotiation, nor has this Court reviewed nor been asked to review the language of any such agreements.  As such, the existence of any such agreements rests with those courts, and will not impact this Court's decisions as to the allocation

---

[68] The process embraced to address amicable resolution of common benefit distribution for the consolidated state court cases remained available to resolve any other such disputed claims, if any arose.

of common benefit fees and expenses and/or costs pursuant to the MSA; however, pursuant to the MSA, this Court will allow the effect of those agreements to be realized within the MSA. This Court, also, has been advised that Judge Dooling and Judge Freeman have established common benefit protocols in their respective proceedings to address individual attorney allocation in those proceedings, and this Court has been provided copies of the orders establishing Qualified Settlement Fund ("QSF") accounts within those respective coordinated proceedings; this Court leaves to those capable judges the decisions as to the individual allocation of common benefit fees within those proceedings, with the Court's appreciation of and for their able involvement.

To date, from June 2012 until June 2016, a total of thirty one firms have submitted claims for common benefit time and/or expense within the federal MDL, resulting in review and approval of over 200,000 hours in audited common benefit time expended in this MDL.

## III.     METHODOLOGY FOR CALCULATING AGGREGATE FEE AWARD

### A.     Distinction between Reasonable Hourly Rates in Multidistrict Litigations and Class Actions

At the outset, this Court wishes to note that much of the jurisprudence concerning common fund and/or common benefit cases arises within the context of class actions, a procedural vehicle similar to, but not the same as, the procedural vehicle of a Multidistrict Litigation. First, it bears noting multidistrict cases flow from a completely separate and distinct statutory origin. The authority to create an MDL flows from 28 U.S.C. § 1407, while class actions are governed by Fed.R.Civ.P. 23 and have roots in the English common law. Although somewhat similar in certain aspects, the two are quite different and distinct in other, fundamental aspects. Whereas, in class actions one attorney or firm represents all claimants and the class action is one case – governed by certain qualifying requirements – in an MDL there are as many separate counsel as there are separate claims, and each claim retains its own independent procedural vehicle, and identity, as

well as its own home venue for *resolution* – the location and venue of the MDL court being only temporary in time, and limited in scope.[69]

The Supreme Court highlighted these statutory limitations in *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 118 S. Ct. 956, 140 L. Ed. 2d 62 (1998); there, the U.S. Supreme Court reversed a Ninth Circuit affirmation of an MDL district court's transfer to itself – under the transfer provision of 28 U.S.C. § 1404 – of a suit the district court deemed sufficiently related to the MDL which had been assigned to it by the JPML. The Supreme Court determined the transfer was improper, basing its decision on a strict reading of 28 U.S.C. § 1407, and noting that the statute "not only authorizes the Panel to transfer [cases] for coordinated or consolidated pretrial proceedings, but obligates the Panel to remand any pending case to its originating court when, at the latest, those pretrial proceedings have run their course." *Lexecon*, 523 U.S. at 34. Furthermore, the Court noted the statute requires that the Panel "shall" remand cases, unless it "shall have been previously terminated" and therefore, held that remand is not subject to judicial discretion. *Lexecon*, 523 U.S. at 34-35.

Other notable distinctions exist between MDLs and class actions, which will be discussed in full detail below. After a full review of all the applicable statutory, jurisprudential and procedural provisions, and with an eye to the existing practical realities existing in an MDL, it is the opinion of this Court that sufficient distinctions exist between the two procedural vehicles – *i.e.*, a class action and a MDL - to warrant review, and that those distinctions should be taken into account and should guide a court when establishing a common benefit award in an MDL. Other

---

[69] Each action transferred by the JPML "shall be remanded by the panel at or before the conclusion of such pretrial proceedings **to the district from which it was transferred unless it shall have been previously terminated**." 28 U.S.C § 1407 (emphasis added). *See also Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 118 S. Ct. 956, 140 L. Ed. 2d 62 (1998).

district courts addressing this issue have suggested a similar conclusion. *See, e.g., In re Vioxx Prod. Liab. Litig.*, 760 F. Supp. 2d 640, 660 (E.D. La. 2010) (electing to use a reasonable hourly rate for the lodestar that is the average of the billing rates for all submitters of common benefit time and/or expense, to reflect the national nature of the plaintiffs' counsels' practice in the MDL, rather than limiting the decision to a reasonable hourly rate within *the court's* locality, as required for class actions); *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on Apr. 20, 2010*, No. 2179, 2016 WL 6215974, at *19 (E.D. La. Oct. 25, 2016) (using an average or blended rate for the purposes of conducting a lodestar analysis).

Within the more homogeneous class action, as noted, a reasonable hourly rate arguably should be determined with reference to the legal community in the locality in which the district court sits[70] – which, also, with a class action will be the proper venue for that matter, as well; that is not the case for an MDL. Rather, in MDLs the venue *for resolution of each case* remains the venue of original filing for that case. There is no *collective venue* but for the *temporary* venue of

---

[70] The Court in *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 754-55 (S.D. Tex. 2008), presented a review of certain relevant common fund jurisprudence within *class actions*, which indicated

> [a] reasonable hourly rate should be in accord with rates "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum v. Stenson*, 465 U.S. 886, 895–96 n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). "A reasonable hourly rate is determined with reference to the prevailing market rate in the *relevant legal community for similar work*.... While the hourly rate must be 'adequate to attract competent counsel,' the 'measure is not the rates which lions at the bar may command.' " *Coleman v. Houston Independent School District*, 202 F.3d 264, 1999 WL 1131554 (5th Cir.1999), *citing Leroy v. City of Houston*, 906 F.2d 1068, 1079 (5th Cir.1990). The relevant legal community is the one in which the district court sits, no matter how much of the work is done elsewhere. *Green v. Administrators of Tulane Educational Fund*, 284 F.3d 642, 662 (5th Cir.2002), *abrogated on other grounds, Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). In addition to the community rate, the district court must also consider the attorneys' regular rates. *Louisiana Power & Light Co. v. Kellstrom*, 50 F.3d 319, 328 (5th Cir.1995)(emphasis added).

the court, *temporarily* empowered to handle *pretrial* matters, with ultimate resolution to occur in the original court of proper venue, unless previously terminated within the MDL.

In determining a reasonable hourly rate within that *class action*, the court in *In re Enron* looked, in part, to the typical hourly rates charged in the Houston/Dallas area, as that was where *the single class action had been filed* and *where venue was proper*.[71]  Looking to local Houston rates to assist in the determination of a reasonable hourly rate for a class action filed in that locality was the method chosen by the court for *that class action* and not without good reason – the matter was a *single* case, filed *against a defendant located in the Houston area*, pursued by *a single attorney or firm*, under the *normal venue* allowed for under the federal rules of civil procedure. As mandated by the class action venue provisions, *the court handling the matter would be situated in the proper venue for the case*, there, Houston.   Thus, Houston was the proper venue for the *single case* – a class action.  *Lead Counsel were located in Houston, the suit concerned actions taken by Enron (a corporation located in Houston), and venue was proper in Houston.* Consequently, much as in any other *single case*, the hourly rates charged should reflect those factual realities.  There, Houston offered the truest picture of the reasonable rates for the work done in that suit, no matter where the work might have been performed - *just as in any non-class action case*.

MDLs, by contrast, are <u>not</u> one case, rather they are *a loose collective of separate cases temporarily* brought together by a specific statute for a limited purpose, *only for the handling of pretrial matters for a limited duration* destined to return to their proper venue if not previously terminated.[72]  Each individual case is unique as to its specific individual claim, and *the collective*

---

[71] *In re Enron*, 586 F. Supp. 2d at 778-86.

[72] 28 U.S.C. § 1407.

*is only a temporary creation* of statute.[73] MDLs are, by statutory creation, only *a temporary forced gathering of a plethora of separate cases, which were originally filed in courts found within their proper venues (across the United States) and destined for final resolution in those courts (across the United States) within those venues, brought together for collective handling before another court for only pre-trial matters and only until those pretrial matters are completed.* Under the MDL statute, it is contemplated that cases *are to be tried in the original courts and districts in which they were filed*, but are consolidated before a selected MDL judge for *pre-trial* purposes only, and only if the JPML determines such temporary consolidation "will be for *the convenience of parties and witnesses* and *will promote the just and efficient conduct* of such actions."[74] Thus, with an MDL, there is no inherent requirement that the transferee district(s) be the situs of the conduct complained of, nor the district where any party is located, nor where any counsel is located, nor where any acts might have occurred, nor where the work should or might be done. In fact, as a practical matter, often no party is a resident of the district selected for the MDL court, and it is not at all unusual that none of the counsel serving for the common benefit is from the location of the MDL court, nor is any of the discovery or pretrial work performed in that venue. Indeed, the selection of the MDL judge and court location historically has had little to do with the location of the defendant or the location of the plaintiffs, or where original venue is proper for the many cases involved – venue being suspended by the statue – rather, that selection is made by the panel with an eye to "the convenience of the parties and witnesses" and to the "just and efficient conduct" of such actions, and historically has keyed more to the capability of the judge and the

---

[73] 28 U.S.C. § 1407.

[74] 28 U.S.C. § 1407. *See also Lexecon, Inc. v. Milberg, Weiss, Bershad, Hynes & Lerach*, 523 U.S. 26, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998).

judge's court's ability to handle such a large collective of cases, and practical considerations such as ease of transportation for *the expected* out of state counsel, witnesses, and parties when working in a given court.  Thus, to tie the allowable fee *for out of state counsel* representing clients *in individual suits filed throughout the country and destined to be resolved in courts throughout the country* to the fees prevalent in *the locality of the court selected to handle the temporary collective*, does not support or display the same logic as with class actions.  Rather, such a requirement in an MDL, in fact, could have unintended negative and harmful consequences, by having the locations which might support a higher hourly rate being favored by counsel over locations which might reflect a lower hourly rate, and act to bypass courts which might be well suited to the task at hand and bypass a judge who might be highly capable, and thus, handicap the sought judicial efficiency.  Requiring common benefit fees in MDLs to be determined by the typical hourly rates charged *in the locality of the <u>transferee</u> court – which might have little if any connection or relationship to the parties, the counsel, the claims made, or proper venue of the many cases involved* – does not hold the same compelling logic as it does with a class action.

Indeed, the Actos® MDL provides a prime example of the incongruity of which this Court speaks.  While the JPML chose the Western District of Louisiana, Lafayette Division as the transferee court to handle the pre-trial matter of MDL 2299, Lafayette bears no inherent relation to the dispute, the parties, the many original venues, or the involved counsel – the chief Takeda entities are located in Japan and Illinois; the plaintiffs and plaintiffs' counsel span the entire United States of America; the venue proper as to each individual claim spans the entire United States, and the PSC, PEC, and Participating Counsel comprise attorneys whose practices span the entire United States.  Indeed, the "relevant legal community," as defined in *In re Enron*,[75] and referenced

---

[75] *In re Enron*, 586 F. Supp. 2d at 754.

by Judge Fallon in *In re: Vioxx Prod. Liability Litigation*, supra, in the Actos® MDL is that reflected by the plethora of counsel having claims in the multidistrict litigation, and the proper venues of those claims.  In this instance, as in many MDLs, that of the United States; thus, the relevant legal community is comprised of counsel who practice within a unique MDL bar and whose practice, as Judge Fallon recognized in *Vioxx,* is national in nature.[76]

The counsel in this MDL span the entire United States; the original and proper venues span the entire United States; the work done spanned both the entire United States and international locations; and the defendants are international and national corporations that bear no relation to the MDL court location.  While this MDL court is located in Lafayette, Louisiana, only a portion of the work in the MDL was performed by attorneys in the physical area of Lafayette, Louisiana and that work, for the most part, was tied directly to participation in Court matters.  Rather, the legal community of the attorneys who prosecuted the MDL, quite literally, spans the nation, conducting work across the nation and outside the United States, for the collective benefit of cases properly filed across the nation, and destined, by statute, to be returned to and resolved in courts located across the nation.[77]  While the legal community of Lafayette, Louisiana is no less skilled or professional than those of, perhaps, San Francisco or New York, in an MDL of this nature, the differing local rates that might prevail in San Francisco or New York or in Lafayette, Louisiana should not by themselves determine the rates of counsel from all across the nation who did work for the benefit of cases from across the nation, destined to be resolved in courts across the nation.  To use the typical hourly rates charged in the area which happens to be where the selected and

---

[76] "In *Vioxx*...the attorneys come from states across the country.  Thus a more national rate is the appropriate pole star to guide the Court."  *In re Vioxx Prod. Liab. Litig.*, 760 F. Supp. 2d 640, 660 (E.D. La. 2010).

[77] 28 U.S.C. § 1407.

temporary MDL Court sits – which, again, almost always is not where all of the parties reside, or where the majority of counsel practice, or the proper venue for every member case – such as here, Lafayette, Louisiana, to calculate the lodestar, again, clearly lacks the compelling logic found in a class action and as noted, would result in an arbitrary determination, higher or lower than that which should be proper for compensation, either for the time expended, or for the caliber of work produced. Again, MDLs, by their statutory creation, represent a *temporary*[78] *collective of cases from across the nation*, pursued by a *nationwide collective* of counsel, who engage in *a national practice*, for the common benefit of *a collection of nationwide claimants*. In reality, with an MDL, the "relevant legal community,"[79] is, in fact, as the Honorable Eldon Fallon noted in *In re: Vioxx Prod. Liab. Litig.*, 760 F. Supp. 2d 640, 660 (E.D. La. 2010) that *collective of counsel from the collective of the proper venues* temporarily brought together for pre-trial purposes – here, *a national collective*. Additionally, there is no indication in the MDL statute or the actions of the JPML that either intends or suggests that the choice of which judge, or whatever location might be selected for the MDL, is to determine the attorney rate for common fund recovery evaluation; to the contrary, the statute is silent as to that discrete issue and the JPML criteria for selection of the MDL venue are geared more to the practicality of the court's capacity and ability and the convenience of those attorneys, witnesses, and parties involved. Therefore, this Court is of the opinion a broader view of what constitutes the "relevant legal community"[80] when dealing with an

---

[78] This Court notes that statutorily MDLs are created for pre-trial purposes only, but is fully cognizant the practical reality is that once pre-trial matters are resolved, the path often, is cleared for settlement – however, this occurs by agreement of all parties and is contemplated by the statute by its reference to return "unless previously terminated."

[79] *In re Enron*, 586 F. Supp. 2d at 754.

[80] *In re Enron*, 586 F. Supp. 2d at 754.

MDL of this size is appropriate to address a lodestar evaluation, rather than the locality found in single class actions.

Additionally, considering the immense expense that must be outlaid to conduct an MDL, tying the evaluation of compensation to the location of the judge and court selected by the Panel, rather than having it reflect the more relevant practical realities and factors of the venue of the cases, recognition of the national nature of the matter, and the unique expertise involved, and costs across the country could, also, result in an egregious over-compensation, or under-compensation, of counsel depending upon the circumstances present. Again, it cannot be overlooked that the selections of the court and judge by the JPML have little, if any, consideration of or relationship to the compensation possible for collective and common benefit work. Therefore, this Court is, again, of the opinion that a broader scope, acknowledging the immense breadth of location and experience represented by plaintiffs' counsel in this case, is required to adequately determine a lodestar for use in addressing the common benefit fee in this case. That, however, is not to say that the location of the presiding court should never have bearing on the calculation or should never be one of several factors considered, particularly in smaller more geographically compact cases. Certainly, this factor should, when relevant, be considered and given weight. This Court can envision circumstances where the location of the MDL Court could, and perhaps should, be given great weight. However, under the facts of this case, this Court remains of the opinion that with the national and international nature of this multidistrict litigation, the locale of the presiding court should not be the determinative factor. Thus, in this matter the Court will follow the lead established by my capable and experienced colleague, the Honorable Eldon Fallon and find, in *this* MDL – the "relevant legal community"[81] is one national in nature, but will, also, be cognizant of

---

[81] *In re Enron*, 586 F. Supp. 2d at 754.

and certainly consider those rates selected in similar MDLs in this area when evaluating an applicable lodestar.[82]

**B.     Calculating the Aggregate Fee Award**

In determining *the analysis* to employ in determining fees in those type cases which contemplate "common funds," the Courts, again, have more often borrowed from class action cases.  In the more generalized "common fund" cases, the Fifth Circuit has noted the court has an independent duty to the plaintiffs and to the public to ensure that amounts paid as common benefit are reasonable, as noted in, *In re High Sulfur Content Gasoline Prods. Liab. Lit.*, 517 F.3d 220, 227-28 (5th Cir. 2008), a class action case.  This Court finds the Fifth Circuit's instruction in that case equally applicable to MDLs.  In all common fund cases, courts have typically used one of two methods for calculating attorneys' fees: (1) the percentage method, where fees are based on a reasonable percentage of the common fund; or (2) the lodestar method, where fees are computed by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate and, in the court's discretion, applying an upward or downward multiplier.  *See Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 642-43 (5th Cir. 2012).  In *Union Asset*, a securities fraud class action, the Fifth Circuit "join[ed] the majority of circuits in allowing our district courts the flexibility to choose between the percentage and lodestar methods in common fund cases, with their analysis under either approach informed by the *Johnson* considerations."  *Id.* at 644.

Virtually all of the recent common fund fee awards by district courts in the Fifth Circuit -- whether MDL or class action -- have used the percentage method, with an overlay analysis of reasonableness, using the *Johnson* factors.  *See In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on Apr. 20, 2010*, No. 2179, 2016 WL 6215974, at *15 (E.D. La.

---

[82] *In re Vioxx Prod. Liab. Litig.*, 760 F. Supp. 2d at 640.

Oct. 25, 2016); *In re FEMA Trailer Formaldehyde Prod. Liab. Litig.*, No. 07-1873, 2013 WL 1867117, \*3 (E.D.La. May 2, 2013); *In re Vioxx Prods. Liab. Litig.*, 760 F.Supp.2d 640, 652 (E.D.La. 2010); *Burford v. Cargill, Inc.*, No. 05-0283, 2012 WL 5471985, \*1 (W.D.La. Nov. 8, 2012); *In re OCA, Inc. Sec. & Derivative Litig.*, No. 05-2165, 2009 WL 512081, at \*19 (E.D.La. Mar. 2. 2009); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F.Supp.2d 732, 766 778 (S.D.Tex. 2008); *Turner v. Murphy Oil USA, Inc.*, 472 F.Supp.2d 830, 860-81 (E.D.La. 2007). Also finding the noted method of analysis appropriate for this MDL, this Court will determine the valuation of the benefit received by the Settlement claimants, and also, set the benchmark percentage to be applied to the total value of the settlement, following which the Court will test the reasonableness of that percentage by consideration of the *Johnson* factors.

By way of context, in *Johnson v. Ga. Highway Express, Inc.*, plaintiffs had prevailed in a class action asserting violations of Title VII of the Civil Rights Act of 1964, and challenged the adequacy of the District Court's award of attorneys' fees for plaintiff's counsel. After describing factors that must be considered as part of the determination of the reasonableness of any award of attorneys' fees – which factors are listed and discussed below – the Fifth Circuit vacated the District Court's award of attorneys' fees and remanded for reconsideration in light of certain factors. *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714, 720 (5th Cir. 1974). *Johnson* was overruled to a very narrow extent by the United States Supreme Court in *Blanchard v. Bergeron*, 489 U.S. 87, 109 S. Ct. 939, 103 L. Ed. 2d 67 (1989). There, the Supreme Court considered the Fifth Circuit's statement in *Johnson* that, while "whether the fee is fixed or contingent" is one factor to consider when determining whether a fee is reasonable, a litigant should never "be awarded a fee greater than he is contractually bound to pay, if indeed the attorneys have contracted

as to amount." *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d at 718.[83] The Supreme Court reversed only that portion of the *Johnson* decision in the context of determining the reasonableness of a fee awarded pursuant to 42 U.S.C. § 1988, stating that in that context "[t]he *Johnson* contingency-fee factor is simply that, a factor," and "a contingent-fee contract does not impose an automatic ceiling on an award of attorney's fees." *Blanchard v. Bergeron*, 489 U.S. 87, 93, 109 S. Ct. 939, 944, 103 L. Ed. 2d 67 (1989). Thus, the list of factors provided in *Johnson,* that must be considered when determining the reasonableness of attorneys' fees, in *a class action*, were not disturbed. Those factors are: (1) the time and labor required; (2) the novelty and difficulty of the issues; (3) the skill required to perform the legal service adequately; (4) the preclusion of other employment by the attorney because he accepted this case; (5) the customary fee for similar work in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974), *overruled on other grounds, Blanchard v. Bergeron*, 489 U.S. 87 (1989).

## IV.    REASONABLENESS ANALYSIS

### A.    Valuation of the Benefit Obtained

First, this Court will determine the value of the benefit obtained; to a certain extent this Court addressed that issue above and references and incorporates that discussion herein as well. The Court, also, notes the monetary value of a settlement fund includes all monetary amounts

---

[83] As explained, any award of common benefit fees to be awarded pursuant to the MSA in this matter, **are to come from the attorney's fees already having been agreed to by the attorney and his of her client at the outset.**

actually paid (or irrevocably deposited into a fund for payment) to or for the benefit of plaintiffs pursuant to the terms of the global settlement. *See, e.g., Murphy Oil*, 472 F.Supp.2d at 861; *Vioxx*, 760 F.Supp.2d at 652. Under the terms of the MSA in this matter, in light of the level of participation, this Court finds the total value of the settlement to be $2.4 billion; and the award given by the jury in the bellwether case, which was awarded by the Court, ultimately, was $1.5 million in compensatory damages, and $36.875 million in punitive damages. The awarded $9 billion in punitive damages having been reduced by this Court to $36.875 million[84], over and above the global settlement amount. Undeniably, great financial benefit has been obtained. Additionally, there are other non-monetary benefits which flow from the resolution obtained; those national/global non-monetary benefits were discussed above, and should be incorporated herein, and will, also, to some extent, be further addressed below.

**B.    Benchmark Percentage**

The next step this Court will address, is to determine the benchmark percentage for the common benefit award. To do this, the Court will first look to awards for common benefit work in comparable cases. This Court finds instructive its fellow courts' suggestions. *See Enron*, 586 F.Supp.2d at 745 n.12; *Murphy Oil*, 472 F.Supp.2d at 862 ("[T]he percentage should not be completely arbitrary, devoid of reality, or inconsistent with the usual fees for the type of case involved. In short, there is no one percentage that should apply to all cases. Each case should be analyzed on its own basis."). Global recoveries of $100 million or less are ubiquitous, and the case law readily establishes a customary or benchmark percentage-of-benefit award of 25%. *See Enron*, 586 F.Supp.2d at 745 n.12; *Murphy Oil*, 472 F.Supp.2d at 863-64. However, in the "mega-fund" cases, (recoveries exceeding $100 million) or "super-mega-fund" cases (recoveries

---

[84] *See* Rec. Doc. 729 in civil action 6:12-cv-00064.

exceeding $1 billion), such as this, whether in class actions or MDLs, there are fewer pure percentage awards to serve as a benchmark; consequently, there is variability in the percentages awarded in these cases. *See In re Prudential Ins. Co.*, 148 F.3d 283, 339 (3rd Cir. 1998) ("The district court also examined the fee awards in *class actions* with recoveries exceeding $100 million and found the fee percentages ranged from 4.1% to 17.92%."); *In re Diet Drugs Prods. Liability Litig.*, 553 F.Supp.2d 442, 480 (E.D.Pa. 2008) (noting percentages ranging from 4.8% to 15% where the fund exceeded $1 billion). It, also, appears that as the size of the recovery increases, the percentage tends to decrease. *See Vioxx*, 760 F.Supp.2d at 652. Nevertheless, a review of the relevant jurisprudence indicates awarding courts have rejected a blanket rule that would automatically cap the fee percentage at a low figure even when the total recovery is quite high. *See Enron*, 586 F.Supp.2d at 753. The settlement in this MDL clearly qualifies as a "super-mega-fund" recovery and, thus, the opportunities for comparison are relatively few. Accordingly, it is perhaps more illuminating to consider *the range or average of percentages* in other *super-mega-fund* cases. This Court has reviewed those super mega-fund cases and found that if one averaged the average fee awards, approximately 9.9% of the total settlement value would be that average. However, this Court cautions that **every case** – whether super mega-fund or not, whether a class action or MDL – **is unique and should be treated as such**. Thus, any attempt to discuss a black letter percentage is illusory. Rather, a court such as this one, it would seem, is better served to *be guided* by its independent duty owed to plaintiffs and to the public to ensure amounts paid as common benefit are reasonable,[85] based upon all hard data available, along with the more subjective concerns explored in other similar cases.[86]

---

[85] See *In re High Sulfur Content Gasoline Prods. Liab. Lit.*, 517 F.3d 220, 227-28 (5th Cir. 2008)

[86] *See In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008); *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Products Liab. Litig.*, 553 F. Supp. 2d 442

Considering the information uniquely available to this Court, *i.e.*, hard data available from the timekeeping process put in place at the outset, the insight of the Deputy Special Master who was put in place at the outset and reviewed all work done within the context of his review and observation of the trial, and the insight provided by this Court's extensive hands on involvement in this case, and from input from all of the Special Masters, and upon request of plaintiffs' counsel to declare a preliminary amount, this Court previously ordered a preliminary *holdback* of 8.6% of the total settlement value, to be available to fund any possible compensation of the PSC and Participating Counsel for their common benefit services,[87] with full recognition the declared percentage could change once the Court had all of the available data and information available that would exist at the resolution of the case. This preliminary holdback was determined using *an approximation* of the *expected amount and value* of the attorney's fee claims and expense claims, based on those claims for fees and expenses that had been received at that time, as informed by the *Johnson* factors ascertained by this Court's extensive hands on participation. Again, this Court

---

(E.D.Pa. 2008); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319 (S.D.N.Y. 2005); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d 437 (E.D.N.Y. 2014); *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003); *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249 (D.N.H. 2007); *In re Cendant Corp. Litig.*, 243 F. Supp. 2d 166 (D.N.J. 2003); *In re AOL Time Warner, Inc. Sec.*, 2006 WL 3057232 (S.D.N.Y. Oct. 25, 2006); *In re Bank of America Corp. Sec., Derivative, and ERISA Litig.*, No. 09-md-2058 (S.D.N.Y., Apr. 8, 2013); *Shaw v. Toshiba Am. Info. Sys., Inc.*, 91 F. Supp. 2d 942 (E.D. Tex. 2000); *In re Toyota Motor. Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liab. Litig.*, No. 10-ml-2151 (C.D. Cal., June 17, 2013); *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 106 F. Supp. 2d 721, 736 (D.N.J. 2000); *In re Black Farmers Discrimination Litig.*, 953 F. Supp. 2d 82 (D.D.C. 2013); *DeLoach v. Phillip Morris Cos.*, 2003 WL 23094907 (M.D.N.C. Dec. 19, 2003); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 WL 1365900 (N.D. Cal. Apr. 3, 2013); *In re Nortel Networks Corp. Sec. Litig.*, No. 01-cv-1855 (S.D.N.Y., Jan. 29, 2007); *In re Nortel Networks Corp. Sec. Litig.*, No. 04-cv-2115 (S.D.N.Y., Dec. 26, 2006); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 461 F. Supp. 2d 383 (D. Md. 2006); *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006); *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998); *In re Sulzer Hip Prosthesis & Knee Prosthesis Liab. Litig.*, 268 F. Supp. 2d 907, 939 (N.D. Ohio 2003).

[87] Rec. Doc. 5850.

now has available more complete information and the experience of presiding over a trial and all pretrial matters, and now considering the additional information available to the Court provided by the Deputy Special Master, the recent settlement, and being informed as to other "super-mega-fund" cases now being available, and, in particular, now having benefit of Deputy Special Master DeJean's Report and Recommendation, as well as benefit of the value of a <u>global</u> resolution and the value of counsels' full participation in this matter, and for the full reasons noted above and incorporated by reference here, as well as those reasons to follow, this Court finds the 8.6% – the percentage established by this Court in its Holdback Order – is reasonable and, also, in line with the common benefit award percentages in other super-mega-fund cases and likely a proper starting point for this Court's analysis.

### C.    *Johnson* Factors

However, a finding of reasonableness does not, in and of itself, necessarily, end the inquiry or the analysis. The relevant jurisprudence instructs the Court's analysis should, also, be informed by the *Johnson* factors. Therefore, the Court will now consider the *Johnson* factors in order to address the reasonableness of the percentage. The Fifth Circuit advises that it does "not require the trial court's findings to be so excruciatingly explicit in this area of minutiae that decisions of fee awards consume more paper than did the cases from which they arose." *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220, 228-29 (5th Cir. 2008). The Court is mindful of this instruction and will reflect that instruction in its review, but, also, is mindful of its obligation to protect the plaintiffs and the public in any award made and the need for full and complete transparency in the area of such great possible contention.

To begin, as part of the reasonableness analysis, *Johnson* suggests consideration of a lodestar amount. As noted above, this Court is mindful of the instruction provided by the jurisprudence, but, also, notes that uniquely, this Court has benefit of an objective history and

71

actual accounting and review of the actual work performed by all counsel or their firms, the location and the nature of the work performed, and the impact or value of that work in this case, that might not have been available in other MDLs or class actions. The Deputy Special Master reports that Participating Counsel have submitted approved claims for more than 200,000 hours of common benefit work on behalf of the respective firms. The audited number of hours each firm has submitted is found in the incorporated Deputy Special Masters' Report and Recommendation and this Court accepts and adopts the Deputy Special Master's recommendation as to the number and nature of compensable hours expended.

Courts with MDLs of similar size *within this area* and the recent past have used $450 as an appropriate average/blended hourly rate for work performed. *See Enron*, 586 F.Supp.2d at 779-80 (a class action, approving an average/blended rate of $456 in 2008); *Vioxx*, 760 F.Supp.2d at 660 (an MDL, approving an average/blended rate of $443.29 in 2010); *Deepwater Horizon*, 2016 WL at *19 (an MDL, approving an average/blended hourly rate of $450 in 2016).[88] Again, the rate reflective of the area where the presiding Court sits, although certainly informative, should not, in a case such as this one, necessarily be wholly determinative. However, neither is it always irrelevant to the inquiry, thus, this Court notes those rates as reflective of the locales and times involved, and includes them as a factor to be considered when evaluating the reasonableness of the amount assessed to compensate common benefit fees.

Again, this Court notes the potential rate as discussed above is only one factor to be considered for the purpose of evaluating the reasonableness of the total amount to be withheld in

---

[88] The Court, for instance, notes that a reasonable hourly rate of approximately $450 has been referenced in previous Fifth Circuit cases but has not necessarily been adjusted over time. *See, e.g., In re Enron* (in which proceedings began in 2001, at the latest); *Vioxx*, (in which the earliest state proceedings began in 2002, and an MDL was created in 2005); *Deepwater Horizon* (initiated following an oil spill that occurred in 2010).

order to compensate common benefit fees. *The jurisprudence suggests that the average rate is not necessarily reflective of the rate ultimately used to calculate any firm's award, rather it is used as an additional evaluation of the reasonableness of a total common benefit fee award.* This Court notes, as did the Common Benefit Fee and Cost Committee in *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010,* that many Participating Counsel in personal injury cases, typically work on contingency basis, and therefore, as a practical reality, do not have established hourly rates.[89] Therefore, an hourly rate should only be considered one factor among several when determining the reasonableness of a fee award, rather than determinative of the hourly rate awarded to any individual attorney.

Furthermore, this Court has the unique advantage of having hard data, generated throughout the litigation, as to the number of hours worked by counsel, as discussed above, to consider as to a reasonable rate; however, the raw data of hours actually worked is, also, merely a starting point for a meaningful evaluation. Neither an hourly rate nor the number of hours expended by a firm for the common benefit necessarily reflects *the value of or the quality of the work performed, nor the benefit obtained* from that work; other "intangible" factors (*e.g.,* the import of the work to the outcome of the MDL or to the negotiation of the MSA, the expertise in a certain field) might have greatly affected the benefit generated. Consequently, the Court will briefly evaluate the work done in light of the *Johnson* factors in light of the analysis suggested by applicable jurisprudence.[90]

---

[89] Fee and Cost Committee Recommendation for Proposed Cost Reimbursement and Fee Allocation, 2:10-md-02179-CJB-JCW, Rec. Doc. 22628, 5 n. 11 (E.D. La. April 11, 2017).

[90] This Court is not unaware that certain pending cases have not participated in the Settlement Program, and that those matters will ultimately be resolved separately. Consequently, this Court finds the common benefit discussion in this ruling would not necessarily be entirely reflective of those remaining matters, nor will work done for the benefit of those remaining matters be attributable to those cases which have participated in this Settlement Program. Consequently, this ruling addresses the common benefit for

First, again it should be noted, full discussion of the history and nature of this case has been laid out above and acts also, to inform this analysis, but for purposes of brevity will not be repeated below, rather will be incorporated by this internal reference.

1.   Novelty and Difficulty of the Issues (Factor 2); The Skill Required to Perform the Legal Service Adequately (Factor 3); and The Experience, Reputation, and Ability of the Attorneys (Factor 9)

In this case, the plaintiffs sought to prove a novel, scientifically obtuse, and extremely document intensive and difficult case founded on a not before legally established link between a drug, Actos® and a certain type of bladder cancer. In so doing, the PSC was required to develop a sophisticated expertise in medical science, the scientific method, an encyclopedic knowledge of vast scientific and medical publications; an understanding and historical knowledge and understanding of broad regulatory action(s) nationally and in the European Union; while also, engaging superb organizational and administrative skill by mastering enormous amounts of technical and regulatory knowledge in order to be able to pull together, into a coherent and meaningful whole, all the information available, while meeting a vigorous, well-funded defense mounted by large corporate defendants with able and aggressive attorneys. This task, while daunting in its own right, was made more difficult by the novelty of the science, the difficulty inherent in proving up cutting edge science and the optimistic time frame imposed by the Court. All these factors argue the 8.6% is reasonable.

The *Johnson* court indicated that, in order to evaluate the skill required to perform the legal service properly, the trial judge should closely observe the attorney's work product, his or her preparation, and general ability before the court. The trial judge's expertise gained from past

---

only those cases which participated in the present Settlement Program – any remaining matters will be addressed in a separate and independent process, and the court will address any possible common benefit issues among those remaining cases separately and apart from this ruling.

experience as a lawyer and his or her observation from the bench of the lawyers at work become(s) highly important in this consideration.  This Court was hands-on on a daily basis throughout the case's progression, and presided over the extensive trial preparation and ten week trial of the bellwether trial and, therefore, has been able to observe the legal skill displayed and expertise required to develop and present to a lay jury both the facts and the law in these proceedings, particularly necessary while contending with an often equally motivated set of counsel for the defense mounting an equally vigorous defense.  This Court found plaintiffs' counsels' skill and expertise displayed to have been superb in all respects.  The PSC, Participating Counsel, co-lead counsel, liaison counsel, trial counsel, and the trial team performed exceptionally, and at the highest level, and the work performed throughout the litigation, *i.e.*, in discovery, in written submissions, trial preparation, trial performance, and settlement negotiations and in the creation of the MSA and implementations of the settlement process, was of equal excellence.  The attorneys involved were highly experienced, displayed a broad panoply of unique expertise, and performed at the top of their profession.  Their tireless efforts and the quality of their work was readily apparent to the Court.  The experience, expertise, skill, ability and reputations of the PSC, co-lead counsel, liaison counsel, and trial counsel are reflective of their mastering of a specialized area of practice, national both in scope and level of performance.  These factors, also, support a finding the 8.6% is reasonable.

    2.    <u>Time and Labor Required (Factor 1); Preclusion of Other Employment (Factor 4); Time Limitations Imposed by the Client or the Circumstances (Factor 7)</u>

As indicated by my able colleague, "[C]ollectively, these three factors require the Court to give appropriate credit to the intensive and sustained efforts of Participating Counsel to bring this litigation to a timely resolution." *Vioxx*, 760 F.Supp.2d at 656.  The "time and labor required" factor not only helps the Court to evaluate the work done, but also, serves the injured claimants

and, also, can help guard against spurious claims and counsel rushing cases to settlement to obtain a fee that might not reflect the actual work done.

Criticism, perhaps not unjustified, of the overall MDL process has been found within the attorneys' belief they would lose control of the destiny of their cases, if a part of an MDL process, and that the MDL process would take too long to complete. With mindfulness of these criticisms, this Court, as explained above, at the outset, offered counsel the opportunity to be active participants in molding the litigation process from a "bottom up" and not a "top down" basis – an opportunity they readily embraced – and the Court, also, established the goal of four year completion – a goal counsel, perhaps, less enthusiastically than the former, embraced. Nonetheless, counsel rose to the challenge and the occasion and diligently worked toward both goals with true commitment and with significant demonstrable success. Therefore, from the outset, the goals of handling this MDL from a "bottom up" and counsel hands on perspective and of completing this MDL in four years were embraced, implemented, and ultimately substantially reached by counsel. From the initial status conference until announcement of the settlement, at each meeting between the Court and various counsel, counsel were reminded the goal remained to conclude this MDL within four years. The importance of this four-year timeframe and hands on approach by counsel was reflected in every case management order negotiated by the parties and submitted to the Court, and in the challenging pace at which counsel worked. The practical impact of the ambitious timeframe and the hands-on involvement of counsel, became the practical reality. In order to meet those dual goals, the PSC, co-lead counsel, liaison counsel, and Participating Counsel dedicated the bulk of their and their firm's time and resources to this MDL, often effectively limiting their ability to participate in other MDLs in any leadership capacity, if at all; and with several counsel having to limit their and their firm's ability to accept other work,

especially larger cases of any nature.  Thus, select members of the PSC, in particular, often found themselves and their firms severely limited in their ability to accept other employment for much, if not all, of their time within this MDL, and thus, also, as a practical reality limited their and their firms' income during that period, all the while having to incur time and expense within the MDL, placing not only time, but also, real financial constraints upon them and their firms.

The PSC have performed an immense amount of work in this MDL.  The PSC and Participating Counsel's firms expended over 200,000 hours of approved common benefit work; counsel took approximately 130 depositions and analyzed more than 32 *million pages* of documents; furthermore, the PSC mounted a complete, ten-week bellwether trial against a vigorous defense that required nearly 24 hour and 7 days a week involvement for over 10 weeks focus and work.  The involved lawyers spent days, weeks, and months away from their practices, their homes, and their families over the course of this case at no small expense and sacrifice. Throughout the litigation, the PSC performed with an extremely high level of expertise, collaboration, and agreement, often unique in large multi-counsel matters, which benefitted not only the plaintiffs in the MDL, but all plaintiffs across the country, as evidenced by the success of the Global Settlement Program.

Furthermore, the Settlement, Settlement Process, and written MSA, which were devised, negotiated, and implemented by certain of the PSC leadership and defendants' settlement counsel, required an unprecedented level of expertise, experience, skill, effort and talent to negotiate, create and implement.  The issues involved included a comprehensive and complex set of claimants, circumstance, and legal issues.  The MSA is a comprehensive and complex document that was so well conceived and constructed almost all of the Actos® cases filed *in the United States* in both state and federal courts, have voluntarily joined in the process created therein.  Historically, and

regrettably often, after the settlement is negotiated, the PSC feels itself largely discharged of their responsibilities. Here, however, the co-leads and certain PSC members have continued to devote much time and effort implementing the settlement and settlement process, working with the Claims Administrator, program vendors, defendants' settlement counsel, and the Court on administrative and interpretive implementation issues – no small matter in a nationwide global settlement such as this and their commitment is reflected in the success of the program created.

Therefore, this Court finds the PSC have expended an incredible amount of time, effort, and expense and have reflected clear expertise in their leadership and representation. The PSC have responded to motions, injunctions, prepared for and engaged in a ten week trial, and met an equally aggressive defense team. The PSC, also, have responded to an initial appeal filed by Takeda, and implemented a nationwide settlement process, all of which could not have been contemplated by this Court at the time the initial holdback was created. The results obtained, and the PSC's involvement, leadership, and participation since that initial holdback only serve to further validate the reasonableness of the percentage ordered withheld, and all support and further validate the reasonableness of the 8.6 percentage.

3.   The Amount Involved and the Results Obtained (Factor 8)

The Supreme Court, the Fifth Circuit, and the district courts addressing this matter have held that the most critical factor in determining the reasonableness of a fee award is the "degree of the success obtained." *Enron Corp.*, 586 F.Supp.2d at 796-97 (*citing Farrar v. Hobby*, 506 U.S. 103 (1992); *Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1047 (5th Cir. 1998)). Success, however, is determined not only by the gross amount of the recovery, but also, by the number of individuals who benefit from the settlement, the degree to which it provides them with full compensation for their injuries, and the extent to which the settlement benefits the public at large. As noted in *Vioxx*,

760 F.Supp.2d at 657-68; *Murphy Oil*, 472 F.Supp.2d at 866; *In re Diet Drugs*, 553 F.Supp.2d 442, 472-73 (E.D.Pa. 2008).

In this matter, the parties chose to participate in a bellwether process; one bellwether case was ultimately selected and tried to completion. That case originated in New York; was tried pursuant to New York substantive law; the claimants resided in New York; the actual trial involved counsel from across the nation. The jury verdict included both substantial general damages of $1.5 million and a substantial punitive damage award of $9 billion (ultimately reduced by this Court to $36.875 million). While this Court did reduce the punitive damages award, the award, nonetheless, remains substantial. The substantial recovery obtained in the bellwether case may be assumed to have prompted or at least influenced the parties to negotiate the agreed to collective settlement totaling $2.4 billion; a sum sufficiently large to provide an adequate pool for recovery for all individual claimants, and an amount sufficient that close to one hundred percent of the plaintiffs, *throughout the entire United States* in state courts as well as the MDL, who were eligible to participate in the settlement program, have voluntarily chosen to join the settlement process. As of this writing, approximately 11,000 claimants, across the United States, are participating in the Settlement Program, and, thus, approximately 11,000 claimants from around the nation are participating in a settlement valued at $2.4 billion, and thus, have benefitted from the work done by the PSC and Participating Counsel. This factor supports a finding the 8.6% is reasonable.

    4.    <u>Nature and Length of the Professional Relationship with the Client (Factor 11)</u>

The professional relationship between the PSC and Participating Counsel, and the individual MDL plaintiffs, generally did not antedate the litigation, nor will it likely continue beyond the closure of this MDL. However, in this MDL setting, the PSC, through its leadership, contemporaneous communication, and consistent work to keep all individual claimant's counsel

fully informed, provided great benefit to all of the claimants involved in the MDL, if reflected nowhere else than in the almost 100% voluntary participation in the Settlement Process. To the extent one could argue the plethora of individual attorneys around the country and, thus, their clients, were served by the PSC, the PSC did an exemplary job of developing, maintaining, and supporting their relationship with those counsel and of providing the information necessary for those individual attorneys to develop, maintain, and support their relationship with their respective individual clients. In its purest form, the Court finds that the "nature and length of the professional relationship" as to the Participating Counsel and the PSC might have little impact here; however, it should not be overlooked that the PSC was instrumental in keeping all plaintiffs' counsel, nationwide, informed, contemporaneously, as to the progress of the MDL so that those attorneys could tend to, not only, their ethical responsibilities, but also, their attorney/client relationships. Without the constant and transparent flow of information, individual claimant counsel could not have maintained and fostered a meaningful, professional relationship with their clients. Additionally, worthy of mention was the attorney client relationship reflected in the bellwether case *Allen, et al. v. Takeda Pharmaceuticals North America Inc., et al.*; counsel representing the Allens, clearly, had fostered a strong and meaningful professional relationship with the entire Allen family – a relationship that was reflected in the tenor of the interaction between and among the family and counsel during the trial, and given the trial's result, clearly this close client relationship benefited all. Therefore, this Court finds this factor to be less of a factor within this MDL setting, but, nonetheless, one worthy of mention. *See Murphy Oil*, 472 F.Supp.2d at 866-67 (finding that the "nature and length of the professional relationship with the client" factor did not warrant an increase in the benchmark percentage because class counsel and the class members did not have a professional relationship before the litigation commenced, and were unlikely to continue to have

one after the litigation was complete).   This factor, however, is of mention to support the

reasonableness of the 8.6%.

5.      The Customary Fee for Similar Work in the Community (Factor 5),
        Whether the Fee is Fixed or Contingent (Factor 6), Awards in Similar
        Cases (Factor 12)

These factors were largely covered in this Court's discussion of the benchmark percentage

and possible lodestar.  *See* Part IV.B, *supra,* and this Court adopts and incorporates that discussion

herein.  However, this Court, also, notes plaintiffs' counsel worked on contingency in this MDL,

as is the case in nearly every MDL involving personal injury claims.   Each of the Participating

Counsel who was appointed to the PSC undertook his or her task(s) (along with their financial

commitment to fund the substantial expenses in these proceedings) based upon an initial

contingency contract with their individual clients with little, if any, guarantee of success or return

on their investment.  Large MDLs such as this one are expensive to mount, sustain, and bring to

conclusion, and require a continuous influx of capital.  The PSC invested, collectively, millions of

dollars, and more than 200,000 hours' work was performed not only by counsel themselves, but

not reflected in this number is the time and work performed by support staff who must be paid by

the firm each pay period, with no assurance the named attorney or firm would receive any

remuneration whatsoever, and with no assurance the expenses they, also, incurred would be, in

any way, reimbursed.  In light of the significant medical and scientific questions inherent in this

case, the risk taken was great and the contingent nature of their recovery uncertain.  The initial

contingency contract is a matter of contract as between counsel and the parties and remains in

place and it is of note, that it is from <u>this</u> contingency fee the common benefit fees will be taken.

Also, as to *allocation of the common benefit recovery* among the Participating Counsel and the

PSC, the Court is informed as to each attorney/firm's attorneys' *actual work performed, its nature,*

*the amount of hours expended, and that work's value.*  In this case, the protocol established by the

81

Court for regular submission of time and expenses allows this Court to have available a more objective set of data to inform its analysis of the risks taken than that offered by a purely contingent fee protocol.  Furthermore, this Court's extensive, daily, and hands-on involvement, as well as having presided over the bellwether trial, along with extensive input from the Special Masters and Magistrate Judge Hanna, grant this Court a unique vantage point for determining the value of the work performed and the value received by all.

Again, it bears repeating that any award of common benefit fees *will come from the original attorney fee contract amount or percentage, agreed to by the attorney and client within their original contract of employment,* and will therefore, act to reduce the amount received by the original contracting attorney *and not the claimant*, as those attorneys have benefited from the work provided by the PSC and Participating Counsel required to reach the favorable resolution, and thus, was done for the benefit of all claimants.

The factors of the customary fee for similar work in the community has been fully discussed above and will not be repeated here, but that discussion is incorporated herein.  Equally so, the factor of awards in similar cases has been fully discussed above and will not be repeated here, but is incorporated herein.

6.    The Undesirability of the Case (Factor 10).

The courts have noted that in certain types of cases the attorney faces hardships in his or her communities because of his or her desire to help the litigant.  For instance, oftentimes the decision to help eradicate discrimination in civil rights cases has not and is not pleasantly received by the community.  This can have an economic impact on the attorney's practice which, also, can be considered by the Court.[91]   Other factors can, also, argue that a case might be deemed

---

[91] *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 719 (1974).

"undesirable." For instance, "[c]ases may be deemed 'undesirable' when 'the defendant is a large corporation with substantial resources, financial and otherwise, for a vigorous defense; and the legal and factual issues presented risks to recover absent settlement."[92]

Here, the defendants are without question large multinational corporations with substantial resources, financial and otherwise, who mounted an exceedingly vigorous and aggressive defense. The science involved was cutting edge and proof of the plaintiff's scientific and medical theories was in no way certain. Discovery with non-domestic corporations can present its own unique practical and procedural challenges; Takeda's parent company is a Japanese corporation and much of the development, also, took place in the European Union. Both defendants, Takeda and Eli Lilly, mounted a very aggressive and at times, perhaps, difficult resistance to discovery. To successfully mount a prosecution of the plaintiff's claims under these circumstances, was not a given, and required great time and expense and involved substantial risk. Thus, this Court finds this factor weighs in favor of finding the 8.6% reasonable.

### 7.   Conclusion: *Johnson* Factors

Taken together, the *Johnson* factors indicate the amount determined to be set aside to compensate attorneys for work done for the common benefit of all is reasonable; in fact, the percentage is, arguably, well within the reasonable range that could have been awarded in similar super mega-sized cases. Thus, this Court finds a common benefit fee award of 8.6% of the settlement amount is reasonably supported.

As a final step in the cross-check process, some cases suggest the Court perform a comparison between the reasonable percentage and the reasonable lodestar amount. *See, e.g.,*

---

[92] *The City of Omaha Police & Fire Retirement Systems v. LHC Group*, 2015 WL 965696, *8 (W.D.LA. 2015).

*Deepwater Horizon,* 2016 WL at *20 (E.D. La. Oct. 25, 2016) (citing *Vioxx,* 760 F. Supp. 2d. at 661). This Court has given full discussion of the lodestar considerations above, and incorporates that discussion herein. This Court's process has identified the numbers of hours expended -- to date -- as over 200,000 approved hours. A review of a possible reasonable lodestar, when viewed on a national level, and applied to the number of hours of work performed, also, argues the percentage selected -- for all the reasons noted above and incorporated herein -- is reasonable.

## V.   ALLOCATION OF COMMON BENEFIT FEES AND EXPENSES

This Court looked to the *Johnson* factors to evaluate the reasonableness of the overall amount to be awarded as to all claims for common benefit work and found the percentage award reasonable. Because of the somewhat unique protocol instituted at the outset to approve and track work done for the benefit of all on an ongoing basis, and this Court's hands on involvement, as well as Deputy Special Master DeJean's involvement, this Court has, perhaps, a unique opportunity to engage in a more objective and refined analysis of the allocation *among the involved counsel* and therefore, this Court finds certain of the Johnson factors, perhaps, may continue to enlighten.

Historically, courts in MDLs have utilized a Plaintiff's Fee Committee to provide portions, if not all, of the information to be considered and to provide the recommendations to be used by the Court to make individual allotments -- a method which, at times, has presented certain challenges, become contentious, and significantly extended the life of the MDL. As noted, in this MDL prior approval for, and identification of the nature of, all common benefit work was required; such work needed to be submitted and reviewed on an ongoing basis; all expenses and time were subject to review by the PEC and Deputy Special Master DeJean, performed regularly as the litigation progressed; thus, perhaps, a more objective basis for this Court's review exists when

considering allocation of common benefits among Participating Counsel and the PSC. This Court, also, has benefit the Deputy Special Master's institutional memory obtained from his review of all work done, and by the Court ordered interview process in which he engaged, as well as Special Master Russo's input and this Court's hands on experience with the MDL and the *Allen* trial.

This Court tasked Deputy Special Master DeJean with providing the court with a review and Report and Recommendation as to allocation among Participating Counsel and the PSC of the common benefit amount awarded, and suggested certain *Johnson* factors, where applicable, might provide some insight when evaluating an attorney's participation *within the confines of the collective amount awarded and available (and only if relevant and applicable)*. In other words, when making allocation to specific attorneys/firms, *within the amount available,* the Court suggested the *Johnson* factors, only where relevant and appropriate, might be enlightening. Consequently, this Court instructed Deputy Special Master DeJean to "amass and gather the facts and information necessary for this Court's analysis, decision, and ruling on the question of whether a common benefit assessment should be made in this case and allocation therein."[93]

This Court has fully reviewed and evaluated Deputy Special Master DeJean's Report and Recommendation, which is based on his ongoing review of submitted hours and expenses, his observations of Participating Counsel in this MDL and the diverse kinds of benefits obtained by their work, and his interviews of those Participating Counsel who wished to be heard. The Court notes however, that it has not reviewed, nor has it requested access to, any raw data underlying as to the hours and expenses reflected in the Report and Recommendation, but relies only on the aggregated summaries as made a part of Deputy Special Master DeJean's Report and Recommendation.

---

[93] Rec. Doc. 5801.

As this Court is in the unique position of, also, having followed the work done by Participating Counsel and by the PSC, by, *e.g.*, having had hands-on involvement from the beginning, having heard a bellwether trial, resolved numerous motions, held weekly meetings with the Special Masters, held monthly meetings with lead counsel for all parties, and maintained an ongoing discourse with Magistrate Judge Hanna, as to those areas of his involvement. Therefore, in keeping with this Court's orders and with the procedure established at the beginning of this MDL for the purpose of tracking the common benefit fees and expenses incurred, Deputy Special Master DeJean has reviewed all submitted common benefit hours and expenses on an ongoing basis, and has conducted interviews with all Participating Counsel who wished to give them. This Court has, separately, also, been in a position to evaluate the type and quality of common benefit work performed, and Deputy Special Master DeJean has conferred with Special Master Russo, who along with Magistrate Judge Hanna was tasked with overseeing the settlement process, and therefore who had the ability to evaluate some common benefit work performed outside this Court's direct supervision. It is of note Magistrate Judge Hanna, nor Special Master Russo, has reviewed any possible raw data as to the hours performed by Participating Counsel. Finally, this Court has conferred separately with Magistrate Judge Hanna, who has been involved with the noted nuanced aspects of this complex litigation. This Court has compared the contents of Deputy Special Master DeJean's Report and Recommendation to its own observations and knowledge of this MDL and finds them to be harmonious, and hereby adopts and incorporates Deputy Special Master DeJean's Report and Recommendation as to the allocation of common benefit fees among individual firms. It is of note, Deputy Special Master DeJean's recommendation was in harmony with the Court's evaluation – an occurrence which might not be unexpected as we each were actively involved in evaluation and observation, albeit from differing vantage points and

perspectives. Finally, as noted above and as found in Deputy Special Master DeJean's Report and Recommendation, the aggregate numbers of approved hours listed by Deputy Special Master DeJean reflect contributions by various levels of counsel and/or staff within the noted firms. For the reasons given in the Factual and Procedural Background (Sec. I, *supra*), and as supplemented by the information given below, this Court makes the following fee awards:

1.  Aylstock, Witkin, Kreis & Overholtz, PLLC (PSC) (Neil Overholtz)

As Deputy Special Master DeJean notes, Mr. Overholtz is a member of the law firm of Alystock, Witkin, Kreis & Overholtz, PLLC. Mr. Overholtz was appointed to the PSC by the Court. Although Mr. Overholtz did not initially start out in a leadership role with the PSC, his work dedication provided great support skills and eventually he evolved into more of a leadership role. Deputy Special Master DeJean notes that "[a]lthough Mr. Overholtz began his service on the PSC in a support role, he ultimately became a valued member of the PSC leadership. He participated in almost every aspect of the case beginning prior to the formation of the MDL through settlement and implementation of the settlement process. He is unequivocally one of the major contributors to the success of the MDL. He was instrumental in setting up predictive coding, the predictive coding process, assisting experts in preparing their reports, document review and prepared for and took depositions of both lay and expert witnesses. He maintained an active role in the MDL from its inception and maintained that role through the settlement and disbursement process and continues in that role today.

Mr. Overholtz, although not in a leadership position, worked tirelessly on Actos matters and had many attorneys and staff from his firm devote numerous

hours for the various tasks he was assigned and undertook. He was present for almost the entire trial. Mr. Overholtz and his firm paid all assessments.

Mr. Overholtz and his firm accumulated 18,767.65 hours of audited Common Benefit time. Mr. Overholtz accumulated $1,177,326.60 in Common Benefit audited expenses."

This Court hereby adopts Deputy Special Master DeJean's recommendation, and awards $16,130,795.18 for Common Benefit fees and $1,177,326.60 for Common Benefit expenses (inclusive of assessments, held expenses and held shared expenses).

2. Andrews Thornton Higgins Razamara LLP (Non PSC) (Anne Andrews)

As Deputy Special Master DeJean notes, "Ms. Andrews is not a member of the PSC. Ms. Andrews did qualify as 'participating counsel' and was thus authorized to perform certain Common Benefit work and incur Common Benefit expenses. She is a member of the firm, Andrews Thornton and performed work on various projects as directed by the PSC.

Ms. Andrews elected to waive her appearance at the interview process and elected to rely solely upon the firm hours submitted for Common Benefit fees and her submissions for expenses.

All assignments given to the firm were performed in a timely manner by either Ms. Andrews or a junior associate, Lauren Davis.

Ms. Andrews and her firm accumulated 244.58 hours of audited Common Benefit time. Ms. Andrews accumulated $0.00 in Common Benefit audited expenses."

This Court hereby adopts Deputy Special Master DeJean's recommendation, and awards $93,551.85 for Common Benefit fees.

3.   Andrus Wagstaff, PC (PSC) (Vance Andrus)

As Deputy Special Master DeJean notes, "Mr. Andrus is a partner in Andrus, Hood and Wagstaff, PC. He is a member of the PSC and was involved in the MDL even prior to his appointment to the PSC. Mr. Andrus received various assignments, which included document review, legal research, opinions on discovery practices and procedures and suggestions as to experts and trial procedure as requested by co-leads or the PEC.

Mr. Andrus elected not to participate in the interview process regarding Common Benefit time and expense. All assignments given to Mr. Andrus were performed in a timely and exemplary manner reflecting his high degree of skill and expertise in complex litigation. Mr. Andrus and his firm paid all assessments.

Mr. Andrus and his firm accumulated 1,024.90 hours of audited Common Benefit time. Mr. Andrus accumulated $588,880.27 in Common Benefit audited expenses."

This Court hereby adopts Deputy Special Master DeJean's recommendation, and awards $479,653.20 for Common Benefit fees and $588,880.27 for Common Benefit expenses (inclusive of assessments, held expenses and held shared expenses).

4. Barrios Kingsdorf & Casteix, LLP (PSC and State Court Liaison) (Dawn Barrios)

As Deputy Special Master DeJean notes, "Ms. Barrios is a partner in the law firm of Barrios, Kingsdorf and Casteix, LLP. She was appointed as a member

of the Actos PSC. Additionally, the Court appointed Ms. Barrios to the Executive Committee and also appointed her as State and Federal Court Liaison for the plaintiffs.

Ms. Barrios maintained exceptional contact and communication with her defense counterpart, Sherry Knutson and State and Federal Judges as directed by the court. Additionally, Ms. Barrios participated in the Bellweather vetting interviews and coordinated well with state court counsel who had potential Bellweather cases. Likewise, as State and Federal Court Liaison, Ms. Barrios coordinated Sherry Knutson on behalf of the defendants concerning all new state court cases, the status of state court trials and corresponded appropriately with State and Federal Judges as directed by Judge Rebecca F. Doherty regarding events taking place on their respective Actos dockets.

All assignments given to Ms. Barrios were performed in a timely and exemplary manner reflecting her high degree of skill and expertise in complex litigation, especially in the management of the difficult State/Federal relationships that are ever present in complex litigation.

Ms. Barrios and her firm accumulated 1,937.70 hours of audited Common Benefit time. Ms. Barrios accumulated $423,498.90 in Common Benefit audited expenses."

This Court hereby adopts Deputy Special Master DeJean's recommendation, and awards $985,320.45 for Common Benefit fees and $423,498.90 for Common Benefit expenses (inclusive of assessments, held expenses and held shared expenses).

5.  Baum Hedlund Aristei Goldman, PC (Non PSC) (Michael Baum)

As Deputy Special Master DeJean notes, "Mr. Baum is a partner in the firm of Baum Hedlund.  He was not on the PSC, but did qualify as "participating counsel" and performed all assignments from the PSC.  Additionally, Mr. Baum represented Dr. Helen Gee, a one-time potential key witness and whistleblower plaintiff regarding Actos.  Mr. Baum acted as liaison between the PSC and Dr. Gee and maintained coordination with the PSC regarding her deposition testimony.  Mr. Baum participated in document review at the direction of the PSC.

Mr. Baum and his firm accumulated 2,953.55 hours of audited Common Benefit time.  Mr. Baum accumulated $27,560.14 in Common Benefit audited expenses."

This Court hereby adopts Deputy Special Master DeJean's recommendation, and awards $797,458.50 for Common Benefit fees and $27,560.14 for Common Benefit expenses (inclusive of assessments, held expenses and held shared expenses).

6.  Beasley Allen Law Firm (PSC) (Andy Birchfield)

As Deputy Special Master DeJean notes, "Mr. Birchfield is a member of the PSC.  He is a partner in the firm of Beasley Allen.  Mr. Birchfield performed Common Benefit work on projects as directed by the PSC and in fact took a lead role in deposition preparation, taking depositions, the predictive coding process, discovery and motion practice.  He was heavily involved in settlement negotiations and in fact his involvement was critical in settling the case and developing the settlement matrix used with the Actos defendants. Subsequent to settlement, Mr.

Birchfield remained active in the settlement process through disbursement. He was a great credit to the overall success of the settlement program and its implementation through BrownGreer and/or Garretson Resolution Group. All assignments given to Mr. Birchfield were performed in a timely and exemplary manner reflecting his high degree of skill and expertise in complex litigation. Mr. Birchfield and his firm paid all assessments.

Mr. Birchfield and his firm accumulated 8,398.45 hours of audited Common Benefit time. Mr. Birchfield accumulated $681,099.90 in Common Benefit audited expenses."

This Court hereby adopts Deputy Special Master DeJean's recommendation, and awards $5,668,953.75 for Common Benefit fees and $681,099.90 for Common Benefit expenses (inclusive of assessments, held expenses and held shared expenses).

7. Climaco, Wilcox, Peca & Garofoli Co., LPA (Dawn Chmielewski – Former PSC member from Climaco Law Firm)

As Deputy Special Master DeJean notes, "Ms. Chmielewski was appointed to the PSC while a member of the Climaco Law Firm. During her time on the PSC, she received many assignments which were all performed in an exemplary manner. She was involved in document review, predictive coding, various research and writing projects and was a valuable asset to the PSC through her work efforts. She eventually began employment with Noblett, Beard and Arsenault and withdrew from the PSC. Her Common Benefit time thereafter was submitted through Neblett, Beard and Arsenault. Her Common Benefit Time in this award only

reflects those hours while she was a member of what was previously known as the Climaco Law Firm.

Ms. Chmielewski and the Climaco Law Firm accumulated 1,862.10 hours of audited Common Benefit time. Ms. Chmielewski and the Climaco Law Firm accumulated $25,669.43 in Common Benefit audited expenses."

This Court hereby adopts Deputy Special Master DeJean's recommendation, and awards $628,458.75 for Common Benefit fees and $25,669.43 for Common Benefit expenses (inclusive of assessments, held expenses and held shared expenses).

8. Derriel McCorvey (Non PSC) (McCorvey Law, LLC)

As Deputy Special Master DeJean notes, "Mr. McCorvey is a sole practitioner in Lafayette, Louisiana. He is not a member of the PSC, but did apply for and was qualified by the PSC as 'participating counsel' to perform Common Benefit work in accord with the case management orders of the court. He was assigned one work task by the PSC which was completed in a timely manner.

Mr. McCorvey accumulated 19 hours of audited Common Benefit time. Mr. McCorvey accumulated $0.00 in Common Benefit audited expenses."

This Court hereby adopts Deputy Special Master DeJean's recommendation, and awards $6,412.50 for Common Benefit fees.

9. Douglas & London, PC (PSC) (Stephanie O'Connor)

As Deputy Special Master DeJean notes, "Ms. O'Connor is a partner at the law firm of Douglas and London. She was appointed by the Court to the PSC. She was also appointed to the Plaintiff Executive Committee and was named as the

Science Coordinator for the PSC. The work performed by Ms. O'Connor represents a tireless and exemplary effort associated with the serious undertaking of responsibilities as Science Coordinator. Ms. O'Connor created a Science Committee and was in fact named the head of that committee. Ms. O'Connor was extensively involved in verification of information and content of expert reports and meeting experts. She also participated extensively in preparing experts for depositions and for trial, as well as having participated in the science aspects of the case in preparation for trial and document review. Her work in preparation for trial received accolades from many of the PSC members in their interviews. She developed a great working relationship with the experts. Her efforts resulted in a seamless presentation of expert testimony at trial and provided experts that survived pre-trial motions and cross examination by the defendants. She was instrumental in making sure that the PSC was in compliance with all of the deadlines established by the Court. Likewise, she reviewed documents, performed research, was actively involved in preparing and defending motions in limine and was a key member of the trial team in preparation for trial and continued in her preparation and observations during the trial. She remained active after trial in preparation for the second Bellweather. Her work was invaluable to the orderly development of presentation of trial materials and the acceptance of experts by the Court.

Ms. O'Connor and her firm accumulated 15,783.21 hours of audited Common Benefit time. Ms. O'Connor accumulated $865,941.67 in Common Benefit audited expenses."

This Court hereby adopts Deputy Special Master DeJean's recommendation, and awards $13,139,522.33 for Common Benefit fees $865,941.67 for Common Benefit expenses (inclusive of assessments, held expenses and held shared expenses).

10. Drakulich Firm (PSC) (Nick Drakulich)

As Deputy Special Master DeJean notes, "Mr. Drakulich is a partner in the Drakulich Law Firm, APLC. He was appointed as a member of the PSC at the beginning of the MDL. Mr. Drakulich, as exhibited by his hours, performed work almost daily in most aspects of the Actos MDL litigation up through settlement. Mr. Drakulich was tasked with reviewing many documents, preparing witnesses for depositions, attending depositions, and in fact took depositions both in the United States and in England. Mr. Drakulich provided much oversight and input to the trial team throughout the trial. He was instrumental in the development of the case against Eli Lily & Co. He attended the trial and was relied upon heavily relied upon for his advice and counsel through settlement due to his extensive experience in complex litigation. Mr. Drakulich maintained a day to day overview of most MDL activities and was literally consumed with the litigation. Co-lead counsel each verified the extent and quality of his involvement and the very important contribution he made to the overall success of the Actos MDL.

Mr. Drakulich and his firm accumulated 8,533.18 hours of audited Common Benefit time. Mr. Drakulich accumulated $406,324.46 in Common Benefit audited expenses."

This Court hereby adopts Deputy Special Master DeJean's recommendation, and awards $7,103,872.35 for Common Benefit fees and $406,324.46 for Common Benefit expenses (inclusive of assessments, held expenses and held shared expenses).

11. Girard Gibbs, LLP (PSC) (A.J. DeBartolomeo)

As Deputy Special Master DeJean notes, "Ms. DeBartolomeo was a partner in the law firm of Girard Gibbs, LLP at the beginning of the MDL. She was appointed to the PSC. Eventually, Ms. DeBartolomeo became a member of the Gibbs Law Group, as well as remaining of counsel to Girard Gibbs, LLP. Ms. DeBartolomeo has extensive experience in complex litigation and has previously served as lead counsel, co-lead counsel and as a member of the PSC in various complex litigation cases. Ms. DeBartolomeo was added to the PSC as a result of her complex trial litigation experience and expertise in science," which contributed toward the seamless presentation of the science aspect of the case at trial. "Ms. DeBartolomeo completed all work assignments in a timely and exemplary manner. Ms. DeBartolomeo worked primarily on the science aspect regarding the theory of causation, worked with experts on their reports and conducted document review. She also coordinated with other attorneys and experts to prepare for trial and develop strategies for trial presentation. Ms. DeBartolomeo and her firm paid all assessments.

Ms. DeBartolomeo and her firm accumulated 4,293.10 hours of audited Common Benefit time. Ms. DeBartolomeo accumulated $559,720.79 in Common Benefit audited expenses."

This Court hereby adopts Deputy Special Master DeJean's recommendation, and awards $2,018,830.28 for Common Benefit fees and $559,720.79 for Common Benefit expenses (inclusive of assessments, held expenses and held shared expenses).

12. Kershaw Cutter & Ratinoff (Non PSC) (Brooks Cutter) (Cutter Law)

As Deputy Special Master DeJean notes, "Mr. Cutter is not a member of the PSC, but did qualify as 'participating counsel' and was thus allowed to perform Common Benefit work and incur Common Benefit expenses. He has vast experience in complex litigation and was assigned various work projects as directed by the PSC. Each of these projects were performed in a timely manner, which included document review, research and various strategies to be used in preparation for trial.

Mr. Cutter and his firm accumulated 916.70 hours of audited Common Benefit time. Mr. Cutter accumulated $5,426.26 in Common Benefit audited expenses."

This Court hereby adopts Deputy Special Master DeJean's recommendation, and awards $309,386.25 for Common Benefit fees and $5,426.26 for Common Benefit expenses (inclusive of assessments, held expenses and held shared expenses).

13. Lanier Law Firm (PSC) (Mark Lanier)

As Deputy Special Master DeJean notes, "Mr. Lanier is the owner of the Lanier Law Firm in Houston, Texas. He was appointed to the PSC and served as lead trial counsel for the first Bellweather trial. Mr. Lanier is deserving of many

accolades for his exemplary presentation and performance at trial, resulting in a nine billion dollar verdict for the plaintiffs.  Mr. Lanier was the sole presenter of witnesses and cross examined all defense witnesses.  Mr. Lanier's presentation of testimony and evidence at trial with the assistance of the PSC trial team was seamless.  Mr. Lanier was instrumental in providing the trial presentation that was critical to obtaining the plaintiff verdict in the Bellweather trial.  Mr. Lanier is known throughout the country for his trial skills and presentation of evidence.  Mr. Lanier has extensive expertise in complex litigation, trial management and presentation of trial evidence through verdict. Mr. Lanier is considered to be one of the leading trial lawyers in America. Mr. Lanier was assisted by members of his firm and the work effort and work product of an exceptional PSC and participating counsel who were also able to provide the necessary support for a seamless trial presentation.  Mr. Lanier participated in focus groups and mock trials and set up an extensive jury selection evaluation system.  Mr. Lanier and his firm paid all assessments.

Mr. Lanier and his firm accumulated 15,742.38 hours of audited Common Benefit time.  Mr. Lanier accumulated $888,718.82 in Common Benefit audited expenses."

This Court hereby adopts Deputy Special Master DeJean's recommendation, and awards $15,230,752.65 for Common Benefit fees and $888,718.82 for Common Benefit expenses (inclusive of assessments, held expenses and held shared expenses).

14. Levin Papantonio Thomas Mitchell Rafferty & Proctor, PA (PSC) (Troy Rafferty)

As Deputy Special Master DeJean notes, "Mr. Rafferty is a partner at Levin, Papantonio, Thomas, Mitchell, Rafferty & Proctor, PA. He is a member of the PSC. Mr. Rafferty was extensively involved in the preparation for depositions, taking of depositions, document review and was assigned various special projects by the PSC. He has extensive experience in complex litigation. He was actively involved in the preparation for trial. All assignments were performed in an exemplary manner. Mr. Rafferty and his firm paid all assessments.

Mr. Rafferty and his firm accumulated 5,870.66 hours of audited Common Benefit time. Mr. Rafferty accumulated $673,483.85 in Common Benefit audited expenses."

This Court hereby adopts Deputy Special Master DeJean's recommendation, and awards $2,905,976.70 for Common Benefit fees and $673,483.85 for Common Benefit expenses (inclusive of assessments, held expenses and held shared expenses).

15. Lieff Cabraser Heimann & Bernstein, LLP (PSC) (Don Arbitblit)

As Deputy Special Master DeJean notes, "Mr. Arbitblit is a partner at Lieff, Cabraser, Herman and Bernstein, LLP. He is a member of the PSC and has remained very active in this litigation from the early stages through time of settlement. Mr. Arbitblit and other members of the firm played a significant role in developing and preparing this matter for trial. He has an extensive science background and was able to work closely with various experts in preparing their reports and opinions. He participated in expert depositions and was particularly important in managing the relationship of the PSC with various key plaintiff

experts.  His involvement with and management of expert witnesses and the information upon which they based their opinion greatly contributed to a seamless presentation of expert testimony of these experts at trial.

Mr. Arbitblit was of particular importance to the PSC in the development of the science aspect of the case and worked closely with Stephanie O'Connor to develop and coordinate expert reports and testimony.

Mr. Arbitblit and members of his firm are nationally recognized experts in complex litigation whose presence in the MDL contributed heavily towards a successful trial presentation of evidence in the first Actos Bellweather case.  The firm also had many plaintiff cases enrolled in the Actos settlement program.  All assignments given to Mr. Arbitblit and his firm were performed in a timely and exemplary manner reflecting his and his firm's high degree of skill and expertise in complex litigation. Mr. Arbitblit and his firm paid all assessments.

Mr. Arbitblit and his firm accumulated 3,936.30 hours of audited Common Benefit time.  Mr. Arbitblit accumulated $630,848.62 in Common Benefit audited expenses."

This   Court   hereby   adopts   Deputy   Special   Master   DeJean's recommendation, and awards $2,479,869.00 for Common Benefit fees and $630,848.62 for Common Benefit expenses (inclusive of assessments, held expenses and held shared expenses).

16. Morrow, Morrow, Ryan, Bassett & Haik (PSC and Liaison Counsel) (Patrick Morrow)

As Deputy Special Master DeJean notes, "Mr. Morrow is a senior partner in the law firm of Morrow, Morrow, Ryan and Bassett. He is a member of the PSC.

The Court appointed Mr. Morrow to the Executive Committee and also appointed him as Liaison Counsel for the Actos MDL.  Mr. Morrow was central to the effective communication, transparency and management of this MDL and plaintiff counsel throughout the country who had claims in the MDL. Mr. Morrow was instrumental in resolving many issues and answering questions with individual plaintiff counsel and the PSC. Mr. Morrow was active in the MDL from inception throughout settlement and has remained so through this day.  He was also a member of the Plaintiff Settlement Resolution Committee.  Mr. Morrow played a key role in managing issues that arose during the course of the litigation with various plaintiff counsel across the country and was responsible for sending extensive email blasts which provided updates to all plaintiff counsel across the country having claims in the MDL. Mr. Morrow attended almost every status conference in person and/or had a representative of his firm present.  During the numerous interviews conducted by the undersigned, Mr. Morrow received accolades from many individuals during the interview process regarding his communication skills and the timeliness of communications to all involved counsel in his position as Liaison Counsel. He later served as local counsel at the request of the Court for filing of all requests for court approval in death cases.  His work was performed in a timely and exemplary manner.

Likewise, Jeff Bassett, a senior partner in the firm, took a lead role in the development of the spoliation issues, which eventually became a heated and critical area of development in this litigation in preparation for trial and after trial.  Mr. Bassett took the lead in the spoliation arguments, prepared briefing, personally

performed extensive and detailed document review associated with spoliation issues and provided an exemplary display of his legal abilities in the spoliation hearings which ultimately was successful. Mr. Morrow and his firm paid all assessments.

Mr. Morrow and his firm accumulated 9,235.02 hours of audited Common Benefit time. Mr. Morrow accumulated $1,018,334.79 in Common Benefit audited expenses."

This Court hereby adopts Deputy Special Master DeJean's recommendation, and awards $12,051,701.10 for Common Benefit fees and $1,018,334.79 for Common Benefit expenses (inclusive of assessments, held expenses and held shared expenses).

17. Murray Law Firm (PSC) (Steven Murray)

As Deputy Special Master DeJean notes, Mr. Murray is a member of the Murray Law Firm and was appointed to serve on the PSC by this Court. Mr. Murray provided valuable experience in complex litigation, was assigned various tasks by the PSC, and played various nuanced roles within the litigation. He and his firm, specifically, also, participated in document review, and undertook specific projects such as punitive damages, research, briefing review and comment. Mr. Murray attended almost every status conference in person, and, as reflected in Deputy Special Master DeJean's Report and Recommendation, was able to bring his "experience and counsel in complex litigation to the making of strategic decisions during development of the case for trial. Mr. Murray and his firm paid all assessments.

Mr. Murray and his firm accumulated 3,072.70 hours of audited Common Benefit time.  Mr. Murray accumulated $567,901.59 in Common Benefit audited expenses."

This Court hereby adopts Deputy Special Master DeJean's recommendation, and awards $2,488,887.00 for Common Benefit fees and $567,901.59 for Common Benefit expenses (inclusive of assessments, held expenses and held shared expenses).

18. NastLaw LLC (PSC) (Dianne Nast)

As Deputy Special Master DeJean notes, "Ms. Nast is a partner at Nast Law.  She was previously a partner at the firm of Roda Nast.  She was appointed to the PSC by the Court.  Ms. Nast provided document review and performed all assignments by the PSC.  She was relied upon for counsel and advice throughout the litigation due to her knowledge and expertise in complex litigation.

Ms. Nast and her firm accumulated 455.90 hours of audited Common Benefit time.  Ms. Nast accumulated $211,947.64 in Common Benefit audited expenses."

This Court hereby adopts Deputy Special Master DeJean's recommendation, and awards $133,350.75 for Common Benefit fees and $211,947.64 for Common Benefit expenses (inclusive of assessments, held expenses and held shared expenses).

19. Neblett, Beard & Arsenault (PSC and Co-Lead Counsel) (Richard Arsenault)

As Deputy Special Master DeJean notes, "Mr. Arsenault is a member of the Neblett, Beard and Arsenault firm. He is a member of the PSC.  The Court

appointed Mr. Arsenault and Mr. Paul Pennock as Co-Lead Counsel and appointed each of them as members of the Plaintiff Executive Committee (PEC).  Even prior to their appointment as co-lead counsel, Mr. Arsenault and Mr. Pennock were both central to the effective organization, development and management of the potential Actos litigation leading to the formation of the Actos MDL. Mr. Arsenault participated in every aspect of the litigation both pre-MDL and continues through settlement and implementation of the settlement program. Mr. Arsenault sat as trial counsel through the entire trial alongside trial counsel Mark Lanier and attended trial every day.  Mr. Arsenault worked closely with his co-lead, Mr. Pennock at every step of the litigation.  Their teamwork, organizational activity and case development and preparation of the first Bellweather case for trial was performed in a seamless and exemplary manner.

Mr. Arsenault devoted all necessary resources of his firm to complete the demands of the litigation. Jennifer Hoekstra, an attorney with his firm contributed greatly to the organizational effort and seamless organization of resources from inception of the MDL through conclusion."  Ms. Hoekstra was an invaluable resource in the auditing of time and expense.

Mr. Arsenault remains extremely active since the settlement process began, and has played a key role in the successful implementation of the Settlement Program. Mr. Arsenault continues to work tirelessly to close out all MDL outstanding issues. Mr. Arsenault and Mr. Pennock were of critical importance to the overall operation of the PSC and in their leadership roles.  As Deputy Special Master DeJean notes, "Mr. Arsenault has extensive experience in complex

litigation and has served as lead and/or co-lead counsel in numerous cases involving complex litigation. He is a frequent lecturer and presenter at seminars and other educational efforts involving complex litigation across the nation.

Mr. Arsenault also contributed to the organizational and efficient operation of the Actos Resolution Program and maintained consistent and frequent contact with BrownGreer, the Actos claims administrator, and the Garretson Resolution Group on lien resolution.  Mr. Arsenault also set up and conducted regular conference calls, as needed, for the Plaintiff Settlement Resolution Committee (PSRC) subsequent to settlement and maintained day to day contact and supervision to ensure the smooth and efficient operation of the settlement program that began making disbursements to claimants earlier rather than later.

In short, under the leadership of Mr. Arsenault and Mr. Pennock, they were at the forefront of the Actos MDL litigation from the filing of the earliest lawsuits, to the formation of the MDL, through the Bellwether process, the settlement process, and they continue to work tirelessly to close all MDL outstanding cases. All assignments given to Mr. Arsenault were performed in a truly timely and exemplary manner reflecting his high degree of skill and expertise in complex litigation.  He was critical to the formation of the highly organized structure of the PSC, the seamless trial preparation and the implementation and oversight of the settlement program. Mr. Arsenault and his firm paid all assessments.

Mr. Arsenault and his firm accumulated 37,658.30 hours of audited Common Benefit time.  Mr. Arsenault accumulated $1,231,864.62 in Common Benefit audited expenses."

This Court hereby adopts Deputy Special Master DeJean's recommendation, and awards $37,281,717.00 for Common Benefit fees and $1,231,864.62 for Common Benefit expenses (inclusive of assessments, held expenses and held shared expenses).

20. Oliver Law Group, PC (Non PSC) (Alyson Oliver)

As Deputy Special Master DeJean notes, "Ms. Oliver is not a member of the PSC, but was qualified as 'participating counsel' through the PSC. She was primarily assigned duties in potential Bellweather selection. Her duties included gathering of information as requested by PSC members.

Ms. Oliver and her firm accumulated 21.50 hours of audited Common Benefit time. Ms. Oliver accumulated $866.13 in Common Benefit audited expenses."

This Court hereby adopts Deputy Special Master DeJean's recommendation, and awards $6,288.75 for Common Benefit fees and $866.13 for Common Benefit expenses (inclusive of assessments, held expenses and held shared expenses).

21. Parker Waichman, LLP (PSC) (Jerrold Parker)

As Deputy Special Master DeJean notes, "Mr. Parker is a senior partner at Parker Waichman, LLP. He was appointed as a member of the PSC by the Court. Mr. Parker played a significant role in the early stages of the MDL through document review as well as having been instrumental in setting up and monitoring the predictive coding process used by the PSC to enhance the reliability of document production. He and members of his office performed document review,

research, proofreading of briefs and provided input into jury selection, witness testimony and cross examination points throughout trial. Mr. Parker has extensive experience in the management of complex litigation. Mr. Parker was instrumental in the development, monitoring and oversight of predicting coding. Mr. Parker attended many of the trial days. Mr. Parker provided valuable support during trial regarding technical matters and cross-examination of witnesses. Mr. Parker and his firm paid all assessments.

Mr. Parker and his firm had 3,788.05 hours of audited Common Benefit time. Mr. Parker had $625,356.67 in Common Benefit audited expenses."

This Court hereby adopts Deputy Special Master DeJean's recommendation, and awards $3,494,476.13 for Common Benefit fees and $625,356.67 for Common Benefit expenses (inclusive of assessments, held expenses and held shared expenses).

22. Pennock Law Firm, LLC (Non PSC) (Shannon Pennock)

As Deputy Special Master DeJean notes, "Ms. Pennock is not a member of the PSC, but did apply for and receive qualification as 'participating counsel.' She was assigned certain research tasks by the PSC and performed all tasks in an exemplary manner.

Ms. Pennock and her firm accumulated 164.50 hours of audited Common Benefit time. Ms. Pennock accumulated $0.00 in Common Benefit audited expenses."

This Court hereby adopts Deputy Special Master DeJean's recommendation, and awards $55,518.75 for Common Benefit fees.

23. Robinson Calcagnie, Inc. (PSC) (Mark Robinson)

As Deputy Special Master DeJean notes, "Mr. Robinson is a shareholder in Robinson Calcagnie, Inc. He is a member of the PSC. He was appointed by the Court to the Executive Committee. Mr. Robinson has vast experience in managing and trying complex cases and was heavily involved in the California Actos proceedings. He and/or members of his firm performed document review, prepared for depositions, attended and took depositions and were involved in the Bellweather vetting process. Dan Robinson, a member of the firm, attended the trial and provided information and assistance leading to the successful trial of this matter and performed all work in an exemplary manner. Mark Robinson was designated as the liaison between the Actos MDL and the California Actos proceedings and maintained oversight of the California proceedings.

Mr. Robinson and his firm accumulated 7,126.90 hours of audited Common Benefit time. Mr. Robinson accumulated $612,282.57 in Common Benefit audited expenses."

This Court hereby adopts Deputy Special Master DeJean's recommendation, and awards $2,309,115.60 for Common Benefit fees and $612,282.57 for Common Benefit expenses (inclusive of assessments, held expenses and held shared expenses).

24. Searcy Denney Scarola Barnhart & Shipley, PA (Non PSC) (Calvin Warriner)

As Deputy Special Master DeJean notes, "Mr. Warriner is not a member of the PSC. He performed work on projects as directed by the PSC. He did qualify as 'participating counsel' pursuant to the case management orders of the Court. Mr.

Warriner has experience in complex litigation matters and provided timely work on all projects assigned.

Mr. Warriner and his firm accumulated 112.10 hours of audited Common Benefit time. Mr. Warriner accumulated $0.00 in Common Benefit audited expenses."

This Court hereby adopts Deputy Special Master DeJean's recommendation, and awards $37,833.75 for Common Benefit fees.

25. Seeger Weiss, LLP (Chris Seeger) (PSC)

As Deputy Special Master DeJean notes, "Mr. Seeger is a partner in the law firm of Seeger Weiss, LLP. He is a member of the PSC. He is a highly experienced member of the complex litigation bar and has managed and/or participated as lead counsel, co-lead counsel and served on many steering committees in his career. Mr. Seeger and his firm were assigned certain work projects by the PSC and performed all of these projects in a timely and exemplary manner. He did not attend the trial. He and members of his firm have been active in post-settlement implementation of the Master Settlement Agreement and working with the Claims Administrator.

Mr. Seeger and his firm accumulated 2,185.70 hours of audited Common Benefit time. Mr. Seeger accumulated $524,504.15 in Common Benefit audited expenses."

This Court hereby adopts Deputy Special Master DeJean's recommendation, and awards $983,565.00 for Common Benefit fees and $524,504.15 for Common Benefit expenses (inclusive of assessments, held expenses and held shared expenses).

26. Sill Law Group, PLLC (PSC) (Tara Tabatabaie)

  As Deputy Special Master DeJean notes, "Ms. Tabatabaie is an attorney and Ph.D. with the Sill Law Group, PLLC.  She is a member of the PSC.  Ms. Tabatabaie has an extensive background in science and played an important role in developing the science relating to Actos.  Likewise, Ms. Tabatabaie spent an extensive amount of time developing experts and their reports and was central to providing the PSC with information regarding defense experts. She performed all tasks requested by the PSC in an exemplary manner.  She was also involved in document review, assessment and analysis of various studies on Actos and was important to the development of the scientific evidence used in direct and cross examination of experts.

  Ms. Tabatabaie and her firm accumulated 2,122.70 hours of audited Common Benefit time.  Ms. Tabatabaie accumulated $561,192.42 in Common Benefit audited expenses. Ms. Tabatabaie and her firm paid all assessments."

  This Court hereby adopts Deputy Special Master DeJean's recommendation, and awards $1,002,975.75 for Common Benefit fees and $561,192.42 for Common Benefit expenses (inclusive of assessments, held expenses and held shared expenses).

27. Simmons, Hanly & Conroy, LLC (PSC) (Jayne Conroy)

  As Deputy Special Master DeJean notes, "Ms. Conroy is currently a partner at Simmons, Hanly and Conroy.  By way of history, she was previously appointed to the PSC while a partner at Hanly Conroy.  Hanly Conroy subsequently merged with Simmons Law Firm, to now be known as Simmons, Hanly Conroy.  Ms.

Conroy engaged in extensive document review and assisted with the preparation of expert reports and providing invaluable advice to the PSC based on her extensive experience in complex litigation. All assignments given to Ms. Conroy were performed in a timely and exemplary manner reflecting her high degree of skill and expertise in complex litigation. Ms. Conroy and her firm paid all assessments.

Ms. Conroy and her firm accumulated 5,090.34 hours of audited Common Benefit time. Ms. Conroy accumulated $572,722.19 in Common Benefit audited expenses."

This Court hereby adopts Deputy Special Master DeJean's recommendation, and awards $2,634,250.95 for Common Benefit fees and $572,722.19 for Common Benefit expenses (inclusive of assessments, held expenses and held shared expenses).

28. Singleton Law Firm, PC (PSC) (James "Willie" Singleton)

As Deputy Special Master DeJean notes, "Mr. Singleton is the owner of the Singleton Law Firm in Shreveport, Louisiana. He is a member of the PSC. He has extensive experience in complex litigation cases. The Court appointed him as Pro Se Liaison. Mr. Singleton performed his job in a timely and exemplary manner in both managing issues relating to Pro Se plaintiffs as well as communicating with Pro Se plaintiffs extensively and maintaining open lines of communication with Pro Se Plaintiffs. Mr. Singleton worked closely with Magistrate Judge Patrick Hanna to ensure orderly and timely communication with transparency of the court proceedings to Pro Se Plaintiffs. He was assigned numerous projects and did an exemplary job on every project. Mr. Singleton attended every status conference in

person and reported the status of his work to the Court at almost all of the status conferences. Mr. Singleton was always available for phone calls, conferences, and assignments and performed all tasks within the given timetable assigned. Mr. Singleton and his firm paid all assessments.

Mr. Singleton and his firm accumulated 1,421.92 hours of audited Common Benefit time. Mr. Singleton accumulated $565,214.69 in Common Benefit audited expenses."

This Court hereby adopts Deputy Special Master DeJean's recommendation, and awards $799,830.00 for Common Benefit fees and $565,214.69 for Common Benefit expenses (inclusive of assessments, held expenses and held shared expenses).

29. Skikos, Crawford, Skikos, & Joseph, LLP (Non PSC) (Steven Skikos)

As Deputy Special Master DeJean notes, "Mr. Skikos is not a member of the PSC but did qualify as participating counsel and was in a leadership role in the California JCCP. Mr. Skikos was instrumental in having the California JCCP participate in the Actos MDL settlement program.

Mr. Skikos performed exemplary work through his valued assistance in developing the MSA and seeing it through implementation."

Mr. Skikos and his firm accumulated 108.90 hours of audited Common Benefit time. Skikos Crawford & Skikos accumulated $8,621.13 in Common Benefit audited expenses.

This Court hereby adopts Deputy Special Master DeJean's recommendation, and awards $53,905.50 for Common Benefit fees and $8,621.13

for Common Benefit expenses (inclusive of assessments, held expenses and held shared expenses).

30. Wagstaff & Cartmell (Non PSC) (Thomas Cartmell)

As Deputy Special Master DeJean notes, "Mr. Thomas Cartmell is not a member of the PSC but did qualify as 'participating counsel.' Mr. Cartmell was assigned various tasks such as research and document review and performed these tasks in a timely and thorough manner.

Mr. Cartmell and his firm accumulated 50.10 hours of audited Common Benefit time. Wagstaff Law accumulated $75.00 in Common Benefit audited expenses."

This Court hereby adopts Deputy Special Master DeJean's recommendation, and awards $14,654.25 for Common Benefit fees and $75.00 for Common Benefit expenses (inclusive of assessments, held expenses and held shared expenses).

31. Weitz & Luxenberg, PC (PSC and Co-Lead Counsel) (Paul Pennock)

As Deputy Special Master DeJean notes, "Mr. Pennock is a partner at Weitz and Luxenberg and is member of the PSC. The Court appointed Mr. Arsenault and Mr. Paul Pennock as Co-Lead Counsel and approved each of them as members of the Plaintiff Executive Committee (PEC). Even prior to their appointment as co-lead counsel, Mr. Arsenault and Mr. Pennock were both central to the effective organization, development and management of the potential Actos litigation leading to the formation of the Actos MDL. Mr. Pennock participated in every aspect of the litigation both pre-MDL and continues through settlement and

113

implementation of the settlement program. Mr. Pennock sat as trial counsel through many days of the trial. Mr. Pennock worked closely with his co-lead, Mr. Arsenault at every step of the litigation. Their teamwork, organizational activity and case development and preparation of the first Bellweather case for trial was performed in a seamless and exemplary manner. Mr. Pennock devoted the necessary resources of his firm to complete the demands of the litigation.

Mr. Pennock remains extremely active since settlement playing a key role in the successful implementation of the settlement program. Mr. Pennock continues to work tirelessly to close out all MDL outstanding issues. Mr. Pennock and Mr. Arsenault were of critical importance to the overall structuring of the PSC. Mr. Pennock has extensive experience in complex litigation and has served as lead and/or co-lead counsel in numerous cases involving complex litigation. He is a frequent lecturer and presenter at seminars and other educational efforts involving complex litigation across the nation.

Mr. Pennock also contributed to the organizational and efficient operation of the Actos Resolution Program.

In short, under the leadership of Mr. Pennock and his firm, he was at the forefront of the Actos MDL litigation from the filing of the earliest lawsuits, to the formation of the MDL, through the Bellweather process, the settlement process, and continues to work tirelessly to close all MDL outstanding cases. All assignments given to Mr. Pennock were performed in a truly timely and exemplary manner reflecting his high degree of skill and expertise in complex litigation. He was critical to the seamless trial presentation.

114

Even prior to their appointment as co-lead counsel, Mr. Pennock and Mr. Arsenault were central to the effective organization, development and management of the potential Actos litigation leading to the formation of the Actos MDL. His work began prior to the formation of the MDL and his efforts were represented by substantial expenditures and expenses.  Mr. Pennock was involved on almost a daily basis in every aspect of this litigation along with Mr. Arsenault.  Mr. Pennock and Mr. Arsenault provided exemplary management styles and techniques, though different from each other, which resulted in the success of the Actos MDL.  Mr. Pennock attended many days of trial in Lafayette, Louisiana and constantly provided input throughout those days. He remained actively involved in all aspects of the case after trial and remained actively involved through settlement and distribution of funds. Mr. Pennock worked closely with his co-lead, Mr. Arsenault, at every step of the litigation.   The collaboration effort between the two was extraordinary and was performed in an exemplary manner.  All of his tasks were performed in an exemplary manner in preparation for trial and post-trial implementation of the MSA.  He has maintained an active role in the disbursement process.

Jonathan Sedge, a member of the firm provided valued assistance in the organizational structure of the case and provided research for various legal issues. His work and dedication were important to the success of the MDL.

Mr. Pennock and his firm paid all assessments.

Mr. Pennock and his firm accumulated 39,523.56 hours of audited Common Benefit time. Mr. Pennock accumulated $1,400,502.07 in Common Benefit audited expenses."

This Court hereby adopts Deputy Special Master DeJean's recommendation, and awards $35,571,204.00 for Common Benefit fees and $1,400,502.07 for Common Benefit expenses (inclusive of assessments, held expenses and held shared expenses).

This Court, also, understands there remain outstanding invoices for expert fees owed to the firm Law & Forensics. This Court hereby adopts Deputy Special Master DeJean's recommendation and orders that $259,635.00 be paid, from the amounts retained to compensate common benefit expenses, to the PSC account from which shared expenses are paid, and that the PSC pay such amount to the firm Law & Forensics.

## VI.    CONCLUSION

This Court has determined, on the basis of its above noted evaluation of various aspects of the proceedings of MDL 2299, that it is appropriate to compensate Participating Counsel for the common benefit work they have performed. This Court further determines that 8.6% of the total Qualified Settlement Fund is a reasonable amount to allocate to compensate common benefit fees, and that $25 million is an appropriate amount to retain to compensate common benefit expenses and/or costs. This Court, additionally, for the reasons given above, and with the adoption of Deputy Special Master DeJean's Report and Recommendation, has determined that reasonable amounts should be awarded to each firm that performed common benefit work, both for fees and for expenses and/or costs, as shown above.

Furthermore, as this Court has paid tremendous deference to the rights of the PSC and Participating Counsel and their due process rights throughout this matter, in keeping with those concerns, the Court grants the PSC and any Participating Counsel the opportunity to be heard.  The Court will allow any member of the PSC and/or Participating Counsel to make comment or provide any information of which this Court currently does not have benefit.   Each firm may, *but is in no way required*, to submit any such comment or evidence, the comment **limited to two pages**, with **an additional limit of three pages of exhibits**, if counsel feel compelled to comment or to submit exhibits.  Such comments shall be filed, with a copy provided to chambers, no later than **5:00 pm (central time) on Thursday, July 27, 2017**.  In the event no comments are received by that time, this ruling shall become effective as of **5:00 pm (central time) on Thursday, July 27, 2017**.  If any comments are received, this Court will review them in the manner appropriate to each as expeditiously as possible, and this ruling shall go into effect immediately upon final issuance.[94]

*The Court cautions counsel* that this opportunity to submit comment *is not an invitation for random response, nor is it an invitation to rehash time or expense claims that have already been submitted, reviewed, and approved or denied*, with all due process protection, such opportunity to comment or object having already been provided (*see* Rec. Doc. 2356, which provides an opportunity to challenge determinations as to time and expense made by Deputy Special Master DeJean and Special Master Russo, with full due process rights to review and appeal).  Rather, it is the opportunity to be heard and to present relevant information or perspective not currently before the Court that counsel might believe the Court might be unaware of or might

---

[94] Pursuant to Fed.R.Civ.P. 53(f)(1), Participating Counsel are hereby given notice of Deputy Special Master DeJean's Report and Recommendation and a chance to be heard regarding its content, in addition to the chances they have been given to be heard throughout the review and approval process. Pursuant to Fed.R.Civ.P 53(f)(2), the time to respond is reduced by this Court from 21 days to 10.

be beneficial for the Court to consider when determining the compensation of common benefit fees and expenses is contemplated. Again, *no counsel should feel he or she is obligated to file*, rather an opportunity to be heard is being provided. Therefore,

IT IS HEREBY ORDERED the Special Master will notify the Garretson Group when the Memorandum Ruling has become effective; immediately thereafter, the Garretson Group is ORDERED to distribute from the amounts previously withheld, the amounts identified as common benefit fees and expenses (inclusive of assessments, held expenses, and held shared expenses) awarded, to the firms and/or accounts as described above. The Garretson Group is, also, ordered to pay $259,635.00 to the PSC account, and the PSC is ORDERED to pay that amount to Law & Forensics as soon as reasonably possible thereafter.

The Garretson Group is, also, ORDERED to distribute the agreed upon amounts set out in any separate agreements, *i.e.*, state court or other Actos® matters, that will be identified by the Special Master, which might have been submitted to BrownGreer and/or the Garretson Group by way of independent agreement.

Any funds that remain for the purpose of compensating common benefit fees and expenses and/or costs in excess of the distributions described above shall continue to be retained for the purpose of compensating any further common benefit fees and expenses and/or costs incurred through the final resolution of the Settlement Program. The Garretson Group is to retain these remaining funds pending further order of this Court, and is to provide weekly updates on the status of the common benefit distributions to Special Master Russo and/or Deputy Special Master DeJean.

Upon the final resolution of the Settlement Program, any remaining funds retained to compensate common benefit *expenses and/or costs* shall be paid to those claimants who received

payments under the Settlement Program, on a *pro rata* basis.  Any funds retained to compensate common benefit work that might remain at the conclusion of this matter will be addressed by the Court at that time.

SIGNED this ___17___ day of _____July_____, 2017.


_____
HONORABLE REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE